## IN THE UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| Wealshire Rehab, LLC, | ) | Case No. 24-09110 |
|  | ) | (Subchapter V) |
| Debtor and Debtor in Possession. | ) |  |
|  | ) | Hon. Donald R. Cassling |
|  | ) |  |
|  | ) |  |

**THIRD INTERIM ORDER (I) AUTHORIZING THE DEBTOR TO OBTAIN POSTPETITION FINANCING ON A SECURED, SUPERPRIORITY BASIS; (II) AUTHORIZING THE DEBTOR TO USE CASH COLLATERAL; (III) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES; (IV) MODIFYING THE AUTOMATIC STAY, AND (V) GRANTING RELATED RELIEF[1]**

This matter came before the Court on the emergency motion (the "Initial Motion") [Docket No. 19] of Wealshire Rehab, LLC (the "Debtor") debtor and debtor-in-possession in the above-captioned chapter 11 proceedings (the "Chapter 11 Case"), seeking relief under §§ 361, 363, and 364 of Title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code"); Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 4001-2 of the Local Rules of the United States Bankruptcy Court for the Northern District of Illinois (the "Local Rules"), requesting entry of interim and final orders (i) authorizing the Debtor to obtain postpetition financing on a secured, superpriority basis; (ii) authorizing the Debtor to use cash collateral; (iii) granting adequate protection to prepetition secured parties; (iv) authorizing the Debtor to convert up to $1,240,543.65 of the Prepetition Obligations to Senior DIP Obligations on the terms set forth herein and under the Senior DIP Facility Documents (the "DIP Roll Up")

---

[1] Capitalized terms not defined herein shall have the meaning ascribed to them in the Superpriority Debtor-In-Possession Credit and Security Agreement.

(iv) modifying the automatic stay, (v) scheduling a final hearing; and (iv) granting related relief. Upon the pleadings and documents filed with the Court in support of the Motion and as supplemented by the first supplement to the Initial Motion (the "First Supplement") [Docket No. 21], the second supplement to the Initial Motion (the "Second Supplement") [Docket No. 30], and the third supplement to the Initial Motion (the "Third Supplement," referred to collectively with the Initial Motion, First Supplement, and Second Supplement, the "Motion") [Docket No. 60] whereby the Debtor is requesting approval of Junior Secured Superpriority Debtor in Possession Credit Facility (the "Junior DIP Facility") by and between the Debtor as borrower and The Asher Group, LLC as lender (the "Junior DIP Lender") evidenced by that certain term sheet entered into on June 25, 2025 (the "Junior DIP Term Sheet") attached to the Third Supplement as Exhibit A; it appearing that appropriate notice of the Motion was provided, and after due deliberation and consideration and good and sufficient cause appearing therefor:

**THE DEBTOR, THE SENIOR DIP LENDER, AND THE JUNIOR DIP LENDER STIPULATE AS FOLLOWS:**

A.      <u>Jurisdiction and Venue.</u> The Court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334. Consideration of the Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2). Venue for the Chapter 11 Case and the proceeding on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

B.      <u>Interim Orders</u>. The Court held hearings to consider granting the relief requested in the Initial Motion on an interim basis on June 26 and 27, 2024. Following such hearing, the Court entered an order granting the relief requested in the Initial Motion (as supplemented by the First and Second Supplements) on an interim basis, which order was entered by the Court on June 27, 2024 [Docket No. 43] (the "First Interim Order"). The Court held a further hearing to consider granting the relief requested in the Motion on an interim basis on July 2, 2024. Following such

hearing, the Court entered an order granting the relief requested in the Motion on an interim basis, which order was entered by the Court on July 2, 2024 [Docket No. 66] (the "<u>Second Interim Order</u>" and together with the First Interim Order, the "<u>Interim Orders</u>"). The Court held another hearing to consider granting the relief requested in the Motion on an interim, rather than a final, basis on July 16, 2024.

        C.      <u>Committee Formation/Trustee</u>. As of the date of this Third Interim Order, no request has been made for the appointment of a trustee or examiner. The Court has not ordered the appointment of a committee of unsecured creditors pursuant to § 1102(a)(3) of the Bankruptcy Code.

        D.      <u>Subchapter V Trustee</u>. In accordance with § 1183 of the Bankruptcy Code, Robert P. Handler has been appointed as the subchapter V trustee (the "<u>Subchapter V Trustee</u>") in the Chapter 11 Case.

        E.      <u>Notice</u>. Sufficient notice of the interim hearings (the "<u>Interim Hearings</u>") and the relief requested in the Motion has been provided by the Debtor to all necessary creditors and parties in interest.

        F.      <u>Interim DIP Orders</u>. On June 27, 2024, this Court entered the First Interim Order approving the Debtors' senior secured postpetition financing facility (the "<u>Senior DIP Facility</u>") with eCapital Healthcare Corp. (the "<u>Senior DIP Lender</u>" and together with the Junior DIP Lender, the "<u>DIP Lenders</u>"). On July 2, 2024, this Court entered the Second Interim Order approving the Senior DIP Facility and the Junior DIP Facility. The "DIP Liens," the "DIP Superpriority Claims," and "DIP Obligations" in the Interim Orders are referred to herein as the Senior DIP Liens, Senior DIP Superpriority Claims, and Senior DIP Obligations, respectively.

**THE DEBTOR AND THE SENIOR DIP LENDER STIPULATE AS FOLLOWS**

G.     <u>No Control</u>. By virtue of any of the actions taken with respect to, in connection with, related to, or arising from the Prepetition Credit Documents, eCapital Healthcare Corp. (the "<u>Senior DIP Lender</u>") does not control the Debtor or its properties or operations, have authority to determine the manner in which the Debtor's operations are conducted, or are control persons or insiders of the Debtor.

H.     <u>No Credit Available on More Favorable Terms</u>. The Debtor has been unable to obtain any of the following on more favorable terms and conditions than those provided in the Third Interim Order: (a) adequate unsecured credit allowable under Section 503(b)(1) of the Bankruptcy Code as an administrative expense; (b) credit for money borrowed with priority over any or all administrative expenses of the kind specified in Sections 503(b) or 507(b) of the Bankruptcy Code; or (c) credit for money borrowed secured by a lien on property of the estate that is not otherwise subject to a lien. The Debtor is unable to obtain credit for borrowed money without granting the Senior DIP Liens and the Senior DIP Superpriority Claims (each defined below) to (or for the benefit of) the Senior DIP Lender on the terms and conditions included in the Senior DIP Facility Documents.

I.     <u>Extension of Financing</u>. The Senior DIP Lender is willing and able to provide financing to the Debtor in accordance with the Superpriority Debtor-In-Possession Credit and Security Agreement attached hereto as **<u>Exhibit A</u>** and all other related documents (collectively, the "<u>Senior DIP Facility Documents</u>") and subject to (i) the entry of this Third Interim Order and (ii) findings by this Court that such financing is essential to the Debtor's estate (and the continued operations of the Debtor), that the Senior DIP Lender is a good faith financier, and that the Senior DIP Lender's claims, superpriority claims, security interests and liens and other protections granted pursuant to and in connection with this Third Interim Order will not be affected by any

subsequent reversal, modification, vacatur, stay or amendment of, as the case may be, this Third

Interim Order as provided in Section 364(e) of the Bankruptcy Code.

J.      <u>Business Judgment and Good Faith Pursuant to Section 364(e)</u>. The terms and

conditions of the Third Interim Order and the Senior DIP Facility Documents (including the DIP

Roll Up) are fair, reasonable, and the best available under the circumstances, reflect the Debtor's

exercise of prudent business judgment, and are supported by reasonably equivalent value and

consideration; all payments made under, and transfers or grants of security set forth in, the Interim

Orders, the Third Interim Order and the Senior DIP Facility Documents are made, transferred or

granted to or for the benefit of the Senior DIP Lender for fair consideration and reasonably

equivalent value, and are granted contemporaneously with the making of the loans and/or

commitments and other financial accommodations secured thereby, including the obligations

incurred by Debtor under this Third Interim Order and the Senior DIP Facility Documents

(collectively, the "<u>Senior DIP Obligations</u>"); the terms of the Senior DIP Facility Documents and

all other related agreements and documents (collectively, the "<u>Senior DIP Facility</u>") were

negotiated in good faith and at arm's length among the Senior DIP Lender and the Debtor, and the

use of the proceeds to be extended under the Senior DIP Facility will be so extended in good faith

and for valid business purposes and uses, as a consequence of which the Senior DIP Lender is

entitled to the protection and benefits of Section 364(e) of the Bankruptcy Code.

K.      <u>Relief Essential; Best Interest of Bankruptcy Estate</u>. The relief provided in the Third

Interim Order is necessary, essential, and appropriate for the continued operation of the Debtor's

business and the management and preservation of its assets and property. It is in the best interest

of the Debtor's bankruptcy estate that the Debtor be allowed to enter into the Senior DIP Facility

Documents, incur the Senior DIP Facility, and grant the liens and claims contemplated herein and

under the Senior DIP Facility Documents to the Senior DIP Lender, subject to the terms of the

Third Interim Order.

L.    <u>DIP Roll Up</u>. The DIP Roll Up under the Senior DIP Facility Documents reflects

the Debtor's exercise of prudent business judgment consistent with its fiduciary duties. Absent the

DIP Roll Up, the Senior DIP Lender would not have provided the Senior DIP Facility or extended

credit to the Debtor. Further, the DIP Roll Up: (i) creates greater availability under the Senior DIP

Facility by enabling the Senior DIP Lender to consider Accounts generated prepetition by the

Debtor in the determination of the Borrowing Base, and (ii) benefits the Debtor and its estate

because it enables the Debtor to obtain urgently needed financing critical to administering this

Chapter 11 Case and funding the Debtor's operations. Because of the floating nature of the

Borrowing Base in the Senior DIP Credit Agreement, denial of the DIP Roll Up would have

resulted in the Debtor's inability to borrow under the DIP Facility until such time as the Debtor

generated new Accounts, which would be impossible to generate absent the capital provided by

the Senior DIP Facility.

M.    <u>Debtor's Stipulations</u>. After consultation with its attorneys and financial advisors,

the Debtor, on its behalf and on behalf of its estate, admits, stipulates, acknowledges, and agrees

as follows (paragraphs K(i) through K(vi) below are referred to herein, collectively, as the

"<u>Debtor's Stipulations</u>"):

> i)    *Prepetition Credit Facility*. Pursuant to that certain Credit and Security
> Agreement, dated as of May 8, 2023 (as amended, restated, supplemented,
> or otherwise modified from time to time, the "<u>Prepetition Credit
> Agreement</u>," and collectively with the Loan Documents (as defined in the
> Prepetition Credit Agreement) and any other agreements and documents
> executed or delivered in connection therewith, each as may be amended,
> restated, supplemented, waived or otherwise modified from time to time,
> the "<u>Prepetition Credit Documents</u>"), among (i) the Debtor; and (ii) the
> Senior DIP Lender; the Senior DIP Lender provided revolving credit and

other financial accommodations to the Debtor pursuant to the Prepetition Loan Documents (the "Prepetition Credit Facility").

ii)   *Prepetition Obligations*. The Prepetition Credit Facility provided the Borrowers with, among other things, the Revolving Loan Commitments (as defined in the Prepetition Credit Agreement). As of the date of filing of this Chapter 11 Case (the "Petition Date"), the aggregate principal amount outstanding under the Prepetition Credit Facility was not less than $1,240,543.65 (collectively, together with accrued and unpaid interest, outstanding letters of credit and bankers' acceptances, any reimbursement obligations (contingent or otherwise) in respect of letters of credit and bankers' acceptances, any fees, expenses and disbursements (including, without limitation, attorneys' fees, accountants' fees, auditor fees, appraisers' fees and financial advisors' fees, and related expenses and disbursements), treasury, cash management, bank product and derivative obligations, indemnification obligations, guarantee obligations, and other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Debtor's obligations pursuant to, or secured by, the Prepetition Credit Documents, and other charges allowable under section 506(b) of the Bankruptcy Code, the "Prepetition Obligations").

iii)   *Prepetition Liens and Prepetition Collateral*. As more fully set forth in the Prepetition Credit Documents, prior to the Petition Date, the Borrower granted to the Senior DIP Lender, for the benefit of itself, a first priority security interest in and continuing lien on (the "Prepetition Liens") the Prepetition Collateral.

iv)   *Validity, Perfection, and Priority of Prepetition Liens and Prepetition Obligations*. The Debtor acknowledges and agrees that as of the Petition Date (i) the Prepetition Liens on the Prepetition Collateral were valid, binding, enforceable, non-avoidable, and properly perfected and were granted to, or for the benefit of, the Senior DIP Lender for fair consideration and reasonably equivalent value; (ii) the Prepetition Liens were senior in priority over any and all other liens on the Prepetition Collateral, subject only to liens senior by operation of law or permitted by the Prepetition Credit Documents (solely to the extent any such liens were valid, properly perfected, non-avoidable, and senior in priority to the Prepetition Liens as of the Petition Date, the "Permitted Prior Liens"); (iii) the Prepetition Obligations constitute legal, valid, binding, and non-avoidable obligations of the Debtor enforceable in accordance with the terms of the applicable Prepetition Credit Documents; (iv) no offsets, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the Prepetition Liens or Prepetition Obligations exist, and no portion of the Prepetition Liens or Prepetition Obligations is subject to any challenge or defense including, without limitation, avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise)

7

pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (v) the Debtor and its estate have no claims, objections, challenges, causes of action, and/or choses in action, including, without limitation, avoidance claims under Chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions for recovery or disgorgement, against the Senior DIP Lender or any of its respective affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees arising out of, based upon or related to the Prepetition Credit Facility; (vi) the Debtor waives, discharges, and releases any right to challenge any of the Prepetition Obligations, the priority of the Debtor's obligations thereunder, and the validity, extent, and priority of the liens securing the Prepetition Obligations, and (vii) the aggregate value of the Prepetition Collateral exceeds the amount of the Prepetition Obligations and the claims of the Senior DIP Lender arising under, or secured by, the Prepetition Credit Documents constitute allowed, secured claims within the meaning of Sections 502 and 506 of the Bankruptcy Code.

v)   *Cash Collateral*. All of the Debtor's cash, including any cash in deposit accounts of the Debtor, wherever located, constitutes Cash Collateral of the Senior DIP Lender.

vi)  *Default by the Debtor.* The Debtor acknowledges and stipulates that it is in default of its obligations under the Prepetition Credit Documents, including as a result of the commencement of this Chapter 11 Case, and that an Event of Default has occurred under the Prepetition Credit Documents.

N.   Representations regarding postpetition financing:

i)   *Request for Postpetition Financing*. The Debtor seeks authority to (i) use Cash Collateral on the terms described herein, and (ii) enter into the Senior DIP Credit Agreement on the terms and conditions described herein and in the Senior DIP Facility Documents, to administer its Chapter 11 Case and to fund the Debtor's operations. At the Interim Hearings on the Motion, the Debtor received final approval of the Senior DIP Facility and use of Cash Collateral pursuant to the Third Interim Order in form and substance acceptable to the Senior DIP Lender. Notice of the Final Hearing and this Third Interim Order will be provided in accordance with this Third Interim Order.

ii)  *Need for Postpetition Financing and Use of Cash Collateral*. The Debtor has a critical need to use Cash Collateral on an interim basis and to obtain credit on an interim basis pursuant to the Senior DIP Facility in order to, among other things, enable the orderly continuation of its operations and administer and preserve the value of its estate. The ability of the Debtor to maintain business relationships with its vendors, suppliers, and customers, to pay its employees, and otherwise finance its operations requires the availability of working capital from the Senior DIP Facility and the use of

Cash Collateral, the absence of either of which would immediately and irreparably harm the Debtor, its estate, creditors, and parties-in-interest. The Debtor does not have sufficient available sources of working capital and financing to operate its business or maintain its properties in the ordinary course of business without the Senior DIP Facility and use of Cash Collateral.

iii)   *No Credit Available on More Favorable Terms*. The Senior DIP Facility is the best source of debtor-in-possession financing available to the Debtor. Given its current financial condition, financing arrangements, and capital structure, the Debtor has been and continues to be unable to obtain financing from sources other than the Senior DIP Lender on terms more favorable than the Senior DIP Facility. The Debtor is unable to obtain unsecured credit allowable under Section 503(b)(1) of the Bankruptcy Code as an administrative expense. The Debtor has also been unable to obtain: (i) unsecured credit solely having priority over that of administrative expenses of the kind specified in Sections 503(b), 507(a) and 507(b) of the Bankruptcy Code; (ii) credit secured solely by a lien on property of the Debtor and its estate that is not otherwise subject to a lien, or (iii) credit secured solely by a junior lien on property of the Debtor and its estate that is subject to a lien.

iv)   *Use of proceeds of the Senior DIP Facility*. As a condition to entry into the Senior DIP Credit Agreement, the extension of credit under the Senior DIP Facility and the authorization to use Cash Collateral, the Senior DIP Lender requires, and the Debtor has agreed, that proceeds of the Senior DIP Facility shall be used, in each case in a manner consistent with the terms and conditions of the Third Interim Order and the Senior DIP Facility Documents and in accordance with the Budget attached hereto as **<u>Exhibit B</u>** (as the same may be modified from time to time consistent with the terms of the Third Interim Order, the Senior DIP Facility Documents and subject to such variances as permitted in the Senior DIP Credit Agreement).

v)   *Application of Proceeds of Collateral*. As a condition to entry into the Senior DIP Credit Agreement, the extension of credit under the Senior DIP Facility, and authorization to use Cash Collateral, the Debtor and the Senior DIP Lender have agreed that as of and commencing on the date of the Final Hearing, the Debtor shall apply the proceeds of DIP Collateral in accordance with the Third Interim Order and the Budget.

vi)   *Roll up of Prepetition Obligations into Obligations.* The Senior DIP Lender would not otherwise consent to the use of its Cash Collateral, and the Senior DIP Lender would not be willing to provide the Senior DIP Facility or extend credit to the Debtor thereunder without the inclusion of the DIP Roll Up in the Senior DIP Obligations. Moreover, the reduction of the Prepetition Obligations upon entry of the Interim Orders and, upon entry of the Third Interim Order, the roll-up of all outstanding Prepetition

9

Obligations into Senior DIP Obligations will enable the Debtor to obtain urgently needed financing that they need to administer this Chapter 11 Case and fund its operations. Moreover, the conversion and "roll-up" of all outstanding Prepetition Obligations into Senior DIP Obligations will create availability under the Senior DIP Facility and will result in interest savings to the Debtor and its estate.

vii)   *Certain Conditions to Senior DIP Facility*. The Senior DIP Lender's willingness to make the Senior DIP Loan is conditioned upon, among other things: (i) the Debtor obtaining Court approval to enter into the Senior DIP Facility Documents and to incur all of the respective obligations thereunder, and to confer upon the Senior DIP Lender all applicable rights, powers, and remedies thereunder in each case as modified by the Third Interim Order; (ii) the provision of adequate protection of the Senior DIP Lender's interests in the Prepetition Collateral pursuant to Sections 361, 363, and 364 of the Bankruptcy Code, and (iii) the granting of continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interests in the DIP Collateral (as defined below) to the Senior DIP Lender, as security for the prompt payment of the Senior DIP Facility and all other obligations of the Debtor under the Senior DIP Facility Documents.

O.     <u>Sections 506(c) and 552(b)</u>. In light of the Senior DIP Lender's agreement that its liens and superpriority claims shall be subject to the Carve-Out, (a) the Senior DIP Lender is entitled to a waiver of any "equities of the case" exception under Section 552(b) of the Bankruptcy Code, and (b) the Senior DIP Lender is entitled to a waiver of the provisions of Section 506(c) of the Bankruptcy Code.

**THE DEBTOR AND THE JUNIOR DIP LENDER STIPULATE AS FOLLOWS**:

P.     <u>No Credit Available on More Favorable Terms</u>. The Debtor has been unable to obtain any of the following on more favorable terms and conditions than those provided in this Third Interim Order: (a) adequate unsecured credit allowable under Section 503(b)(1) of the Bankruptcy Code as an administrative expense; (b) credit for money borrowed with priority over any or all administrative expenses of the kind specified in Sections 503(b) or 507(b) of the Bankruptcy Code; or (c) credit for money borrowed secured by a lien on property of the estate that is not otherwise subject to a lien. The Debtor is unable to obtain credit for borrowed money without

granting the Junior DIP Liens and the Junior DIP Superpriority Claims (each defined below) to (or

for the benefit of) the Junior DIP Lender on the terms and conditions included in the Junior DIP

Facility Documents.

Q.      Extension of Financing. The Junior DIP Lender is willing and able to provide

financing to the Debtor in accordance with the Junior DIP Term Sheet, and any other related

documents (collectively, the "Junior DIP Facility Documents").

R.      Business Judgment and Good Faith Pursuant to Section 364(e). The terms and

conditions of the Third Interim Order and the Junior DIP Facility Documents are fair, reasonable,

and the best available under the circumstances, reflect the Debtor's exercise of prudent business

judgment, and are supported by reasonably equivalent value and consideration; all payments made

under, and transfers or grants of security set forth in, the Interim Orders, the Third Interim Order,

and the Junior DIP Facility Documents are made, transferred or granted to or for the benefit of the

Junior DIP Lender for fair consideration and reasonably equivalent value, and are granted

contemporaneously with the making of the loans and/or commitments and other financial

accommodations secured thereby, including the obligations incurred by Debtor under this Third

Interim Order, the Interim Orders, and the Junior DIP Facility Documents (collectively, the "Junior

DIP Obligations"); the terms of the Junior DIP Facility Documents and any other related

agreements and documents (collectively, the "Junior DIP Facility") were negotiated in good faith

and at arm's length among the Junior DIP Lender and the Debtor, and the use of the proceeds to

be extended under the Junior DIP Facility will be so extended in good faith and for valid business

purposes and uses, as a consequence of which the Junior DIP Lender is entitled to the protection

and benefits of Section 364(e) of the Bankruptcy Code.

S.      Relief Essential; Best Interest of Bankruptcy Estate. The relief provided in this

Third Interim Order is necessary, essential, and appropriate for the continued operation of the Debtor's business and the management and preservation of its assets and property. It is in the best interest of the Debtor's bankruptcy estate that the Debtor be allowed to enter into the Junior DIP Facility Documents, incur the Junior DIP Facility Obligations, and grant the liens and claims contemplated herein and under the Junior DIP Facility Documents to the Junior DIP Lender, subject to the terms of this Third Interim Order.

**NOW, THEREFORE**, upon the Motion and the record before this Court with respect to the Motion, including the record made during the Hearings, and good and sufficient cause appearing therefor, **IT IS ORDERED, ADJUDGED, AND DECREED** that:

1.    <u>Motion Granted</u>. The Motion is granted on an interim basis in accordance with the terms and conditions set forth in the Interim Orders and the Third Interim Order. Any objections to the Motion with respect to entry of this Third Interim Order to the extent not withdrawn, waived, or otherwise resolved, and all reservation of rights included therein, are hereby denied and overruled.

2.    <u>DIP Facilities</u>.

(a)    The Debtor is expressly and immediately authorized to enter into the Senior DIP Facility Documents and the Junior DIP Facility Documents, to incur the obligations thereunder and to perform in accordance with the Senior DIP Facility and the Junior DIP Facility in accordance with and subject to this Third Interim Order, the Budget, the Senior DIP Facility Documents and the Junior DIP Facility Documents, to enter into, execute and/or deliver all Senior DIP Facility Documents, the Junior DIP Facility Documents, and all other instruments, certificates, agreements, and documents, and to take all actions, which may be reasonably required or otherwise necessary for the performance by the Debtor under the Senior DIP Facility Documents and the

Junior DIP Facility Documents, including the creation and perfection of the Senior DIP Liens

described and provided for under the Senior DIP Facility Documents and the Junior DIP Facility

Documents. The Debtor is hereby immediately authorized to borrow up to a total available amount

of (i) $2,500,000.00 (including the DIP Roll Up) under the Senior DIP Facility (subject to the

Borrowing Base (as defined in the Senior DIP Credit Agreement)) and (ii) $500,000.00 under the

Junior DIP Facility, which funds shall be used solely as expressly provided in this Third Interim

Order and the Budget. The Senior DIP Facility (including the DIP Roll Up) and the Junior DIP

Facility shall respectively (i) be evidenced by the books and records of the Senior DIP Lender,

Junior DIP Lender, the Interim Orders, the Third Interim Order, the Senior DIP Facility

Documents, and the Junior DIP Facility Documents; (ii) bear interest and incur fees at the rates set

forth in the Senior DIP Facility Documents and Junior DIP Facility Documents, as applicable; (iii)

be secured in the manner specified below and under the applicable Senior DIP Facility Documents

and Junior DIP Facility Documents; (iv) be payable in accordance with the applicable Senior DIP

Facility Documents and Junior DIP Facility Documents, and (v) otherwise be governed by the

terms set forth in the Interim Orders, this Third Interim Order, the Senior DIP Facility Documents,

and the Junior DIP Facility Documents. Upon a written request from the Debtor (for which email

shall suffice), the Senior DIP Lender may agree, in its sole and absolute discretion, to provide an

over-advance to the Debtor in excess of the Borrowing Base (which over-advance shall not

increase the Borrowing Base) and/or to increase the Facility Cap (as defined in the Senior DIP

Credit Agreement). Following an agreement by the Senior DIP Lender to provide an increased

Facility Cap, the Debtor shall promptly file a notice of such increase with the Court in form and

substance reasonably acceptable to the Senior DIP Lender.

      (b)     The Debtor shall pay to (i) the Senior DIP Lender principal and interest as such

payments come due as provided in the Senior DIP Facility Documents and in accordance with the procedures set forth therein and (ii) subject to the terms and conditions of the Subordination Agreement, the Junior DIP Lender principal and interest at the Maturity Date (as defined in the Junior DIP Loan Term Sheet) and in accordance with the procedures set forth therein. In consideration of the financial accommodations made by the Senior DIP Lender under this Third Interim Order and the Senior DIP Facility Documents, in accordance with Paragraph 3 of this Third Interim Order and the Budget, the Debtor is hereby authorized, without further order of this Court and as set forth in the Senior DIP Facility Documents, to pay to the Senior DIP Lender all fees and charges provided for in the Senior DIP Facility Documents.

(c)    Except as otherwise set forth in the Senior DIP Facility Documents or the Junior DIP Facility Documents, respectively, neither the Senior DIP Lender nor the Junior DIP Lender, respectively, shall have any obligation to make any loan or advance under the Senior DIP Facility Documents or the Junior DIP Facility Documents, respectively, unless all of the conditions precedent to the making of such extensions of credit under the applicable Senior DIP Facility Documents, Junior DIP Facility Documents, and this Third Interim Order have been satisfied in full or waived in writing by the Senior DIP Lender or the Junior DIP Lender, as applicable, in its sole discretion.

(d)    The Senior DIP Facility Documents or, subject to the terms of the Subordination Agreement, the Junior DIP Facility Documents, as the case may be, may from time to time be amended, modified, or supplemented by the parties thereto without notice or a hearing if: (a) the amendment, modification, or supplement is (i) in accordance with the Senior DIP Facility Documents or the Junior DIP Facility Documents, respectively; (ii) beneficial to the Debtor; and (iii) not prejudicial in any material respect to the rights of third parties; and (b) the amendment,

modification or supplement is filed with the Court. Except as otherwise provided in this paragraph, no waiver, modification, or amendment of any of the provisions of any Senior DIP Facility Documents or Junior DIP Facility Documents shall be effective unless set forth in writing, signed on behalf of the Debtor, and with the necessary consents required under and executed in accordance with the Senior DIP Facility Documents or the Junior DIP Facility Documents, respectively, and approved by the Court on notice.

(e)      To the extent that the terms of this Third Interim Order conflict with the terms of any of the Senior DIP Facility Documents or the Junior DIP Facility Documents, the terms of this Third Interim Order will control.

3.      <u>Use of Cash Collateral</u>. Subject to the terms and conditions of this Third Interim Order, the Senior DIP Facility, and the Senior DIP Facility Documents and solely in accordance with the Budget (subject to the variances set forth in the Senior DIP Credit Agreement), the Debtor is authorized to use Cash Collateral until the Termination Date (as defined in the Senior DIP Credit Agreement). Nothing in this Third Interim Order shall authorize the disposition of any assets of the Debtor or its estate outside the ordinary course of business or the Debtor's use of any Cash Collateral or other proceeds resulting therefrom, except as permitted in this Third Interim Order, the Senior DIP Facility, the Senior DIP Facility Documents, and in accordance with the Budget.

4.      <u>Adequate Protection Liens</u>. Pursuant to Sections 361, 363(e), and 364(d) of the Bankruptcy Code, the Prepetition Lenders are entitled to secure, as adequate protection, an amount equal to any diminution in the value of the respective Prepetition Lender's interests in the Prepetition Collateral resulting from (i) the postpetition use, sale or lease of the Prepetition Collateral; (ii) the imposition of the automatic stay; (iii) the priming of the Prepetition Liens on the Prepetition Collateral by the Senior DIP Liens in favor of the Senior DIP Lender, or (iv) the

15

DIP Roll Up granted in the Interim Orders and this Third Interim Order and the Senior DIP Facility Documents pursuant to Section 364(d) of the Bankruptcy Code. If any such diminution in value occurs, the Prepetition Lenders shall be and hereby are granted (effective upon the date of this Third Interim Order and without the necessity of the execution by the Debtor of mortgages, security agreements, pledge agreements, financing statements or otherwise) valid and perfected, replacement security interests, in the same priority and to the same extent as existed prepetition, in any post-petition collateral, including post-petition generated accounts receivables, solely to the extent of any diminution in the value of such Subordinated Prepetition Lender's interests in the Prepetition Collateral from and after the Petition Date, and in each case subject to the Carve Out (the "Adequate Protection Liens").

(a)      Priority of Adequate Protection Liens. The Adequate Protection Liens shall be subject and subordinate to the payment of the Carve Out and shall otherwise be junior (in order of priority) to the Senior DIP Liens, the Junior DIP Liens, and the interests of any lessors of equipment to the Debtor. The Adequate Protection Liens shall otherwise be senior to all other security interests in or liens on any of the Debtor's assets.

(b)      Except as provided herein, the Adequate Protection Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter in the Chapter 11 Case or any successor cases, and shall be valid and enforceable against any trustee appointed in any of the Chapter 11 Case or any successor cases, or upon the dismissal of any of the Chapter 11 Case or successor cases. The Adequate Protection Liens shall not be subject to Sections 510, 549, or 550 of the Bankruptcy Code. No lien or interest avoided and preserved for the benefit of the estate pursuant to Section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the Prepetition Liens or the Adequate Protection Liens.

(c)      <u>Adequate Protection Superpriority Claim</u>. Subject and subordinate in each case to the Junior DIP Liens and payment of the Carve Out as set forth in the Interim Orders, solely to the extent of any diminution in value of their respective interests in the Prepetition Collateral from and after the Petition Date resulting from the use, sale or lease thereof, the imposition of the automatic stay, or the priming of the Prepetition Liens in favor of the Senior DIP Lender, Prepetition Lenders are entitled to a superpriority administrative claim to the extent of such diminution in value and the absence of sufficient security to pay such diminution under Section 507 of the Bankruptcy Code (the "<u>Adequate Protection Superpriority Claim</u>").

(d)      <u>Priority of the Adequate Protection Superpriority Claim</u>. Except as set forth herein, the Adequate Protection Superpriority Claim shall have priority over all administrative expense claims and unsecured claims against the Debtor or its estate, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to Sections 326, 328, 330, 331, 503(a), 503(b), 507(a), 506(c), 507(b), 546(c), 546(d), 726, 1113 and 1114 of the Bankruptcy Code; *provided, however*, that the Adequate Protection Superpriority Claim shall be subject and subordinate to the payment of the Junior DIP Loan Obligations and the Carve Out as set forth in the Interim Orders and junior to the DIP Claim, and subject to the lien priorities set forth herein.

5.      <u>DIP Roll Up</u>. Upon the funding of the first Advance (as defined in the Senior DIP Credit Agreement), the Prepetition Obligations were converted into, and have been converted into, Senior DIP Loans and Senior DIP Obligations and shall be entitled to all the priorities, privileges, rights, and other benefits afforded to the other Senior DIP Loans and Senior DIP Obligations under the Interim Orders and the Senior DIP Facility Documents.

6.      <u>Budget Maintenance</u>. The use of borrowings under the Senior DIP Facility and the Junior DIP Facility, and the use of Cash Collateral, shall be in accordance with the Budget, depicting, on a weekly basis, cash revenues, receipts, expenses, and disbursements, net cash flows, inventory receipts and other items set forth therein, which shall be in form and substance satisfactory to, and approved by, the Senior DIP Lender in its sole and reasonable discretion. The Budget shall be updated by the Debtor (with the consent and/or at the request of the Senior DIP Lender) from time to time in accordance with the DIP Facility Documents. No such updated, modified or supplemented budget shall be effective until approved by the Senior DIP Lender in writing in its sole and absolute discretion, and filed on the docket of this Chapter 11 Case attaching proof of the Senior DIP Lender's written consent to such budget, and once so approved and filed shall thereafter be deemed the "Budget"; provided that in the event that the Senior DIP Lender and the Debtor cannot agree as to an updated, modified or supplemented budget, before the end of the period covered by the Budget then in effect in accordance with this Third Interim Order, the Budget (or such updated, modified, or supplemented Budget as may have been subsequently approved by the Senior DIP Lender) shall continue in effect for this Chapter 11 Case, and such disagreement shall give rise to an "Event of Default" under the DIP Credit Agreement and this Third Interim Order. For the avoidance of doubt, the Senior DIP Lender shall not be required to make any Loan or Advance in an amount which would, in the aggregate, increase outstanding borrowings to an amount in excess of the "Borrowing Base."

7.      <u>Budget Compliance Covenant</u>. The Debtor shall at all times comply with the Budget, subject to the variances set forth in the Senior DIP Credit Agreement. The Debtor shall provide all reports and other information as required in the Senior DIP Credit Agreement to the Senior DIP Lender, the Junior DIP Lender, and the Subchapter V Trustee. The Debtor's failure to

18

comply with the Budget or to provide the reports and other information required in the Senior DIP Credit Agreement shall constitute an Event of Default (as defined herein).

8.  <u>Modification of the Automatic Stay.</u> The automatic stay provisions of Section 362 of the Bankruptcy Code and any other restriction imposed by an order of the Court or applicable law are hereby modified, subject to paragraph 15 of this Third Interim Order, but only to the extent necessary to permit the (i) Senior DIP Lender, subject in all respects to the Senior DIP Facility Documents and the Interim Orders and (ii) Junior DIP Lender, subject in all respects to the Junior DIP Facility Documents and this Third Interim Order, each to perform any act authorized or permitted under or by virtue of the Interim Orders: (i) to implement the (a) Senior DIP Facility authorized by the Interim Orders and pursuant to the terms of the Senior DIP Facility Documents and (b) to implement the Junior DIP Facility authorized by this Third Interim Order and pursuant to the terms of the Junior DIP Facility Documents; (ii) to take any act reasonably necessary to create, validate, evidence, attach, or perfect any (a) Senior DIP Lien, security interest, right, or claim in the DIP Collateral and (b) Junior DIP Lien, security interest, right, or claim in the Junior DIP Collateral, (iii) authorize the Debtor to pay, and the Senior DIP Lender to retain and apply, payments made in accordance with the terms of the Interim Orders, and (iv) to exercise any remedies to which the (a) Senior DIP Lender is entitled under the Senior DIP Facility Documents including this Third Interim Order and (b) Junior DIP Lender is entitled under the Junior DIP Facility Documents including this Third Interim Order.

9.  <u>Senior DIP Lender's Fees and Expenses</u>. Without duplication of amounts required to be paid pursuant to the Senior DIP Facility Documents, upon entry of the Interim Orders, the Debtor shall pay in cash all fees, expenses, and disbursements payable to the Senior DIP Lender as provided for in the Senior DIP Facility Documents. The Debtor shall pay, upon demand, all

other reasonable and documented fees, costs, expenses and other amounts payable under the terms

of the Senior DIP Facility Documents and this Third Interim Order and all other reasonable and

documented fees and out-of-pocket costs and expenses of the Senior DIP Lender in accordance

with the terms of the Senior DIP Facility Documents and this Third Interim Order, including,

without limitation, all reasonable and documented fees and out-of-pocket costs and expenses of

legal counsel to the Senior DIP Lender (the "DIP Professional Fees and Expenses"), subject to

receiving a written summary invoice therefor. None of such fees, costs, expenses or other amounts

shall be subject to further application to or approval of this Court, and shall not be subject to

allowance or review by this Court or subject to the U.S. Trustee's fee guidelines, and no attorney

or advisor to the Senior DIP Lender shall be required to file an application seeking compensation

for services or reimbursement of expenses with this Court; *provided, however*, that copies of any

such invoices shall be provided contemporaneously to the U.S. Trustee and the Subchapter V

Trustee (together with the Debtor, the "Review Parties"), provided further, however, that such

invoices may be redacted or modified to the extent necessary to delete any information subject to

the attorney-client privilege, any information constituting attorney work product, or any other

confidential information, and the provision of such invoices shall not constitute a waiver of the

attorney-client privilege or any benefits of the attorney work product doctrine. Any objections

raised by any Review Party with respect to such invoices must be in writing and state with

particularity the grounds therefor and must be submitted to the affected professional within ten

(10) calendar days after delivery of such invoices to the Review Parties (such ten (10) day calendar

period, the "Review Period"). If no written objection is received prior to the expiration of the

Review Period from the Review Parties, the Debtor shall pay such invoices within four (4) business

days following the expiration of the Review Period. If an objection is received within the Review

Period, the Debtor shall promptly pay the undisputed amount of the invoice within four (4) business days, and the disputed portion of such invoice shall not be paid until such dispute is resolved by agreement between the affected professional and the objecting party or by order of this Court. Any hearing to consider such an objection to the payment of any fees, costs or expenses set forth in a professional fee invoice hereunder shall be limited to the reasonableness of the fees, costs and expenses that are the subject of such objection. All such unpaid fees, costs, expenses and other amounts owed or payable to the Senior DIP Lender shall be secured by the DIP Collateral and afforded all of the priorities and protections afforded to the Senior DIP Obligations under the Senior DIP Facility Documents and the Interim Orders. For the avoidance of doubt, as set forth in the Senior DIP Facility Documents, the DIP Professionals' Fees and Expenses must first be paid from funds held by the Senior DIP Lender's counsel.

(a)     Notwithstanding anything contained in this Third Interim Order to the contrary, any and all payments, premiums, fees, costs, expenses, and other amounts paid at any time by any of the Debtor to the (i) Senior DIP Lender pursuant to the requirements of the Interim Orders or the Senior DIP Facility Documents (ii) Junior DIP Lender pursuant to the requirements of this Third Interim Order or the Junior DIP Facility Documents shall in each case be non-refundable and irrevocable, are hereby approved, and shall not be subject to any challenge, objection, defense, claim or cause of action of any kind or nature whatsoever, including, without limitation, avoidance (whether under chapter 5 of the Bankruptcy Code or under applicable law (including any applicable state law Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law)), reduction, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), reclassification, disgorgement, disallowance, impairment, marshaling, surcharge, or recovery or any other cause of

21

action, whether arising under the Bankruptcy Code, applicable non- bankruptcy law or otherwise, by any person or entity (subject, solely in the case of the DIP Professional Fees and Expenses, to paragraph 8 of this Third Interim Order)

10.     Senior DIP Superpriority Claims.

(a)     Subject and subordinate to payment of the Carve Out as set forth in the Interim Orders, the Senior DIP Lender is hereby granted, pursuant to Section 364(c)(1) of the Bankruptcy Code, allowed superpriority administrative expense claims in the Chapter 11 Case and any successor cases (collectively, the "Senior DIP Superpriority Claims") for all Senior DIP Obligations. Except as set forth herein, the Senior DIP Superpriority Claims shall have priority over any and all other obligations, liabilities and indebtedness of the Debtor other than payment of the Carve Out, including without limitation any and all administrative expense claims and unsecured claims against the Debtor or its estate in the Chapter 11 Case and any successor cases, at any time existing or arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to Sections 326, 328, 330, 331, 364, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 726, 1113 and 1114 of the Bankruptcy Code, and any other provision of the Bankruptcy Code, as provided under Section 364(c)(1) of the Bankruptcy Code. No lien or interest avoided and preserved for the benefit of the estate pursuant to Section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the Senior DIP Superpriority Claims.

(b)     Subject and subordinate to payment of the Senior DIP Superpriority Claims and the Carve Out as set forth in this Third Interim Order, the Junior DIP Lender is hereby granted, pursuant to Section 364(c)(1) of the Bankruptcy Code, allowed superpriority administrative expense claims in the Chapter 11 Case and any successor cases (collectively, the "Junior DIP

Superpriority Claims") for all Junior DIP Obligations. Except as set forth herein, the Junior DIP

Superpriority Claims shall have priority over any and all other obligations, liabilities and

indebtedness of the Debtor other than payment of the Senior DIP Superpriority Claims and the

Carve Out, including without limitation any and all administrative expense claims and unsecured

claims against the Debtor or its estate in the Chapter 11 Case and any successor cases, at any time

existing or arising, of any kind or nature whatsoever, including, without limitation, administrative

expenses of the kinds specified in or ordered pursuant to Sections 326, 328, 330, 331, 364, 503(a),

503(b), 507(a), 507(b), 546(c), 546(d), 726, 1113 and 1114 of the Bankruptcy Code, and any other

provision of the Bankruptcy Code, as provided under Section 364(c)(1) of the Bankruptcy Code.

No lien or interest avoided and preserved for the benefit of the estate pursuant to Section 551 of

the Bankruptcy Code shall be *pari passu* with or senior to the Junior DIP Superpriority Claims.

11.    Senior DIP Liens.

(a)    As security for the full and timely payment of the Senior DIP Facility, the Senior

DIP Lender is hereby granted, pursuant to Sections 364(c)(2), (c)(3), and (d)(1) of the Bankruptcy

Code, a superpriority, senior, perfected priming lien upon the DIP Collateral (defined below),

which liens shall constitute valid, enforceable, non-avoidable, fully perfected, and first-priority

security interests in and liens upon all DIP Collateral (the "Senior DIP Liens"). The Senior DIP

Liens securing the Senior DIP Obligations are valid, automatically perfected, non-avoidable,

senior in priority, and superior to any security, mortgage, collateral interest, lien, or claim to any

of the DIP Collateral, except that the Senior DIP Liens shall be subject to payment of the Carve

Out as set forth in the Third Interim Order. Other than as set forth herein or in the Senior DIP

Facility Documents and this Third Interim Order, the Senior DIP Liens shall not be made subject

to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Chapter

11 Case or any successor cases and shall be valid and enforceable against any trustee appointed in

the Chapter 11 Case or any successor cases, upon the conversion of any of the Chapter 11 Case to

a case under Chapter 7 of the Bankruptcy Code (or in any other successor case), and/or upon the

dismissal of any of the Chapter 11 Case or successor cases. The Senior DIP Liens shall not be

subject to Sections 510, 549, or 550 of the Bankruptcy Code. No lien or interest avoided and

preserved for the benefit of the estate pursuant to Section 551 of the Bankruptcy Code shall be

*pari passu* with or senior to the DIP Liens. "DIP Collateral" shall mean the Debtor's right, title,

and interest in and to the following, whether now owned or hereafter created, acquired or arising

and wherever located:

> (i)    all Accounts (including health-care insurance receivables and any amounts received on account of governmental programs or grants) and Related Property;

> (ii)    all of Debtor's deposit accounts, including the Governmental Deposit Account;

> (iii)    all Books and Records, whether or not related to any Collateral;

> (iv)    all of Debtor's other personal property and fixtures, including all Goods, Inventory, Equipment, furniture, General Intangibles (including Payment Intangibles and Software), Chattel Paper (whether tangible or electronic), Supporting Obligations, Investment Property, Financial Assets, Documents, Instruments (including any Promissory Notes), Securities, Securities Accounts, contract rights or rights to payment of money, leases, Permits, license agreements, franchise agreements, Commercial Tort Claims, stock in direct and indirect subsidiaries, machinery, cash, Letter-of-Credit Rights (whether or not the letter of credit is evidenced by a writing), Intellectual Property, copyrights, trademarks, patents, and tradestyles; and

> (v)    any and all claims, rights and interests in any of the above and all substitutions for, additions, attachments, accessories, accessions and improvements to and replacements, products, Proceeds and insurance proceeds of any or all of the foregoing.

(b)    As security for the full and timely payment of the Junior DIP Facility, the Junior

DIP Lender is hereby granted, pursuant to Sections 364(c)(2), (c)(3), and (d)(1) of the Bankruptcy

Code, a superpriority, junior, perfected priming lien upon the DIP Collateral (the "Junior DIP

Collateral"), which collateral is subordinate to the liens of the Senior DIP Lender in the DIP

Collateral), which liens shall constitute valid, enforceable, non-avoidable, fully perfected, and first-priority security interests in and liens upon all DIP Collateral (the "Junior DIP Liens"). The Junior DIP Liens securing the Junior DIP Obligations are valid, automatically perfected, non-avoidable, senior in priority, and superior to any security, mortgage, collateral interest, lien, or claim to any of the DIP Collateral, except that the Junior DIP Liens shall be (i) subordinate to the Senior DIP Lender's Liens in the DIP Collateral and (ii) subject to payment of the Carve Out as set forth in this Third Interim Order. Other than as set forth in this Third Interim Order or in the Junior DIP Facility Documents, the Junior DIP Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Chapter 11 Case or any successor cases and shall be valid and enforceable against any trustee appointed in the Chapter 11 Case or any successor cases, upon the conversion of any of the Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code (or in any other successor case), and/or upon the dismissal of any of the Chapter 11 Case or successor cases. The Junior DIP Liens shall not be subject to Sections 510, 549, or 550 of the Bankruptcy Code. Except for the Senior DIP Liens, no lien or interest avoided and preserved for the benefit of the estate pursuant to Section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the Junior DIP Liens.

(c)     Except as expressly permitted in the Senior DIP Facility Documents, the Junior DIP Facility Documents or this Third Interim Order, absent full payment and satisfaction of all Senior DIP Obligations and Junior DIP Obligations, the Debtor shall not (i) grant or impose any liens on the DIP Collateral, or (ii) except as permitted in the Senior DIP Facility Documents or Junior Facility Documents, prime or seek to prime the Senior DIP Liens or the Junior DIP Liens and shall not offer any other parties any lien on the DIP Collateral. In addition, the Debtor shall not incur, create, assume, become, or be liable in any manner with respect to, or permit to exist, any secured

25

indebtedness, except as expressly permitted under the Senior DIP Facility Documents, the Junior DIP Facility Documents, the Budget, and the Interim Orders.

(d)    Notwithstanding anything herein or in the Senior DIP Facility Documents or the Junior DIP Facility Documents to the contrary, to the extent not prohibited by applicable non-bankruptcy law, the priming liens granted pursuant to section 364(d)(1) of the Bankruptcy Code in the Interim Orders shall **not** apply to encumber the FHA Lender Priority Collateral (as defined below) owned by the Debtor. "FHA Lender Priority Collateral" shall mean the collateral granted to Cambridge Realty Capital Ltd. Of Illinois (the "HUD Lender") pursuant to that certain Operator Security Agreement by and between the Debtor and the HUD Lender, but only to the extent such collateral also constitutes FHA Lender Priority Collateral under and as defined in that certain Intercreditor Agreement, by and among eCapital, Debtor, HUD Lender, Lincolnshire Properties, L.P., and Wealshire Master Tenant, LLC, dated as of May 8, 2023 (the "FHA Intercreditor Agreement"), a copy of which is attached as Exhibit A to the Motion. Except as provided in the Interim Orders, nothing herein shall be deemed to waive, modify, or otherwise impair the respective rights of the Senior DIP Lender pursuant to the FHA Intercreditor Agreement.

(e)    Subject to payment of the Carve Out, neither the Senior DIP Liens nor the Junior DIP Liens shall be subject to Sections 510, 549, or 550 of the Bankruptcy Code. No lien or interest avoided and preserved for the benefit of any estate pursuant to Section 551 of the Bankruptcy Code shall be made *pari passu* with or senior to the Senior DIP Liens or the Junior DIP Liens.

12.    Carve Out.

(a)    Subject to the terms, conditions and limitations contained in this paragraph 12, but only to the extent and subject to the express exclusions set forth herein, the Senior DIP Liens, the Senior DIP Superpriority Claims, the Junior DIP Superpriority Claims, the

Prepetition Liens, the Adequate Protection Liens and the Adequate Protection Superpriority Claims, and any other liens or claims granted under the Interim Orders, are all subordinate to the following solely to the extent such amounts are included in the approved Budget (collectively, the "Carve Out"):

     (i)     all unpaid fees required to be paid in the Chapter 11 Case to the Clerk of the Bankruptcy Court and to the office of the United States Trustee under 28 U.S.C. § 1930(a)(6);

     (ii)     the reasonable and documented unpaid fees, costs, and disbursements of professionals retained by the Debtor in the Chapter 11 Case (the "Debtor's Professionals");

     (iii)     the reasonable and documented unpaid fees, costs, and disbursements of the Subchapter V Trustee;

     (iv)     the reasonable and documented unpaid fees, costs, and disbursements of the patient care ombudsman (referred to collectively with the Debtor's Professionals and the Subchapter V Trustee, as the "Estate Professionals");

     (v)     Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $50,000 incurred after the first (1st) Business Day following delivery by Senior DIP Lender of a Carve Out Trigger Notice, whether by Interim Order, Third Interim Order, the Senior DIP Facility Documents or the Junior DIP Facility Documents (the amounts set forth in this clause (iv), the "Post-Carve Out Trigger Notice Cap")

          (1)     For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the Senior DIP Lender to the Debtor and its counsel, with a copy to the U.S. Trustee, the Junior DIP Lender and the Subchapter V Trustee, which notice may be delivered following the occurrence and during the continuation of a DIP Termination Event stating that the Carve Out Trigger Notice Cap has been invoked. If the Debtor cures the DIP Termination Event giving rise to a Carve Out Trigger Notice in accordance with any applicable cure period under the Senior DIP Facility Documents, such Carve Out Trigger Notice shall no longer be of force and effect.

     (b)     Nothing herein, including the inclusion of line items in the Budget for Estate Professionals, shall be construed as consent to the allowance of any particular professional

fees or expense of the Debtor, or of any other person or shall affect the right of the Senior

DIP Lender to object to the allowance and payment of such fees and expenses.

(c)     The Senior DIP Lender shall not be responsible for the direct payment or

reimbursement of any fees or disbursements of any Estate Professionals incurred in

connection with the Chapter 11 Case. Nothing in the Interim Orders or otherwise shall be

construed to obligate the Senior DIP Lender in any way to pay compensation to or to

reimburse expenses of any Estate Professional, or to guarantee that the Debtor has

sufficient funds or sufficient availability under the Borrowing Base to pay such

compensation or reimbursement.

13.     Notwithstanding anything to the contrary herein, amounts in the Carve Out shall

only be in the amount provided for in the Budget and as are allowed by the Bankruptcy Court (after

notice and hearing) under sections 327, 330, or 363 of the Bankruptcy Code and remain unpaid

after application of any retainers being held by such professionals.

14.     <u>Additional Covenants</u>.

(a)     <u>Collateral Covenant</u>. The Debtor shall not sell, transfer, lease, encumber or

otherwise dispose of any portion of the DIP Collateral except in the ordinary course of

business and other than as permitted in the Senior DIP Facility Documents or the Junior

DIP Facility Documents, without the prior written order of the Bankruptcy Court, after

notice and an opportunity for a hearing; any required consent shall not be implied from any

other action, inaction or acquiescence by the Senior DIP Lender or the Junior DIP Lender.

(b)     <u>Milestones</u>. The Debtor shall timely comply with the Milestones set forth

on the schedule attached hereto as **<u>Exhibit C</u>** (the "<u>DIP Milestones</u>") in each case on or

before the applicable dates set forth thereon (or on or before any later dates approved in

writing (for which email shall suffice) by the Senior DIP Lender in its sole and absolute

discretion). The failure of the Debtor to timely satisfy any of the DIP Milestones shall, in

the absence of a written waiver by the Senior DIP Lender (for which email shall suffice),

(i) constitute an Event of Default under the Senior DIP Credit Agreement and the Interim

Orders; (ii) result in the automatic termination of the Debtor's authority to use Cash

Collateral under the Interim Orders; and (iii) permit the Senior DIP Lender, subject to

paragraph 15 of the Interim Orders, to exercise the rights and remedies provided for in the

Interim Orders and the Senior DIP Facility Documents.

15.     Termination of DIP Financing. The Debtor's authorization to use the Senior DIP

Facility or the Junior DIP Facility, respectively, shall immediately terminate upon the occurrence

of a "Termination Event," which shall mean the earliest to occur of (i) the expiration of four (4)

business days (the "Default Notice Period") following the provision of written notice to the Debtor

upon the occurrence of an Event of Default (as defined in the Senior DIP Facility Documents) and

such Event of Default remains uncured at the expiration of such Default Notice Period unless the

Bankruptcy Court determines no such Event of Default has occurred following the filing of a

motion or proceeding during such Default Notice Period requesting such a determination; (ii) the

occurrence of a Maturity Date as that term is defined in the Senior DIP Facility Documents or the

Junior DIP Facility Documents, and (iii) the date on which this Third Interim Order is no longer

in full force and effect. Neither the Senior DIP Lender nor the Junior DIP Lender shall have no

further obligation to fund hereunder if a Chapter 11 trustee is appointed or an examiner with

enlarged powers is appointed.

(a)     Upon the occurrence of a Termination Event pursuant to this paragraph 15,

the Junior DIP Lender shall immediately fund a cash reserve of $20,000 (the "Relocation

Reserve") to address the emergency relocation of the Debtor's residents in the event it becomes necessary.

16.   <u>Release</u>. As of the date of entry of this Third Interim Order, the Debtor hereby absolutely and unconditionally releases and forever discharges and acquits the Senior DIP Lender and its officers, directors, managers, principals and employees and their respective predecessors, assignors and successors (collectively, the "<u>Released Parties</u>") from any and all obligations and liabilities to the Debtor (and their successors and assigns) and from any and all chapter five claims and causes of action, claims, counterclaims, demands, debts, accounts, contracts, liabilities, actions and causes of action arising prior to the date of entry of the Third Interim Order (collectively, the "<u>Released Claims</u>") of any kind, nature or description, whether known or unknown, foreseen or unforeseen or liquidated or unliquidated, arising in law or equity or upon contract or tort or under any state or federal law or otherwise, that the Debtor at any time had, now have or may have, or that its successors or assigns hereafter can or may have against any of the Released Parties for or by reason of any act, omission, matter, cause or thing whatsoever arising at any time on or prior to the date of the Third Interim Order, in connection with or relating to the DIP Collateral, the Prepetition Obligations, or any of the Released Parties' service as an officer, director, manager or member of the Debtors, whether such Released Claims are matured or unmatured or known or unknown..

17.   <u>Perfection of Liens</u>. This Third Interim Order shall be sufficient and conclusive evidence of the creation, validity, perfection, and priority of the Senior DIP Liens and the Junior DIP Liens without the necessity of executing, filing, or recording any mortgage, security agreement, pledge agreement, financing statement, or other instrument or document, or the taking of any other act that otherwise may be required under state or federal law, rule, or regulation of

any jurisdiction to validate or perfect the (i) Senior DIP Liens or to entitle the Senior DIP Lender to the priorities granted herein and (ii) Junior DIP Liens or to entitle the Junior DIP Lender to the priorities granted herein. The Debtor may execute, and the Senior DIP Lender and the Junior DIP Lender, respectively are hereby authorized to execute, file, and/or record mortgages, security agreements, pledge agreements, financing statements, and/or other instruments or documents to evidence the Senior DIP Liens, the Junior DIP Liens, and the Debtor is hereby authorized, promptly upon a demand by the (y) Senior DIP Lender made in accordance with the terms of the Senior DIP Facility Documents or (z) Junior DIP Lender made in accordance with the terms of the Junior DIP Facility Documents, to execute, file, and/or record any such mortgages, security agreements, pledge agreements, financing statements, or other instruments or documents as the Senior DIP Lender or Junior DIP Lender may request; provided, however, that no such execution, filing, or recordation shall be necessary or required in order to create or perfect the Senior DIP Liens or the Junior DIP Liens, and further, if the Senior DIP Lender or the Junior DIP lender, in their respective sole discretion, shall choose to execute, file, and/or record such mortgages, security agreements, pledge agreements, financing statements, or other instruments or documents, or otherwise confirm perfection of such Senior DIP Liens and Junior DIP Liens, all such instruments and documents shall be deemed to have been filed or recorded as of the Petition Date. A copy of this Third Interim Order may, in the discretion of the Senior DIP Lender or the Junior DIP Lender, be filed with or recorded in any filing or recording office in addition to or in lieu of such mortgages, security agreements, pledge agreements, financing statements, or other instruments or documents, and each and every federal, state, and local governmental agency, department, or office is hereby directed to accept a copy of this Third Interim Order and any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by this Third Interim

Order, the Senior DIP Facility Documents or the Junior DIP Facility Documents, for filing and recording, and to deem this Third Interim Order to be in proper form for filing and recording. Notwithstanding the foregoing, pursuant to any applicable law, the Senior DIP Lender and the Junior DIP Lender are hereby authorized (but not required) to file or record financing statements and other filing or recording documents or instruments with respect to the DIP Collateral, Junior DIP Collateral, Senior DIP Liens and Junior DIP Liens as applicable, without the Debtor's signature in such form and in such offices as the Senior DIP Lender or Junior DIP Lender determines appropriate to perfect the security interests of the (i) Senior DIP Lender under the Senior DIP Facility Documents and the Interim Orders and (ii) Junior DIP Lender under the Junior DIP Facility Documents and the Interim Orders, and the Senior DIP Lender and the Junior DIP Lender are authorized to use collateral descriptions such as "all personal property" or "all assets," in each case "whether now owned or hereafter acquired," words of similar import or any other description the Senior DIP Lender or the Junior DIP Lender so choose in any such financing statements; provided that any such description shall not alter the scope of the (y) DIP Collateral as provided in this Third Interim Order or in the Senior DIP Facility Documents and (z) Junior DIP Collateral as provided in this Third Interim Order or in the Junior DIP Facility Documents.

18.    Limitation of Liability. With respect to its determination to extend credit under the Senior DIP Facility or in exercising any rights or remedies pursuant to this Third Interim Order and the Senior DIP Facility Documents, the Senior DIP Lender shall not be deemed to be in control of the Debtor's operations or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtor (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601, *et seq*., as amended, or any similar federal or state statute).

19.    <u>Collateral Rights</u>. Except as expressly permitted in this Third Interim Order, the Senior DIP Facility Documents or the Junior DIP Facility Documents, respectively, in the event that any person or entity that holds a lien or security interest in (i) DIP Collateral that is junior or subordinate to the Senior DIP Liens in such DIP Collateral receives or is paid the proceeds of such DIP Collateral, or receives any other payment with respect thereto from any other source, prior to payment in full and in cash and the complete satisfaction of the Senior DIP Facility, such junior or subordinate lienholder shall be deemed to have received, and shall hold, the proceeds of any such DIP Collateral in trust for the Senior DIP Lender, and shall immediately turnover such proceeds to the Senior DIP Lender for application in accordance with this Third Interim Order and the Senior DIP Facility Documents; or (ii) DIP Collateral that is junior or subordinate to the Junior DIP Liens in such Junior DIP Collateral receives or is paid the proceeds of such Junior DIP Collateral, or receives any other payment with respect thereto from any other source, prior to payment in full and in cash and the complete satisfaction of the Junior DIP Facility, such junior or subordinate lienholder shall be deemed to have received, and shall hold, the proceeds of any such Junior DIP Collateral in trust for the Junior DIP Lender, and shall immediately turnover such proceeds to the Junior DIP Lender for application in accordance with this Third Interim Order and the Junior DIP Facility Documents.

20.    <u>Excluded Use of Cash Collateral and Proceeds of DIP Financing</u>. Notwithstanding anything to the contrary in this Third Interim Order, and irrespective of the Carve Out, in no event shall Cash Collateral, the Carve Out, or the proceeds of any loans, advances, or other funds made available by the Senior DIP Lender or Junior DIP Lender to or for the benefit of the Debtor be used for the payment or reimbursement of any fees, expenses, costs or disbursements of any Estate Professional or other persons incurred with the purpose of: (a) objecting to or contesting in any

manner, or in raising any defenses to, the validity, extent, perfection, priority, or enforceability of the Senior DIP Superpriority Claims, the Prepetition Loan Documents, the Interim Orders, or any liens or security interests granted thereby or with respect thereto, (b) reserved; (c) reserved; (d) incurring indebtedness except as permitted by the Interim Orders; (e) modifying Senior DIP Lender's rights under any Senior DIP Facility Documents or the Interim Orders without the Senior DIP Lender's consent in its determination; (f) modifying Junior DIP Lender's rights under any Junior DIP Facility Documents or this Third Interim Order without the Senior DIP Lender's consent in its determination or the Junior DIP Lender's consent, respectively; (g) reserved; (h) asserting or declaring any of the Senior DIP Facility Documents, Junior DIP Facility Documents or the Interim Orders to be invalid, not binding or unenforceable in any respect; or (i) using Cash Collateral or selling any DIP Collateral to the extent such sale would breach or violate any law, rule, regulatory requirement.

21.     <u>Limitation of Junior DIP Lender's Rights, Subordination of Junior DIP Lender's Junior DIP Claims, and Effectiveness of the Subordination Agreement</u>.

(a)     Until the Senior DIP Loan Obligations have been indefeasibly paid in full in cash, the Senior DIP Lender shall have the exclusive right to exercise remedies with respect to the DIP Collateral, and the Junior DIP Lender shall not exercise any remedies with respect to the DIP Collateral.  The Junior DIP Lender's right to exercise any remedies under this Third Interim Order or the Junior DIP Loan Documents are subject in all respects to the Subordination Agreement (as defined below).

(b)     Notwithstanding anything herein to the contrary or in the Junior DIP Facility Documents or this Third Interim Order to the contrary, it is expressly understood and agreed that the Junior DIP Liens and the Junior DIP Superpriority Claims shall be junior and

subordinated (including in right of payment) in all respects to the liens and claims (including any adequate protection liens and claims) of the Senior DIP Liens and the Senior DIP Superpriority Claims, including, for the avoidance of doubt, to the payment and enforcement rights of the Senior DIP Lender.

(c)     Until such time as the Senior DIP Obligations have been indefeasibly paid in full in cash and all financing agreements between the Debtor and the Senior DIP Lender are terminated, the Junior DIP Lender will not receive any cash payments from the Debtor.

(d)     The Debtor, the Senior DIP Lender, and the Junior DIP Lender have entered into that certain Subordination Agreement attached hereto as Exhibit A (the "Subordination Agreement"), which is in full force and effect.   The Subordination Agreement becoming unenforceable or ineffective at any time shall be considered an "Event of Default" under the Senior DIP Credit Agreement.

22.     Survival of Third Interim Order. The provisions of this Third Interim Order and any actions taken pursuant hereto (a) shall survive the entry of any order: (i) confirming any chapter 11 plan in this Chapter 11 Case; (ii) converting the Chapter 11 Case to a successor case, or (iii) dismissing the Chapter 11 Case, and (b) shall continue in full force and effect notwithstanding the entry of any such order, and the claims, liens, and security interests granted pursuant to this Third Interim Order shall maintain their priority as provided by this Third Interim Order and the Interim Orders until (y) all of the Senior DIP Obligations approved hereunder are indefeasibly paid in full and discharged in accordance with the Third Interim Order and the Senior DIP Facility Documents, and (z) all of the Junior DIP Obligations approved hereunder are indefeasibly paid in full and discharged in accordance with the Third Interim Order.

23.     Effect of Stipulations on Third Parties.

(a)     *Generally*. The admissions, stipulations, agreements, releases, waivers and other relief set forth in Paragraph K of this Third Interim Order (collectively, the "Prepetition Stipulations and Other Relief") are and shall be binding on the Debtor upon entry and notice of this Third Interim Order, and, 45 days following entry of the First Interim Order on any subsequent trustee, responsible person, examiner with expanded powers, any other estate representative, and all creditors and parties-in-interest and all of its successors in interest and assigns.

(b)     *Binding Effect*. The Prepetition Stipulations and Other Relief are binding, conclusive, and final on the Debtor upon entry of this Third Interim Order, and, 60 days following entry of the First Interim Order, on any person, entity, or party in interest in the Chapter 11 Case, and its successors and assigns, and in any successor case for all purposes and shall not be subject to challenge or objection by any party-in-interest, including, without limitation, a trustee, responsible individual, examiner with expanded powers, or other representative of the Debtor's estate.

24.    Cash Collection. From and after the date of the entry of this Third Interim Order, all collections and proceeds of any DIP Collateral or services provided by the Debtor and all Cash Collateral that shall at any time come into the possession, custody, or control of the Debtor, or to which Debtor is now or shall become entitled at any time, shall be promptly deposited in the same lock-box and/or deposit accounts into which the collections and proceeds of the Prepetition Collateral were deposited under the Prepetition Credit Documents (or in such other accounts as are designated by the Senior DIP Lender from time to time) (collectively, the "Cash Collection Accounts"), which accounts (except as otherwise set forth in the Senior DIP Credit Agreement) shall be subject to the sole dominion and control of the Senior DIP Lender. Unless otherwise

agreed to in writing by the Senior DIP Lender or otherwise provided for herein, the Debtor shall maintain no accounts except those identified in that certain first-day motion governing cash management (as such order may be amended or modified from time to time, the "Cash Management Order"). The Debtor and the financial institutions where the Debtor's Cash Collection Accounts are maintained (including those accounts identified in the Cash Management Order) shall, without offset or deduction, direct funds in such Cash Collection Accounts upon receipt of any direction to that effect from the Senior DIP Lender.

25.    No Third-Party Rights. Except as explicitly provided for herein, the Third Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary.

26.    Subsequent Reversal or Modification. This Third Interim Order is entered pursuant to, *inter alia*, Section 364 of the Bankruptcy Code and Bankruptcy Rules 4001(b) and (c), granting the Senior DIP Lender and Junior DIP Lender all protections afforded by Section 364(e) of the Bankruptcy Code. If any or all of the provisions of this Third Interim Order are hereafter reversed, modified, vacated, or stayed, that action will not affect (i) the validity of any obligation, indebtedness, or liability incurred hereunder by the Debtor to the Senior DIP Lender or the Junior DIP Lender, or (ii) the validity and enforceability of any lien, claim, obligation, or priority authorized or created under this Third Interim Order or pursuant to the Senior DIP Facility Documents or the Junior DIP Facility Documents as of such date. Notwithstanding any such reversal, stay, modification, or vacatur, any postpetition indebtedness, obligation, or liability incurred by the Debtor to the Senior DIP Lender or the Junior DIP Lender, prior to written notice being delivered to the Senior DIP Lender and the Junior DIP Lender, of the effective date of such action, shall be governed in all respects by the original provisions of this Third Interim Order, and

the (i) Senior DIP Lender shall be entitled to all the rights, remedies, privileges, and benefits granted herein and in the Senior DIP Facility Documents with respect to all such indebtedness, obligations, or liability; and (ii) Junior DIP Lender shall be entitled to all the rights, remedies, privileges, and benefits granted herein and in the Junior DIP Facility Documents with respect to all such indebtedness, obligations, or liability.

27.    <u>Right to be Heard; No Waiver</u>. This Third Interim Order shall not be construed in any way as a waiver or relinquishment of any rights that the DIP Lenders or any other party in interest may have to bring or be heard on any matter brought before this Court.  Notwithstanding any provision of this Third Interim Order to the contrary, the Senior DIP Lender is deemed to have waived any default or Event of Default existing (or that previously existed), which is known or which reasonably could have been known by the Senior DIP Lender under the Senior DIP Facility Documents as of the date of this Third Interim Order; including any default or Event of Default based on failure to comply with the Budget on or before the date of entry of this Third Interim Order.

28.    <u>Binding Effect; Successors and Assigns</u>. Except as otherwise provided in the Senior DIP Facility Documents, the Junior Facility Documents and paragraph 23 of this Third Interim Order, the provisions of this Third Interim Order shall be binding upon and inure to the benefit of the Senior DIP Lender, the Junior DIP Lender, the Debtor, and their respective successors and assigns (including any trustee or fiduciary hereafter appointed or elected as a legal representative of the Debtor, its estate, or with respect to the property of its estate) whether in this Chapter 11 Case, in any successor case, or upon dismissal of this Chapter 11 Case or successor case; provided, however, that neither the Senior DIP Lender nor the Junior DIP Lender shall have no obligation to extend any financing to, or permit the use of cash collateral, DIP Collateral or Junior DIP Collateral

by, any chapter 7 or chapter 11 trustee or similar representative person appointed for the Debtor's estate.

29.     <u>No Proof of Claim.</u> The Senior DIP Lender shall not be required to file proofs of claim in this Chapter 11 Case or any successor case in order to maintain its respective claims with respect to the Senior DIP Facility or the Prepetition Obligations, all of which shall be due and payable in accordance with the Third Interim Order, and the Senior DIP Facility Documents, without the necessity of filing any such proof of claim; the statements of claim in respect of the respective Senior DIP Facility set forth in this Third Interim Order, together with the evidence accompanying the Motion, and presented at the Hearings, are deemed sufficient to and do constitute proofs of claim in respect of such obligations and such secured status.

30.     <u>Monitoring of Collateral.</u> The Senior DIP Lender and the Junior DIP Lender and their respective consultants and advisors shall be given reasonable access to the Debtor's books, records, assets, and properties.

31.     <u>Section 506(c) Claims</u>. No costs or expenses of administration which have been or may be incurred in the Chapter 11 Case at any time shall be charged against the DIP Lenders or any of their claims, the DIP Collateral, the Prepetition Collateral, or the Junior DIP Collateral pursuant to Section 506(c) of the Bankruptcy Code, or otherwise, without the prior written consent of the Senior DIP Lender or the Junior DIP Lender, respectively, and no such consent shall be implied from any other action, inaction, or acquiescence by any such agents or lenders.

32.     <u>Section 552(b)</u>. The Senior DIP Lender shall be entitled to all of the rights and benefits of Section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under Section 552(b) of the Bankruptcy Code shall not apply to the Senior DIP Lender, with respect to proceeds, product, offspring or profits of any of the Prepetition Collateral.

33.   <u>DIP Roll Up</u>. The Court approves, on an interim basis, a full Roll Up of all Prepetition Obligations of the Debtor to the Senior DIP Lender upon the entry of the First Interim Order.

34.   <u>Indemnification</u>. The Senior DIP Lender has acted in good faith, and without negligence or violation of public policy or law, in respect of all actions taken by them in connection with or related in any way to negotiating, implementing, documenting, or obtaining the requisite approvals of the Senior DIP Facility, including in respect of the granting of the Senior DIP Liens and the Adequate Protection Liens, any challenges or objections to the Senior DIP Facility, and all documents related to any and all transactions contemplated by the foregoing. Accordingly, Senior DIP Lender, and, solely in its capacities as Senior DIP Lender or prepetition lender, each of its respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, heirs, predecessors, successors, and assigns, shall be and hereby are indemnified and held harmless by the Debtor in respect of any claim or liability incurred in respect thereof or in any way related thereto, provided that no such parties will be indemnified for any cost, expense, or liability to the extent determined in a final, non-appealable judgment of a court of competent jurisdiction to have resulted primarily from such parties' gross negligence, actual fraud, or willful misconduct. Except as provided herein, no exception or defense exists in contract, law, or equity as to any obligation set forth, as the case may be, in this paragraph, in the Prepetition Credit Documents, or in the Senior DIP Facility Documents, to the Debtor's obligation to indemnify and/or hold harmless the Senior DIP Lender.

35.   <u>Order Effective Immediately.</u> Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, 9024, or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules

of Civil Procedure, this Third Interim Order shall be immediately effective and enforceable upon

its entry, and there shall be no stay of execution or effectiveness of this Third Interim Order.

36.    <u>Service of this Third Interim Order</u>.

(a)    Within three (3) business days upon entry of this Third Interim Order, the

Debtor shall serve, by United States mail, first-class postage prepaid, notice of the entry of

this Third Interim Order and the date and time of the Final Hearing (the "<u>Final Hearing</u>

<u>Notice</u>"), to all known creditors and parties in interest.

(b)    The Final Hearing with respect to the Motion and Interim Orders is

scheduled for August 6, 2024, at 10:00 a.m. prevailing Central Time, at which time any

party in interest may present any timely-filed objection to the entry of the Final Order.

Parties must file any objections to the entry of a Final Order no later than August 2, 2024

at 4:00 p.m. prevailing Central Time.

(c)    No later than July 31, 2024, at 11:59 p.m. prevailing Central Time, the

Debtor must file a proposed form of Final Order, budget, and any modifications,

amendments, or supplements, to the Senior DIP Credit Agreement or Junior DIP Term

Sheet, and serve a copy of the proposed Final Order via the Court's CM/ECF noticing

system.

37.    <u>Retention of Jurisdiction.</u> The Bankruptcy Court has and will retain jurisdiction to

interpret and enforce this Third Interim Order according to its terms.

38.    <u>Assignability of Junior DIP Lender Rights.</u> The Junior DIP Lender's rights, title,

and interest under this Third Interim Order and the Junior DIP Facility Documents are assignable

in whole or in part by the Junior DIP Lender, so long as the Junior DIP Lender makes such

assignment to an Eligible Assignee (defined herein). As used in this Order, an "Eligible Assignee,"

means a person or entity that has been approved in writing (with email by counsel to suffice) by Junior DIP Lender, the Senior DIP Lender, and Debtor in each such party's sole and absolute discretion. Any Eligible Assignee who is assigned the Junior DIP Lender's rights, titles, and interests, in accordance with this paragraph, may only receive such rights, titles, and interests following such Eligible Assignee's signing an acknowledgment of the Subordination Agreement and an amendment thereto noting that such Eligible Assignee's rights, titles and interests are subject to the Subordination Agreement pursuant to the terms included therein and which amendment shall be in form and substance acceptable to the Senior DIP Lender.

(a)    In the event the Junior DIP Lender assigns some or all of its rights, title, and interest under this Third Interim Order and the Junior DIP Facility Documents, the Junior DIP Lender must file notice of such assignment on the docket in this Chapter 11 Case, (i) identifying the assignee; (ii) attaching a copy of any agreement(s) entered into between the Junior DIP Lender and the assignee evidencing the terms of the assignment; and (iii) attaching an acknowledgment and amendment to the Subordination Agreement.

39.    Reserved.


### END OF ORDER ###


Order submitted by:
Harold D. Israel
Jack R. O'Connor
Sean P. Williams
**LEVENFELD PEARLSTEIN, LLC**
120 S. Riverside Plaza, Suite 1800
Chicago, IL 60606
Telephone: (312) 346-8380
e-mail: hisrael@lplegal.com
e-mail: joconnor@lplegal.com
e-mail: swilliams@lplegal.com

DATED: July 19, 2024

Donald R. Cassling
U.S. Bankruptcy Judge

42

**EXHIBIT A**

**CREDIT AND SECURITY AGREEMENT**

# SUPERPRIORITY DEBTOR-IN-POSSESSION
# CREDIT AND SECURITY AGREEMENT

**between**

## WEALSHIRE REHAB, LLC,

### as the Borrower

### and

## ECAPITAL HEALTHCARE CORP.

### as the Lender

**Dated as of**
**June [__], 2024**

# SUPERPRIORITY DEBTOR-IN-POSSESSION
# CREDIT AND SECURITY AGREEMENT

## Table of Contents

Page

I.   DEFINITIONS ................................................................................................... 2

    1.1   General Terms ......................................................................................... 2
    1.2   Specific Terms ......................................................................................... 2
    1.3   Other Definitional and Interpretative Provisions ................................ 23
    1.4   Time is of the Essence .......................................................................... 24

II.  ADVANCES, PAYMENT AND INTEREST ..................................................... 24

    2.1   Advances; Roll Up of Prepetition Obligations .................................... 24
    2.2   Evidence of Obligations; Maturity ....................................................... 26
    2.3   Interest ................................................................................................... 26
    2.4   Revolving Facility Disbursements; Requirement to Deliver Borrowing
          Certificate ............................................................................................. 27
    2.5   Revolving Facility Collections; Repayment; Borrowing Availability  and
          Controlled Deposit Accounts ................................................................ 27
    2.6   Promise to Pay; Manner of Payment .................................................... 30
    2.7   Repayment of Excess Advances ........................................................... 30
    2.8   Payments by Lender .............................................................................. 30
    2.9   Grant of Security Interest; Collateral ................................................... 31
    2.10  Collateral Administration ..................................................................... 32
    2.11  Power of Attorney ................................................................................. 34
    2.12  Setoff Rights ......................................................................................... 35

III. FEES AND OTHER CHARGES ....................................................................... 35

    3.1   Facility Fee ............................................................................................ 35
    3.2   Unused Line Fee .................................................................................... 35
    3.3   Collateral Management Fee ................................................................... 35
    3.4   Early Termination Fees ......................................................................... 36
    3.5   Software Interface Fee ........................................................................... 36
    3.6   Computation of Fees; Lawful Limits .................................................... 36
    3.7   Default Rate of Interest ......................................................................... 37

IV.  CONDITIONS PRECEDENT .......................................................................... 37

    4.1   Conditions to Closing and Advances .................................................... 37
    4.2   Waivers of Conditions to Advances ...................................................... 41
    4.3   Post-Closing Document Delivery Requirements ................................... 41

V.   REPRESENTATIONS AND WARRANTIES ................................................... 41

5.1     Organization and Authority ..................................................................... 41
5.2     Loan Documents ..................................................................................... 42
5.3     Subsidiaries, Capitalization and Ownership Interests ........................... 42
5.4     Properties .............................................................................................. 42
5.5     Other Agreements .................................................................................. 43
5.6     Litigation ............................................................................................... 43
5.7     Labor Matters ........................................................................................ 43
5.8     Tax Returns, Governmental Reports ...................................................... 44
5.9     Financial Statements and Reports .......................................................... 44
5.10    Compliance with Law ............................................................................ 44
5.11    Intellectual Property .............................................................................. 45
5.12    Licenses and Permits ............................................................................. 45
5.13    Disclosure .............................................................................................. 46
5.14    Existing Indebtedness; Investments, Guarantees and Certain Contracts ........... 46
5.15    Agreements with Affiliates .................................................................... 46
5.16    Insurance ................................................................................................ 46
5.17    Names, Location of Offices, Records and Collateral ............................. 47
5.18    Accounts ................................................................................................ 47
5.19    Healthcare Law Compliance Representations ........................................ 47
5.20    Reliance on Representations; Survival .................................................... 51
5.21    Compliance with Environmental Requirements; No Hazardous Substances ...... 51
5.22    Material Contracts ................................................................................. 52
**5.23    Third-Party Payor Billing Numbers** ................................................. 52
5.24    Non-Subordination ................................................................................ 52
**5.25    Financing Orders** ................................................................................ 53
**5.26    DIP Order Notices** ............................................................................... 53
**5.27    Superpriority Administrative Expense Claims** ................................. 53
**5.28    DIP Liens** ............................................................................................. 53
5.29    Use of Proceeds. .................................................................................... 53

VI.     AFFIRMATIVE COVENANTS ....................................................................... 53

6.1     Financial Statements, Reports and Other Information .......................... 53
6.2     Payment of Obligation ........................................................................... 57
6.3     Conduct of Business and Maintenance of Existence and Assets ........... 57
6.4     Compliance with Legal, Tax and Other Obligations .............................. 58
6.5     Insurance ................................................................................................ 58
6.6     True Books ............................................................................................. 59
6.7     Inspection; Period Audits ...................................................................... 59
6.8     Further Assurances; Post Closing .......................................................... 60
6.9     Payment of Indebtedness ....................................................................... 60
6.10    Lien Terminations .................................................................................. 60
6.11    Use of Proceeds ..................................................................................... 61
6.12    Collateral Documents; Security Interest in Collateral ........................... 61
6.13    Taxes and Other Charges ....................................................................... 61
6.14    Payroll Agent ......................................................................................... 62
6.15    Hazardous Substances ........................................................................... 62

6.16    Licensed Facilities ................................................................... 63
6.17    Healthcare Operations ............................................................. 64
6.18    Right of First Refusal .............................................................. 66
6.19    Bankruptcy Matters ................................................................. 66

VII.    NEGATIVE COVENANTS ................................................................ 66

7.1     Financial Covenants ................................................................ 66
7.2     No Indebtedness Other Than Permitted Indebtedness ............. 66
7.3     No Liens Other Than Permitted Liens ..................................... 67
7.4     Investments, New Facilities or Collateral; Subsidiaries.......... 67
7.5     Prohibited Payments ................................................................ 67
7.6     Transactions with Affiliates .................................................... 67
7.7     Organizational Documents; Fiscal Year; Dissolution; Use of Proceeds ............ 68
7.8     Asset Sales .............................................................................. 69
7.9     Management ............................................................................ 69
7.10    Restrictive Agreements ........................................................... 69
7.11    Modifications of Certain Agreements ..................................... 69
7.12    Payments and Modifications of Subordinated Debt................. 70
7.13    Deposit Accounts ..................................................................... 70
7.14    Truth of Statements ................................................................. 70
7.15    IRS Form 8821 ........................................................................ 71
7.16    Third-Party Payor Programs.................................................... 71
7.17    Filing of Motions and Applications......................................... 71
7.18    Cash Advance Loans ............................................................... 71
7.19    Interim and Final Financing Orders ........................................ 71
7.20    Bankruptcy Actions ................................................................. 72

VIII.   EVENTS OF DEFAULT .................................................................... 72

8.1     Events of Default ..................................................................... 72
8.2     Acceleration and Suspension or Termination of Commitments ........................ 76

IX.     RIGHTS AND REMEDIES AFTER DEFAULT.................................... 76

9.1     Rights and Remedies ............................................................... 76
9.2     Application of Proceeds ........................................................... 77
9.3     Rights of Lender to Appoint Receiver ..................................... 78
9.4     Application of Payments Following Default ............................ 78
9.5     Power of Attorney Following Default....................................... 78
9.6     Rights and Remedies not Exclusive ......................................... 79

X.      WAIVERS AND JUDICIAL PROCEEDINGS ..................................... 79

10.1    Waivers..................................................................................... 79
10.2    Delay; No Waiver of Defaults.................................................. 80
10.3    Jury Waiver .............................................................................. 80
10.4    Cooperation in Discovery and Litigation ................................ 80

XI.    EFFECTIVE DATE AND TERMINATION ................................................... 81

    11.1    Effectiveness and Termination ................................................... 81
    11.2    Survival .......................................................................... 81

XII.   ASSIGNMENTS AND PARTICIPATIONS ................................................ 82

    12.1    Assignments ...................................................................... 82
    12.2    Participations .................................................................... 82
    12.3    Defaulting Participants ........................................................ 82
    12.4    Definitions ....................................................................... 83

XIII.  MISCELLANEOUS ....................................................................... 83

    13.1    Governing Law; Jurisdiction; Service of Process; Venue ................. 83
    13.2    Binding Effect of Loan Documents .......................................... 84
    13.3    Revival of Obligations ......................................................... 84
    13.4    Indemnity ......................................................................... 84
    13.5    Notice ............................................................................. 85
    13.6    Severability; Captions; Counterparts; Facsimile Signatures .............. 86
    13.7    Expenses .......................................................................... 86
    13.8    Entire Agreement ............................................................... 87
    13.9    Lender Approvals ............................................................... 87
    13.10   Confidentiality and Publicity ................................................ 87
    13.11   USA PATRIOT Act ............................................................ 88
    13.12   Release of Lender ............................................................... 88

ANNEX I

Financial and Loan Covenants

## EXHIBITS

| | | |
|---|---|---|
| Exhibit A | - | Borrowing Certificate |
| Exhibit B | - | Compliance Certificate |
| Exhibit C | - | Budget |

## SCHEDULES

| | | |
|---|---|---|
| Schedule 2.4 | - | Borrower's Account for Funding Wires |
| Schedule 2.5 | - | Borrower's Deposit Accounts |
| Schedule 5.3 | - | Organizational Information |
| Schedule 5.4 | - | Real Property Owned or Leased |
| Schedule 5.6 | - | Litigation |
| Schedule 5.11 | - | Intellectual Property |
| Schedule 5.16 | - | Insurance |
| Schedule 5.17A | - | Corporate Names |
| Schedule 5.17B | - | Business and Collateral Locations |
| Schedule 5.19 | - | Healthcare Law Compliance Representations |
| Schedule 5.22 | - | Material Contracts |
| Schedule 5.23 | - | Third-Party Payor Billing Numbers |
| Schedule 7.3 | - | Liens |

## SUPERPRIORITY DEBTOR-IN-POSSESSION
## CREDIT AND SECURITY AGREEMENT

This SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AND SECURITY AGREEMENT (this "**Agreement**") dated as of June [_], 2024, is entered into between WEALSHIRE REHAB, LLC, an Illinois limited liability company ("**Borrower**"), and ECAPITAL HEALTHCARE CORP., a Delaware corporation (the "**Lender**").

## RECITALS

**WHEREAS**, on June 20, 2024 (the "**Petition Date**"), the Borrower filed a voluntary petition with the Bankruptcy Court commencing the Bankruptcy Case under case number 24-09110, and subsequent to such filing, the Borrower has continued to be in possession of its assets and in the management of its business pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

**WHEREAS**, the Borrower has requested and the Lender has agreed to make available to the Borrower a secured debtor-in-possession revolving credit facility in the maximum principal amount of $2,500,000.00 (the "**Revolving Facility**") to provide the Borrower with the funds necessary for it to meet its working capital needs and other expenses set forth in the Budget upon the terms set forth herein and subject to the approval of the Bankruptcy Court;

**WHEREAS**, prior to the Petition Date, the Lender provided financing to the Borrower pursuant to the Prepetition Credit Agreement (as defined herein);

**WHEREAS**, as of the close of business on June 20, 2024, the Lender under the Prepetition Credit Agreement was owed $1,240,543.65 in the outstanding principal with respect to Loans (as such term is defined in the Prepetition Credit Agreement) plus interest, fees, costs and expenses and all other Prepetition Obligations under the Prepetition Credit Agreement;

**WHEREAS**, the Prepetition Obligations, under and as defined in the Prepetition Credit Agreement, are secured by a security interest in certain existing and after-acquired assets of the Borrower as more fully set forth in the Prepetition Credit Agreement, and such security interest is properly perfected, with certain exceptions, and as described in the Prepetition Credit Agreements has priority over other security interests;

**WHEREAS**, the Lender's willingness to extend financial accommodations to the Borrower as more fully set forth in this Agreement and the other Loan Documents, is done solely as an accommodation to the Borrower and at the Borrower's request and in furtherance of the Borrower's mutual and collective enterprise;

**WHEREAS**, to secure the Borrower's obligations hereunder, the Borrower will grant to the Lender, valid, perfected and enforceable superpriority Liens, senior to all other security interests in the Collateral, approved pursuant to Sections 364(c)(1) and (d)(1) of the Bankruptcy Code, which Liens are a material and necessary condition of the Lender's willingness to provide the credit contemplated herein; and

**WHEREAS** the Lender is willing to make the Revolving Facility available to the Borrower upon the terms and subject to the conditions set forth herein.

## AGREEMENT

In consideration of the foregoing and for other good and valuable consideration, the receipt and adequacy of which hereby are acknowledged, Borrower and Lender hereby agree as follows:

## I.   DEFINITIONS

### 1.1   General Terms

For purposes of this Agreement, in addition to the definitions above and elsewhere in this Agreement, the terms listed below shall have the meanings set forth. All capitalized terms used which are not specifically defined shall have meanings provided in Article 9 of the UCC to the extent the same are used or defined therein. Unless otherwise specified herein, any agreement or contract referred to herein shall mean such agreement as modified, amended or supplemented from time to time. Unless otherwise specified, as used in the Loan Documents or in any certificate, report, instrument or other document made or delivered pursuant to any of the Loan Documents, all accounting terms not defined elsewhere in this Agreement shall have the meanings given to such terms in and shall be interpreted in accordance with GAAP applied on a basis consistent with the most recent audited consolidated financial statements of Borrower and its consolidated Subsidiaries delivered to Lender on or prior to the Closing Date.

### 1.2   Specific Terms

**"Account Debtor"** shall mean "account debtor," as defined in Article 9 of the UCC, and any other obligor in respect of an Account.

**"Accounts"** shall mean all of Borrower's (i) accounts (as that term is defined in the UCC), (ii) Payment Intangibles, and (iii) all other rights of payment, collection or reimbursement (whether owed directly to Borrower or assigned to Borrower by a patient or other third party), whenever due, that arose out of, or will arise out of, the rendering of services, the provision of room, board or other daily living assistance, or the sale, assignment, lease or license of Equipment, prosthetics, pharmaceutical or other Goods, whether before or after the date of this Agreement and including, all of Borrower's rights of payment, collection or reimbursement with respect to such services from any insurer, federal or state government agency or other third party; whether billed on a fee for service, monthly per patient capitation charge or any other basis, whether or not the accounts, payment intangibles, or rights of payment, collection or reimbursement have been invoiced or billed, written off, partially paid, currently assigned to collection agencies or other third party service vendors. Without limiting the foregoing, Accounts shall also include all monies due or to become due to Borrower and obligations to Borrower in any form (whether arising in connection with contracts, contract rights, Instruments, or Chattel Paper), in each case whether or not earned by performance, now or hereafter in existence, and all documents of title or other documents representing any of the foregoing, and all collateral security and guaranties of any kind, now or hereafter in existence, given by any Person with respect to any of the foregoing.

**"Accrediting Organization"** shall mean any Person from which Borrower has received an accreditation as of the Closing Date or thereafter.

**"ACH"** shall mean automated clearing house.

**"Advance"** shall mean a borrowing under the Revolving Facility. Any amounts paid by Lender on behalf of Borrower or any Guarantor under any Loan Document shall also be an Advance for purposes of this Agreement. Each Advance shall increase the principal amount outstanding hereunder.

**"Affiliate"** shall mean, as to any Person, any other Person (a) that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such Person, (b) who is a director or officer (i) of such Person, (ii) of any Subsidiary of such Person, or (iii) of any Person described in clause (a) above with respect to such Person, (c) which, directly or indirectly through one or more intermediaries, is the beneficial or record owner (as defined in Rule 13d-3 of the Securities Exchange Act of 1934, as amended, as the same is in effect on the date hereof) of ten percent (10%) or more of any class of the outstanding voting stock, securities or other equity or ownership interests of such Person and (d) any spouses, parents, descendants and siblings of any of the Persons described in clauses (a), (b) and (c) above. For purposes of this definition, the term "control" (and the correlative terms, "controlled by" and "under common control with") shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the administrative management or policies (even without the power to direct or cause the direction of the clinical/medical management or policies), whether through ownership of securities or other interests, by contract or otherwise.

**"Applicable Margin"** shall mean two percent (2%).

**"Applicable Rate"** shall mean the interest rate applicable from time to time to Advances under this Agreement.

**"Availability"** shall mean the Revolving Loan Limit less all Revolving Loans outstanding, minus any reserves against Availability imposed by Lender in its Permitted Discretion.

**"Bankruptcy Case"** shall have the meaning assigned to that term in the preamble of this Agreement.

**"Bankruptcy Code"** shall mean Title 11 of the United States Code entitled "Bankruptcy," as the same may be amended, modified, or supplemented from time to time, and any successor statute thereto.

**"Bankruptcy Court"** means the United States Bankruptcy Court for the Northern District of Illinois, or such other bankruptcy court having jurisdiction over the Bankruptcy Case from time to time.

**"Books and Records"** shall mean Borrower's books and records specifically relating to Accounts, including, but not limited to, ledgers, records indicating, summarizing, or evidencing Accounts and all computer programs, disc or tape files, printouts, runs, and other computer prepared information with respect to the foregoing and any software necessary to operate the same.

"**Borrower**" shall mean the entity described in the first paragraph of this Agreement and its successors and permitted assigns.

"**Borrowing Base**" shall mean, as of any date of determination:

(a)    the Net Collectible Value of Eligible Receivables, as such Net Collectible Value is determined by Lender with reference to the most recent Borrowing Certificate, other factors deemed relevant by Lender and otherwise in accordance with this Agreement; provided, however, that if as of such date of determination the most recent Borrowing Certificate is of a date more than four (4) Business Days before such date, the Borrowing Base shall be determined by Lender in its sole discretion; *minus*

(b)    the amount of any Carve Out, reserves or adjustments against the Borrowing Base provided for in this Agreement or determined by Lender from time to time, in its Permitted Discretion.

"**Budget**" shall initially mean the Budget attached hereto as <u>Exhibit C</u> to this Agreement, in form and substance satisfactory to the Lender and approved by the Bankruptcy Court.  It is understood that the Budget attached hereto as <u>Exhibit C</u> will be updated in accordance with Section 6.1(d)(vi).  Any amended or restated Budget shall be in form and substance satisfactory to Lender and shall be subject to the written consent of the Lender; however, unless otherwise agreed upon in writing by the Lender, for purposes of calculating compliance with the Budget and providing a Budget-to-actual presentation, the initial expenses and revenues for the relevant time periods as set forth in the earliest Budget shall be used and not the expenses and revenues for such time period as may be set forth in any subsequently amended or restated Budget.

"**Borrowing Certificate**" shall mean a Borrowing Certificate substantially in the form of <u>Exhibit A</u>.

"**Borrowing Date**" shall have the meaning assigned to that term in Section 2.4.

"**Business Day**" shall mean any day other than a Saturday, Sunday, Good Friday or other day on which the Federal Reserve or Lender is closed. Unless specifically referenced in this Agreement as a Business Day, all references to "days" shall be to calendar days.

"**Capital Lease**" shall mean, as to any Person, a lease or any interest in any kind of property or asset by that Person as lessee that is, should be or should have been recorded as a "capital lease" of such person in accordance with GAAP.

"**Capitalized Lease Obligations**" shall mean all obligations of any Person under Capital Leases, in each case, taken at the amount thereof accounted for as a liability in accordance with GAAP.

"**Carve Out**" has the meaning set forth in the Financing Orders.

"**Cash Advance Loan**" means any loan, debt, advance, merchant cash advance, business cash advance, ACH business loan, or other indebtedness or financing arrangement (whether such financing is on or off-balance sheet, secured or unsecured) incurred by Borrower based on or to be

repaid by Account proceeds or Borrower's other revenue, or by ACH pull or withholding from any of Borrower's Controlled Deposit Accounts, other than the Operating Accounts.

"**CCP**" shall have the meaning assigned to the term in Section 6.17(d).

"**CERCLA**" shall mean the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C.A. § 9601 *et seq*., as the same may be amended from time to time.

"**Change of Control**" shall mean any of the following: (a) the occurrence of a merger, consolidation, reorganization, recapitalization or share or interest exchange, sale or transfer or any other transaction or series of transactions as a result of which the owners, directly or indirectly, of a majority of any Credit Party's voting stock or voting power as of the date hereof cease to be entitled to elect or appoint at least a majority of such Credit Party's Board of Directors, or (b) the resignation, termination, replacement, death, disability or any other event the result of which is the failure of Arnold Goldberg to function in his current capacity, unless, (i) in the case of a replacement, the replacement is reasonably acceptable to Lender, (ii) in the case of death or disability, a replacement reasonably satisfactory to Lender is identified and engaged within 120 days following such event, or (iii) in all other cases a replacement reasonably satisfactory to Lender is identified and engaged within 30 days following such event, or (c) the sale, assignment, transfer, lease, conveyance or other disposition of all or substantially all of Borrower's assets to, or a consolidation or merger with or into, any other Person, other than any such transaction where immediately thereafter the surviving Person is a direct or indirect subsidiary of Borrower.

"**Closing**" shall mean the date of the initial Advance under the Revolving Facility.

"**Closing Date**" shall mean the date the Closing occurs.

"**Collateral**" shall mean, collectively and each individually, all collateral or security identified in Section 2.9, together with any additional collateral or security now or hereafter granted to Lender by Borrower or any Guarantor pursuant to a Loan Document.

"**Collateral Management Fee**" shall have the meaning assigned to the term in Section 3.3.

"**Collection Bank**" shall mean a depository bank acceptable to Lender in its sole discretion.

"**Commercial Deposit Account**" shall mean a deposit account established and maintained in Borrower's name, which is used solely to collect payments with respect to Borrower's Accounts and other Collateral, other than payments with respect to Governmental Receivables.

"**Compliance Certificate**" shall have the meaning assigned to the term in Section 6.1(a).

"**CON**" shall mean any certificate of need or similar license which determines that there is a need for a healthcare facility at a particular location or within a certain geographic region.

"**Concentration Account**" shall have the meaning assigned to the term in Section 2.5.

"**Contingent Obligation**" shall mean, with respect to any Person, any direct or indirect liability of such Person: (a) with respect to any Indebtedness of another Person (a "**Third Party Obligation**") if the purpose or intent of such Person incurring such liability, or the effect thereof, is to provide assurance to the obligee of such Third Party Obligation that such Third Party Obligation will be paid or discharged, or that any agreement relating thereto will be complied with, or that any holder of such Third Party Obligation will be protected, in whole or in part, against loss with respect thereto; (b) with respect to any undrawn portion of any letter of credit issued for the account of such Person or as to which such Person is otherwise liable for the reimbursement of any drawing; or (c) for any obligations of another Person pursuant to any Guaranty (other than a Guaranty of the Obligations or any part thereof) or pursuant to any agreement to purchase, repurchase or otherwise acquire any obligation or any property constituting security therefor, to provide funds for the payment or discharge of such obligation or to preserve the solvency, financial condition or level of income of another Person. The amount of any Contingent Obligation shall be equal to the amount of the obligation so guaranteed or otherwise supported or, if not a fixed and determinable amount, the maximum amount so guaranteed or otherwise supported.

"**Controlled Deposit Accounts**" shall mean each Governmental Deposit Account, Commercial Deposit Account, Operating Account, and if applicable, the master collections account established by Borrower in accordance with Section 2.5(b).

"**Control Agreements**" shall mean each deposit account control agreement, deposit account instructions and service agreement or similar agreements on each Governmental Deposit Account, Commercial Deposit Account, Operating Account, and if applicable, the master collections account established by Borrower in accordance with Section 2.5(b).

"**Credit Party**" shall mean any Guarantor under a Guaranty of the Obligations or any part thereof, Borrower and any other Person (other than Lender or a participant of a Lender), whether now existing or hereafter acquired or formed, that becomes obligated as a borrower, guarantor, surety, indemnitor, pledgor, assignor or other obligor under any Loan Document, and "**Credit Parties**" means all such Persons, collectively.

"**Date of Service**" of an Account shall mean the earliest date the service for which the Account is payable was rendered, the Equipment, prosthetics, pharmaceuticals or other Goods for which the Account is payable were delivered, or the room, board or other daily living assistance for which the Account is payable was provided.

"**Debtor Relief Law**" shall mean, collectively, the Bankruptcy Code and all other applicable liquidation, conservatorship, bankruptcy, moratorium, rearrangement, receivership, insolvency, reorganization or similar debtor relief laws from time to time in effect affecting the rights of creditors generally, as amended from time to time.

"**Default**" shall mean (a) any event, fact, circumstance or condition that, with the giving of applicable notice or passage of time or both, would, unless cured or waived, constitute, be, become or result in an Event of Default and (b) any Event of Default.

"**Default Rate**" shall have the meaning assigned to the term in Section 3.7.

"**Distribution**" shall mean (a) any dividend or other distribution (whether in cash, securities or other property) on any equity interest in the Borrower (except those payable solely in its equity interests of the same class), (b) any payment by the Borrower on account of (i) the purchase, redemption, retirement, defeasance, surrender, cancellation, termination or acquisition of any equity interests in the Borrower or any claim respecting the purchase or sale of any equity interest in the Borrower, or (ii) any option, warrant or other right to acquire any equity interests in the Borrower, (iii) amounts owed by Borrower to any Affiliate of the Borrower, and (c) any loan or advance to an Affiliate of Borrower.

"**Dollars**" or "**$**" shall mean the lawful and freely-transferrable currency of the United States of America.

"**Eligible Billed Receivables**" shall mean each Account (other than Eligible Unbilled Receivables) arising in the ordinary course of Borrower's business, which meets the following criteria:

a.      it is subject to a valid perfected first priority security interest in favor of Lender, subject to no other Lien (other than Permitted Liens);

b.      it is evidenced by an invoice, statement, electronic submission or other documentary evidence satisfactory to Lender which has been submitted to the Account Debtor for payment in accordance with applicable Law;

c.      it is in substantial compliance and conformance with any requisite procedures, requirements and regulations governing payment by such Account Debtor with respect to such Account, and, if due from a Medicaid/Medicare Account Debtor, is properly payable directly to Borrower;

d.      any portion thereof that is payable by a beneficiary, recipient or subscriber individually and not directly by a third-party obligor acceptable to Lender shall not be included as an Eligible Billed Receivable;

e.      it does not arise out of services rendered to, room, board or other daily living assistance provided to, a sale made to, or out of any other transactions between Borrower or any of its Subsidiaries and, one or more Affiliates of Borrower or any of its Subsidiaries;

f.      it is outstanding for no more than 120 days after the Date of Service with respect to such Account; provided that if more than fifty percent (50%) in Net Collectible Value of the Accounts payable by any one Third-Party Payor are outstanding for more than 120 days after such Accounts' Date of Service, no Accounts payable by such Third-Party Payor shall be Eligible Billed Receivables;

g.      no covenant, agreement, representation or warranty with respect to such Accounts contained in any Loan Document has been breached and remains uncured;

h.      to the extent the Account Debtor for such Account is solvent and has a claims-paying ability rating by A.M. Best Company, such rating shall be "A" or better; or to the extent the Account Debtor for such Account does not have a claims-paying ability rating

7

by A.M. Best Company or its claims-paying ability is not rated "A" or better, such Account Debtor is otherwise creditworthy as determined by Lender in its sole discretion, and there are no proceedings or actions which are threatened or pending against any Account Debtor thereunder which might result in any Material Adverse Change in such Account Debtor's financial condition or the collectability of Accounts with respect to such Account Debtor;

i.      arises out of a completed, bona fide sale, assignment, lease, license and related delivery of Goods, provision of room, board or other daily living assistance, or rendering of services by Borrower in the ordinary course of business, in accordance with applicable Law, and in accordance with the terms and conditions of all purchase orders, contracts, certifications, participations, certificates of need and other agreements and documents relating thereto or forming a part of the contract between Borrower and the Account Debtor;

j.      it does not represent the sale of Goods or rendering of services to an Account Debtor with respect to which the obligation of payment by the Account Debtor is or may be conditional for any reason whatsoever, including, accounts arising with respect to Goods that were (i) not sold on an absolute basis, (ii) sold on a bill-and-hold sale basis, (iii) sold on a consignment sale basis, (iv) sold on a guaranteed sale basis, (v) sold on a sale or return basis, or (vi) sold on the basis of any other similar understanding, and is not evidenced by Chattel Paper or an Instrument of any kind and has not been reduced to judgment;

k.      it does not represent amounts payable to Borrower for the use (whether through leasing or otherwise) of Borrower's employees by third parties;

l.      it is not payable under worker's compensation laws or insurance, automobile insurance whether a no-fault law or otherwise, does not represent a census capitation payment or a claim for a personal injury and is not a Self-Pay Account;

m.      the applicable Account Debtor for such Account is not a Governmental Authority, unless all applicable statutes, ordinances or regulations respecting the assignment of such Account have been complied with; provided, however, neither Borrower or Lender will be required to comply with any filing or notice requirements under the Assignment of Claims Act (31 U.S.C. § 3727);

n.      any portion of an Account that is subject to any offset, credit (including any resource or other income credit or offset), lien, deduction, defense, discount, chargeback, freight claim, allowance, adjustment, dispute or counterclaim, is not for a liquidated amount or is contingent in any respect or for any reason (except to the extent that the same is taken into consideration in determining Net Collectible Value) shall not be included as an Eligible Billed Receivable;

o.      except for deductions taken into consideration in determining Net Collectible Value, there is no agreement with an Account Debtor for any deduction from such Accounts, except for discounts or allowances made in the ordinary course of business for prompt payment, all of which discounts or allowances are reflected in the calculation of the face value of each invoice related thereto, such that only the discounted amount of such

8

Accounts after giving effect to such discounts and allowances shall be considered an Eligible Billed Receivable;

p.      no return, rejection or repossession of Goods or services related to it has occurred;

q.      the Account Debtor with respect thereto has its principal place of business or chief executive offices within the continental United States and the Account is payable to Borrower in US dollars;

r.      Borrower has not agreed to accept and has not accepted any non-cash payment for such Account;

s.      if the Account Debtor is the Medicaid Program, the Account is not in a "Medicaid Pending" status; and

t.      such Account meets such specifications and requirements other than as set forth above, which may from time to time be established by Lender, in Lender's sole discretion, by written notice to Borrower.

"**Eligible Receivables**" shall mean Eligible Billed Receivables and Eligible Unbilled Receivables and shall include such additional Accounts as may be permitted from time to time by Lender at the request of Borrower pursuant to Section 2.1(e).

"**Eligible Unbilled Receivables**" shall mean each Account meeting all of the criteria of Eligible Billed Receivable (and otherwise acceptable to Lender in Lender's sole discretion), except:

a.      clause (b) of the definition of "Eligible Billed Receivables" shall be restated as follows: "it does not remain unbilled for longer than the fifteenth (15th) day of the month following the month in which the Date of Service occurred;"

b.      clause (f) of the definition of "Eligible Billed Receivables" shall be restated as follows: "it is outstanding for no more than 120 days after the Date of Service with respect to such Account; provided that if more than fifty percent (50%) in Net Collectible Value of the Accounts payable by any one Third-Party Payor are outstanding for more than 120 days after such Accounts' Date of Service, no Accounts payable by such Third-Party Payor shall be Eligible Unbilled Receivables;" and

c.      the eligible unbilled portion of any such Accounts shall include amounts earned on each day prior to issuance of any invoice in an amount equal to the rate per patient per day established under the applicable Government Contract; provided that (i) Lender in its Permitted Discretion may from time to time determine the liquidity factors and reserves applicable to Advances made on any such Accounts and (ii) the aggregate amount of Eligible Unbilled Receivables included in the Borrowing Base shall be adjusted monthly based on the amounts actually billed with respect to such Accounts.

"**Environmental Laws**" shall mean all federal, state, local, and foreign laws now or hereafter in effect relating to pollution or protection of the environment, including laws relating to

emissions, discharges, releases, or threatened releases of pollutants, contaminants, chemicals, or industrial, toxic, or hazardous substances or wastes or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, removal, transport, or handling of pollutants, contaminants, chemicals, or industrial, toxic, or hazardous substances or wastes, and any and all regulations, notices, or demand letters issued, entered, promulgated, or approved thereunder.

**"Equipment"** shall mean "equipment" as defined in Article 9 of the UCC.

**"ERISA"** shall mean the Employee Retirement Income Security Act of 1974, as the same may be amended, modified or supplemented from time to time, and any successor statute thereto, and any and all rules or regulations promulgated from time to time thereunder.

**"ERISA Plan"** shall mean any "employee benefit plan," as such term is defined in Section 3(3) of ERISA (other than a Multiemployer Plan), which Borrower maintains, sponsors or contributes to, or, in the case of an employee benefit plan which is subject to Section 412 of the Code or Title IV of ERISA, to which Borrower or any member of the Controlled Group may have any liability, including any liability by reason of having been a substantial employer within the meaning of Section 4063 of ERISA at any time during the preceding five (5) years, or by reason of being deemed to be a contributing sponsor under Section 4069 of ERISA. For purposes of this definition, a "Controlled Group" shall mean all members of any group of corporations and all members of a group of trades or businesses (whether or not incorporated) under common control which, together with Borrower, are treated as a single employer under Section 414(b), (c), (m) or (o) of the Code or Section 4001(b) of ERISA.

**"Event of Default"** shall mean the occurrence of any event set forth in Article VIII.

**"Facility Cap"** shall mean the maximum principal amount that may be outstanding hereunder, the amount of which shall initially be $2,500,000.00, subject to such increases as may be made pursuant to Section 2.1(c).

**"Facility Fee"** shall have the meaning set forth in Section 3.1.

**"FHA Priority Collateral"** shall have the meaning set forth in the Financing Orders.

**"Final Financing Order"** shall mean an order that is entered by the Bankruptcy Court in the Bankruptcy Case pursuant to Sections 364(c) and (d) of the Bankruptcy Code and Bankruptcy Rule 4001(c), in form and substance that are satisfactory to the Lender, approving the Loan Documents, and which order shall, among other things (i) have been entered on such prior notice as is required by applicable Law and any applicable orders of the Bankruptcy Court, (ii) authorize the extensions of credit in respect of the Revolving Facility in the amounts and on the terms and conditions set forth herein, (iii) grant the Superpriority Claim and other Liens on Collateral referred to herein and in the other Loan Documents (subject to the Carve Out), and (iv) approve the payment by the Borrower of the Obligations.

**"Financing Orders"** shall mean, collectively, the Interim Financing Order, the Final Financing Order, and any amendments or modifications thereto entered by the Bankruptcy Court in the Bankruptcy Case.

"**GAAP**" shall mean generally accepted accounting principles in the United States of America in effect from time to time as applied by nationally recognized accounting firms.

"**General Intangible**" shall mean "general intangible" as defined in Article 9 of the UCC.

"**Government Contract**" shall mean all contracts (including all amendments thereto) relating to the payment of Government Receivables (a) with the United States government or with any agency or instrumentality thereof, or (b) with any State or Territory of the United States or the District of Columbia or with any agency or instrumentality thereof.

"**Governmental Authority**" shall mean any federal, state, municipal, national, local or other governmental department, court, commission, board, bureau, agency or instrumentality or political subdivision thereof, or any entity or officer exercising executive, legislative or judicial, regulatory or administrative functions of or pertaining to any government or any court, in each case, whether of the United States or a state, territory or possession thereof, a foreign sovereign entity or country or jurisdiction or the District of Columbia.

"**Governmental Deposit Account**" shall mean a deposit account established and maintained in Borrower's name, which is used to collect payments with respect to Borrower's Governmental Receivables.

"**Governmental Receivable**" shall mean any Account which is the obligation of the United States of America, or any State or Territory of the United States of America, and the District of Columbia, or any of their respective agencies, whether under the Medicaid or Medicare program established pursuant to the Social Security Act or any other federal healthcare program, including TRICARE (formerly known as CHAMPUS) and CHAMPVA and whether or not the Account is the primary obligation of such government or agency.

"**Guarantor**" shall mean any guarantor of the Obligations or any part thereof, including any guarantor of the accuracy of any one or more representations or warranties of Borrower contained in this Agreement. As of the Closing Date, Arnold Goldberg shall be the only Guarantor; provided, however, that the Lender shall obtain an additional Guaranty from Lincolnshire Properties Limited Partnership in accordance with Section 4.3 of this Agreement.

"**Guaranty**" shall mean any obligation, contingent or otherwise, of such Person directly or indirectly guaranteeing any Indebtedness or other obligation of any other Person and, without limiting the generality of the foregoing, any obligation, direct or indirect, contingent or otherwise, of such Person (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation (whether arising by virtue of partnership arrangements, by agreement to keep-well, to purchase assets, Goods, securities or services, to take-or-pay, or to maintain financial statement conditions or otherwise), or (b) entered into for the purpose of assuring in any other manner the obligee of such Indebtedness or other obligation of the payment thereof or to protect such obligee against loss in respect thereof (in whole or in part), provided, however, that the term Guaranty shall not include endorsements for collection or deposit in the ordinary course of business. The term "**Guaranty**" used as a verb has a corresponding meaning. The term "**Guaranties**" shall mean the plural of Guaranty.

11

"**Hazardous Substances**" shall mean petroleum and petroleum products and compounds containing them, including gasoline, diesel fuel and oil; explosives, flammable materials; radioactive materials; polychlorinated biphenyls and compounds containing them; lead and lead-based paint; asbestos or asbestos-containing materials; underground or above-ground storage tanks, whether empty or containing any substance; any substance the presence of which is prohibited by any Environmental Laws; any contaminant, pollutant, waste or substance that is likely to cause immediately or at some future time harm or degradation to the surrounding environment or risk to human health; toxic mold, any substance that requires special handling; and any other material or substance now or in the future defined, classified or listed as a "hazardous substance," "hazardous material," "hazardous waste," "toxic substance," "toxic pollutant," "contaminant," "pollutant", "radioactive", "dangerous" or other words of similar import within the meaning of any Environmental Law, including: (a) any "hazardous substance" defined as such in (or for purposes of) CERCLA, or any so-called "superfund" or "superlien" Law, including the judicial interpretation thereof; (b) any "pollutant or contaminant" as defined in 42 U.S.C.A. § 9601(33); (c) any material now defined as "hazardous waste" pursuant to 40 C.F.R. Part 260; (d) any petroleum or petroleum by-products, including crude oil or any fraction thereof; (e) natural gas, natural gas liquids, liquefied natural gas, or synthetic gas usable for fuel; (f) any "hazardous chemical" as defined pursuant to 29 C.F.R. Part 1910; (g) any toxic or harmful substances, wastes, materials, pollutants or contaminants (including asbestos, polychlorinated biphenyls ("**PCB's**"), flammable explosives, radioactive materials, infectious substances, materials containing lead-based paint or raw materials which include hazardous constituents); and (h) any other toxic substance or contaminant that is subject to any Environmental Laws or other past or present requirement of any Governmental Authority. Notwithstanding the foregoing, Hazardous Substances shall not include substances in kinds and amounts commonly used in the operation of businesses of similar kind and nature to the business engaged in by Borrower in accordance with all applicable Laws (including, but not limited to, Environmental Laws) and prudent business management practices and in a manner that does not result in any contamination of all or any portion of properties utilized by Borrower.

"**Hazardous Substances Contamination**" shall mean contamination (whether now existing or hereafter occurring) of the improvements, buildings, facilities, personalty, soil, groundwater, air or other elements on or of the relevant property by Hazardous Substances, or any derivatives thereof, or on or of any other property as a result of Hazardous Substances, or any derivatives thereof, generated on, emanating from or disposed of in connection with the relevant property.

"**Healthcare Laws**" shall mean all applicable Laws relating to the possession, control, warehousing, marketing, sale and distribution of pharmaceuticals, the operation of medical or senior housing facilities (such as, but not limited to, nursing homes, skilled nursing facilities, rehabilitation hospitals, intermediate care facilities and adult care facilities), patient healthcare, patient healthcare information, patient abuse, the quality and adequacy of medical care, rate setting, Equipment, personnel, operating policies, fee splitting, including (a) all federal and state fraud and abuse laws, including the federal Anti-Kickback Statute (42 U.S.C. §1320a-7b(6)), the Stark Law (42 U.S.C. §1395nn), the civil False Claims Act (31 U.S.C. §3729 et seq.), (b) TRICARE, (c) HIPAA, (d) Medicare, (e) Medicaid, (f) the Patient Protection and Affordable Care Act (P.L. 111-1468), (g) The Health Care and Education Reconciliation Act of 2010 (P.L. 111-152), (h) quality, safety and accreditation standards and requirements of all applicable state laws

12

or regulatory bodies, (i) all laws, policies, procedures, requirements and regulations pursuant to which Healthcare Permits are issued, and (j) any and all other applicable health care laws, regulations, manual provisions, policies and administrative guidance, each of (a) through (j) as may be amended from time to time.

"**Healthcare Permit**" shall mean a Permit (a) issued or required under Healthcare Laws applicable to the business of Borrower or any of its Subsidiaries or necessary in the possession, ownership, warehousing, marketing, promoting, sale, labeling, furnishing, distribution or delivery of Goods or services under Healthcare Laws applicable to the business of Borrower or any of its Subsidiaries, (b) issued by any Person from which Borrower has, as of the Closing Date, received an accreditation, or (c) issued or required under Healthcare Laws applicable to the ownership or operation of any business location of Borrower.

"**HIPAA**" shall mean the Health Insurance Portability and Accountability Act of 1996, as the same may be amended, modified or supplemented from time to time, and any successor statute thereto, and any and all rules or regulations promulgated from time to time thereunder.

"**HIPAA Compliant**" shall mean that the applicable Person is in compliance with each of the applicable requirements of the so-called "Administrative Simplification" provisions of HIPAA, and is not and could not reasonably be expected to become the subject of any civil or criminal penalty, process, claim, action or proceeding, or any administrative or other regulatory review, survey, process or proceeding (other than routine surveys or reviews conducted by any government health plan or other accreditation entity) that could result in any of the foregoing or that could reasonably be expected to adversely affect such Person's business, operations, assets, properties or condition (financial or otherwise), in connection with any actual or potential violation by such Person of the provisions of HIPAA.

"**Indebtedness**" of a Person shall mean at any date, without duplication, (a) all obligations of such Person for borrowed money, (b) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments, (c) all obligations of such Person to pay the deferred purchase price of property or services, except trade accounts payable arising and paid on a timely basis and in the ordinary course of business, (d) all Capital Leases of such Person, (e) all non-Contingent Obligations of such Person to reimburse any bank or other Person in respect of amounts paid under a letter of credit, banker's acceptance or similar instrument, (f) all equity securities of such Person subject to repurchase or redemption other than at the sole option of such Person, (g) all obligations secured by a Lien on any asset of such Person, whether or not such obligation is otherwise an obligation of such Person, (h) "earnouts," purchase price adjustments, profit sharing arrangements, deferred purchase money amounts and similar payment obligations or continuing obligations of any nature of such Person arising out of purchase and sale contracts, (i) all Indebtedness of others guaranteed by such Person, (j) off-balance sheet liabilities or Pension Plan or Multiemployer Plan liabilities of such Person, and (k) obligations arising under non-compete agreements.

"**Indemnified Persons**" shall have the meaning assigned to the term in Section 13.4.

"**Intellectual Property**" shall mean, with respect to any Person, all patents, patent applications and like protections, including improvements divisions, continuation, renewals,

13

reissues, extensions and continuations in part of the same, trademarks, trade names, trade styles, trade dress, service marks, logos and other business identifiers and, to the extent permitted under applicable Law, any applications therefor, whether registered or not, and the goodwill of the business of such Person connected with and symbolized thereby, copyright rights, copyright applications, copyright registrations and like protections in each work of authorship and derivative works, whether published or unpublished, technology, know-how and processes, operating manuals, trade secrets, computer hardware and software, rights to unpatented inventions and all applications and licenses therefor, used in or necessary for the conduct of business by such Person and all claims for damages by way of any past, present or future infringement of any of the foregoing.

"**Interim Financing Order**" shall mean the interim order by the Bankruptcy Court in the Bankruptcy Case under Sections 364(c) and (d) of the Bankruptcy Code and Bankruptcy Rule 4001(c), in form and substance satisfactory in all respects to the Lender: (i) authorizing the Borrower to enter into this Agreement and the transactions contemplated hereunder; (ii) approving the terms and conditions of this Agreement; (iii) granting to the Lender super-priority over any and all administrative expenses, secured claims, and unsecured claims, now existing or hereafter arising, including administrative expenses of the kind specified in or ordered pursuant to 11 U.S.C. §§ 105, 326, 327, 328, 330, 331, 361, 362, 363, 364, 365, 503, 506, 507(a), 507(b), 546, 552, 726, 1113, 1114 or any other provision of the Bankruptcy Code or otherwise (the "**Superpriority Claim**"), unless such claims are Carve Outs; (iv) granting to the Lender a super-priority lien and security interest in all assets of the Borrower; (v) including a prohibition applicable to any governmental authority or other party from exercising rights of set-off or recoupment against any account that arises from and after the filing of the bankruptcy petition; (vi) including a prohibition against using the proceeds of the loan to initiate or prosecute any claims, causes of action, adversary proceedings or other litigation against the Lender or any of its officers, directors, equity holders, employees or affiliates; (vii) including a prohibition against the Borrower using the proceeds of the loan to object, contest, or raise in any proceeding any defense to the validity, perfection, priority, extent or enforceability of this Agreement or the liens contemplated thereby or taking any action that would be injurious to the Lender's interests; (viii) ordering that all government payments owing to the Borrower be paid to a Controlled Account; (ix) granting relief from the automatic stay to permit the Lender to take any action permitted under this Agreement; (x) authorizing the Borrower to pay the Lender at the initial Closing all of the Lender's due diligence and legal counsel fees related to the financing and all fees required by this Agreement; (xi) determining that the "equities of the case" exception in Section 552(b) of the Bankruptcy Code will not apply to or limit the Lender's security interest in the proceeds, product, offspring or profits of the Collateral; and (xii) including such other provisions as to the Lender or the Lender's counsel may require or approve.

"**Landlord Waiver and Consent**" shall mean a waiver/consent in form and substance reasonably satisfactory to Lender from the owner/lessor of (i) 150 Jamestown Lane, Lincolnshire, Illinois 60069 and (ii) any other premises not owned by Borrower at which billing operations are conducted or Books and Records are maintained or, at the request of Lender, any of the Collateral is now or hereafter located, for the purpose of providing Lender access to such Collateral, in each case as such may be modified, amended or supplemented from time to time and subordinating in favor of Lender any claims that the owner/lessor may have against Borrower or against any of the Collateral.

14

"**Laws**" shall mean any and all federal, state, provincial, territorial, municipal, local and foreign statutes, laws, judicial decisions, regulations, ordinances, rules, judgments, orders, decrees, codes, injunctions, permits, and governmental agreements, whether now or hereafter in effect, which are applicable to any Credit Party in any particular circumstance. "**Laws**" includes Environmental Laws and Healthcare Laws.

"**Lease**" shall have the meaning assigned to the term in Section 6.1.

"**Liability Event**" shall mean any event, fact, condition or circumstance or series thereof (i) in or for which Borrower becomes liable or otherwise responsible for any amount owed or owing to any Medicaid or Medicare program by a provider under common ownership with Borrower or any provider owned by Borrower pursuant to any applicable Law, ordinance, rule, decree, order or regulation of any Governmental Authority after the failure of any such provider to pay any such amount when owed or owing, (ii) in which Medicaid or Medicare payments to Borrower are lawfully set-off against payments to Borrower to satisfy any liability of or for any amounts owed or owing to any Medicaid or Medicare program by Borrower, a provider under common ownership with Borrower, or any provider owned by Borrower pursuant to any applicable Law, ordinance, rule, decree, order or regulation of any Governmental Authority, or (iii) any of the foregoing under clauses (i) or (ii) in each case pursuant to statutory or regulatory provisions that are similar to any applicable Law, ordinance, rule, decree, order or regulation of any Governmental Authority referenced in clauses (i) and (ii) above or successor provisions thereto. Notwithstanding the foregoing, a "Liability Event" shall not exist unless it could reasonably be expected to have a Material Adverse Effect.

"**Lien**" shall mean any mortgage, pledge, security interest, encumbrance, restriction, lien or charge of any kind (including any agreement to give any of the foregoing, any conditional sale or other title retention agreement or any lease in the nature thereof), or any other arrangement pursuant to which title to the property is retained by or vested in some other Person for security purposes. For the purposes of this Agreement and the other Loan Documents, any Credit Party or any Subsidiary shall be deemed to own subject to a Lien any asset which it has acquired or holds subject to the interest of a vendor or lessor under any conditional sale agreement, Capital Lease or other title retention agreement relating to such asset.

"**Loan**" or "**Loans**" shall mean, individually and collectively, all Advances under the Revolving Facility.

"**Loan Documents**" shall mean, collectively and each individually, this Agreement, any documents that provide, as security for all or any portion of the Obligations, a Lien on any assets in favor of Lender, the Guaranties and any documents evidencing a security interest in assets as collateral for the Guaranties, the Control Agreements, the Uniform Commercial Code Financing Statements and all other documents or instruments necessary to create or perfect the Liens in the Collateral, the Subordination Agreements, the Landlord Waiver and Consents, the Borrowing Certificates, and all other agreements, documents, instruments and certificates heretofore or hereafter executed or delivered to Lender in connection with any of the foregoing or the Loans, as the same may be amended, modified or supplemented from time to time; all of which shall be in form and substance acceptable to Lender in its sole discretion.

**"Management Agreement"** shall mean any agreement between Borrower and a Manager pursuant to which such Person is compensated for providing any management services of any nature to Borrower in the ordinary course of its business consistent with past practices.

**"Manager"** shall have the meaning assigned to the term in Section 6.16(c).

**"Material Adverse Effect"** or **"Material Adverse Change"** shall mean any event, act, condition or occurrence of whatever nature (including any adverse determination in any litigation, arbitration, or governmental investigation or proceeding), whether singly or in conjunction with any other event or events, act or acts, condition or conditions, occurrence or occurrences, whether or not related, which results, directly or indirectly in (a) a material adverse change in, or a material adverse effect upon, any of (i) the condition (financial or otherwise), operations, business, properties or prospects of any of the Credit Parties, (ii) the rights and remedies of Lender under any Loan Document, or the ability of any Credit Party to perform any of its obligations under any Loan Document to which it is a party, (iii) the legality, validity or enforceability of any Loan Document, (iv) the existence, perfection or priority of any security interest granted in any Loan Document, (v) the value of any material Collateral; or (vi) the use or scope of any Healthcare Permits; (b) an impairment to the likelihood that Eligible Receivables in general will be collected and paid in the ordinary course of business of Borrower and upon the same schedule and with the same frequency as Borrower's recent collections history; or (c) the imposition of a fine against or the creation of any liability of any Credit Party to any Governmental Authority.  For the avoidance of doubt, the filing of the Bankruptcy Case shall not be construed as a Material Adverse Effect or Material Adverse Change,

**"Material Contracts"** shall have the meaning set forth in Section 5.22.

**"Medicaid"** shall mean that certain program of medical assistance, funded jointly by the federal government and the states, for impoverished individuals who are aged, blind or disabled, or members of families with dependent children, which program is more fully described in Title XIX of the Social Security Act (42 U.S.C. §§ 1396 *et seq*.) and the regulations promulgated thereunder, or any successor program.

**"Medicaid/Medicare Account Debtor"** shall mean any Account Debtor which is (i) the United States of America acting under the Medicaid or Medicare program established pursuant to the Social Security Act or any other federal healthcare program, including TRICARE and CHAMPVA, (ii) any state or the District of Columbia acting pursuant to a health plan adopted pursuant to Title XIX of the Social Security Act or any other state healthcare program, or (iii) any agent, carrier, administrator or intermediary for any of the foregoing.

**"Medicaid Pending"** shall mean that an application for Medicaid payment on behalf of a patient has not yet been approved by Medicaid.

**"Medicaid Program"** shall mean a medical assistance program administered by a state agency and approved by the Federal Centers for Medicare and Medicaid Services (formerly the federal Health Care Financing Administration) pursuant to the terms of Title XIX of the Social Security Act, codified at 42 U.S.C. 1396 et seq.

16

"**Medicare**" shall mean that certain federal program providing health insurance for eligible elderly and other individuals, under which physicians, hospitals, skilled nursing homes, home health care and other providers are paid for certain covered services they provide to the beneficiaries of such program, which program is more fully described in Title XVIII of the Social Security Act (42 U.S.C. §§ 1395 *et seq*.) and the regulations promulgated thereunder, or any successor program.

"**Net Collectible Value**" shall mean the amount that Lender reasonably expects from time to time to be collected with respect to Eligible Receivables from third-party payors within 120 days of the Date of Service taking into account historical and recent collection rates for each payor class (e.g., Medicare, Medicaid, commercial, etc.), entitled reimbursement pursuant to any contract or arrangement between Borrower and the applicable Account Debtor(s), offsets, historical returns, rebates, discounts, credits and allowances, and other factors that affect the collectability of Eligible Receivables.

"**Net Operating Cash Flow**" shall mean the difference between (a) cash received in the Borrower's Commercial Deposit Accounts and Governmental Deposit Account; and (b) cash disbursements, except for (i) interest, fees, and other payments to Lender in cash; (ii) deposits paid to public utility companies as ordered by the Bankruptcy Court; (iii) fees paid to the United States Trustee; and (iv) fees and expenses paid to all restructuring-related professionals, including attorneys and restructuring advisors, for the Borrower and the Lender.

"**Obligations**" shall mean all present and future obligations, Indebtedness and liabilities of any Credit Party to Lender at any time and from time to time of every kind, nature and description, direct or indirect, secured or unsecured, joint and several, absolute and contingent, due or to become due, matured or unmatured, now existing or hereafter arising, contractual or tortious, liquidated or unliquidated, under any of the Loan Documents or under applicable Law including all applicable fees, charges, expenses and all amounts paid or advanced by Lender on behalf of or for the benefit of any Credit Party for any reason at any time, including in each case obligations of performance as well as obligations of payment and interest that accrue after the commencement of any proceeding under any Debtor Relief Law by or against any such Person.

"**Old Operator**" shall mean any entity that, as of the date immediately prior to the effective date of the applicable Operations Transfer Agreement, holds the Medicare and Medicaid provider numbers and provider agreements relating to the Project.

"**Operating Account**" shall mean a deposit account established and maintained in Borrower's name, which is used to receive Advances or for Borrower's operating disbursements.

"**Operations Commencement Date**" shall mean any date that Borrower assumes responsibility for the operations of a Project pursuant to an Operations Transfer Agreement.

"**Operations Transfer Agreements**" shall mean that certain Operations Transfer Agreement, by and among Borrower and Lincolnshire Living & Rehab Center, LLC, dated as of the date hereof, as may be amended, restated, supplemented or otherwise modified from time to time;

**"Organizational Documents"** shall mean, with respect to any Person other than a natural person, the documents by which such Person was organized (such as a certificate of incorporation, certificate of limited partnership or articles of organization, including any certificates of designation for preferred stock or other forms of preferred equity) and which relate to the internal governance of such Person (such as bylaws, a partnership agreement or an operating, limited liability company or members agreement), including any and all shareholder agreements or voting agreements relating to the capital stock or other equity interests of such Person.

**"Payroll Account"** shall mean a deposit account established and maintained in Borrower's name, which is used solely to hold any and all amounts to be used by Borrower for payroll, payroll taxes and other employee wage and benefit payments, and which does not contain monies allocated for any other purpose.

**"Permit"** shall mean all governmental licenses, authorizations, provider numbers, supplier numbers, registrations, permits, drug or device authorizations and approvals, certificates, franchises, qualifications, accreditations, consents and approvals of a Credit Party required under all applicable Laws and required for such Credit Party in order to carry on its business as now conducted, including Healthcare Permits.

**"Permitted Contest"** shall mean, with respect to any tax obligation or other obligation allegedly or potentially owing from Borrower or its Subsidiary to any governmental tax authority or other third party, a contest maintained in good faith by appropriate proceedings promptly instituted and diligently conducted and with respect to which such reserve or other appropriate provision, if any, as shall be required in conformity with GAAP shall have been made on the books and records and financial statements of the applicable Credit Party(ies); provided, however, that (a) compliance with the obligation that is the subject of such contest is effectively stayed during such challenge; (b) Borrower's and its Subsidiaries' title to, and its right to use, the Collateral is not adversely affected thereby and Lender's Lien and priority on the Collateral are not adversely affected, altered or impaired thereby; (c) Borrower has given prior written notice to Lender of Borrower's or its Subsidiary's intent to so contest the obligation; (d) the Collateral or any part thereof or any interest therein shall not be in any danger of being sold, forfeited or lost by reason of such contest by Borrower or its Subsidiaries; (e) Borrower has given Lender notice of the commencement of such contest and upon request by Lender, from time to time, notice of the status of such contest by Borrower and confirmation of the continuing satisfaction of this definition; (f) a final determination of such contest could not result in Lender's Lien and its priority on the Collateral being adversely affected, altered or impaired; and (g) upon a final determination of such contest, Borrower and its Subsidiaries shall promptly comply with the requirements thereof.

**"Permitted Discretion"** shall mean a determination or judgment made by Lender in the good faith exercise of its business judgment.

**"Permitted Indebtedness"** shall mean: (i) Indebtedness under the Loan Documents, (ii) Capitalized Lease Obligations incurred after the Closing Date and secured only by the Equipment being leased pursuant to such Capitalized Lease Obligations; (iii) a purchase-money obligation, as defined in Section 9-103(a) of the UCC, provided that the aggregate amount thereof outstanding at any time shall not exceed $25,000, (iv) Indebtedness in connection with advances made by an equity holder in order to cure any Default of the financial and loan covenants set forth on Annex

18

I; provided, however, that such Indebtedness shall be on an unsecured basis, subordinated in right of repayment and remedies to all of the Obligations and to all of Lender's rights and in form and substance satisfactory to Lender; (v) accounts payable to trade creditors and current operating expenses incurred in the ordinary course of business and paid on a timely basis; (vi) borrowings incurred in the ordinary course of business and not exceeding $50,000 individually or in the aggregate outstanding at any one time; provided, however, that such Indebtedness shall be on an unsecured basis, subordinated in right of repayment and remedies to all of the Obligations and to all of Lender's rights and in form and substance satisfactory to Lender; (vii) Indebtedness in the form of insurance premiums financed through the applicable insurance company; and (viii) any other Indebtedness to which Lender may expressly consent in writing prior to its incurrence, which consent shall be in the sole discretion of Lender.

"**Permitted Liens**" shall mean: (a) deposits or pledges of cash to secure obligations under worker's compensation, social security or similar laws, or under unemployment insurance (but excluding Liens arising under ERISA, or, with respect to any Pension Plan or Multiemployer Plan, the Code) pertaining to Borrower's or its Subsidiary's employees, if any; (b) deposits or pledges of cash to secure bids, tenders, contracts (other than contracts for the payment of money or the deferred purchase price of property or services), leases, statutory obligations, surety and appeal bonds and other obligations of like nature arising in the ordinary course of business; (c) carrier's, warehousemen's, mechanic's, workmen's, materialmen's or other like Liens on Collateral, other than any Collateral which is part of the Borrowing Base, arising in the ordinary course of business with respect to obligations which are not due, or which are being contested pursuant to a Permitted Contest; (d) Liens on Collateral, other than Accounts, for taxes or other governmental charges not at the time delinquent or thereafter payable without penalty or the subject of a Permitted Contest; (e) attachments, appeal bonds, judgments and other similar Liens on Collateral other than Accounts, for sums not exceeding $25,000 in the aggregate arising in connection with court proceedings; provided, however, that the execution or other enforcement of such Liens is effectively stayed and the claims secured thereby are the subject of a Permitted Contest; (f) Liens and encumbrances in favor of Lender under the Loan Documents; (g) Liens on Collateral, other than Collateral which is part of the Borrowing Base, existing on the date hereof and set forth on Schedule 7.3; (h) any Lien on any Equipment securing Indebtedness permitted under subpart (iii) of the definition of Permitted Indebtedness, provided, however, that such Lien attaches concurrently with or within twenty (20) days after the acquisition thereof, and (i) any other Liens to which Lender may expressly consent in writing, which consent shall be in the sole discretion of Lender.

"**Permitted Modifications**" shall mean (a) such amendments or other modifications to Borrower's or Subsidiary's Organizational Documents as are required under this Agreement or by applicable Law and fully disclosed to Lender within thirty (30) days after such amendments or modifications have become effective, and (b) such amendments or modifications to Borrower's or Subsidiary's Organizational Documents (other than those involving a change in the name of Borrower or Subsidiary or involving a reorganization of Borrower or Subsidiary under the laws of a different jurisdiction) that would not adversely affect the rights and interests of Lender and fully disclosed to Lender within thirty (30) days after such amendments or modifications have become effective.

**"Permitted Variance"** shall mean a variance of no more than ten percent (10%) between projected Net Operating Cash Flow as set forth in the Budget, and the actual Net Operating Cash Flow of Borrower.

**"Person"** shall mean any natural person, corporation, limited liability company, professional association, limited partnership, general partnership, joint stock company, joint venture, association, company, trust, bank, trust company, land trust, business trust or other organization, whether or not a legal entity, and any Governmental Authority or any other entity of whatever nature.

**"Petition Date"** shall have the meaning assigned to that term in the Recitals.

**"Prepetition Aggregate Exposure"** shall mean the aggregate sum of the Loans made pursuant to the Prepetition Credit Agreements plus interest, fees, costs and expenses arising thereunder.

**"Prepetition Credit Agreement"** shall mean, as amended, that certain Credit and Security Agreement dated as of May 8, 2023, entered into between Wealshire Rehab, LLC, and Lender.

**"Prepetition Loans"** means the "Loans" as defined in the Prepetition Credit Agreement.

**"Prepetition Obligations"** shall mean, collectively, the "Obligations" (as defined in the Prepetition Credit Agreements) arising under the Prepetition Credit Agreement.

**"Prime Rate"** shall mean a fluctuating interest rate per annum equal at all times to the rate of interest announced, from time to time, within Wells Fargo Bank at its principal office in San Francisco as its "prime rate," with the understanding that the "prime rate" is one of Wells Fargo Bank's base rates (not necessarily the lowest of such rates) and serves as the basis upon which effective rates of interest are calculated for those loans making reference thereto and is evidenced by the recording thereof after its announcement in such internal publications as Wells Fargo Bank may designate; provided that Lender may, upon prior written notice to Borrower, choose a reasonably comparable index or source to use as the basis for the Prime Rate, and further provided, that in no event shall the Prime Rate be lower than such rate as in effect as of the Closing Date, and further provided, that each change in the fluctuating interest rate shall take effect simultaneously with the corresponding change in the Prime Rate.

**"Project"** shall mean any healthcare facility (including any assisted living facility, skilled nursing facility or short- or long-term rehabilitation facility) operated or owned or leased by Borrower or any of its Subsidiaries.

**"Related Property"** shall mean, with respect to each Account, the following: (i) all records of any nature evidencing or related to the Account, including contracts, invoices, charges slips, credit memoranda, notes and other instruments and other documents, books, records and other information (including computer data) (ii) all security interests or liens and property subject thereto from time to time purporting to secure payment of such Account, whether pursuant to the contract related to such Account or otherwise, including all rights of stoppage in transit, replevin, reclamation, Supporting Obligations and Letter of Credit Rights, and all claims of lien filed or held by Borrower on personal property; (iii) all rights to any Goods whose sale gave rise to such

Account, including returned or repossessed Goods; (iv) all Instruments, Documents, Chattel Paper and General Intangibles arising from, related to or evidencing such Account; (v) all UCC financing statements covering any collateral securing payment of such Account; (vi) all guaranties and other agreements or arrangements of whatever character from time to time supporting or securing payment of such Account whether pursuant to the contract related to such Account or otherwise; and (vii) all proceeds and amounts received or receivable arising from any of the foregoing.

"**Resident Agreements**" shall mean the singular or collective reference to all patient and resident care agreements, admission agreements and service agreements which include an occupancy agreement and all amendments, modifications or supplements thereto.

"**Revolving Facility Termination**" shall mean any of the following:

a.    a termination of the Revolving Facility by Borrower under Section 11.1;

b.    any other voluntary or involuntary prepayment of the Obligations by Borrower or any other Person occurs (other than reductions to zero of the outstanding balance of the Revolving Facility resulting from the ordinary course operation of the provisions of Section 2.5), whether by virtue of Lender's exercising its right of set-off or otherwise;

c.    Lender demands or Borrower is otherwise required to make payment in full of the Obligations upon the occurrence of an Event of Default;

d.    Lender terminates its obligations to make Advances hereunder upon the occurrence of an Event of Default; or

e.    any payment reduction or reduction of the outstanding balance of the Revolving Facility is made during a bankruptcy, reorganization or other proceeding or is made pursuant to any plan of reorganization or liquidation or any Debtor Relief Law.

"**Revolving Facility**" shall have the meaning assigned to such term in the recitals.

"**Revolving Loan**" shall mean the aggregate of the loans made pursuant to Section 2.1(a).

"**Revolving Loan Limit**" shall mean, at any time, the lesser of (a) the Facility Cap and (b) eighty-five percent (85%) the Borrowing Base.

"**Roll-Up Date**" shall have the meaning assigned to the term in section 2.1(b) of this Agreement.

"**Roll-Up Amount**" shall have the meaning assigned to the term in section 2.1(b) of this Agreement.

"**Rolled-Up Amount**" shall have the meaning assigned to the term in section 2.1(b) of this Agreement.

"**Self-Pay Account**" shall mean an Account payable by the individual receiving medical goods or services or by an individual (as opposed to a third-party insurance company, Medicare,

Medicaid or similar entity) responsible for such payment on behalf of the individual receiving medical goods or services. Self-Pay Accounts shall also include any co-pays and deductibles payable by such individual.

**"Software Interface Fee"** shall have the meaning assigned to the term in Section 3.5.

**"Subordination Agreement"** shall mean each agreement between Lender and another creditor of Borrower (including any Manager with respect to any Management Agreement), as the same may be amended, supplemented, restated or otherwise modified from time to time in accordance with the terms thereof, pursuant to which Indebtedness or other obligations owing from Borrower or the Liens securing such Indebtedness granted by Borrower to such creditor are subordinated in any way to the Obligations and the Liens created under the Loan Documents, the terms and provisions of such Subordination Agreements to have been agreed to by and be acceptable to Lender in the exercise of its sole discretion, which may include requirements that the Subordinated Debt (i) not mature prior to the end of the Term, and (ii) not require any payment other than interest during the Term, and (iii) will receive no payments following an Event of Default.

**"Subordinated Debt"** shall mean any Indebtedness of Borrower incurred pursuant to the terms of the Subordinated Debt Documents and with the prior written consent of Lender, all of which documents must be in form and substance acceptable to Lender in its sole discretion.

**"Subordinated Debt Documents"** shall mean any documents evidencing or securing Indebtedness governed by a Subordination Agreement, all of which documents must be in form and substance acceptable to Lender in its sole discretion.

**"Subsidiary"** shall mean (i) as to Borrower, any Person in which more than fifty percent (50%) of all equity, membership, partnership or other ownership interests is owned directly or indirectly by Borrower through one or more of its Subsidiaries, and (ii) as to any other Person, any Person in which more than fifty percent (50%) of all equity, membership, partnership or other ownership interests is owned directly or indirectly by such Person through one or more of such Person's Subsidiaries. Unless the context otherwise requires, each reference to a Subsidiary shall be a reference to a Subsidiary of Borrower.

**"Test Period"** shall have the meaning assigned to that term in Annex I.

**"Term"** shall mean the period commencing on the date set forth on the first page hereof and ending on the earlier to occur of (i) the effective date of a plan of reorganization of the Borrower confirmed by the Bankruptcy Court; (ii) consummation of a sale or other disposition of a material portion of the Borrower's assets pursuant to 11 U.S.C. § 363 or otherwise; (iii) the Borrower's filing of a motion or other pleading seeking, or consenting to, conversion to a proceeding under Chapter 7 of the Bankruptcy Code; (iv) conversion to a proceeding under Chapter 7 of the Bankruptcy Code; (v) a dismissal by the Bankruptcy Court of the Borrower's Bankruptcy Case; (vi) the Borrower's filing of a motion or other pleading seeking the dismissal of the Bankruptcy Case under Section 1112 of the Bankruptcy Code or otherwise; (vii) six (6) months from Closing, or (viii) any date on which the Loans are accelerated during the continuance of an Event of Default.

"**Termination Date**" shall mean the earlier to occur of (a) the end of the Term, (b) any date on which Lender accelerates the maturity of the Loans pursuant to Article VIII, or (c) the termination date stated in any notice of termination of this Agreement provided by Borrower in accordance with Section 11.1.

"**Termination Fee**" shall mean (for the time period indicated) the amount equal to (i) one percent (1%) of the Facility Cap if a Revolving Facility Termination occurs on or before the first anniversary of the Closing Date, or (ii) one half of one percent (0.5%) of the Facility Cap if a Revolving Facility Termination occurs after the first anniversary of the Closing Date The Termination Fee is an "Obligation," as that term is defined herein.

"**Third-Party Payor**" shall mean Medicare, Medicaid, TRICARE, any other state or federal health care program, BlueCross BlueShield, private insurers, managed care plans, or any other Person or entity which presently or in the future maintains Third-Party Payor Programs.

"**Third-Party Payor Programs**" shall mean all payment and reimbursement programs, sponsored by a Third-Party Payor, in which Borrower participates.

"**Tie-In**" shall mean both of the following have occurred: (a) in the case of Medicare, the Centers for Medicare and Medicaid Services ("**CMS**") issues a tie-in notice and the fiscal intermediary complete the process of tying, by assignment, the Old Operator of the respective Project Medicare provider number to the applicable Borrower's NPI number and tax identification number, and (b) in the case of Medicaid, the Medicaid provider agreement has been issued to the applicable Borrower by the Medicaid provider certification office and a Medicaid billing number has been issued to the applicable Borrower by the appropriate Medicaid office. The Tie-In is complete with respect to Borrower when the Medicare and Medicaid provider numbers have been assigned over and transferred to Borrower, allowing Borrower to bill directly for services provided at the Project.

"**TRICARE**" shall mean the program administered pursuant to 10 U.S.C. Section 1071 et. seq., Sections 1320a-7 and 1320a-7a of Title 42 of the United States Code and the regulations promulgated pursuant to such statutes.

"**UCC**" and "**Uniform Commercial Code**" shall mean the Uniform Commercial Code of the State of New York or of any other state the laws of which are required to be applied in connection with the perfection of security interests in any Collateral.

"**United States**" and "**U.S.**" shall mean the United States of America.

"**Unused Line Fee**" shall have the meaning assigned to the term in Section 3.2.

### 1.3    Other Definitional and Interpretive Provisions

References in this Agreement to "Articles", "Sections", "Annexes", "Exhibits", or "Schedules" shall be to Articles, Sections, Annexes, Exhibits or Schedules of or to this Agreement unless otherwise specifically provided. Any term defined herein may be used in the singular or plural. "Include", "includes" and "including" shall be deemed to be followed by "without limitation". Except as otherwise specified or limited herein, references to any Person include the

successors and assigns of such Person. References "from" or "through" any date mean, unless otherwise specified, "from and including" or "through and including", respectively. Unless otherwise specified herein, the settlement of all payments and fundings hereunder between or among the parties hereto shall be made in lawful money of the United States and in immediately available funds. Unless otherwise specified herein, all amounts (including, for the avoidance of doubt, for purposes of calculating the Borrowing Base) shall be calculated in Dollars. References to any statute or act shall include all related current regulations and all amendments and any successor statutes, acts and regulations. All amounts used for purposes of financial calculations required to be made herein shall be without duplication. References to any statute or act, without additional reference, shall be deemed to refer to federal statutes and acts of the United States. References to any agreement, instrument or document shall include all schedules, exhibits, annexes and other attachments thereto. As used in this Agreement, the meaning of the term "material" or the phrase "in all material respects" is intended to refer to an act, omission, violation or condition which reflects or could reasonably be expected to result in a Material Adverse Effect. References to capitalized terms that are not defined herein, but are defined in the UCC, shall have the meanings given them in the UCC. All references herein to times of day shall be references to daylight or standard time, as applicable, in New York City.

### 1.4    Time is of the Essence

Time is of the essence in Borrower's and each other Credit Party's performance under this Agreement and all other Loan Documents.

## II.    ADVANCES, PAYMENT AND INTEREST

### 2.1    Advances; Roll Up of Prepetition Obligations

(a)    <u>Advances</u>. Subject to the provisions of this Agreement, Lender shall make Advances to Borrower under the Revolving Facility from time to time during the Term, and not more than twice per each week unless agreed to by Lender and subject to the processing fees set forth in Section 2.4; provided that, notwithstanding any other provision of this Agreement (but subject to the provisions of this Section 2.1(a)), the principal amount at any one time outstanding under the Revolving Facility shall not exceed the Revolving Loan Limit. The Revolving Facility is a revolving credit facility, which may be drawn, repaid and redrawn, from time to time as permitted under this Agreement. Any determination as to whether there is availability within the Borrowing Base for Advances shall be made by Lender in its Permitted Discretion and is final and binding upon Borrower. Unless otherwise permitted by Lender, each Advance requested by Borrower shall be in an amount of at least $25,000. Subject to the provisions of this Agreement, Borrower may request Advances under the Revolving Facility up to and including the Availability. Lender may, in Lender's sole discretion, withhold from Advances made to Borrower such amounts as may be necessary to pay interest on the Revolving Facility and other Obligations hereunder. In addition, Advances under the Revolving Facility automatically may, in the discretion of Lender, be made for the payment of interest on the Revolving Facility and other Obligations on the date when due to the extent of Availability and as provided for herein.

(b)    <u>Roll-Up</u>. Effective immediately upon the making of an Advance under this Agreement (such date, the "<u>Roll-Up Date</u>"), and without any further action by any party to this

Agreement or the other Loan Document, the Bankruptcy Court or any other Person, (i) the Prepetition Obligations shall be automatically deemed to constitute Loans under this Agreement (on a dollar-for-dollar basis) (such Loans, the "Rolled-Up Loans") which shall be due and payable in accordance with the terms and conditions set forth in this Agreement as if originally funded hereunder on the date of such Advance (such aggregate amount, the "Roll-Up Amount") and (ii) from and after the Roll-Up Date, Prepetition Obligations shall be automatically and irrevocably reduced by the Roll-Up Amount.

(c)    Lender has established the eighty-five percent (85%) advance rate for purposes of determining the Revolving Loan Limit. Lender shall have the right to establish and readjust from time to time, in its Permitted Discretion, reserves (without duplication of other reserves) against the Borrowing Base, which reserves shall have the effect of reducing the amounts otherwise eligible to be disbursed to Borrower under the Revolving Facility pursuant to this Agreement.

(d)    The Facility Cap may, at Borrower's request and with the consent of Lender, which consent shall be in the Lender's sole discretion, be increased in increments of $250,000. In the event that the Facility Cap is increased, Borrower shall pay to Lender a Facility Fee in an amount equal to two percent (2.0%) of the amount by which the Facility Cap is increased.

(e)    Lender may in its sole discretion make one or more Advances in excess of Availability. The making of any Advance(s) in excess of Availability shall not be deemed an acknowledgement that any additional such Advance(s) will be made or may be required to be made; nor shall any such Advance(s) be deemed to establish any course of conduct, waiver, or estoppel that would obligate Lender to make any further such Advance or prevent Lender from treating Borrower's failure to repay such Advance(s) as a Default or an Event of Default. Each time an Advance causes the principal balance under the Revolving Facility to exceed the Availability (whether because of an intentional Advance in excess of Availability or a reduction in the Borrowing Base or otherwise), Lender may charge an over-advance fee of ten percent (10%) of the amount by which the principal balance exceeds the Availability as a result of such Advance. Such over-advance fee shall be in addition to any other fees, charges or other provisions that may increase the Applicable Rate of interest hereunder and the assessment or collection of such over-advance fee shall not, unless Lender specifically agrees in writing to the contrary, prevent Lender from considering any such over-advance arising from a reduction in the Borrowing Base, or the circumstances giving rise to any over advance, from being a Default or an Event of Default. The over-advance fee shall be paid on the first Business Day of each week if the amount outstanding hereunder is in excess of the Availability at any time during the immediately preceding week.

(f)    Borrower may request from time to time certain otherwise non-Eligible Receivables to be included as Eligible Receivables for purposes of calculating Availability. If after underwriting such non-Eligible Receivables, Lender determines in its sole discretion to include them as Eligible Receivables, Borrower shall pay to Lender an additional underwriting fee in an amount equal to two percent (2%) of the Borrowing Base attributable to such non-Eligible Receivables at such time as such Accounts are included in the Borrowing Base. Payment of such additional underwriting fee shall be made, at the discretion of Lender: (i) by application of available funds in the Concentration Account pursuant to Section 2.5, (ii) by application of Advances under the Revolving Facility pursuant to this Section 2.1, or (iii) upon two Business

Days' notice, directly by Borrower. In addition, Lender may, in its sole discretion require an amendment to this Agreement including additional representations, warranties or covenants, as a condition for including such non-Eligible Receivables as Eligible Receivables.

**2.2    Evidence of Obligations; Maturity**

(a)    Lender shall maintain, in accordance with its usual practice, electronic or written records evidencing the outstanding Obligations to Lender, including the amounts of principal, interest, fees and other amounts payable and paid to Lender from time to time under this Agreement.

(b)    The entries made in the electronic or written records maintained pursuant to subsection (a) above shall be prima facie evidence of the existence and amounts of the Obligations therein recorded; provided, however, that the failure of the Lender to maintain such records or any error therein shall not in any manner affect the Borrower's obligation to repay the Obligations in accordance with their terms. Subject to the foregoing, Advances under the Revolving Facility may also be evidenced by a promissory note, payable to the order of Lender, duly executed and delivered by Borrower and dated as of the date hereof, evidencing Borrower's aggregate indebtedness to Lender resulting from Advances under the Revolving Facility, from time to time. Lender hereby is authorized, but is not obligated, to enter the amount of each Advance under the Revolving Facility and the amount of each payment or prepayment principal or interest thereon in the appropriate spaces on the reverse of or on an attachment to the promissory note. Lender may account to Borrower from time to time with a statement of Advances under the Revolving Facility, the amounts outstanding hereunder, and charges and payments made pursuant to this Agreement, and in the absence of manifest and demonstrable error, such accounting rendered by Lender shall be deemed final, binding and conclusive unless Lender is notified by Borrower in writing to the contrary within thirty (30) days of Borrower's receipt of each accounting, which notice shall be deemed an objection only to items specifically objected to therein.

(c)    All amounts outstanding hereunder and other Obligations shall be due and payable in full, if not earlier in accordance with this Agreement or the Financing Orders, on the Termination Date.

**2.3    Interest**

Interest shall accrue daily on the principal amount outstanding from time to time hereunder at a rate per annum equal to the Prime Rate plus the Applicable Margin calculated on the basis of a 360-day year and adjusted for the actual number of days elapsed in each interest calculation period. Interest shall be payable by Borrower monthly in arrears but in no event later than the first day of each calendar month, commencing the first day of the first full month following entry of the Interim DIP Order. Interest payments shall, at the discretion of the Lender, be made (i) by application of funds in the Concentration Account as set forth in Section 2.5, (ii) by an Advance on the Revolving Facility, as set forth in Section 2.1, without any further action by Borrower, or (iii) upon two Business Days' notice, directly by Borrower. Interest shall continue to accrue on the principal amount outstanding from time to time until the irrevocable payment in full in cash of the Obligations and termination of this Agreement. Any accrued but unpaid interest shall

be added to the Obligations and increase the principal amount outstanding hereunder on the first Business Day of each month.

**2.4    Revolving Facility Disbursements; Requirement to Deliver Borrowing Certificate**

So long as no Default or Event of Default shall have occurred and be continuing, Borrower may give Lender written notice requesting an Advance under the Revolving Facility by delivering to Lender not later than 11:00 a.m. (New York City time) at least two but not more than four Business Days before the proposed borrowing date of such requested Advance (the "**Borrowing Date**"), a completed Borrowing Certificate and relevant supporting documentation satisfactory to Lender in its Permitted Discretion, which shall (i) specify the proposed Borrowing Date of such Advance which shall be a Business Day, (ii) specify the principal amount of such requested Advance, and (iii) certify the matters specified therein. In the event that Borrower does not request an Advance during any two consecutive calendar weeks, Borrower shall, on the last Business Day of the second such week (and more frequently if Lender shall so request) and thereafter every five (5) Business Days until the Obligations are indefeasibly paid in cash in full and this Agreement is terminated, deliver to Lender a completed Borrowing Certificate. On each Borrowing Date, Borrower authorizes Lender to disburse the proceeds of the requested Advance to the account(s) as set forth on Schedule 2.4 (or to such other account as to which Borrower shall expressly instruct Lender in writing), in all cases for credit by the recipient of such proceeds to the Borrower, via Federal funds wire transfer no later than 4:00 p.m. (New York City time); provided, however, if any amounts are then due to Lender on account of any interest, fees or expense reimbursements pursuant to the Loan Documents at the time such Advance is requested, Lender is authorized (but not required) to reduce the proceeds to Borrower with respect to such Advance by the amount of such interest, fees or expense reimbursements and to retain such amounts as payment of such interest, fees or expense reimbursements. It is understood and agreed that Lender shall have no responsibility for the application of proceeds disbursed pursuant to Schedule 2.4. Lender shall charge a processing fee of $150.00 for the first Advance each calendar week and $300.00 for each additional Advance during such calendar week. In the event that the written notice by Borrower requesting an Advance under the Revolving Facility does not comply with the foregoing requirements within the timing parameters set forth above, Lender is under no obligation to provide the requested Advance. If, however, Lender nonetheless determines to provide the requested Advance, Lender may charge Borrower an irregular Advance fee of one percent (1%) of the amount of such requested Advance. Such irregular Advance fee shall be paid, at the discretion of Lender: (i) by application of available funds in the Concentration Account pursuant to Section 2.5, (ii) by application of Advances under the Revolving Facility pursuant to Section 2.1, or (iii) upon two Business Days' notice, directly by Borrower.

**2.5    Revolving Facility Collections; Repayment; Borrowing Availability and Controlled Deposit Accounts**

(a)    Borrower shall establish and maintain at a Collection Bank and at Borrower's expense:

(i)     a Governmental Deposit Account, which shall be subject to a deposit account instructions agreement or similar agreement between Borrower, Lender and a Collection Bank;

(ii)     a Commercial Deposit Account, which shall be subject to a blocked deposit account control agreement between Borrower, Lender and a Collection Bank;

(iii)     an Operating Account, which shall be subject to a springing deposit account control agreement between Borrower, Lender and a Collection Bank; and

(iv)     a Payroll Account, which shall not be subject to a deposit account control agreement.

(b)     The Control Agreements on the Governmental Deposit Account and Commercial Deposit Account shall instruct the Collection Bank to transfer, on each Business Day, all funds on deposit therein to (i) a deposit account established and maintained by Lender or an Affiliate of Lender at such bank as Lender may communicate to the Collection Bank from time to time (the "**Concentration Account**"), or (ii) a master collections account established and maintained in the name of Borrower, which is subject to a blocked deposit account control agreement between Borrower, Lender and a Collection Bank, which causes all funds on deposit in such master collections account to be transferred to the Concentration Account on each Business Day.

(c)     Borrower hereby agrees to (i) identify its Governmental Deposit Account as the "pay to" address on all invoices sent to each payor of Borrower's Governmental Receivables, and (ii) identify its Commercial Deposit Account as the "pay to" address on all invoices sent to each payor of Borrower's other Accounts and Collateral not constituting Governmental Receivables. Borrower further agrees not to (A) change such directives to payors without the prior written consent of Lender, (B) terminate any Controlled Deposit Account or Control Agreement, or (C) terminate or modify, or attempt to terminate or modify, the standing transfer order in any Controlled Deposit Agreement.

(d)     Borrower hereby acknowledges and agrees that any violation of this Section 2.5 would be an Event of Default hereunder, would cause irreparable harm to the Lender for which there would be no adequate remedy at law, and agrees and consents to entry of an order by a court of competent jurisdiction granting the Lender specific performance of the terms and provisions of this Agreement as to Borrower. At the request of Lender, Borrower shall also enter into a lockbox agreement with the Collection Bank providing for the receipt of deposits at an address specified in such lockbox agreement and the deposit of funds received at such address to the applicable Controlled Deposit Account.

(e)     Lender acknowledges that as of the date hereof, Borrower does not have Tie-In, and, therefore, notwithstanding anything contained in the foregoing paragraph and elsewhere herein or in any of the Loan Documents, collections of Borrower's Governmental Receivables are being deposited into the deposit accounts of the Old Operator and then the Old Operator, by way of check or wire transfer to a Controlled Deposit Account, remits such collections to Borrower. Lender agrees that the remittal process described in the preceding sentence shall not be deemed to be a violation, breach or default of the terms or conditions of this Agreement; provided that (i) Old

28

Operator enters into an agreement with Lender, acceptable to Lender in its sole discretion, acknowledging its responsibilities in such remittal process, and (ii) Old Operator does not breach the terms of any agreement between Old Operator and Lender, or the applicable Operations Transfer Agreement. To the extent that any Account collections or any other cash payments received by Borrower or an Affiliate of Borrower are not sent directly to the appropriate Controlled Deposit Account, such collections and proceeds shall be held in trust for the benefit of the Lender and immediately remitted (and in any event within one (1) Business Day), in the form received (or, with respect to cash, by check or wire transfer), to the appropriate Controlled Deposit Account for immediate transfer to the Concentration Account. Borrower acknowledges and agrees that compliance with the terms of this Section 2.5 is an essential term of this Agreement, and that, in addition to and notwithstanding any other rights Lender may have hereunder under any other Loan Document, under applicable Law or equity, upon each and every failure by Borrower or any Affiliates of Borrower to cause collections with respect to Accounts or any other cash payments to Borrower to be deposited into the appropriate Controlled Deposit Account as set forth in this Section 2.5, Lender shall be entitled to assess Borrower with a non-compliance fee in an amount equal to ten percent (10%) of the amount of such collections or other cash payments; provided that such non-compliance fee shall be in addition to any other fees, charges or other provisions that may increase the Applicable Rate of interest hereunder and the assessment or collection of such non-compliance fee shall not, unless Lender specifically agrees in writing to the contrary, prevent Lender from considering any such non-compliance to be a Default or an Event of Default.

(f)     For purposes of calculating interest, all funds transferred to the Lender's Concentration Account shall be subject to a four (4) Business Day clearance period and all interest accruing on such funds during such clearance period shall accrue for the benefit of Lender. All funds transferred to the Concentration Account shall be applied to reduce the Obligations hereunder in the following order of priority: (i) payment of any fees and expense reimbursements due to Lender under the Loan Documents, (ii) any of Borrower's Obligations not included in items (iii) and (iv) below, (iii) to any interest then due and owing hereunder, and (iv) to the principal amount outstanding hereunder. For purposes of determining Availability, all funds transferred to the Concentration Account in accordance with this Section shall be applied in accordance with the foregoing sentence as of the date of the transfer.

(g)     If there is a positive balance in favor of Borrower in the Concentration Account, such positive balance shall not accrue interest in favor of Borrower, but shall be available to Borrower in accordance with the terms of this Agreement.

(h)     At all times, Borrower and its Affiliates shall direct all collections or proceeds it receives on Accounts or from other Collateral to the account(s) and in the manner specified by Lender in its Permitted Discretion so long as any amounts are outstanding under the Revolving Facility.

(i)     Borrower shall provide Lender with all information (including user identifications and passwords) necessary for Lender to have online view-only access to all information regarding Borrower's deposit accounts.

(j)      Schedule 2.5 identifies each of Borrower's deposit accounts, the depository bank at which such accounts are maintained, the type of Control Agreements on such accounts (if any), and the second lien secured party to such Control Agreements (if any).

**2.6      Promise to Pay; Manner of Payment**

Borrower promises to pay principal, interest and all other amounts payable hereunder, or under any other Loan Document, without any right of rescission and without any deduction whatsoever, including any deduction for any setoff, counterclaim or recoupments, and notwithstanding any damage to, defects in or destruction of the Collateral or any other event, including obsolescence of any property or improvements. Unless paid in accordance with Section 2.5, all payments made by Borrower (other than payments automatically paid through Advances under the Revolving Facility as provided herein), shall be made only by wire transfer on the date when due, without offset or deduction for counterclaim, in Dollars, in immediately available funds to such account as may be indicated in writing by Lender to Borrower from time to time. Any such payment received after 4:00 p.m. (New York City time) on the date when due shall be deemed received on the following Business Day. Whenever any payment hereunder shall be stated to be due or shall become due and payable on a day other than a Business Day, the due date thereof shall be extended to, and such payment shall be made on, the next succeeding Business Day, and such extension of time in such case shall be included in the computation of payment of any interest (at the interest rate then in effect during such extension) or fees, as the case may be.

**2.7      Repayment of Excess Advances**

Subject to the following sentence, any balance of Advances under the Revolving Facility outstanding at any time in excess of the Revolving Loan Limit shall be immediately due and payable by Borrower upon demand (or, if such overadvance was created as a result of Lender's adjustment of the advance rates for Availability or eligibility criteria, then within five (5) Business Days, unless such adjustment by Lender was the result of any misrepresentation or fraud of Borrower, in which case there shall be no grace period and any such overadvance shall be immediately due and payable), whether or not a Default or Event of Default has occurred or is continuing and shall be paid in the manner specified in Section 2.6. Notwithstanding the foregoing, if Lender intentionally makes an Advance that is in excess of Availability, such Advance shall be repaid within five (5) Business Days of a demand for repayment or when it is otherwise required to be repaid pursuant to other Sections of this Agreement.

**2.8      Payments by Lender**

Should any amount, interest or other Obligation required to be paid under any Loan Document remain unpaid after it is due and payable and after the expiration of any cure period, if applicable, such amount may be paid by Lender, which payment shall be deemed a request for an Advance under the Revolving Facility as of the date such payment is due, and Borrower irrevocably authorizes disbursements of any such funds to Lender by way of direct payment of the relevant amount, interest or other Obligations. No payment or prepayment of any amount by Lender or any other Person shall entitle any Person to be subrogated to the rights of Lender under any Loan Document unless and until the Obligations have been fully performed and paid irrevocably in cash and this Agreement has been terminated. Any sums expended by Lender as a

result of Borrower's or any Guarantor's failure to pay, perform or comply with any Loan Document or any of the Obligations may be charged to Borrower's account as an Advance under the Revolving Facility and added to the Obligations and thereby increase the principal amount outstanding hereunder.

### 2.9    Grant of Security Interest; Collateral

(a)    To secure the payment and performance of the Obligations, and without limiting any grant of any Lien and security interest in any other Loan Document, Borrower, upon entry of the Interim Financing Order, hereby grants to Lender a continuing security interest in and Lien upon, and pledges to Lender, all of its right, title and interest in and to the following, whether now owned or hereafter created, acquired or arising and wherever located (collectively and each individually, the "Collateral"):

(i)    all Accounts (including health-care insurance receivables) and Related Property;

(ii)    all of Borrower's deposit accounts, including the Governmental Deposit Account;

(iii)    all Books and Records, whether or not related to any Collateral;

(iv)    all of Borrower's other personal property and fixtures, including all Goods, Inventory, Equipment, furniture, General Intangibles (including Payment Intangibles and Software), Chattel Paper (whether tangible or electronic), Supporting Obligations, Investment Property, Financial Assets, Documents, Instruments (including any Promissory Notes), Securities, Securities Accounts, contract rights or rights to payment of money, leases, Permits, license agreements, franchise agreements, Commercial Tort Claims, stock in direct and indirect subsidiaries, machinery, cash, Letter-of-Credit Rights (whether or not the letter of credit is evidenced by a writing), Intellectual Property, copyrights, trademarks, patents, and tradestyles; and

(v)    any and all claims, rights and interests in any of the above and all substitutions for, additions, attachments, accessories, accessions and improvements to and replacements, products, Proceeds and insurance proceeds of any or all of the foregoing.

(b)    Except as otherwise expressly stated in the Financing Orders, the Liens and security interests granted to the Lender above or under the Financing Orders shall be valid, binding, continuing, enforceable, non-avoidable, and automatically and properly perfected first-priority security interests and Liens. Under Section 364(c)(2) of the Bankruptcy Code, the Lender has been granted a first-priority Lien on all Collateral not encumbered as of the Petition Date. Under Section 364(d) of the Bankruptcy Code, the Lender has been granted a first-priority priming Lien on all Collateral encumbered as of the Petition Date. Borrower authorizes the Lender to file or record financing statements and other filing or recording documents or instruments with respect to the Collateral in such form and in such offices as the Lender determines appropriate to perfect the security interests of the Lender under this Agreement. Borrower authorizes the Lender to use collateral descriptions such as "all personal property" or "all assets" in each case "whether now owned or hereafter acquired", or using words of similar import.

31

(c)     Pursuant to the Financing Orders, the Liens granted in favor of the Lender in all of the Collateral shall be perfected without the recordation of any UCC financing statements, notices of Liens or other instruments of assignment.  Notwithstanding the foregoing, the Borrower further agrees that the Lender is authorized to file or record financing statements with respect to the Collateral without the signatures of Borrower in such form and in such offices as the Lender reasonably determines appropriate to further evidence the perfection of the security interests of the Lender under this Agreement and to use the collateral description "all assets of the Debtor" in any such financing statements.

(d)     The Liens, lien priority, administrative priorities and other rights and remedies granted to the Lender in the Financing Orders and the other Loan Documents shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of debt by the Borrower (pursuant to Section 364 of the Bankruptcy Code or otherwise), or by any other act or omission whatsoever until the full performance and irrevocable payment in full in cash of the Obligations and termination of this Agreement.

**2.10    Collateral Administration**

(a)     All Collateral (except funds required to be deposited in the Controlled Deposit Accounts) will at all times be kept by Borrower at the locations set forth on Schedule 5.17B hereto and shall not, without concurrent written notice to Lender, be moved therefrom and in any case shall not be located (as that term is used in Section 9-301(2) of the UCC) outside the continental United States.

(b)     Borrower shall keep accurate and complete records of its Accounts and all payments and collections thereon and shall submit such records to Lender on such periodic basis as Lender may request. After the occurrence and during the continuance of an Event of Default, and upon Lender's request, Borrower shall execute and deliver to Lender formal written assignments of all of its Accounts weekly or daily as Lender may request, including all Accounts created since the date of the last assignment, together with copies of claims, invoices or other information related thereto. To the extent that collections from such assigned Accounts exceed the amount of the Obligations, such excess amount shall not accrue interest in favor of Borrower, but shall be available to Borrower upon Borrower's written request.

(c)     Any of Lender's officers, employees, representatives or agents shall have the right, at any time during normal business hours upon reasonable prior notice to Borrower, to verify the validity, amount or any other matter relating to any Accounts. Borrower shall cooperate fully with Lender in an effort to facilitate and promptly conclude such verification.

(d)     Lender shall have the right at all times after the occurrence and during the continuance of an Event of Default to notify (i) Account Debtors owing Accounts to Borrower other than Medicaid/Medicare Account Debtors that their Accounts have been assigned to Lender and to collect such Accounts directly in its own name and to charge collection costs and expenses, including reasonable attorneys' fees, to Borrower, and (ii) Medicaid/Medicare Account Debtors that Borrower has waived any and all defenses and counterclaims it may have or could interpose in any action or procedure brought by Lender to obtain a court order recognizing the collateral assignment or security interest and lien of Lender in and to any Account or other Collateral and

that Lender is seeking or may seek to obtain a court order recognizing the collateral assignment or security interest and lien of Lender in and to any Account or Collateral and that Lender is seeking or may seek to obtain a court order recognizing the collateral assignment or security interest and lien of Lender in and to all Accounts and other Collateral payable by Medicaid/Medicare Account Debtors.

(e)     As and when determined by Lender in its Permitted Discretion, Lender shall have the right to perform the searches described in clauses (i) and (ii) below against Borrower and Guarantors (the results of which are to be consistent with Borrower's representations and warranties under this Agreement), at Borrower's reasonable expense: (i) UCC searches with the Secretary of State or local filing offices of the state where Borrower is organized; and (ii) bankruptcy, judgment, federal, state and local tax lien and litigation searches, in each jurisdiction in which such actions, or Liens may be recorded.

(f)     Borrower (i) shall provide prompt written notice to its current bank to transfer all items, collections and remittances to the Concentration Account, (ii) shall direct each Account Debtor to make payments to the appropriate Controlled Deposit Account as set forth in Section 2.5, and Borrower hereby authorizes Lender, upon any failure to send such notices and directions within ten (10) days after the date of this Agreement (or ten (10) days after the Person becomes an Account Debtor), to send any and all similar notices and directions to such Account Debtors, and (iii) shall do anything further that may be lawfully required by Lender to secure Lender and effectuate the intentions of the Loan Documents.

(g)     As of the Closing Date, Borrower has no ownership interest in any Chattel Paper (as defined in Article 9 of the UCC), letter of credit rights, commercial tort claims, Instruments, documents or Investment Property (other than equity interests in any Subsidiaries of Borrower disclosed on Schedule 5.3) and Borrower shall give notice to Lender promptly (but in any event not later than the delivery by Borrower of the next Borrowing Certificate required pursuant to Section 2.4 above) upon the acquisition by Borrower of any such Chattel Paper, letter of credit rights, commercial tort claims, Instruments, documents, Investment Property. No Person other than any Lender has "control" (as defined in Article 9 of the UCC) over any deposit account, Investment Property (including Securities Accounts and Commodities Accounts), Letter of Credit Rights or electronic Chattel Paper in which Borrower has any interest (except for such control arising by operation of law in favor of any bank or securities intermediary or commodities intermediary with whom any deposit account, Securities Account or Commodities Account of Borrower is maintained).

(h)     Borrower shall deliver to Lender all tangible Chattel Paper and all Instruments and Documents owned by Borrower and constituting part of the Collateral duly endorsed and accompanied by duly executed instruments of transfer or assignment, all in form and substance satisfactory to Lender. Borrower shall provide Lender with "control" (as defined in Article 9 of the UCC) of all electronic Chattel Paper owned by Borrower and constituting part of the Collateral by having Lender identified as the assignee on the records pertaining to the single authoritative copy thereof and otherwise complying with the applicable elements of control set forth in the UCC. Borrower also shall deliver to Lender all security agreements securing any such Chattel Paper and securing any such Instruments. Borrower will mark conspicuously all such Chattel Paper and all such Instruments and Documents with a legend, in form and substance satisfactory to Lender,

indicating that such Chattel Paper and such Instruments and Documents are subject to the security interests and Liens in favor of Lender created pursuant to this Agreement and the Loan Documents.

(i)       Borrower shall deliver to Lender all letters of credit on which Borrower is the beneficiary and which give rise to letter of credit rights owned by Borrower which constitute part of the Collateral in each case duly endorsed and accompanied by duly executed instruments of transfer or assignment, all in form and substance satisfactory to Lender. Borrower shall take any and all actions as may be necessary or desirable, or that Lender may request, from time to time, to cause Lender to obtain exclusive "control" (as defined in Article 9 of the UCC) of any such letter of credit rights in a manner acceptable to Lender.

(j)       Borrower shall promptly advise Lender upon Borrower becoming aware that it has any interests in any commercial tort claim that constitutes part of the Collateral, which such notice shall include descriptions of the events and circumstances giving rise to such commercial tort claim and the dates such events and circumstances occurred, the potential defendants with respect such commercial tort claim and any court proceedings that have been instituted with respect to such commercial tort claims, and Borrower shall, with respect to any such commercial tort claim, execute and deliver to Lender such documents as Lender shall request to perfect, preserve or protect the Liens, rights and remedies of Lender with respect to any such commercial tort claim.

(k)       After the occurrence and during the continuance of an Event of Default, (a) Lender may elect to exercise any and all of the rights and remedies of Borrower under the Permits, without any interference from Borrower, and Borrower shall cooperate in causing the Governmental Authorities, contractors, or purchasers and lessees to comply with all the terms and conditions of the Licenses, and, (b) if and to the extent permitted by applicable Law and the terms of the Permits, Lender may, at its option, take over and enjoy the benefits of the Permits, exercise Borrower's rights under the Permits, and perform all acts in the same manner and to the same extent as Borrower might do.

(l)       Upon request of Lender, Borrower shall promptly deliver to Lender any and all certificates of title, applications for title or similar evidence of ownership of all such tangible personal property and shall cause Lender to be named as lienholder on any such certificate of title or other evidence of ownership. Borrower shall not permit any such tangible personal property to become fixtures to real estate unless such real estate is subject to a Lien in favor of Lender.

(m)      Borrower shall furnish to Lender from time to time any statements and schedules further identifying or describing the Collateral and any other information, reports or evidence concerning the Collateral as Lender may reasonably request from time to time.

### 2.11    Power of Attorney

Borrower hereby appoints Lender as its attorney-in-fact, with power (a) to endorse the name of Borrower on any checks, notes, acceptances, money orders, drafts, or other forms of payment or security that may come into Lender's possession, (b) to sign the name of Borrower on any invoice or bill of lading relating to any Accounts, inventory, or other Collateral, (c) to perfect Lender's security interest or lien in any Collateral, including filing financing statements, without Borrower's signature, covering part or all of the Collateral in such jurisdictions as Lender shall

34

determine to be advisable and (d) sign IRS Forms W-9 on behalf of Borrower reflecting Borrower's address as the address of the Controlled Deposit Accounts established pursuant to Section 2.5 (or, at Lender's option, the address set forth on the signature page hereof) and deliver such forms to Third-Party Payors on Accounts. The appointment of Lender as attorney-in-fact for Borrower is coupled with an interest and is irrevocable prior to full payment in cash of all Obligations.

### 2.12   Setoff Rights

During the continuance of any Event of Default, Lender is hereby authorized by Borrower at any time or from time to time, with reasonably prompt subsequent notice to Borrower (any prior or contemporaneous notice being hereby expressly waived) to set off and to appropriate and to apply any and all (a) balances held by Lender or any of Lender's Affiliates for the account of Borrower or any of its Subsidiaries (regardless of whether such balances are then due to Borrower or its Subsidiaries), and (b) other property at any time held by Lender to or for the credit or for the account of Borrower or any of its Subsidiaries, against and on account of any of the Obligations.

## III.   FEES AND OTHER CHARGES

### 3.1   Facility Fee

On the Closing Date, and as a condition of Closing, Lender shall earn two percent (2.0%) of the Facility Cap as a nonrefundable fee.  Such amount shall be earned upon entry of the Interim Financing Order and payable upon entry of the Final Financing Order. The fee payable pursuant to this Section 3.1 and the fee payable pursuant to the last sentence of Section 2.1(c) are herein collectively referred to as the "<u>Facility Fee</u>."

### 3.2   Unused Line Fee

Borrower shall pay to Lender monthly an unused line fee (the "**Unused Line Fee**") in an amount equal to eight and three-tenths basis points (0.083%) per month of the difference derived by subtracting (i) the average daily balance under the Revolving Facility outstanding during the preceding month, from (ii) the Facility Cap. The Unused Line Fee shall be payable monthly in arrears but in no event later than the first day of each successive calendar month (starting with the first day of the first full month immediately following entry of the Interim Financing Order). Payment of the Unused Line Fee shall be made, at the discretion of Lender: (i) by application of available funds in the Concentration Account pursuant to Section 2.5, (ii) by application of Advances under the Revolving Facility pursuant to Section 2.1, or (iii) upon two Business Days' notice, directly by Borrower. The final payment shall be prorated to the date of payment in full and shall be paid on that date as part of the Obligations.

### 3.3   Collateral Management Fee

Borrower shall pay Lender as additional interest a monthly collateral management fee (the "**Collateral Management Fee**") for monitoring and servicing the Revolving Facility, equal to twenty-five basis points (0.25%) per month calculated on the basis of the average daily balance under the Revolving Facility outstanding during the preceding month. The Collateral

Management Fee shall be payable monthly in arrears but in no event later than the first day of each successive calendar month (starting with the first day of the first full month immediately following entry of the Interim Financing Order). Payment of the Collateral Management Fee shall be made, at the discretion of Lender: (i) by application of available funds in the Concentration Account pursuant to Section 2.5, (ii) by application of Advances under the Revolving Facility pursuant to Section 2.1, or (iii) upon two Business Days' notice, directly by Borrower. The final payment shall be prorated to the date of payment in full and shall be paid on that date as part of the Obligations.

### 3.4    Early Termination Fees

Upon a Revolving Facility Termination, Borrower shall pay Lender (in addition to the then outstanding principal, accrued interest and other Obligations (other than indemnity obligations with respect to which no claim has been made) relating to the Revolving Facility pursuant to the terms of this Agreement and any other Loan Documents), as yield maintenance for the loss of bargain and not as a penalty, an amount equal to the applicable Termination Fee. Notwithstanding any other provision of any Loan Document, no Termination Fee as described above shall be due and payable if (i) Borrower refinances the Obligations (in whole or in part) with Lender (which, for purposes of this Section 3.4, shall include Lender, and any of its parents, subsidiaries or Affiliates), (ii) this Agreement terminates in accordance with its terms at the end of its Term, or (iii) Borrower terminates this Agreement within 10 days after Borrower provides written notice to Lender of a default by Lender hereunder, and such default by Lender remains uncured as of the date of such termination.

### 3.5    Software Interface Fee

Upon the first occurrence of an Event of Default, Borrower shall pay to Lender a nonrefundable fee of $3,500 for the setup and implementation of the software interface used by Lender to calculate the Borrowing Base. Payment of the setup fee shall be made, at the discretion of Lender: (i) by application of available funds in the Concentration Account pursuant to Section 2.5, (ii) by application of Advances under the Revolving Facility pursuant to Section 2.1, or (iii) upon two Business Days' notice, directly by Borrower.

Commencing with the first calendar month in which an Event of Default occurs, Borrower shall pay Lender a monthly software interface fee (the "**Software Interface Fee**") for maintaining and servicing the software interface used by Lender to calculate the Borrowing Base, equal to $1,000 per month, until such Event of Default is cured. The Software Interface Fee shall be payable monthly in arrears but in no event later than the first day of each successive calendar month. Payment of the Software Interface Fee shall be made, at the discretion of Lender: (i) by application of available funds in the Concentration Account pursuant to Section 2.5, (ii) by application of Advances under the Revolving Facility pursuant to Section 2.1, or (iii) upon two Business Days' notice, directly by Borrower. The final payment shall be prorated to the date of payment in full and shall be paid on that date as part of the Obligations.

### 3.6    Computation of Fees; Lawful Limits

All fees hereunder shall be computed on the basis of a year of 360 days and for the actual number of days elapsed in each calculation period, as applicable. In no contingency or event

whatsoever, whether by reason of acceleration or otherwise, shall the interest and other charges paid or agreed to be paid to Lender for the use, forbearance or detention of money hereunder exceed the maximum rate permissible under applicable Law which a court of competent jurisdiction shall, in a final determination, deem applicable hereto. If, due to any circumstance whatsoever, fulfillment of any provision hereof, at the time performance of such provision shall be due, shall exceed any such limit, then, the obligation to be so fulfilled shall be reduced to such lawful limit, and, if Lender shall have received interest or any other charges of any kind which might be deemed to be interest under applicable Law in excess of the maximum lawful rate, then such excess shall be applied first to any unpaid fees and charges hereunder, then to unpaid principal balance owed by Borrower hereunder, and if the then remaining excess interest is greater than the previously unpaid principal balance, Lender shall promptly refund such excess amount to Borrower and the provisions hereof shall be deemed amended to provide for such permissible rate. The terms and provisions of this Section shall control to the extent any other provision of any Loan Document is inconsistent herewith.

### 3.7   Default Rate of Interest

Upon the occurrence and during the continuation of an Event of Default, the Applicable Rate of interest in effect at such time with respect to the Obligations shall be increased by five percent (5.0%) per annum (the "**Default Rate**"). Such increase shall be in addition to any other specific charges provided for herein for noncompliance with specific provisions of this Agreement.

## IV. CONDITIONS PRECEDENT

### 4.1   Conditions to Closing and Advances

The obligations of Lender to consummate the transactions contemplated herein and to make any Advance under the Revolving Facility are subject to the satisfaction, in the sole judgment of Lender, of the following:

(a)     The Bankruptcy Court shall have entered the Interim Financing Order in the Bankruptcy Case and such order shall be in full force and effect and shall not have been vacated, reversed, modified or stayed in any respect (and, if such order is the subject of a pending appeal, motion for reconsideration, rehearing, etc., no further performance of any obligation of any party shall have been stayed pending appeal or motion);

(b)     The Lender shall have received, reviewed and approved the Budget and any amendments and restatements thereof in writing;

(c)     Borrower shall have executed and delivered to Lender this Agreement;

(d)     Borrower shall have delivered to Lender a personal guarantee signed by Arnold Goldberg in form and substance reasonably acceptable to Lender.

(e)     Borrower shall have executed and delivered to Lender a Closing Certificate certifying to the Organizational Documents of Borrower, the good standing of Borrower in its

jurisdiction of organization, the adoption of resolutions approving the Revolving Facility and the incumbency of its authorized officers;

(f)     Each Guarantor shall have duly executed and delivered to Lender a Guaranty Agreement;

(g)     Legal counsel to Borrower and each Guarantor shall have delivered to Lender a written legal opinion, in form and substance satisfactory to Lender and its counsel, addressing the following: (i) the organization of the Borrower and any entities that are Guarantors; (ii) the due authorization and execution of the Loan Documents; (iii) the absence of conflicts between the Loan Documents and the Organizational Documents of the Borrower and any entities that are Guarantors; and (iv) the legal, valid and binding effect of the Loan Documents;

(h)     The Borrower shall have delivered to Lender all applicable Landlord Waivers and Consents;

(i)     Borrower shall have delivered to Lender duly executed intercreditor agreements in form and substance acceptable to Lender in its sole discretion, from the following entities: Cambridge Realty Capital Ltd. of Illinois;

(j)     Borrower shall have delivered to Lender duly executed Subordination Agreement from the Manager, under which the Manager shall agree to limit the monthly fees charged to the Borrower under the Management Agreement to no more than five percent (5%) of the gross patient revenues for such month;

(k)     Borrower shall have established Controlled Deposit Accounts and Lender shall have received fully executed Control Agreements, all in accordance with Section 2.5;

(l)     Reserved;

(m)     Borrower shall have delivered to Lender, in form and substance acceptable to Lender in Lender's sole discretion, (i) evidence that the Operations Commencement Date has occurred; (ii) estoppel agreements (or other similar agreement) between the Old Operator and Lender; and (iii) collateral assignment of the Operations Transfer Agreement;

(n)     Borrower shall have delivered to Lender a Borrowing Certificate in the form of Exhibit A executed by Borrower's authorized signatory;

(o)     Borrower shall have executed and delivered to Lender an IRS Form 8821 in form acceptable to Lender naming Tax Guard as appointee;

(p)     Lender shall have received (i) copies of all insurance policies required by Section 6.5, (ii) a copy of the declarations page for such insurance policies and (iii) certificates of insurance and applicable endorsements confirming that the Lender has been named as sole beneficiary, loss payable or additional insured, as appropriate;

(q)      Borrower shall have provided Lender with all information (including user identifications and passwords) necessary for Lender to have online access to view all information regarding all of Borrower's bank accounts;

(r)      Borrower shall have provided Lender with any information necessary, and taken any action necessary, for Lender to setup and implement the software interface used by Lender to calculate the Borrowing Base;

(s)      Reserved;

(t)      Lender shall have received, in form and substance satisfactory to Lender, payoff letters or evidence of the repayment in full of all existing indebtedness secured by the Collateral and termination of any and all Liens, security interests and Uniform Commercial Code financing statements relating thereto that is not subject to an intercreditor agreement or a Subordination Agreement;

(u)      Reserved;

(v)      Borrower shall have provided evidence satisfactory to Lender, in Lender's sole discretion, that (i) Borrower has been issued a National Provider Identifier, and (ii) Borrower has submitted a CMS Form 855A to the appropriate agency or administrator;

(w)      Lender shall have received each document (including any Uniform Commercial Code financing statement) required by any Loan Documents or under applicable Law or requested by Lender to be filed, registered or recorded to create in favor of Lender, a perfected first priority security interest upon the Collateral (subject only to Permitted Liens);

(x)      Lender shall have:

(i)      completed its examinations, the results of which shall be satisfactory in form and substance to Lender, of the Collateral, the financial statements and the books, records, business, obligations, financial condition and operational state of Borrower and each Guarantor, and each such Person shall have demonstrated to Lender's satisfaction that (i) its operations comply, in all material respects, with all applicable Law, except where the failure to comply would not reasonably be expected to have a Material Adverse Effect (ii) its operations are not the subject of any governmental investigation, evaluation or any remedial action which could reasonably be expected to result in any Material Adverse Effect, and (iii) it has no liability (whether contingent or otherwise) that could reasonably be expected to have a Material Adverse Effect;

(ii)      completed its legal due diligence examinations of Borrower, the results of which shall be satisfactory in form and substance to Lender, as evidenced by Lender's execution of the Loan Documents;

(iii)      completed a background check of the Borrower's principals and all Guarantors and the results of such background checks are satisfactory to Lender in its sole discretion;

(iv)    obtained, at Borrower's expense, (a) UCC lien searches as deemed necessary or appropriate by Lender, certified by the Secretary of State of the State in which Borrower is organized, or issued by a reputable UCC lien search company acceptable to Lender in its sole discretion, which state that there are no liens or encumbrances affecting the Collateral (or, if there are liens or encumbrances affecting the Collateral, Lender shall have approved of the same), and (b) litigation and bankruptcy searches in such jurisdictions as deemed necessary or appropriate by Lender, issued by a reputable litigation search company acceptable to Lender in its sole discretion, which state that the Borrower, Guarantors and Project are not subject to any material adverse litigation or other legal proceeding; and

(v)    received all fees, charges and expenses payable to Lender on or prior to the date of the Advance pursuant to the Loan Documents;

(y)    All corporate and other proceedings, documents, instruments and other legal matters in connection with the transactions contemplated by the Loan Documents shall be satisfactory to Lender;

(z)    Each of the representations and warranties made by Borrower in or pursuant to this Agreement shall be accurate in all material respects on and as of the date the Advance is requested as if made on and as of such date, before and after giving effect to such Advance; and no Default or Event of Default shall have occurred and be continuing or would exist after giving effect to the Advance under the Revolving Facility on such date;

(aa)    (i) No default shall exist pursuant to any of Borrower's obligations under any Material Contract and Borrower shall be in compliance with all applicable Laws in all material respects, in each case except to the extent such default or failure would not reasonably be expected to have a Material Adverse Effect, and (ii) Borrower has no accounts payable or taxes payable that are more than 90 days past due, or to the extent that such accounts payable or taxes payable exist, Borrower shall provide to Lender written evidence (satisfactory to Lender in its sole discretion) from such account creditors, and if applicable, taxing authorities of payment plans with respect thereto;

(bb)    Immediately after giving effect to the requested Advance, the aggregate outstanding principal amount of Advances under the Revolving Facility shall not exceed the Revolving Loan Limit, less any reserves against the Revolving Loan Limit imposed by Lender in its Permitted Discretion;

(cc)    No event shall have occurred which has had or could reasonably be expected to have a Material Adverse Effect; and

(dd)    Lender shall have received such other documents, certificates, information or legal opinions as Lender may reasonably request, all in form and substance reasonably satisfactory to Lender.

**4.2      Waivers of Conditions to Advances**

No waiver of any of the foregoing conditions to an Advance, or the making of an Advance by Lender notwithstanding the failure of any of the foregoing conditions to be met as of the date of such Advance, shall be deemed to constitute a waiver by Lender of any such conditions with respect to any future requested Advance.

**4.3      Post-Closing Document Delivery Requirements**

Borrower shall take the actions identified below by the dates indicated. If any of the below post-closing conditions under this Section 4.3 are not timely performed by Borrower (subject to reasonable extensions granted by Lender), Borrower shall pay Lender a late fee equal to $750.00 per day until such post-closing conditions have been completed in full. Such late fee shall be in addition to any other fees, charges or other provisions that may increase the Applicable Rate of interest hereunder and the assessment or collection of such late fee shall not, unless Lender specifically agrees in writing to the contrary, prevent Lender from considering any such non-timely completion to be a Default or an Event of Default.

(a)      No later than three (3) business days following the Closing, Borrower shall have delivered to Lender a personal financial statement from Arnold Goldberg in form and substance satisfactory to the Lender.

(b)      No later than fourteen (14) days following the Closing, Borrower shall have delivered a duly authorized secured guarantee from Lincolnshire Properties Limited Partnership ("LPLP") to Lender with the most recently available balance sheet and income statement of LPLP in form and substance satisfactory to the Lender.

**V.      REPRESENTATIONS AND WARRANTIES**

In order to induce Lender to enter into this Agreement and to advance funds to Borrower, Borrower represents and warrants as of the date hereof, the Closing Date, and each Borrowing Date as follows:

**5.1      Organization and Authority**

Each Credit Party is an entity of the type specified on Schedule 5.3, is duly organized, validly existing and in good standing under the laws of the jurisdiction specified on Schedule 5.3 and no other jurisdiction. Each Credit Party (i) has all requisite corporate or other organizational power and authority to own its properties and assets and to carry on its business as now being conducted and as contemplated in the Loan Documents, (ii) is duly qualified to do business in every jurisdiction in which failure so to qualify could reasonably be expected to have a Material Adverse Effect, and (iii) has requisite power and authority (A) to execute, deliver and perform the Loan Documents to which it is a party and all amendments thereto, (B) to borrow hereunder, (C) to consummate the transactions contemplated under the Loan Documents, and (D) to grant the Liens with regard to the Collateral pursuant to the Loan Documents to which it is a party. No Credit Party is an "investment company" registered or required to be registered under the Investment Company Act of 1940, as amended, nor is any Credit Party controlled by or a subsidiary of such an "investment company."

### 5.2    Loan Documents

The execution, delivery and performance by each Credit Party of the Loan Documents to which it is a party, and the consummation of the transactions contemplated thereby, including the grants of Liens and security interests in the Collateral, (i) have been duly authorized by all requisite action of the appropriate Credit Party and have been duly executed and delivered by or on behalf of such Credit Party; (ii) do not violate any provisions of (A) applicable Law, statute, rule, regulation, ordinance or tariff, (B) any order of any Governmental Authority binding on any Credit Party or any of the Credit Parties' respective properties the effect of which could reasonably be expected to have a Material Adverse Effect, or (C) the certificate of incorporation or bylaws (or any other equivalent governing agreement or document) of each Credit Party, or any agreement between any Credit Party and its shareholders, members, partners or equity owners or among any such shareholders, members, partners or equity owners; (iii) are not in conflict with, and do not result in a breach or default of or constitute an Event of Default, or an event, fact, condition, breach, Default or Event of Default under, any indenture, agreement or other instrument to which any Credit Party is a party, or by which the properties or assets of any Credit Party are bound, the effect of which could reasonably be expected to have a Material Adverse Effect; (iv) except as set forth therein, will not result in the creation or imposition of any Lien of any nature upon any of the properties or assets of any Credit Party, and (v) do not require the consent, approval or authorization of, or filing, registration or qualification with, any Governmental Authority or Credit Party unless otherwise obtained. When executed and delivered, each of the Loan Documents to which each Credit Party is a party will constitute the legal, valid and binding obligation of the respective Credit Party, enforceable against such Credit Party in accordance with its terms.

### 5.3    Subsidiaries, Capitalization and Ownership Interests

Each Credit Party has no Subsidiaries other than those Persons listed as Subsidiaries on Schedule 5.3, each of which is a Credit Party. Schedule 5.3 also states the authorized and issued capitalization of each Credit Party and each subsidiary, the number and class of equity securities and ownership, voting or partnership interests issued and outstanding of Borrower and the record and beneficial owners thereof (including options, warrants and other rights to acquire any of the foregoing). The ownership interests of each Credit Party that is a limited partnership or a limited liability company are not certificated, the documents relating to such interests do not expressly state that the interests are governed by Article 8 of the Uniform Commercial Code, and the interests are not held in a Securities Account. The outstanding equity securities and ownership, voting or partnership interests of each Credit Party have been duly authorized and validly issued and are fully paid and nonassessable, and each Person listed on Schedule 5.3 owns beneficially and of record all of the equity securities and ownership, voting or membership interests it is listed as owning free and clear of any Liens other than Permitted Liens. Except as listed on Schedule 5.3, no Credit Party owns an interest in or participates or engages in any joint venture, partnership or similar arrangements with any Persons.

### 5.4    Properties

Borrower (i) is the sole owner and has good, valid and marketable title to, or a valid leasehold interest in, all of its material properties and assets, including the Collateral, whether personal or real, subject to no transfer restrictions or Liens of any kind except for Permitted Liens,

and (ii) is in compliance in all material respects with each lease to which it is a party or otherwise bound except for such noncompliance as would not reasonably be expected to have a Material Adverse Effect. Schedule 5.4 lists all real properties (and their locations) owned or leased by or to Borrower. Borrower enjoys peaceful and undisturbed possession under all such leases and such leases are all the leases necessary for the operation of such properties and assets, are valid and subsisting and are in full force and effect.

### 5.5    Other Agreements

No Credit Party is (i) a party to any judgment, order or decree or any agreement, document or instrument, or subject to any restriction, which would materially adversely affect its ability to execute and deliver, or perform under, any Loan Document or to pay the Obligations, or (ii) in default in the performance, observance or fulfillment of any obligation, covenant or condition contained in any agreement, document or instrument to which it is a party or to which any of its properties or assets are subject, which default, if not remedied within any applicable grace or cure period could reasonably be expected to have a Material Adverse Effect, nor is there any event, fact, condition or circumstance which, with notice or passage of time or both; would constitute or result in a conflict, breach, default or event of default under, any of the foregoing which, if not remedied within any applicable grace or cure period could reasonably be expected to have a Material Adverse Effect.

### 5.6    Litigation

Except as disclosed on Schedule 5.6, there is no action, suit, proceeding or investigation pending or, to any Credit Party's knowledge, threatened against a Credit Party that (i) could reasonably be expected to affect the validity of any of the Loan Documents or the right of Borrower to enter into any Loan Document or to consummate the transactions contemplated thereby or (ii) could reasonably be expected to be or have, either individually or in the aggregate, any Material Adverse Change or Material Adverse Effect. No Credit Party is a party or subject to any order, writ, injunction, judgment or decree of any Governmental Authority that could reasonably be expected to have a Material Adverse Effect, except as so identified in Schedule 5.6.

### 5.7    Labor Matters

There are no strikes, slowdowns, work stoppages, lockouts, grievances, other collective bargaining or labor related disputes pending or, to Borrower's knowledge, threatened against any Credit Party. Hours worked and payments made to the employees of the Credit Parties have not been in violation of the Fair Labor Standards Act or any other applicable Law dealing with such matters. No Credit Party is engaged in unfair labor practice, and there is no unfair labor practice, complaint or complaint of employment discrimination pending against any Credit Party or threatened against any Credit Party. All payments due from the Credit Parties, or for which any claim may be made against any of them, on account of wages and employee and retiree health and welfare insurance and other benefits have been paid or accrued as a liability on their books, as the case may be. Each Credit Party and each of its predecessors and Affiliates has complied and is in compliance with all Laws pertaining to any terms or conditions of employment, including Laws governing or regarding employment standards, labor relations, application and employee background checking, immigration, the payment of wages or other compensation, including

overtime compensation, employee leave, employee benefits, the classification of workers as employees and independent contractors, employment discrimination and harassment and retaliation, pay equity, occupational safety and health, workers' compensation, and any and all other Laws governing or pertaining to the terms and conditions of employment. The provisions of any collective agreement are consistent with applicable industry standards respecting wage rates, benefits and working rules. Borrower is not in breach of any provision of any collective agreement to which it is a party. The consummation of the transactions contemplated by the Loan Documents will not give rise to a right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which it is a party or by which it is bound.

### 5.8    Tax Returns, Governmental Reports

Each Credit Party (i) has filed all material federal, state, foreign (if applicable) and local tax returns and other reports which are required by applicable Law to be filed by such Credit Party, and (ii) has paid all taxes, assessments, fees and other governmental charges, including payroll and other employment related taxes, in each case that are due and payable.

### 5.9    Financial Statements and Reports

All financial information and statements relating to any Credit Party that have been or may hereafter be delivered to Lender by any Credit Party are accurate and complete in all material respects and have been prepared in accordance with GAAP consistently applied with prior periods. No Credit Party has any material obligations or liabilities of any kind not disclosed in such financial information or statements, and since the date of the most recent financial statements submitted to Lender, there has not occurred any Material Adverse Change, Material Adverse Effect, Liability Event or, to Borrower's knowledge, any other event or condition that could reasonably be expected to have a Material Adverse Effect or Liability Event.

### 5.10    Compliance with Law

Borrower (i) is in substantial compliance with all Laws applicable to Borrower and Borrower's business, assets or operations, including ERISA, and (ii) is not in violation of any order of any Governmental Authority or other board or tribunal, except where noncompliance or violation would not reasonably be expected to have a Material Adverse Effect. There is no event, fact, condition or circumstance which, with notice or passage of time, or both, would constitute or result in any noncompliance with, or any violation of, any of the foregoing, in each case except where noncompliance or violation would not reasonably be expected to have a Material Adverse Effect. Borrower has not received any notice that Borrower is not in compliance in any respect with any of the requirements of any of the foregoing. No Credit Party has (a) engaged in any Prohibited Transactions as defined in Section 406 of ERISA and Section 4975 of the Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated thereunder, (b) failed to meet any applicable minimum funding requirements under Section 302 of ERISA in respect of its plans and no such funding requirements have been postponed or delayed, (c) any knowledge of any event or occurrence which would cause the Pension Benefit Guaranty Corporation to institute proceedings under Title IV of ERISA to terminate any of the employee benefit plans, (d) any fiduciary responsibility under ERISA for investments with respect to any plan existing for the benefit of Persons other than its employees or former employees, or (e)

44

withdrawn, completely or partially, from any multi-employer pension plans so as to incur liability under the Multiemployer Pension Plan Amendments of 1980. With respect to each Credit Party, there exists no event described in Section 4043 of ERISA, excluding Subsections 4043(b)(2) and 4043(b)(3) thereof, for which the thirty (30) day notice period contained in 12 C.F.R. § 26153 has not been waived. Each ERISA Plan (and the related trusts and funding agreements) complies in form and in operation with, has been administered in compliance with, and the terms of each ERISA Plan satisfy, the applicable requirements of ERISA and the Code in all material respects. Each ERISA Plan which is intended to be qualified under Section 401(a) of the Code is so qualified, and the United States Internal Revenue Service has issued a favorable determination letter with respect to each such ERISA Plan which may be relied on currently. No Credit Party has incurred liability for any material excise tax under any of Sections 4971 through 5000 of the Code.

### 5.11    Intellectual Property

Each Credit Party owns, is licensed to use or otherwise has the right to use, all Intellectual Property that is material to the condition (financial or other), business or operations of such Credit Party. All Intellectual Property existing as of the Closing Date which is owned by a Credit Party and issued, registered or pending with any United States or foreign Governmental Authority (including any and all applications for the registration of any Intellectual Property with any such United States or foreign Governmental Authority) are set forth on Schedule 5.11. The applicable Credit Party is the sole and exclusive owner of the entire and unencumbered right, title and interest in and to each such registered Intellectual Property (or application therefor) purported to be owned by such Credit Party, free and clear of any Liens (except for Permitted Liens) or licenses in favor of third parties or agreements or covenants not to sue such third parties for infringement. All registered Intellectual Property of each Credit Party is duly and properly registered, filed or issued in the appropriate office and jurisdictions for such registrations, filings or issuances, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect. No Credit Party is party to, nor bound by, any material license or other agreement with respect to which any Credit Party is the licensee that prohibits or otherwise restricts such Credit Party from granting a security interest in Borrower's interest in such license or agreement or other property. To Borrower's knowledge, each Credit Party conducts its business without infringement or claim of infringement of any Intellectual Property rights of others and there is no infringement or claim of infringement by others of any Intellectual Property rights of any Credit Party, which infringement or claim of infringement could reasonably be expected to have a Material Adverse Effect.

### 5.12    Licenses and Permits

Without limitation of anything contained in Section 5.19:  Each Credit Party is in substantial compliance with and has all Permits necessary or required by applicable Law or Governmental Authority for the operation of its businesses except where the failure to be in compliance would not reasonably be expected to have a Material Adverse Effect. All of the foregoing are in full force and effect and not in known conflict with the rights of others except where the failure to be in compliance would not reasonably be expected to have a Material Adverse Effect. Borrower is not (i) in breach of or default under the provisions of any of the foregoing, nor is there any event, fact, condition or circumstance which, with notice or passage of time or both, would constitute or result in a conflict, breach, Default or Event of Default under, any of the

foregoing which, if not remedied within any applicable grace or cure period could reasonably be expected to have a Material Adverse Effect, (ii) a party to or subject to any agreement, instrument or restriction that is so unusual or burdensome that it might have a Material Adverse Effect.

### 5.13   Disclosure

No information in any application for the Revolving Facility, Loan Document or any other agreement, document, certificate, or statement furnished to Lender by or on behalf of any Credit Party in connection with the transactions contemplated by the Loan Documents, when taken as a whole contains any untrue statement of material fact or omits to state any fact necessary to make the statements therein not materially misleading in light of current circumstances. There has been no Material Adverse Change in any fact or circumstance that would make any such information incomplete or inaccurate as of the Closing Date. All financial projections delivered to Lender by any Credit Party (or their agents) have been prepared on the basis of the assumptions stated therein. Such projections represent each Credit Party's best estimate of such Credit Party's future financial performance and such assumptions are believed by such Credit Party to be fair and reasonable in light of current business conditions; provided, however, that no Credit Party can give any assurance that such projections will be attained.

### 5.14   Existing Indebtedness; Investments, Guarantees and Certain Contracts

Except as permitted by the Loan Documents, Borrower (i) has no outstanding Indebtedness other than Permitted Indebtedness, (ii) is not subject or party to any mortgage, note, indenture, indemnity or guarantee of, with respect to or evidencing any Indebtedness of any other Person other than in connection with a Permitted Lien, or (iii) does not own or hold any equity or long-term debt investments in, and does not have any outstanding advances to or any outstanding guarantees for the obligations of, or any outstanding borrowings from, any Person. Borrower has performed all material obligations required to be performed by Borrower pursuant to or in connection with its outstanding Indebtedness and the items permitted by the Loan Documents and there has occurred no breach, default or event of default under any document evidencing any such items or any fact, circumstance, condition or event which, with the giving of notice or passage of time or both, would constitute or result in a breach, default or event of default thereunder. Borrower has not agreed to pay any other Indebtedness in priority to the Obligations.

### 5.15   Agreements with Affiliates

Except for transactions permitted under Section 7.6, there are no existing or proposed material agreements, arrangements, understandings or transactions between any Credit Party and any of its officers, members, managers, Managers, directors, stockholders, partners, other interest holders, employees or Affiliates or any members of their respective immediate families, other than the Management Agreements.

### 5.16   Insurance

Borrower has in full force and effect such insurance policies as are customary in its industry and as may be required pursuant to Section 6.5. All such insurance policies as in force on the date of this Agreement are listed and described on Schedule 5.16.

### 5.17    Names, Location of Offices, Records and Collateral

During the preceding five years, Borrower has not conducted business under or used any name (whether corporate, partnership or assumed) other than as shown on Schedule 5.17A. Borrower is the sole owner of all of its names listed on Schedule 5.17A, and any and all business done and invoices issued in such names are Borrower's sales, business and invoices. As of the date of this Agreement, Borrower maintains its places of business and chief executive offices only at the locations set forth on Schedule 5.17B and Schedule 5.17B also identifies all of the addresses (including warehouses) at which any of the Collateral is located or Borrower's Books and Records regarding any Collateral are kept and identifying which Collateral and which Books and Records are kept at each location, the nature of such location (e.g., leased business location operated by Borrower, third party warehouse, consignment location, processor location, etc.) and the name and address of the third party owning or operating such location. Borrower may change any of the information set forth in Schedule 5.17B with no less than ten (10) Business Days' notice to Lender. No Collateral and no Books and Records in connection therewith or in any way relating thereto or that evidence the Collateral are located at any other location. All of the Collateral is and shall remain located (as that term is used in Section 9-301(2) of the UCC) only in the continental United States.

### 5.18    Accounts

In determining which Accounts are Eligible Receivables, Lender may rely on all statements and representations made by Borrower with respect to any Account. Unless otherwise indicated in writing to Lender, (i) each Account of Borrower that is included on a Borrowing Certificate as an Eligible Receivable (A) is genuine and in all respects what it purports to be and is not evidenced by a judgment, and (B) meets the criteria for an Eligible Receivable as set forth in the definition of that term, (ii) there are no facts, events or occurrences which in any way impair the validity or enforceability thereof or materially reduce the amount payable thereunder from the face amount of the claim or invoice and statements delivered to Lender with respect thereto, except to the extent the same is reflected in the calculation of Net Collectible Value, and (iii) Borrower has disclosed to Lender on each Borrowing Certificate the amount of all Accounts for which Medicare is the Account Debtor and for which payment has been denied and subsequently appealed, and Borrower is properly pursuing all available appeals in respects of such Accounts.

### 5.19    Healthcare Law Compliance Representations

To induce Lender to enter into this Agreement and to make credit accommodations contemplated hereby, Borrower hereby represents and warrants that all of the information regarding the Borrower and Project set forth in Schedule 5.19 is true, complete and correct, and that, except as disclosed in Schedule 5.19, the following statements are true, complete and correct:

(a)    <u>Healthcare Permits</u>. Borrower has (i) each Healthcare Permit and other rights from, and has made all declarations and filings with, all applicable Governmental Authorities, all self-regulatory authorities and all courts and other tribunals necessary to engage in the ownership, management and operation of the Project or the assets of Borrower, and (ii) no knowledge that any Governmental Authority is considering limiting, suspending or revoking any such Healthcare

47

Permit. All such Healthcare Permits are valid and in full force and effect and Borrower is in compliance with the terms and conditions of all such Healthcare Permits.

(b)     <u>Specific Licensing</u>. The Project is duly licensed under the applicable Laws of the state where the facility is located. The licensed bed or unit capacity of each such facility is shown on Schedule 5.19. Borrower has not granted to any third party the right to reduce the number of licensed beds, persons served or units in any of the health care facilities operated by Borrower or the right to apply for approval to move any and all of the licensed beds, persons served or units in the Project to any other location and there are no proceedings or contemplated to reduce the number of licensed beds, persons served or units in the Project.

(c)     <u>Leases</u>. The Lease has been approved by all necessary Governmental Authorities, if any. Under applicable Healthcare Laws in the state in which the Project is located, the reimbursement rate of the Borrower under applicable Third-Party Payor participation agreements is not affected by the rental rates under the Lease. The rentals provided for under the Lease comply with all applicable Healthcare Laws and do not exceed the sums permitted to be paid under applicable Healthcare Laws.

(d)     <u>Resident Agreements</u>. The Resident Agreements comply with all applicable Laws, including Healthcare Laws. Borrower shall not: (i) modify the form of Resident Agreement previously approved by Lender; (ii) accept any payment under any Resident Agreement more than one month in advance of its due date or in violation of the cash management or lockbox provisions of this Agreement; (iii) enter into any subleases with respect to the Project; (iv) modify, amend, renew, surrender, terminate, consent to a sublease of, consent to a transfer of, abate rent or other payments due under or otherwise grant any financial or other concession under any sublease with respect to the Project; or (v) enter into any Resident Agreement for a term of more than one (1) year, or upon rates other than market rates or upon a form that fails to comply with applicable Laws.

(e)     <u>Accreditation</u>. Borrower has received and maintains accreditation in good standing and without impairment by all applicable Accrediting Organizations, to the extent required by law (including any equivalent regulation) or the terms of any Lease pertaining to the Project. Neither Borrower nor Manager has received any notice or communication from any Accrediting Organization that the Project is (i) subject to or is required to file a plan of correction with respect to any accreditation survey, or (ii) in danger of losing its accreditation due to a failure to comply with a plan of correction.

(f)     <u>Participation Agreements/Provider Status/Cost Reports</u>. There is no investigation, audit, claim review, or other action pending or, to the knowledge of Borrower, threatened which could result in a revocation, suspension, termination, probation, restriction, limitation, or non-renewal of any Third-Party Payor participation agreement or provider number or other Healthcare Permit or result in Borrower's exclusion from any Third-Party Payor Program, nor has Borrower or any Third Party Payor Program made any decision not to renew any participation agreement or provider agreement or other Healthcare Permit related to the Project, nor is there any action pending or threatened to impose material intermediate or alternative sanctions with respect to the Project. Borrower, and, to Borrower's knowledge, its contractors, have properly and legally billed all intermediaries and Third-Party Payors for services rendered with respect to the Project and have

48

maintained their records to reflect such billing practices. No funds relating to Borrower are now, or, to Borrower's knowledge will be, withheld by any Third-Party Payor. Borrower has the requisite participation agreement or provider number or other Healthcare Permit to bill the Medicare program and the respective Medicaid programs in the state or states in which Borrower operates (to the extent Borrower participates in the Medicare or Medicaid program in such state or states) and all other Third-Party Payor Programs (including Medicare) which have historically accounted for any portion of the revenues of the Project. All Medicare, Medicaid, and private insurance cost reports and financial reports submitted by Borrower are and will be materially accurate and complete and have not been and will not be misleading in any material respects. No cost reports for the Project remain "open" or unsettled, and there are no current, pending, or outstanding Medicare, Medicaid, or other Third-Party Payor Program reimbursement audits or appeals pending with respect to the Project or Borrower.

(g)   No Violation of Laws. None of the Project, Borrower or any Manager are in violation of any applicable Laws, except where any such violation would not have a Material Adverse Effect. Borrower is HIPAA Compliant. The Project has not received a statement of deficiencies or survey violation of a "Level A" (or equivalent) or worse (with respect to assisted living facilities) or a tag level of "G" or higher with respect to any skilled nursing facility, within the past three years for which a plan of correction has not been filed with the applicable state authority. The Project is not currently subject to any plan of correction that has not been accepted by or is currently the subject of a review by the applicable state authority. Borrower has not received notice of any charges of patient abuse.

(h)   Proceedings. Neither Borrower nor the Project is subject to any proceeding, suit or, to Borrower's knowledge, investigation by any federal, state or local government or quasi-governmental body, agency, board or authority or any other administrative or investigative body (including the Office of the Inspector General of the United States Department of Health and Human Services):  (i) which may result in the imposition of a fine, alternative, interim or final sanction, a lower reimbursement rate for services rendered to eligible patients which has not been provided for on its financial statements, or which would have a Material Adverse Effect on Borrower or the operation of the Project; (ii) which could result in the revocation, transfer, surrender, suspension or other impairment of the operating certificate, provider agreement or Healthcare Permits of the Project; (iii) which pertains to or requests any voluntary disclosure pertaining to a potential overpayment matter involving the submission of claims to such payor by Borrower; or (iv) which pertains to any state or federal Medicare or Medicaid cost reports or claims filed by Borrower (including any reimbursement audits), or any disallowance by any commission, board or agency in connection with any audit of such cost reports.

(i)   Hill Burton. Except for Governmental Receivables, Borrower is not or will be a participant in any federal program whereby any federal, state or local government or quasi-governmental body, agency, board or other authority may have the right to recover funds by reason of the advance of federal funds, including those authorized under the Hill-Burton Act (42 U.S.C. 291, et seq.).

(j)   Fraud and Abuse.

(i)   Neither Borrower nor Manager has, or to its knowledge has been alleged to

have, and no owner, officer, Manager, manager, employee or Person with a "direct or indirect ownership interest" (as that phrase is defined in 42 C.F.R. §420.201) in Manager or Borrower has, engaged in any of the following:  (1) knowingly and willfully making or causing to be made a false statement or representation of a material fact in any application for any benefit or payment under any Healthcare Laws; (2) knowingly and willfully making or causing to be made any false statement or representation of a material fact for use in determining rights to any benefit or payment under any Healthcare Laws; (3) failing to disclose knowledge by a claimant of the occurrence of any event affecting the initial or continued right to any benefit or payment under any Healthcare Laws on its own behalf or on behalf of another, with intent to secure such benefit or payment fraudulently; (4) knowingly and willfully soliciting or receiving any remuneration (including any kickback, bribe or rebate), directly or indirectly, overtly or covertly, in cash or in kind or offering to pay such remuneration (I) in return for referring an individual to a Person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part by any Healthcare Laws, or (II) in return for purchasing, leasing or ordering or arranging for or recommending the purchasing, leasing or ordering of any good, facility, service, or item for which payment may be made in whole or in part by any Healthcare Laws; (5) presenting or causing to be presented a claim for reimbursement for services that is for an item or services that was known or should have been known to be (I) not provided as claimed, or (II) false or fraudulent; or (6) knowingly and willfully making or causing to be made or inducing or seeking to induce the making of any false statement or representation (or omitting to state a fact required to be stated therein or necessary to make the statements contained therein not misleading) of a material fact with respect to (I) the Project in order that the Project may qualify for Governmental Authority certification, or (II) information required to be provided under 42 U.S.C. § 1320a-3. All contractual arrangements to which Borrower is a party are in compliance with all Healthcare Laws.

(ii)    Neither Borrower nor Manager has, or to its knowledge has been alleged to have, and no owner, officer, Manager, manager, employee or Person with a "direct or indirect ownership interest" (as that phrase is defined in 42 C.F.R. §420.201) in Manager or Borrower has:  (1) had a civil monetary penalty assessed against him or her pursuant to 42 U.S.C. §1320a-7a or is the subject of a proceeding seeking to assess such penalty; (2) been excluded from participation in a Federal Health Care Program (as that term is defined in 42 U.S.C. §1320a-7b) or is the subject of a proceeding seeking to assess such penalty, or has been "suspended" or "debarred" from selling products to the U.S. government or its agencies pursuant to the Federal Acquisition Regulation, relating to debarment and suspension applicable to federal government agencies generally (48 C.F.R. Subpart 9.4), or other applicable Laws; (3) been convicted (as that term is defined in 42 C.F.R. §1001.2) of any of those offenses described in 42 U.S.C. §1320a-7b or 18 U.S.C. §§669, 1035, 1347, 1518 or is the subject of a proceeding seeking to assess such penalty; (4) been involved or named in a U.S. Attorney complaint made or any other action taken pursuant to the False Claims Act under 31 U.S.C. §§3729-3731 or qui tam action brought pursuant to 31 U.S.C. §3729 et seq.; (5) been made a party to any other action by any governmental authority that may prohibit it from selling products to any governmental or other purchaser pursuant to any applicable Law; or (6) become subject to any federal, state, local governmental or private payor civil or criminal investigations or inquiries, proceedings, validation review, program integrity review or statement of charges involving or related to its compliance

with Healthcare Laws or involving or threatening its participation in Medicare, Medicaid or other Third-Party Payor Programs or its billing practices with respect thereto.

**5.20    Reliance on Representations; Survival**

Borrower makes the representations and warranties contained herein with the knowledge and intention that Lender is relying and will rely thereon. All such representations and warranties will survive the execution and delivery of this Agreement and the making of the Advances under the Revolving Facility. No investigation or inquiry made by or on behalf of Lender nor knowledge by Lender which is in any fashion inconsistent with the representations and warranties contained herein, shall in any way (i) affect or lessen the representations and warranties made and entered into by Borrower hereunder, or (ii) reduce or in any way affect Lender's rights with respect to a breach of such representations and warranties.

**5.21    Compliance with Environmental Requirements; No Hazardous Substances**

(a)    No investigation, proceeding, directive, notice, notification, demand, request for information, citation, summons, complaint or order has been issued, no complaint has been filed, no penalty has been assessed and no investigation or review is pending, or to Borrower's knowledge, threatened by any Governmental Authority or other Person with respect to any (i) alleged violation by any Credit Party of any Environmental Law, (ii) alleged failure by any Credit Party to have any Permits required in connection with the conduct of its business or to comply with the terms and conditions thereof, (iii) any generation, treatment, storage, recycling, transportation or disposal of any Hazardous Substances, or (iv) release of Hazardous Substances;

(b)    No property now owned or leased by any Credit Party and, to the knowledge of Borrower, no such property previously owned or leased by any Credit Party, to which any Credit Party has, directly or indirectly, transported or arranged for the transportation of any Hazardous Substances, is listed or, to Borrower's knowledge, proposed for listing, on the National Priorities List promulgated pursuant to CERCLA, or CERCLIS (as defined in CERCLA) or any similar state list or is the subject of federal, state or local enforcement actions or, to the knowledge of Borrower, other investigations which may lead to claims against any Credit Party for clean-up costs, remedial work, damage to natural resources or personal injury claims, including claims under CERCLA;

(c)    Each Credit Party and its business, operations, assets, Equipment, property, leaseholds and other facilities are in compliance in all material respects with all Environmental Laws, specifically including all Environmental Laws concerning the storage and handling of Hazardous Substances; and

(d)    There has been no material emission, spill, release, or discharge into or upon (i) the air; (ii) soils, or any improvements located thereon; (iii) surface water or groundwater; or (iv) the sewer, septic system or waste treatment, storage or disposal system servicing the premises, of any Hazardous Substances at or from any of the real property listed on Schedule 5.4.

For purposes of this Section 5.21, each Credit Party shall be deemed to include any business or business entity (including a corporation) that is, in whole or in part, a predecessor of such Credit Party.

### 5.22    Material Contracts

Except for the Organizational Documents and the other agreements set forth on Schedule 5.22 (collectively with the Organizational Documents, the "**Material Contracts**"), there are no (a) employment agreements covering the management of any Credit Party, (b) collective bargaining agreements or other similar labor agreements covering any employees of any Credit Party, (c) agreements for managerial, consulting or similar services to which any Credit Party is a party or by which it is bound, (d) agreements regarding any Credit Party, its assets or operations or any investment therein to which any of its equity holders is a party or by which it is bound, (e) real estate leases, Intellectual Property licenses or other lease or license agreements to which any Credit Party is a party, either as lessor or lessee, or as licensor or licensee (other than licenses arising from the purchase of "off the shelf" products), (f) customer, distribution, marketing or supply agreements to which any Credit Party is a party, in each case with respect to the preceding clauses (a) through (f) requiring payment of more than $25,000 in any year, (g) partnership agreements to which any Credit Party is a general partner or joint venture agreements to which any Credit Party is a party, or (h) any other agreements or instruments to which any Credit Party is a party, and the breach, nonperformance or cancellation of which, or the failure of which to renew, could reasonably be expected to have a Material Adverse Effect. Schedule 5.22 sets forth, with respect to each real estate lease agreement to which Borrower is a party (as a lessee), the address of the subject property and the annual rental (or, where applicable, a general description of the method of computing the annual rental). The consummation of the transactions contemplated by the Loan Documents will not give rise to a right of termination in favor of any party to any Material Contract (other than any Credit Party), except for such Material Contracts the noncompliance with which would not reasonably be expected to have a Material Adverse Effect.

### 5.23    Third-Party Payor Billing Numbers

The numbers under which the Borrower bills Third-Party Payors are listed on Schedule 5.23 and all such billing numbers have been issued to Borrower and not to any Affiliate of Borrower and not to any unaffiliated third party; and Borrower has not allowed any Person that is not a borrower hereunder to use such billing numbers for any purpose.

### 5.24    Non-Subordination

(a)    Except as otherwise set forth in the Financing Orders, the Obligations are not subordinated in any way to any other obligations of Borrower or to the rights of any other Person.

(b)    Upon the entry of each Financing Order by the Bankruptcy Court, the Obligations of the Borrower will, subject to the Carve Out, constitute allowed Superpriority Claims, having priority in payment over all other administrative expenses and unsecured claims against the Borrower now existing or hereafter arising, of any kind or nature whatsoever, including without limitation, all administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 328, 503(b), 506(c), 507(a), 507(b), 546(c), 726 and 1114 of the Bankruptcy Code.

(c)     The security interests granted in this Agreement will, upon the entry of each Financing Order by the Bankruptcy Court, be prior to all other interests and Liens with respect to the Collateral.

### 5.25   Financing Orders

The Financing Orders are in full force and effect and are not subject to a pending appeal, motion for leave to appeal, or other proceeding to set aside such orders, and such Financing Orders have not been reversed, modified, stayed or vacated absent the Lender's written consent.

### 5.26   DIP Order Notices

The Bankruptcy Case was commenced on the Petition Date in accordance with applicable law and proper and all legally required notice thereof and the proper notice for (i) the motion seeking approval of the Loan Documents and the Interim Financing Order and Final Financing Order; (ii) the hearing for the approval of the Interim Financing Order, and (iii) the hearing for the approval of the Final Financing Order, have been or will be timely given.

### 5.27   Superpriority Administrative Expense Claims

After the entry of the Interim Financing Order, and pursuant to and to the extent permitted in the Interim Financing Order and the Final Financing Order, the Obligations will constitute allowed Superpriority Claims.

### 5.28   DIP Liens

After the entry of the Interim Financing Order and pursuant to and to the extent provided in the Final Financing Order, the Obligations will be secured by a valid and perfected superpriority Lien on all of the Collateral, subject only to the Liens and priorities of other claims (if any) as provided by the Financing Orders.

### 5.29   Use of Proceeds.

The Proceeds of the Loans have been used in and will be used in compliance with Section 6.11.

## VI.   AFFIRMATIVE COVENANTS

Borrower covenants and agrees that, until full performance and satisfaction, and payment in full in cash, of all the Obligations (other than indemnity obligations with respect to which no claim has been made) and termination of this Agreement:

### 6.1   Financial Statements, Reports and Other Information

(a)     <u>Financial Reports</u>. Borrower shall furnish to Lender (i) as soon as available and in any event within one hundred twenty (120) days after the end of each fiscal year of Borrower, Borrower's annual financial statements, including the notes thereto, consisting of a balance sheet at the end of such completed fiscal year and the related income statements, retained earnings, cash

flows and owners' equity for such completed fiscal year, internally prepared by Borrower, and, if Borrower's annual revenues exceed $20,000,000, such financial statements shall be audited and certified without qualification by an independent certified public accounting firm satisfactory to Lender and accompanied by related management letters, if available, and (ii) within thirty (30) days after the end of each calendar month, Borrower's unaudited financial statements consisting of a balance sheet and income statements, retained earnings, cash flows and owners' equity as of the end of such calendar month. All such financial statements shall be prepared in accordance with GAAP consistently applied with prior periods. With each such financial statement, Borrower shall also deliver a compliance certificate of its chief executive officer or chief financial officer in the form set forth in Exhibit B (a "**Compliance Certificate**") showing compliance with all financial and loan covenants set forth in Annex I. In addition to the above financial reports, Borrower shall furnish to Lender as soon as available and, in any event, within ten (10) days after the end of each calendar month, statements from Borrower's bank showing all account activity for the preceding calendar month.

(b)    <u>Accounts Receivable Aging Schedules</u>. Borrower shall furnish to Lender as soon as available, and in any event within ten (10) days after the end of each calendar month, detailed accounts receivable and accounts payable aging schedules as of the end of such month, in a form satisfactory to Lender.

(c)    <u>Forms 941</u>. Within thirty (30) days following the end of each calendar quarter, Borrower shall furnish Lender with a copy of all IRS Forms 941 required to be filed by Borrower with respect to the quarter then ended.

(d)    <u>Other Materials</u>. Borrower shall furnish to Lender as soon as available, and in any event within fifteen (15) days after the preparation or issuance thereof or at such other time as set forth below:

(i)    *Communications with Equity Owners*. Any reports, returns, information, notices and other materials that Borrower shall send or be required to send to all of its stockholders, members, partners or other equity owners at any time;

(ii)    *Cost Reports*. All Medicare and Medicaid cost reports and other documents and materials filed by or on behalf of Borrower and any other reports, materials or other information regarding or otherwise relating to Medicaid or Medicare prepared by, for or on behalf of Borrower;

(iii)    *Medicare/Medicaid Documents*. Any other reports, materials or other information regarding or otherwise relating to Medicaid or Medicare prepared by, for, or on behalf of, Borrower or any of its Subsidiaries, including (A) copies of licenses and permits required by any applicable federal, state, foreign or local law, statute ordinance or regulation or Governmental Authority for the operation of its business, (B) Medicaid or Medicare provider numbers and agreements, (C) state surveys pertaining to the Project, (D) participating agreements relating to medical plans and (E) copies of all Medicare or

Medicaid surveys, or other surveys or reviews conducted by any government health plan or other accreditation entity;

(iv)    *Monthly Reports*. Within ten (10) days after the end of each calendar month for such month, (A) a report of the status of all payments, denials and appeals of all Medicaid and Medicare Accounts, (B) a sales and collection report (including credits issued) in a form satisfactory to Lender, all such reports showing a reconciliation to the amounts reported in the monthly financial statements, and (C) a report of census and occupancy percentage;

(v)    *Insurance Renewals*. Prior to the expiration date of each of the insurance policies required to be maintained pursuant to Section 6.5, proof of the renewal of each such insurance policy together with copies of the declarations page for each such renewed policy;

(vi)    *Accountants Communications*. Promptly upon receipt thereof, copies of any reports submitted to Borrower by its independent accountants in connection with any interim audit of the books of Borrower and copies of each management control letter provided by such independent accountants;

(vii)    *Documents Requested by Lender*. Such additional information, documents, statements, reports and other materials as Lender may reasonably request from a credit or security perspective or otherwise from time to time, including, but not limited to, periodic receivable and payable aging reports, payroll tax information, dilution analyses, origination reports and default/charge off reports; and

(viii)    *Budget*.  On or before 12:00 pm EST on the fourth Business Day of each week, commencing with the first week following the Petition Date, the Borrower shall deliver to the Lender (i) a report comparing, on a line-item basis, actual cash receipts and disbursements against cash receipts and disbursements set forth in the previously delivered Budget, and (ii) an updated Budget for the proceeding thirteen-week period. Such updated Budget(s), in each case in form and substance satisfactory to the Lender, once approved in writing by the Lender, shall become the Budget for all purposes going forward hereunder until a subsequent Budget is submitted and approved by the Lender. In the event the updated Budget provided by the Borrower under section (ii) of this provision is not approved in writing by the Lender, the Budget most recently approved by the Lender in writing shall remain the Budget for all purposes going forward.

(e)    Notices. Borrower shall promptly, and in any event within five (5) Business Days after Borrower or any officer of Borrower obtains knowledge thereof, notify Lender in writing of (i) any pending litigation, suit, investigation, arbitration, formal dispute resolution proceeding or administrative proceeding brought against or initiated by Borrower or otherwise affecting or involving or relating to Borrower or any of its property or assets to the extent (A) the amount in controversy exceeds $25,000, or (B) to the extent any of the foregoing seeks injunctive relief, (ii) any Default or Event of Default, which notice shall specify the nature and status thereof, the period of existence thereof and what action is proposed to be taken with respect thereto, (iii) any other development, event, fact, circumstance or condition that could reasonably be expected to have a

Material Adverse Effect, in each case describing the nature and status thereof and the action proposed to be taken with respect thereto, (iv) any notice received by Borrower from any payor of an Account to the effect that such payor has one or more claims against Borrower involving aggregate amounts in excess of $25,000, (v) any matter(s) affecting the value, enforceability or collectability of any of the Collateral, including claims or disputes in the amount of $25,000 or more, singly or in the aggregate, in existence at any one time, (vi) any notice given by Borrower to any other lender of Borrower and shall furnish to Lender a copy of such notice, (vii) receipt of any notice or request from any Governmental Authority or governmental payor regarding any liability or claim of liability outside the ordinary course of business, (viii) termination of any executive manager of any facility owned, operated or leased by Borrower, or (ix) if any Account becomes evidenced or secured by an Instrument or Chattel Paper. Borrower shall not be required to provide any notices to the extent any of the foregoing are set forth in a document filed on the Bankruptcy Court's CM-ECF system in the Bankruptcy Case,

(f)      Consents. Borrower shall obtain and deliver from time to time all required consents, approvals and agreements from such third parties as Lender shall determine are necessary or desirable in its Permitted Discretion (as communicated to Borrower by written notice) for the protection of its Collateral and that are reasonably satisfactory to Lender with respect to the Loan Documents and the transactions contemplated thereby or any of the Collateral, including Landlord Waivers and Consents with respect to leases entered into after the Closing Date.

(g)      Operating Budget. The Borrower shall furnish to the Lender prior to the Closing Date a Budget setting forth the Borrower's projected cash receipts and disbursements and the Loans projected to be outstanding on a weekly basis for a period of thirteen weeks, commencing with the week Closing occurs. On the fourth Business Day of each calendar week, the Borrower will provide the Lender with (i) a report comparing, on a line-item basis, actual cash receipts and disbursements against cash receipts and disbursements set forth in the previously delivered Budget, and (ii) an updated Budget for the proceeding thirteen-week period. At the request of the Lender, the Borrower shall furnish to the Lender month-by-month projected operating budgets, annual projections, balance sheets, and cash flow reports of and for the Borrower for any requested period (including an income statement for each month). All reports and Budgets delivered under this Section 6.1(g) shall be prepared in accordance with GAAP and consistently applied with prior periods.

(i)      The use of Loans and other extensions of credit by the Lender under this Agreement and the other Loan Documents shall be limited in accordance with the Budget (subject to the Permitted Variance) and the terms hereof.  The initial approved Budget shall depict, on a weekly basis, cash receipts, expenses, disbursements, and net cash flows, budgeted 503(b)(9) payments, the projected Borrowing Base, Availability, and the other items set forth therein, for the first thirteen (13) week period from the Effective Date and such initial approved Budget shall be approved by, and in form and substance satisfactory to, the Lender in its discretion (it being acknowledged and agreed that the initial approved Budget attached hereto is approved by and satisfactory to the Lender).  The Budget shall be updated, modified or supplemented by the Borrower only with the written consent of the Lender. In the event the Lender, on the one hand, and the Borrower, on the other hand, cannot agree as to an updated, modified or supplemented Budget, such disagreement shall give rise to an Event of Default once the period covered by the prior Budget has terminated.

Each Budget delivered to the Lender shall be accompanied by such supporting documentation as reasonably requested by the Lender.  Each Budget shall be prepared in good faith based upon assumptions which the Borrower believes to be reasonable.

(h)     <u>Healthcare Notices</u>. Borrower shall notify Lender within three (3) Business Days (but in any event prior to Borrower submitting any requests for advances of reserves or escrows or fundings of credit facility proceeds under this Agreement) following the occurrence of any facts, events or circumstances known to Borrower, whether threatened, existing or pending, that would make any of the representations and warranties contained in Section 5.19 untrue, incomplete or incorrect (together with such supporting data and information as shall be necessary to fully explain to Lender the scope and nature of the fact, event or circumstance), and shall provide to Lender within 2 Business Days of Lender's request, such additional information as Lender shall request regarding such disclosure.

(i)     <u>Notices with Respect to Lease</u>. In connection with that certain Sublease Agreement between Wealshire Master Tenant, LLC, an Illinois limited liability company, as landlord or sublessor, and Borrower, as tenant or sublessee, dated as of the date hereof (the "**Lease**"), Borrower shall:

(i)  notify Lender within one (1) Business Day of any default, event of default, or alleged default or event of default in connection with the Lease;

(ii)  notify Lender within one (1) Business Day of any termination of the Lease; and

(iii) at Lender's request, provide Lender with evidence satisfactory to Lender of Borrower's payment of all rent due under the Lease on a monthly basis within one (1) Business Day of such payment.

(j)     <u>Late Fee</u>. Notwithstanding any other provision of this Agreement, in the event any of the financial statements or other reports or documents due by Borrower under this Section 6.1 are not timely delivered to Lender, Borrower shall pay Lender a late fee equal to $250 per day until such statements or reports are delivered to Lender. Such late fee shall be in addition to any other fees, charges or other provisions that may increase the Applicable Rate of interest hereunder and the assessment or collection of such late fee shall not, unless Lender specifically agrees in writing to the contrary, prevent Lender from considering any such non-timely delivery to be a Default or an Event of Default.

**6.2     Payment of Obligation**

Borrower shall make full and timely payment in cash of the principal of and interest on the Loans, Advances and all other Obligations when due and payable. Borrower will maintain, and cause each Subsidiary to maintain, in accordance with GAAP, appropriate reserves for the accrual of all of their respective obligations and liabilities.

**6.3     Conduct of Business and Maintenance of Existence and Assets**

Borrower shall (i) engage principally in the same or similar lines of business substantially as heretofore conducted, (ii) collect its Accounts in the ordinary course of business,

(iii) maintain all of its material properties, assets and Equipment used or useful in its business in good repair, working order and condition (normal wear and tear excepted and except as may be disposed of in the ordinary course of business and in accordance with the terms of the Loan Documents and otherwise as determined by Borrower using commercially reasonable business judgment), and shall promptly make or cause to be made all repairs, replacements and other improvements in connection therewith that are necessary or desirable to such end, (iv) from time to time make all necessary or desirable repairs, renewals and replacements thereof, as determined by Borrower using commercially reasonable business judgment, (v) maintain and keep in full force and effect its existence, (vi) maintain and keep in full force and effect, in good standing, and free from restrictions, probations, conditions or known conflicts which would materially impair Borrower's business, all qualifications to do business in each jurisdiction in which the ownership or lease of property or the nature of its business makes such qualification necessary, and (vii) maintain and keep in full force and effect all Healthcare Permits necessary under Healthcare Laws to continue to receive reimbursement under all Third-Party Payor Programs in which Borrower participates as of the date of this Agreement.

### 6.4    Compliance with Legal, Tax and Other Obligations

Borrower shall (i) substantially comply with all Laws applicable to it or its business, assets or operations, (ii) file their tax returns (including any informational returns) and pay all taxes (including bed taxes), assessments, fees, governmental charges, claims for labor, supplies, rent and all other obligations or liabilities of any kind, as and when due and payable, except liabilities being contested in a Permitted Contest; however, all payroll taxes payable in connection with each payroll shall be paid or funds shall set aside in a reserve in an amount adequate to pay all such payroll taxes contemporaneously with the payment of such payroll, and (iii) perform in accordance with its terms each contract, agreement or other arrangement to which it is a party or by which it or any of the Collateral is bound, in each case, except where the failure to comply with any of the foregoing provisions of this Section 6.4 could reasonably be expected not to have a Material Adverse Effect.

### 6.5    Insurance

(a)    Borrower shall (i) keep all of its insurable properties and assets adequately insured in all material respects against losses, damages and hazards as are customarily insured against by businesses engaging in similar activities or owning similar assets or properties and at least the minimum amount required by applicable Law, including medical malpractice and professional liability insurance, as applicable; (ii) maintain business interruption insurance, (iii) maintain general public liability insurance at all times against liability on account of damage to persons and property having such limits, deductibles, exclusions and co-insurance and other provisions as are customary for a business engaged in activities similar to those of Borrower; and (iv) maintain insurance under all applicable workers' compensation Laws. All of the insurance policies referenced above shall be (x) satisfactory in form and substance to Lender in its Permitted Discretion and (y) placed with insurers having an A.M. Best policyholder rating acceptable to Lender in its Permitted Discretion. Borrower agrees that it shall not alter, amend, modify or cancel its insurance policies without thirty (30) Business Days prior written notice to Lender unless such alteration, amendment, modification or cancellation, shall be in compliance with the requirements set forth above. The insurance policies referenced in clauses (i) and (ii) shall name Lender as a

loss payable thereunder. The insurance policies referenced in clause (iii) shall name Lender as an additional insured thereunder.

(b)      **Warning. In the event Borrower fails to provide Lender with evidence of the insurance coverage required by this Agreement, Lender may purchase insurance at Borrower's expense to protect Lender's interests in the Collateral. This insurance may, but need not, protect Borrower's interests.** The coverage purchased by Lender may not pay any claim made by Borrower or any claim that is made against Borrower in connection with the Collateral. Borrower may later cancel any insurance purchased by Lender, but only after providing Lender with evidence that Borrower has obtained insurance as required by this Agreement. If Lender purchases insurance for the Collateral, Borrower will be responsible for the costs of that insurance to the fullest extent provided by applicable Law, including interest and other charges imposed by Lender in connection with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance. The costs of the insurance may be added to the Obligations. The costs of the insurance may be more than the cost of insurance Borrower is able to obtain on its own.

6.6      **True Books**

Borrower shall (i) keep true, complete and accurate books of record and accounts in accordance with commercially reasonable business practices in which true and correct entries are made of all of its dealings and transactions in all material respects; and (ii) set up and maintain on its books such reserves as may be required by GAAP with respect to doubtful accounts and all taxes, assessments, charges, levies and claims and with respect to its business, and include such reserves in its quarterly as well as year-end financial statements; and (iii) maintain their Books and Records separate from the books and records of their members, managers, shareholders, Affiliates and any other Person.

6.7      **Inspection; Period Audits**

Borrower shall permit the representatives of Lender, from time to time during normal business hours, upon at least 72 hours prior notice but not more than one time in any twelve-month period, to (i) visit and inspect any of its offices or properties or any other place where Collateral is located to inspect the Collateral or to examine or audit all of Borrower's books of account, records, reports and other papers, (ii) make copies and extracts therefrom, and (iii) discuss Borrower's business, operations, prospects, properties, assets, liabilities, condition or Accounts with Borrower's officers, managers, and independent public accountants (the performance of the foregoing activities is referred to herein as a "site audit"). In addition, Lender may conduct "desk audits" of Borrower at Lender's offices no more frequently than monthly by (i) reviewing and inspecting Borrower's books and records as Lender may require Borrower to transmit to Lender, and (ii) discussing Borrower's business, operations, prospects, properties, assets, liabilities, condition or Accounts with Borrower's officers, managers and independent public accountants. Each of Borrower's officers, managers and accountants are authorized to discuss any matter relating to the foregoing with Lender at any time. At the completion of each site audit, Borrower shall pay Lender an audit fee of $1,200.00 per auditor per day (provided, however, Lender shall utilize the services of only one auditor per day for its site audits) and Borrower shall reimburse Lender for all site audit-related out-of-pocket expenses. At the

59

completion of each desk audit, Borrower shall pay Lender an audit fee of $1,240.00 and Borrower shall reimburse Lender for all desk audit-related out-of-pocket expenses. Notwithstanding the foregoing, upon the occurrence and during the continuance of an Event of Default, there shall be no restrictions on the number of auditors that Lender may use or number of times that Lender may perform the activities described in this Section 6.7 nor shall Lender be required to give prior notice to Borrower of any visit to inspect Borrower's books and records or to discuss any matter with Borrower's officers, managers or independent public accountants.

### 6.8    Further Assurances; Post Closing

At Borrower's cost and expense, Borrower shall (i) within five (5) Business Days after Lender's reasonable request, take such further actions, and duly execute and deliver such further agreements, assignments, instructions or documents and do such further acts and things as may be necessary or proper in the reasonable opinion of Lender to carry out more effectively the provisions and purposes of this Agreement and the Loan Documents, and (ii) upon the exercise by Lender or any of its Affiliates of any power, right, privilege or remedy pursuant to any Loan Documents or under applicable Law or at equity which requires any consent, approval, registration, qualification or authorization of any Person, including a Governmental Authority, execute and deliver, or cause the execution and delivery of, all applications, certificates, instruments and other documents that Lender or its Affiliate may be required to obtain for such consent, approval, registration, qualification or authorization. Without limiting the generality of the foregoing, (x) Borrower shall, at the time of the delivery of any Compliance Certificate disclosing the acquisition by an Credit Party of any registered Intellectual Property or application for the registration of Intellectual Property, deliver to Lender a duly completed and executed supplement to the applicable Credit Party's patent security agreement or trademark security agreement in the form of the respective Exhibit thereto, and (y) at the request of Lender, following the disclosure by Borrower on any Compliance Certificate of the acquisition by any Credit Party of any rights under a license as a licensee with respect to any registered Intellectual Property or application for the registration of any Intellectual Property owned by another Person, Borrower shall execute any documents requested by Lender to establish, create, preserve, protect and perfect a first priority lien in favor of Lender, to the extent legally possible, in Borrower's rights under such license and shall use its commercially reasonable best efforts to obtain the written consent of the licensor which such license to the granting in favor of Lender of a Lien on Borrower's rights as licensee under such license.

### 6.9    Payment of Indebtedness

Except as otherwise prescribed in the Loan Documents, Borrower shall pay, discharge or otherwise satisfy at or before maturity (subject to applicable grace periods and, in the case of trade payables, to ordinary course payment practices) all of its material Indebtedness, except when the amount or validity thereof is being contested in a Permitted Contest.

### 6.10   Lien Terminations

If Liens other than Permitted Liens exist, Borrower immediately shall take, execute and deliver all actions, documents and instruments necessary to release and terminate such Liens.

### 6.11    Use of Proceeds

The Borrower shall use the proceeds of the Loans solely for (a) transaction fees incurred in connection with the Loan Documents; and (b) for working capital needs of the Borrower through the Bankruptcy Case in accordance with the Budget. No portion of the proceeds of the Loans will be used for family, personal, agricultural or household use, or for any purpose prohibited by the Financing Orders or the Bankruptcy Code or any other order of the Bankruptcy Court.

### 6.12    Collateral Documents; Security Interest in Collateral

Borrower hereby acknowledges that Lender is authorized to file UCC-1 Financing Statements with respect to the Collateral, and any amendments or continuations relating thereto, without the signature of Borrower in such jurisdictions as Lender, from time to time determines appropriate. Borrower hereby ratifies, confirms and consents to any such filings made by Lender prior to the date hereof. Borrower hereby agrees to execute any additional documents or financing statements which Lender deems necessary in its reasonable discretion in order to evidence Lender's security interest in the Collateral. Borrower shall not allow any financing statement (other than that filed by or on behalf of Lender and other than with respect to Permitted Liens) to be on file in any public office covering any Collateral or the proceeds thereof. Pursuant to Section 2.11, Lender has full power of attorney to execute, deliver, file, register and record in the name of Borrower any financing statements, schedules, assignments, instruments, and documents necessary to perfect Lender's security interest in or lien on any Collateral. If necessary or advisable beyond that power of attorney, and at the reasonable request of Lender upon reasonable notice, Borrower shall (i) execute, obtain, deliver, file, register and record any and all financing statements, continuation statements, stock powers, instruments and other documents, or cause the execution, filing, registration, recording or deliver of any and all of the foregoing, that are necessary or required under applicable Law or otherwise or reasonably requested by Lender to be executed, filed, registered, obtained, delivered or recorded to create, maintain, perfect, preserve, validate or otherwise protect the pledge of the Collateral to Lender and Lender's perfected first priority Lien on the Collateral (and Borrower irrevocably grants Lender the right, at Lender's option, to file any or all of the foregoing) and (ii) defend the Collateral and Lender's perfected first priority Lien thereon against all claims and demands of all Persons at any time claiming the same or any interest therein adverse to Lender, and pay all reasonable costs and expenses (including reasonable in-house documentation and diligence fees and reasonable legal expenses and reasonable attorneys' fees and expenses) in connection with such defense, which may at Lender's discretion be added to the Obligations and increase the principal amount outstanding hereunder.

### 6.13    Taxes and Other Charges

All payments and reimbursements to Lender made under any Loan Document shall be free and clear of and without deduction for all taxes, levies, imposts, deductions, assessments, charges or withholdings, and all liabilities with respect thereto of any nature whatsoever, excluding taxes to the extent imposed on Lender's net income. If Borrower shall be required by applicable Law to deduct any such amounts from or in respect of any sum payable under any Loan Document to Lender, then the sum payable to Lender shall be increased as may be necessary so that, after making all required deductions, Lender receives an amount equal to the sum it would have received

had no such deductions been made. Notwithstanding any other provision of any Loan Document, if at any time after the Closing (i) any change in any existing Law or in the interpretation or application thereof, (ii) any new Law (A) subjects Lender to any tax, levy, impost, deduction, assessment, charge or withholding of any kind whatsoever with respect to any Loan Document, or changes the basis of taxation of payments to Lender of any amount payable thereunder (except for net income taxes, or franchise taxes imposed in lieu of net income taxes, imposed generally by federal, state or local taxing authorities with respect to interest or facility fees or other fees payable hereunder or changes in the rate of tax on the overall net income of Lender), or (B) imposes on Lender any other condition or increased cost in connection with the transactions contemplated thereby or participations therein; and the result of any of the foregoing is to increase the cost to Lender of making or continuing any Loan hereunder or to reduce any amount receivable hereunder, then, in any such case, Borrower shall promptly pay to Lender any additional amounts necessary to compensate Lender, on an after-tax basis, for such additional cost or reduced amount as determined by Lender. If Lender becomes entitled to claim any additional amounts pursuant to this Section 6.13 it shall promptly notify Borrower of the event by reason of which Lender has become so entitled, and each such notice of additional amounts payable pursuant to this Section 6.13 submitted by Lender to Borrower shall, absent manifest error, be final, conclusive and binding for all purposes. For purposes of this Section, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "change in any law", regardless of the date enacted, adopted or issued.

### 6.14   Payroll Agent

In the event any payroll taxes owed by Borrower are not paid on a timely basis, or at any time at the request of Lender, Borrower shall either (a) retain and use a payroll agent for purposes of processing, managing and paying Borrower's payrolls, including all payroll tax payments required to be made under applicable tax laws and regulations, or (b) be enrolled in the Electronic Federal Payment Tax Service on line at www.eftps.com and provide such information and authorizations to Lender as may be required for Lender to monitor payment of periodic payroll taxes or (c) utilize a professional employer service organization to lease employees, provided that such organization provides to Borrower adequate insurance against the failure of such organization to make required tax payments with respect to the leased employees. If Borrower uses a payroll agent, the payroll agent shall be a third party, independent of Borrower, reasonably acceptable to Lender. Borrower shall instruct the payroll agent to provide such reports directly to Lender as Lender may request from time to time reflecting payment of applicable payroll taxes and, in any event, such payroll agent shall deliver to Lender within ten (10) days after the end of each calendar month a report of Borrower's payroll taxes for the immediately preceding calendar month and evidence of payment thereof.

### 6.15   Hazardous Substances

(a)      If any release or disposal of Hazardous Substances shall occur or shall have occurred on any real property or any other assets of Borrower or any other Credit Party, Borrower

will cause, or direct the applicable Credit Party to cause, the prompt containment and removal of such Hazardous Substances and the remediation of such real property or other assets as is necessary to comply with all Environmental Laws and to preserve the value of such real property or other assets. Without limiting the generality of the foregoing, Borrower shall, and shall cause each other Credit Party to, comply with each Environmental Law requiring the performance at any real property by Borrower or any other Credit Party of activities in response to the release or threatened release of a Hazardous Substances.

(b)      Borrower will provide Lender within thirty (30) days after written demand therefor with a bond, letter of credit or similar financial assurance evidencing to the reasonable satisfaction of Lender that sufficient funds are available to pay the cost of removing, treating and disposing of any Hazardous Substances or Hazardous Substances Contamination and discharging any assessment which may be established on any property as a result thereof, such demand to be made, if at all, upon Lender's reasonable business determination that the failure to remove, treat or dispose of any Hazardous Substances or Hazardous Substances Contamination, or the failure to discharge any such assessment could reasonably be expected to have a Material Adverse Effect.

**6.16    Licensed Facilities**

(a)      <u>Certificates of Need</u>. (i) If required under applicable Healthcare Laws, Borrower has and shall maintain in full force and effect a valid CON for no less than the number of beds and units in the Project as of the date of this Agreement. Borrower shall maintain any applicable CON free from restrictions or known conflicts which would materially impair the use or operation of the Project for its current use, and shall not permit any CON to become provisional, probationary or restricted in any way. Borrower that is the owner of the fee simple real estate for the Project shall be the owner of the CON, if any, relating to the Project. (ii) Borrower shall not do (or suffer to be done by Borrower or any Affiliate of Borrower) any of the following without Lender's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed: (1) replace or transfer all or any part of the Project's units or beds to another site or location; (2) transfer or demise any CON or other Healthcare Permit or rights thereunder to any Person (other than Lender) or to any location other than the Project to which such CON or Healthcare Permit pertains; or (3) pledge or hypothecate any CON or other Healthcare Permit as collateral security for any indebtedness other than indebtedness to Lender.

(b)      <u>Resident Deposits and Resident Agreements</u>. Borrower will maintain or cause to be maintained all deposits (including deposits relating to patients or Resident Agreements), and if such deposits are in cash, such deposits are to be deposited and held by Borrower (or the Manager under the Management Agreement), as the case may be, at such commercial or savings bank or banks as may be reasonably satisfactory to Lender; if such deposits are in any other form, such deposits are to be maintained as Lender may expressly permit. Any bond or other instrument which Borrower (or the Manager under the Management Agreement), as the case may be, is permitted to hold in lieu of cash deposits under any applicable legal requirements shall be maintained in full force and effect unless replaced by cash deposits as hereinabove described, shall be issued by an institution reasonably satisfactory to Lender, shall, if permitted pursuant to any legal requirements, name Lender as payee or mortgagee thereunder (or at Lender's option, be fully assignable to Lender) and shall, in all respects, comply with any applicable Laws and legal requirements and otherwise be reasonably satisfactory to Lender. Borrower shall, upon request, provide Lender with

evidence reasonably satisfactory to Lender of Borrower's compliance with the foregoing. Following the occurrence and during the continuance of any Event of Default, Borrower shall, upon Lender's request, if permitted by any applicable legal requirements, turn over to Lender the deposits (and any interest theretofore earned thereon) with respect to the Project, to be held by Lender subject to the terms of their related agreements. No Resident Agreements (i) deviate or will deviate in any material adverse respect from the standard form approved by Lender prior to Closing, or (ii) conflict with any Laws.

(c)    Manager. To the extent the Project is subject to a Management Agreement, Borrower shall cause the Project at all times to be managed by one or more managers (collectively in the singular, the "**Manager**") pursuant to Management Agreements approved by Lender in writing and that comply with all applicable Healthcare Laws. Borrower shall not (i) change the Manager of the Project or make any modification, amendment, termination or cancellation of the Management Agreements or agreements with brokers, (ii) enter into any other agreement relating to the management or operation of the Project with Manager or any other Person, (iii) consent to the assignment by Manager of its interest under the Management Agreements, or (iv) waive or release any of its rights and remedies under the Management Agreements, in each case, without the prior written consent of Lender given or withheld in Lender's sole discretion. Any substitute property manager (or Manager) shall be required to enter into an assignment and subordination of management or operating agreement in form and substance reasonably satisfactory to Lender. Such restrictions and approval rights are solely for the purposes of assuring that the Project are managed and operated in a first-class manner consistent with Healthcare Laws and the preservation and protection of the Project as security for the Obligations and shall not place responsibility for the control, care, management or repair of the Project upon Lender, or make Lender responsible or liable for any negligence in the management, operation, upkeep, repair or control of the Project.

**6.17    Healthcare Operations**

(a)    Borrower will:

(i)    timely file or cause to be timely filed (after giving effect to any extension duly obtained), all notifications, reports, submissions, Permit renewals and reports (other than cost reports as provided in Section 6.17(a)(ii) below) of every kind whatsoever required by Healthcare Laws (which reports will be materially accurate and complete in all respects and not misleading in any respect and shall not remain open or unsettled); and

(ii)    timely file or cause to be timely filed (after giving effect to any extension duly obtained), all cost reports required by Healthcare Laws, which reports shall be materially accurate and complete in all respects and not misleading in any material respect and which shall not remain open or unsettled, except in accordance with applicable settlement appeals procedures that are timely and diligently pursued and except for any processing delays of any Governmental Authority.

(b)    Borrower will maintain in full force and effect, and free from restrictions, probations, conditions or known conflicts which would materially impair the use or operation of the Project for its current use, all Healthcare Permits necessary under Healthcare Laws to carry on Borrower's business as it is conducted on the Closing Date.

64

(c)      Borrower will not suffer or permit to occur any of the following:

(i)      any transfer of a Healthcare Permit or rights thereunder to any Person (other than Borrower or Lender) or to any location other than a Project approved by Lender in advance in writing;

(ii)      any pledge or hypothecation of any Healthcare Permit as collateral security for any indebtedness other than indebtedness to Lender;

(iii)      any rescission, withdrawal, revocation, amendment or modification of or other alteration to the nature, tenor or scope of any Healthcare Permit without Lender's prior written consent, including (A) any change to the authorized units/beds and persons served capacity of the Project or the number of units/beds and persons served approved by the applicable Governmental Authority, and (B) any transfer all or any part of the Project's authorized units or beds to another site or location;

(iv)      any voluntary transfer of any resident of the Project to any other facility, unless such transfer is at the request of the resident (without economic incentives being given to the resident by an Affiliate of Borrower) or its payor or is for reasons relating to non-payment or the health, required level of medical care or safety of the resident to be transferred; or

(v)      any fact, event or circumstance for which notice to Lender is required under Sections 5.20 and 6.1(h).

(d)      Borrower will maintain a corporate health care regulatory compliance program ("**CCP**") which includes at least the following components and allows Lender or any outside consultants from time to time to review such CCP:  (i) standards of conduct and procedures that describe compliance policies regarding laws with an emphasis on prevention of fraud and abuse; (ii) specific officer within high-level personnel identified as having overall responsibility for compliance with such standards and procedures; (iii) training and education programs which effectively communicate the compliance standards and procedures to employees and agents, including fraud and abuse laws and illegal billing practices; (iv) auditing and monitoring systems and reasonable steps for achieving compliance with such standards and procedures including publicizing a report system to allow employees and other agents to anonymously report criminal or suspect conduct and potential compliance problems; (v) disciplinary guidelines and consistent enforcement of compliance policies including discipline of individuals responsible for the failure to detect violations of the CCP; and (vi) mechanisms to immediately respond to detected violations of the CCP.

(e)      Borrower will at all times be, and cause all Managers to be, HIPAA Compliant.

(f)      If the Project is currently accredited by an Accrediting Organization, Borrower will (i) maintain such accreditation in good standing and without limitation or impairment, (ii) promptly submit to the Accrediting Organization a plan of correction for any deficiencies listed on any accreditation survey report, and (iii) cure all such deficiencies within such time frame as is necessary to preserve and maintain in good standing and without limitation or impairment such accreditation.

65

### 6.18     Right of First Refusal

Borrower hereby agrees that if, at any time during the term of this Agreement, Borrower receives from a third party an offer, term sheet or commitment, or Borrower makes a proposal to or accepted by any Person (all of the foregoing being referred to as an "**Offer**"), which Offer provides for financing, Borrower shall first forward the Offer or the terms of the Offer to Lender, and Lender shall have thirty (30) days after receipt thereof (the "**Option Period**") to agree to provide similar financing in the place of such third party upon terms and conditions no less favorable to Borrower than those set forth in the Offer and to notify Borrower in writing of Lender's agreement to provide such financing (the "**Acceptance Notice**"). If Borrower has not received an Acceptance Notice within the Option Period, Borrower shall be free to consummate the transaction described in the Offer with the third party providing the Offer (the "**Financing Transaction**") so long as the Obligations are indefeasibly paid in full and this Agreement is terminated concurrently with or prior to such consummation; provided, however, the foregoing, and Lender's failure to respond or issue an Acceptance Notice, shall not be construed as a waiver of any of the terms, covenants or conditions of this Agreement or any other Loan Document. In the event that the Financing Transaction is not consummated with such Person during the one hundred twenty (120) day period following the expiration of the Option Period, or any material term is changed in a fashion less favorable to Borrower, Borrower shall not be permitted to consummate the Financing Transaction without again complying with this Section 6.19. For purposes of this Section 6.19, "Lender" shall mean and include eCapital Healthcare Corp., and its Affiliates. The Acceptance Notice and consummation of such financing transaction may be executed by Lender or its Affiliates. Nothing in this Section 6.19 is intended, or shall be construed, to constitute Lender's consent to the consummation of any transaction described in any Offer.

### 6.19     Bankruptcy Matters

The Borrower will promptly, following the receipt thereof, deliver to the Lender copies of all letters of intent, expressions of interest, offers to purchase or draft purchase agreements (together with subsequent drafts with substantive changes) with respect to any sale of Collateral under Section 363 of the Bankruptcy Code.

## VII.     NEGATIVE COVENANTS

Borrower covenants and agrees that, until full performance and satisfaction, and payment in full in cash, of all the Obligations (other than indemnity obligations with respect to which no claim has been made) and termination of this Agreement:

### 7.1     Financial Covenants

Borrower shall not violate the financial and loan covenants set forth on Annex I to this Agreement, which is incorporated herein and made a part hereof. Borrower shall comply with the Budget subject to the Permitted Variance and as set forth in the Financing Orders.

### 7.2     No Indebtedness Other Than Permitted Indebtedness

Borrower will not, and will not permit any Subsidiary to, directly or indirectly, create, incur, assume, guarantee or otherwise become or remain directly or indirectly liable with

respect to, any Indebtedness, except for Permitted Indebtedness. Borrower will not, and will not permit any Subsidiary to, directly or indirectly, create, assume, incur or suffer to exist any Contingent Obligations.

### 7.3     No Liens Other Than Permitted Liens

Borrower shall not create, incur, assume or suffer to exist any Lien upon, in or against, or pledge of, any of the Collateral or any of its properties or assets or any of its shares, securities or other equity or ownership or partnership interests, whether now owned or hereafter acquired, except Permitted Liens which are reflected in Schedule 7.3 attached hereto.

### 7.4     Investments, New Facilities or Collateral; Subsidiaries

Borrower, directly or indirectly, shall not (i) purchase, own, hold, invest in or otherwise acquire obligations or stock or securities of, or any other interest in, or all or substantially all of the assets of, any Person or any joint venture whether by merger, consolidation, outright purchase or otherwise, (ii) make or permit to exist any loans, advances or guarantees to or for the benefit of any Person or assume, guarantee, endorse, contingently agree to purchase or otherwise become liable for or upon or incur any obligation of any Person (other than those created by the Loan Documents and Permitted Indebtedness and other than (A) trade credit extended in the ordinary course of business, (B) advances for business travel and similar temporary advances made in the ordinary course of business to officers, directors and employees, (C) deposits to landlords and (D) the endorsement of negotiable instruments for deposit or collection or similar transactions in the ordinary course of business), (iii) purchase, own, operate, hold, invest in or otherwise acquire any facility, property or assets or any Collateral that is not located at the locations set forth on Schedule 5.17B unless Borrower shall provide to Lender at least thirty (30) Business Days prior written notice, or (iv) acquire or own any material assets other than the Project. Borrower shall have no Subsidiaries other than such Subsidiaries existing at Closing.

### 7.5     Prohibited Payments

(a)     So long as Borrower is in Default or an Event of Default exists under this Agreement, Borrower shall not make any (i) Distribution or (ii) payment of management fees or Subordinated Debt in violation of the applicable Subordination Agreement.

(b)     Borrower shall not pay any Distribution, management fees, or Subordinated Debt payments described in subsection (a) above, if such payment would cause an Event of Default. For purposes of this Section, a Distribution, payment of a management fee or payment of Subordinated Debt described in subsection (a) above will be deemed to cause an Event of Default only if such payment, if included in the most recently completed calculation of (A) the Fixed Charge Coverage Ratio (as defined in Annex I), would have caused such Fixed Charge Coverage Ratio to be less than 1.0 to 1.0, or (B) the Current Ratio (as defined in Annex I), would have caused such Current Ratio to be less than 1.0 to 1.0.

### 7.6     Transactions with Affiliates

Borrower shall not enter into or consummate any transactions of any kind with any of its Affiliates other than:  (i) salary, bonus, employee stock option and other compensation to

and employment arrangements with directors, officers or employees in the ordinary course of business, provided, that no payment of any bonus shall be permitted if an Event of Default has occurred and is continuing or would be caused by or result from such payment, (ii) payments permitted pursuant to Section 7.5, (iii) transactions that Lender or its Affiliates are a party to, (iv) payments (other than those referenced in cause (i) above) permitted under and pursuant to written agreements entered into by and between Borrower and one or more of its Affiliates that (A) both reflect and constitute transactions on overall terms at least as favorable to Borrower as would be the case in an arm's-length transaction between unrelated parties of equal bargaining power, (B) do not grant a security interest in the Collateral to any Affiliate of Borrower, (C) contain payment obligations, if any, that are subordinate to the Obligations, and (D) do not involve a loan to any Affiliate of any Borrower, (v) transactions that create Accounts that are payable to Borrower by any Affiliate of Borrower, which do not exceed $50,000 in the aggregate, and (vi) loans or instruments payable by Borrower to any Affiliate of Borrower, which are classified as short-term debt and do not exceed $50,000 in the aggregate, provided, that notwithstanding the foregoing Borrower shall not enter into, consummate, or perform with respect to any transactions or agreement pursuant to which it becomes a party to any mortgage, note, indenture or guarantee evidencing any Indebtedness of any of its Affiliates or otherwise to become responsible or liable, as a guarantor, surety or otherwise, pursuant to an agreement for any Indebtedness of any such Affiliate other than Permitted Indebtedness. Borrower shall not comingle its funds or other assets with any funds or assets of any of its Affiliates, or any other Person, in such a manner that it will be costly or difficult to segregate, ascertain or identify Borrower's individual assets from those of any of its members, shareholders, or partners (as applicable), its Affiliates, the Affiliates of any of its members, shareholders, or partners (as applicable), or any other Person.

### 7.7   Organizational Documents; Fiscal Year; Dissolution; Use of Proceeds

Borrower shall not (i) change its name, state of formation, or amend, modify, restate or change its certificate of incorporation or formation or bylaws or similar charter documents in a manner that would be materially adverse to Lender and, in any event, without the prior consent of Lender, (ii) change its fiscal year, unless Borrower demonstrates to Lender's satisfaction compliance with the covenants contained herein for both the fiscal year in effect prior to any change and the new fiscal year period by delivery to Lender of appropriate interim and annual pro forma, historical and current compliance certificates for such periods and such other information as Lender may reasonably request, (iii) amend, alter or suspend or terminate or make provisional in any material way, any Permit without the prior written consent of Lender, which consent shall not be unreasonably withheld, (iv) wind up, liquidate or dissolve (voluntarily or involuntarily) or commence or suffer any proceedings seeking to wind up, liquidate or dissolve or that would result in any of the foregoing, (v) use any proceeds of any Advance for "purchasing" or "carrying" "margin stock" as defined in Regulations U, T or X of the Board of Governors of the Federal Reserve System, or (vi) fail either to hold itself out to the public as a legal entity separate and distinct from any other Person or to conduct its business in its own name or its registered trade name, in order not (a) to mislead others as to the identity with which such other party is transacting business, or (b) suggest that it is responsible for the debts of any third party (including any of its members, managers, partners and shareholders or Affiliates, or any general partner, principal or Affiliate thereof).

### 7.8    Asset Sales

Borrower shall not, without the prior written approval of Lender, directly or indirectly sell, convey, transfer, assign, license, lease (that has the effect of a disposition) or otherwise dispose of (including any merger or consolidation or upon any condemnation, eminent domain or similar proceedings) to any Person, in one transaction or a series of related transactions, any permitted contracts with Third-Party Payors, Books and Records (except for the removal of patient records at the request of such patient), or any assets of Borrower which constitute all or substantially all of an operating unit of Borrower or any other assets (including intellectual property) of Borrower outside of the ordinary course of business. Borrower shall not, directly or indirectly, transfer or assign any contract, patient relationship, or other business relationship, or right to provide services, Goods, room or board to any Affiliate of Borrower. Borrower shall not let any contract, patient relationship, or other business relationship be terminated or expire if at any time following such termination or expiration, such contract, patient relationship or other business relationship is reinstated with any Affiliate of Borrower.

### 7.9    Management

Borrower shall not pay any compensation or other amounts to senior management of Borrower in excess of such amounts as are usual and customary for companies in similar businesses and of a similar size.

### 7.10    Restrictive Agreements

Borrower will not, and will not permit any Subsidiary to, directly or indirectly (a) enter into or assume any agreement (other than the Loan Documents and any agreements for purchase money debt permitted under clause (iii) of the definition of Permitted Indebtedness) prohibiting the creation or assumption of any Lien upon its properties or assets, whether now owned or hereafter acquired, or (b) create or otherwise cause or suffer to exist or become effective any consensual encumbrance or restriction of any kind (except as provided by the Loan Documents) on the ability of any Subsidiary to: (i) pay or make Distributions to Borrower or any Subsidiary; (ii) pay any Indebtedness owed to Borrower or any Subsidiary; (iii) make loans or advances to Borrower or any Subsidiary; or (iv) transfer any of its property or assets to Borrower or any Subsidiary; provided, that, any agreements for purchase money debt shall not prohibit (x) the creation or assumption of any Lien upon any assets or properties to secure the Obligations or (y) the repayment of the Obligations.

### 7.11    Modifications of Certain Agreements

Other than with respect to Permitted Modifications, Borrower will not, and will not permit any Subsidiary to, directly or indirectly, amend, terminate or otherwise modify any Material Contract, any Management Agreement or the Lease, without Lender's prior written consent (which Lender may give or withhold in Lender's sole discretion), which amendment, termination or modification in any case: (a) is contrary to the terms of this Agreement or any other Loan Document; (b) could reasonably be expected to be adverse to the rights, interests or privileges of the Lender or its ability to enforce the same; (c) results in the imposition or expansion in any material respect of any obligation of or restriction or burden on Borrower or any Subsidiary; or

(d) reduces in any material respect any rights or benefits of Borrower or any Subsidiaries (it being understood and agreed that any such determination shall be in the discretion of the Lender). Borrower shall, prior to entering into any amendment, termination or other modification of any of the foregoing documents, deliver to Lender reasonably in advance of the execution thereof, any final or execution copy of amendments, terminations or other modifications to such documents, and Borrower agrees not to take, nor permit any of its Subsidiaries to take, any such action with respect to any such documents without obtaining such approval from Lender.

### 7.12    Payments and Modifications of Subordinated Debt

Borrower will not, and will not permit any Subsidiary to, directly or indirectly (a) declare, pay, make or set aside any amount for payment in respect of Subordinated Debt, except for payments made in full compliance with and expressly permitted under the Subordination Agreement, (b) amend or otherwise modify the terms of any Subordinated Debt, except for amendments or modifications made in full compliance with the Subordination Agreement, (c) declare, pay, make or set aside any amount for payment in respect of any Indebtedness hereinafter incurred that, by its terms, or by separate agreement, is subordinated to the Obligations, except for payments made in full compliance with and expressly permitted under the subordination provisions applicable thereto, or (d) amend or otherwise modify the terms of any such Indebtedness if the effect of such amendment or modification is to (i) increase the interest rate or fees on, or change the manner or timing of payment of, such Indebtedness, (ii) accelerate or shorten the dates upon which payments of principal or interest are due on, or the principal amount of, such Indebtedness, (iii) change in a manner adverse to any Credit Party or Lender any event of default or add or make more restrictive any covenant with respect to such Indebtedness, (iv) change the prepayment provisions of such Indebtedness or any of the defined terms related thereto, (v) change the subordination provisions thereof (or the subordination terms of any guaranty thereof), or (vi) change or amend any other term if such change or amendment would materially increase the obligations of the obligor or confer additional material rights on the holder of such Indebtedness in a manner adverse to Borrower, any Subsidiaries, or Lender. Borrower shall, prior to entering into any such amendment or modification, deliver to Lender reasonably in advance of the execution thereof, any final or execution form copy thereof.

### 7.13    Deposit Accounts

Borrower shall not make any changes to its deposit accounts, including the Controlled Deposit Accounts, or establish new deposit accounts or change the passwords or user identification information with respect thereto in such a fashion as would result in Lender not having (i) online view-only access to Borrower's Controlled Deposit Accounts and any other deposit account established by or in the name of Borrower, or (ii) control of Borrower's Commercial Deposit Account and Operating Account.

### 7.14    Truth of Statements

Borrower shall not furnish to Lender any certificate or other document that contains any untrue statement of a material fact or that omits to state a material fact necessary to make it not misleading in light of the circumstances under which it was furnished.

### 7.15   IRS Form 8821

Borrower shall not materially alter, amend, restate, or otherwise modify, or withdraw, terminate or re-file any IRS Form 8821 that has named Tax Guard as an appointee.

### 7.16   Third-Party Payor Programs

Neither the Project, nor Borrower, shall, other than in the ordinary course of Borrower's business, change the terms of any Third-Party Payor Programs or its normal billing payment and reimbursement policies and procedures with respect thereto (including the amount and timing of finance charges, fees and write-offs) without prior written notice of such change to Lender. Borrower shall provide to Lender, upon request, an accurate, complete and current list of all participation agreements with Third-Party Payors with respect to Borrower's business. Borrower shall not fail to comply with all requirements, contracts, conditions and stipulations applicable to Borrower in order to maintain in good standing and without default or limitation all such participation agreements.

### 7.17   Filing of Motions and Applications

The Borrower shall not, without the prior written consent of the Lender, apply to the Bankruptcy Court for authority to (i) take any action that is prohibited by the terms of any of the Loan Documents, or (ii) refrain from taking any action that is required to be taken by the terms of any of the Loan Documents or the Financing Orders.

### 7.18   Cash Advance Loans

Borrower shall not, directly or indirectly, create, assume or permit, or suffer to exist or to be created, any Cash Advance Loan.

### 7.19   Interim and Final Financing Orders

The Borrower shall not:

(a)     seek or consent to exist at any time any modification, stay, vacation or amendment of the Interim Financing Order (until such time as the Final Financing Order is entered) and the Final Financing Order, except for modifications and amendments joined in or agreed to in writing by the Lender;

(b)     seek the use of "Cash Collateral" (as defined in the Financing Orders) in a manner inconsistent with the terms of the Loan Documents or the Financing Orders without the prior written consent of the Lender;

(c)     seek or consent to exist at any time a priority for any administrative expense or unsecured claim against Borrower (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation, any administrative expenses of the kind specified in Sections 105, 326, 328, 503(b), 506(c), 507(a), 507(b), 546(c), 552(b), 726 and 1114 of the Bankruptcy Code) or any superpriority claim which is equal or superior to the priority of the Lender in respect of the Obligations, except as expressly permitted by the Financing Orders; or

(d)      prior to the date on which the Obligations have been paid in full, pay any administrative expenses, except administrative expenses incurred in accordance with the Budget or the Financing Orders.

### 7.20    Bankruptcy Actions

The Borrower shall not seek, consent to, or permit to exist, without the prior written consent of the Lender, any order granting authority (a) to take any action (i) that is prohibited by the terms of this Agreement or the Financing Orders, or (ii) that proposes to sell, use, dispose of, transfer, or in any way negatively impact the value of the Collateral, or (b) to refrain from taking any action that is required to be taken by such documents.

## VIII.   EVENTS OF DEFAULT

### 8.1    Events of Default

The occurrence of any one or more of the following shall constitute an "Event of Default:"

(a)      Borrower shall fail to pay any amount on the Obligations or provided for in any Loan Document when due (whether on any payment date, at maturity, by reason or acceleration, by notice of intention to prepay, by required prepayment or otherwise);

(b)      any representation, statement, warranty or certification made by or on behalf of any Credit Party or any Subsidiary in, or in connection with, this Agreement or any other Loan Document or any amendment or modification hereof or thereof or waiver hereunder or thereunder, or in any report, certificate, financial statement or other document furnished pursuant to this Agreement or any other Loan Document or any amendment or modification hereof or thereof or waiver hereunder or thereunder (including, without limitation, any Variance Report, Borrowing Base Certificate or Compliance Certificate), shall have been materially incorrect when made;

(c)      Borrower or any Guarantor or other party thereto other than Lender shall be in violation, breach or default of, or shall fail to perform, observe or comply with any covenant, obligation or agreement set forth in any Loan Document and such violation, breach, default or failure shall not be cured within the applicable period set forth in the applicable Loan Documents; provided that, with respect to the affirmative covenants set forth in Article VI (other than Sections 6.2, 6.3(i) and (ii), 6.9, 6.10, 6.11, 6.12, 6.16, and 6.17 for which there shall be no cure period), there shall be a twelve (12) day cure period commencing from the earlier of (i) receipt by such Person of written notice of such breach, default, violation or failure, and (ii) the time at which such Person or any officer thereof knew or became aware, or should have known or been aware, of such failure, violation, breach or default;

(d)      (i) Any of the Loan Documents ceases to be in full force and effect, or (ii) any Lien created thereunder ceases to constitute a valid perfected superpriority Lien on the Collateral in accordance with the terms thereof (subject to Permitted Liens, the FHA Priority Collateral and the Carve Out), or Lender ceases to have a valid perfected first priority security interest in any material portion of the Collateral (excluding Permitted Liens, the FHA Priority Collateral and the Carve Out);

(e)      One or more judgments or decrees is rendered against Borrower or any Guarantor in an amount in excess of $25,000 individually or $50,000 in the aggregate at one time outstanding, which is/are not satisfied, stayed, bonded, vacated or discharged of record within thirty (30) days of being rendered;

(f)      (i) Any default occurs, which is not cured within any applicable grace period or cure period or waived, (x) in the payment of any amount with respect to any Indebtedness (other than the Obligations) of Borrower or Guarantor in excess of $25,000, (y) in the performance, observance or fulfillment of any provision contained in any agreement, contract, document or instrument to which any Credit Party is a party or to which any of their properties or assets are subject or bound under or pursuant to which any Indebtedness was issued, created, assumed, guaranteed or secured and such Default continues for more than any applicable grace period or permits the holder of any Indebtedness to accelerate the maturity thereof, or (z) in the performance, observance or fulfillment of any provision contained in any agreement, contract, document or instrument between any Credit Party and Lender or Affiliate of Lender (other than the Loan Documents), or (ii) any Indebtedness of any Credit Party is declared to be due and payable or is required to be prepaid (other than by a regularly scheduled payment) prior to the stated maturity thereof, or any obligation of such Person for the payment of Indebtedness (other than the Obligations) is not paid when due or within any applicable grace period, or any such obligation becomes or is declared to be due and payable before the expressed maturity thereof, or there occurs an event which, with the giving of notice or lapse of time, or both, would cause any such obligation to become, or allow any such obligation to be declared to be, due and payable;

(g)      The Debtor files a motion for the Bankruptcy Court to approve a sale of a material portion of the Collateral under section 363 of the Bankruptcy Code which proposed sale is not reasonably acceptable to the Lender, unless such proposed sale provides for indefeasible payment in full of all Obligations immediately upon closing of such sale;

(h)      A court of competent jurisdiction shall enter an order, judgment or decree appointing a custodian, receiver, trustee, liquidator or conservator of any Credit Party or the whole or any substantial part of any such Person's properties;

(i)      Failure of Debtor to meet and/or comply with a DIP Milestone, unless extended or waived by the prior written consent of the Lender;

(j)      A court of competent jurisdiction shall assume custody or control of any Credit Party or of the whole or any substantial part of any such Person's properties, which (x) has the effect of Lender not receiving collections with respect to Accounts as and when contemplated by Section 2.5, (y) has the effect of delaying the billing or collection of Accounts beyond Borrower's normal or historical billing and collection periods, or (z) is not irrevocably relinquished within sixty (60) days;

(k)      Appointment of a chapter 11 trustee examiner with enlarged powers, or Borrower shall file a motion or other pleading seeking such appointment;

(l)       (i) Any Change of Control occurs or any agreement or commitment to cause or that may result in any such Change of Control is entered into, (ii) any Material Adverse Effect,

Material Adverse Change occurs, (iii) any Liability Event occurs, or (iv) any Credit Party ceases any material portion of its business operations as currently conducted;

(m)    Lender receives any indication or evidence that any Credit Party may have directly or indirectly been engaged in any type of activity which, in Lender's judgment, might result in forfeiture of any property to a Governmental Authority which shall have continued unremedied for a period of ten (10) days after written notice from Lender;

(n)    Any Credit Party or any of their respective members or senior officers is criminally indicted or convicted under any Law that could lead to a forfeiture of any material portion of their respective assets; or

(o)    The issuance of any process for levy, attachment or garnishment or execution upon or prior to any judgment for in any one instance or in the aggregate an amount of $25,000 or more against any Credit Party or any of their respective property or assets.

(p)    The Lender's administrative expense claim in the Bankruptcy Case becomes subject (or subordinate) to another administrative expense claim pursuant to a final order of the Bankruptcy Court;

(q)    The Bankruptcy Case shall be converted to a case under Chapter 7 of the Bankruptcy Code or be dismissed or a motion requesting such relief shall have been filed by the Borrower;

(r)    The Borrower files or supports, or the Bankruptcy Court enters an order confirming a proposed plan of reorganization or liquidation that does not provide for the indefeasible payment in full and in cash of the Obligations, unless otherwise agreed in writing by the Lender in its sole discretion;

(s)    Any attempt by the Borrower to obtain, or if any other party in interest obtains, an order of the Bankruptcy Court or other judgment, and the effect of such order or judgment is to, (i) invalidate, reduce or otherwise impair the Lender's claims, or (ii) amend, supplement, stay, vacate or otherwise modify the Revolving Facility or the Financing Orders without the written consent of the Lender;

(t)    The Borrower requests approval of any postpetition financing, other than pursuant to the Revolving Facility, that would not immediately repay all Obligations, in full, in cash, on the date of the closing of such post-petition financing, unless otherwise agreed by the Lender;

(u)    The entry of an order granting liens or claims that are senior or *pari passu* to the Liens granted in favor of the Lender under the Loan Documents except with respect to the holder of Permitted Liens and with respect to the FHA Priority Collateral;

(v)    The Borrower shall assert that any of the Liens securing the Obligations are invalid, or any such Liens granted to the Lender shall be determined to be invalid;

(w)    Any report is filed by a patient care ombudsman or state long-term care ombudsman in the Bankruptcy Case indicating that patient care has materially declined or been compromised;

74

subject to the Debtor's right shall to file a pleading with the Bankruptcy Court within 7 days of the filing of such report contesting the allegations in such report;

(x)     Any creditor or party in interest shall be granted relief from the automatic stay with respect to any material portion of the assets used in the operation of the Borrower's business pursuant to a final order of the Bankruptcy Court;

(y)     The Borrower shall default in the due performance or observance by it of any material term, covenant or agreement contained in the Interim Financing Order or the Final Financing Order;

(z)     From and after the date of entry thereof, the Interim Financing Order or the Final Financing Order approving this Agreement and the Revolving Facility shall cease to be in full force and effect;

(aa)     A Final Financing Order approving this Agreement and the Revolving Facility has not been entered by the Bankruptcy Court within forty-five (45) days of the Petition Date, unless otherwise agreed to by the Lender;

(bb)     The Borrower applies for an order substituting any assets for all or any portion of the Collateral, or

(cc)     The Lease is determined to be terminated or otherwise invalid by a final order of a court of competent jurisdiction;

(dd)     Excluding adequate protection granted to the holders of Permitted Liens of the FHA Priority Collateral, payment of or granting adequate protection with respect to any prepetition debt other than as expressly provided herein or as otherwise consented to by the Lender; or

(ee)     The Borrower asserts in any pleading filed in any court that the guarantee contained in the Loan Documents is not valid and binding, for any reason, to be in full force and effect, other than under the terms hereof or the Financing Orders;

(ff)     Termination or modifications of the provisions of section 1189(a) of the Bankruptcy Code for the exclusive right to file a plan with respect to the Debtor unless such termination or modification was sought by the Lender;

(gg)     The allowance of any claim or claims under section 506(c) of the Bankruptcy Code or otherwise against the Lender pursuant to a final order of the Bankruptcy Court;

(hh)     The entry of a final order in the Bankruptcy Case avoiding or requiring repayment of any portion of the payments made on account of the Obligations owing under the Loan Documents;

(ii)     The entry of an order by the Bankruptcy Court providing relief adverse to the interests of the Lender with respect to any motion, objection, application, or adversary proceeding to challenge the validity, enforceability, perfection, or priority of, or seeking avoidance, subordination or characterization of, any portion of the Obligations and/or the liens and security

interests securing the Obligations or asserting any other claim or cause of action against and/or with respect to the Obligations or the liens and security interests securing the Obligations, but excluding preliminary or final relief granting standing to any other party to prosecute such claims, causes of action or proceeding;

(jj)      At any time, the personal guarantee of Arnold Goldberg becomes unenforceable;

(kk)      At any time, Borrower is not in compliance with the Budget most recently approved by the Lender in writing (subject to the Permitted Variance); or

(ll)      Any Credit Party shall make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise on account of any prepetition indebtedness or payables or postpetition indebtedness or payables other than payments other than in accordance with the Budget.

**8.2      Acceleration and Suspension or Termination of Commitments**

Upon the occurrence of an Event of Default, notwithstanding any other provision of any Loan Documents, Lender may by notice to Borrower (i) terminate the obligations of the Lender under this Agreement, or (ii) by notice to Borrower declare all or any portion of the Obligations to be due and payable immediately (except in the case of an Event of Default under Section 8.1 (h), (i), (k), (p), (q), (r), (u), (v), (x), (ee), (gg), or (kk), in which event all of the foregoing shall automatically and without further act by Lender be due and payable).

## IX.      RIGHTS AND REMEDIES AFTER DEFAULT

**9.1      Rights and Remedies**

(a)      In addition to the acceleration provisions set forth in Article VIII above, upon the occurrence and continuation of an Event of Default, subject to the Financing Orders (including in respect of required notices), Lender shall be permitted to seek relief from the automatic stay provisions of section 362 of the Bankruptcy Code on an emergency basis (which emergency basis is agreed upon by the Borrower) to permit the Lender to exercise all rights and remedies provided for in the Loan Documents, and to take any or all of the following actions without further order of or application to the Bankruptcy Court, under the UCC or at law or in equity): (i) apply any property of Borrower received or held by Lender to reduce the Obligations in such manner as Lender may deem advisable, (ii) foreclose the Liens created under the Loan Documents, (iii) realize upon, take possession of or sell any Collateral or securities pledged with or without judicial process, (iv) exercise all rights and powers with respect to the Collateral as Borrower might exercise (other than with respect to Collateral consisting of Accounts owed or owing by Medicaid/Medicare Account Debtors absent a court order or compliance with applicable Law), (v) collect and send notices regarding the Collateral with or without judicial process, (vi) at Borrower's expense, require that all or any part of the Collateral be assembled and made available to Lender at any reasonable place designated by Lender, (vii) reduce or otherwise change the Facility Cap, (viii) engage, on behalf of Borrower, a third party to service and collect Borrower's receivables, including billing and rebilling Third-Party Payors as well as the patients to the extent of their obligations thereunder, or (ix) relinquish or abandon any Collateral or securities pledged

or any Lien thereon,  (x) immediately terminate the Debtor's use of any Cash Collateral, (xi) cease making any Loans under the Revolving Facility and (xii) freeze monies or balances in the Debtor's accounts and sweep any and all funds contained in any account subject to a control agreement. .

(b)     Notwithstanding any provision of any Loan Document, Lender, in its Permitted Discretion, shall have the right, at any time that Borrower fails to do so, and from time to time, without prior notice, to: (i) obtain insurance covering any of the Collateral to the extent required hereunder; (ii) pay for the performance of any Obligations; (iii) discharge taxes or liens on any of the Collateral that are in violation of any Loan Document unless Borrower is in good faith with due diligence by appropriate proceedings contesting those items; and (iv) pay for the maintenance and preservation of the Collateral. Such expenses and advances shall be added to the Obligations and increase the principal amount outstanding hereunder, until reimbursed to Lender and shall be secured by the Collateral, and such payments by Lender shall not be construed as a waiver by Lender of any Event of Default or any other rights or remedies of Lender.

(c)     Borrower agrees that notice received by it at least ten (10) days before the time of any intended public sale, or the time after which any private sale or other disposition of Collateral is to be made, shall be deemed to be reasonable notice of such sale or other disposition. If permitted by applicable Law, any perishable Collateral which threatens to speedily decline in value or which is sold on a recognized market may be sold immediately by Lender without prior notice to Borrower. At any sale or disposition of Collateral or securities pledged, Lender may (to the extent permitted by applicable Law) purchase all or any part thereof free from any right of redemption by Borrower which right is hereby waived and released. Borrower covenants and agrees not to, and not to permit or cause any of its Subsidiaries to, interfere with or impose any obstacle to Lender's exercise of its rights and remedies with respect to the Collateral. Lender, in dealing with or disposing of the Collateral or any part thereof, shall not be required to give priority or preference to any item of Collateral or otherwise to marshal assets or to take possession or sell any Collateral with judicial process.

**9.2     Application of Proceeds**

In addition to any other rights, options and remedies Lender has under the Loan Documents, the UCC, at law or in equity, all dividends, interest, rents, issues, profits, fees, revenues, income and other proceeds collected or received from collecting, holding, managing, renting, selling, or otherwise disposing of all or any part of the Collateral or any proceeds thereof upon exercise of its remedies hereunder shall be applied in the following order of priority: (i) first, to the payment of all reasonable out-of-pocket costs and expenses of such collection, storage, lease, holding, operation, management, sale, disposition or delivery and of conducting Borrower's business and of maintenance, repairs, replacements, alterations, additions and improvements of or to the Collateral, and to the payment of all sums which Lender may be required or may elect to pay, if any, for taxes, assessments, insurance and other charges upon the Collateral or part thereof, and all other payments that Lender may be required or authorized to make under any provision of this Agreement (including in each such case, in-house documentation and diligence fees and legal expenses, search, audit, recording, professional and filing fees and expenses and reasonable attorneys' fees and all expenses, expert witness fees, liabilities and advances made or incurred in connection therewith, whether litigation is commenced or not); (ii) second, to the payment of all Obligations as provided herein, (iii) third, to the satisfaction of Indebtedness secured by any

subordinate security interest of record in the Collateral if written notification of demand therefor is received before distribution of the proceeds is completed, provided, that, if requested by Lender, the holder of a subordinate security interest shall furnish reasonable proof of its interest, and unless it does so, Lender need not address its claims; and (iv) <u>fourth</u>, to the payment of any surplus then remaining to Borrower, unless otherwise provided by applicable Law or directed by a court of competent jurisdiction, provided that Borrower shall be liable for any deficiency if such proceeds are insufficient to satisfy the Obligations or any of the other items referred to in this Section.

### 9.3    Rights of Lender to Appoint Receiver

Without limiting and in addition to any other rights, options and remedies Lender has under the Loan Documents, the UCC, at law or in equity, upon the occurrence and continuation of an Event of Default, Lender shall have the right to apply for and have a receiver appointed by a court of competent jurisdiction in any action taken by Lender to enforce its rights and remedies in order to manage, protect and preserve the Collateral and continue the operation of Borrower's business to the extent necessary to collect all revenues and profits thereof and apply the same to the payment of all expenses and other charges of such receivership including the compensation of the receiver and to the payments as aforesaid until a sale or other disposition of such Collateral shall be finally made and consummated. Borrower hereby consents to the appointment of a receiver selected by Lender upon the occurrence and during the continuance of an Event of Default and agrees not to oppose the appointment of such receiver or the rights and powers granted, or proposed by Lender to be granted, to such receiver so long as such rights and powers are consistent with applicable Law. Borrower waives any right to require a bond to be posted by or on behalf of any such receiver.

### 9.4    Application of Payments Following Default

Following the occurrence and continuance of an Event of Default, Lender may, notwithstanding Section 9.2, apply any and all payments received by Lender in respect of the Obligations, and any and all proceeds of Collateral received by Lender, in such order as Lender may from time to time elect.

### 9.5    Power of Attorney Following Default

Until full payment in cash of all Obligations, Borrower hereby irrevocably designates, makes, constitutes, and appoints Lender (and all Persons designated by Lender from time to time) as Borrower's true and lawful attorney and agent in fact to act in the name of Borrower to effectuate any term in this Agreement after the occurrence and during the continuation of any Event of Default. Without limiting the generality of the foregoing, Borrower's power of attorney to Lender provided above authorizes Lender to:

(a)    demand payment of the Accounts, enforce payment thereof by legal proceedings or otherwise, settle, adjust, compromise, extend, or renew any or all of the Accounts or any legal proceedings brought to collect the Accounts, discharge and release the Accounts or any of them, and exercise all of Borrower's rights and remedies with respect to the collection of Accounts;

(b)    prepare, file, and sign the name of Borrower on any proof of claim in bankruptcy or any similar document against any Account Debtor or any notice of Lien, assignment, or satisfaction of Lien or similar document in connection with any of the Collateral;

(c)    use the stationery of Borrower, open Borrower's mail, notify the post office authorities to change the address for delivery of Borrower's mail to an address designated by Lender, and sign the name of Borrower to verifications of the Accounts and on any notice to the Account Debtors; and

(d)    use the information recorded on or contained in any data processing equipment and computer hardware and software relating to the Accounts, inventory, or other Collateral.

In addition to the foregoing, if Borrower breaches its obligation hereunder to direct payments of Accounts or the proceeds of any other Collateral to the appropriate Controlled Deposit Account, Lender, as the irrevocably made, constituted and appointed true and lawful attorney for Borrower pursuant to this Section, may by the signature or other act of any of Lender's officers or authorized signatories (without requiring any of them to do so), direct any federal, state or private payor or fiscal intermediary to pay proceeds of Accounts or any other Collateral to the appropriate Controlled Deposit Account.

The appointment of Lender as attorney-in-fact for Borrower is coupled with an interest and is irrevocable until full payment in cash of all Obligations.

**9.6    Rights and Remedies not Exclusive**

Lender shall have the right in accordance with the terms hereof, in its Permitted Discretion to determine which rights, Liens or remedies Lender may at any time pursue, relinquish, subordinate or modify, and such determination will not in any way modify or affect any of Lender's rights, Liens or remedies under any Loan Document, applicable Law or equity. The enumeration of any rights and remedies in any Loan Document is not intended to be exhaustive, and all rights and remedies of Lender described in any Loan Document are cumulative and are not alternative to or exclusive of any other rights or remedies which Lender otherwise may have. The partial or complete exercise of any right or remedy shall not preclude any other further exercise of such or any other right or remedy.

**X.     WAIVERS AND JUDICIAL PROCEEDINGS**

**10.1    Waivers**

Except as expressly provided for herein, Borrower hereby waives setoff, counterclaim, demand, presentment, protest, all defenses with respect to any and all instruments and all notices and demands of any description, and the pleading of any statute of limitations as a defense to any demand under any Loan Document. Borrower hereby waives any and all defenses and counterclaims it may have or could interpose in any action or procedure brought by Lender to obtain an order of court recognizing the assignment of, or Lien of Lender in and to, any Collateral, whether or not payable by a Medicaid/Medicare Account Debtor. With respect to any action hereunder, Lender conclusively may rely upon, and shall incur no liability to Borrower in acting

upon, any request or other communication that Lender reasonably believes to have been given or made by a person authorized on Borrower's behalf, whether or not such person is listed on the incumbency certificate delivered pursuant to Section 4.1. In each such case, Borrower hereby waives the right to dispute Lender's action based upon such request or other communication, absent manifest error.

### 10.2    Delay; No Waiver of Defaults

No course of action or dealing, renewal, release or extension of any provisions of any Loan Document, or single or partial exercise of any such provision, or delay, failure or omission on Lender's part in enforcing any such provision shall affect the liability of Borrower or Guarantor or operate as a waiver of such provision or affect the liability of Borrower or Guarantor or preclude any other or further exercise of such provision. No waiver by any party to any Loan Document of any one or more defaults by any other party in the performance of any of the provisions of any Loan Document shall operate or be construed as a waiver of any future default, whether of a like or different nature, and each such waiver shall be limited solely to the express terms and provisions of such waiver. Notwithstanding any other provision of any Loan Document, by completing the Closing under this Agreement or by making Advances, Lender does not waive any breach of any representation or warranty of under any Loan Document, and all of Lender's claims and rights resulting from any such breach or misrepresentation are specifically reserved.

### 10.3    Jury Waiver

EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION ARISING UNDER THE LOAN DOCUMENTS OR IN ANY WAY CONNECTED WITH OR INCIDENTAL TO THE DEALINGS OF THE PARTIES WITH RESPECT TO THE LOAN DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED THEREBY, WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE. EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENTS OF THE PARTIES TO THE WAIVER OF THEIR RESPECTIVE RIGHTS TO TRIAL BY JURY.

### 10.4    Cooperation in Discovery and Litigation

In any litigation, arbitration or other dispute resolution proceeding relating to any Loan Document, Borrower waives any and all defenses, objections and counterclaims it may have or could interpose with respect to (i) any of its directors, officers, employees or agents being deemed to be employees or managing agents of Borrower for purposes of all applicable Law or court rules regarding the production of witnesses by notice for testimony (whether in a deposition, at trial or otherwise), (ii) Lender's counsel examining any such individuals as if under cross-examination and using any discovery deposition of any of them as if it were an evidence deposition, and (iii) using all commercially reasonable efforts to produce in any such dispute resolution proceeding, at the time and in the manner requested by Lender, all Persons, documents

80

(whether in tangible, electronic or other form) or other things under its control and relating to the dispute.

## XI.    EFFECTIVE DATE AND TERMINATION

### 11.1    Effectiveness and Termination

(a)    <u>Termination by Lender</u>. Subject to Lender's right to terminate and cease making Advances upon the occurrence and during the continuance of an Event of Default, this Agreement shall continue in full force and effect until the full performance and indefeasible payment in cash of all Obligations (other than indemnity obligations with respect to which no claim has been made), unless terminated sooner as provided in this Section 11.1.

(b)    <u>Termination by Borrower</u>. Borrower may terminate this Agreement at any time upon not less than thirty (30) days' prior written notice to Lender and upon full performance and indefeasible payment in full in cash of all Obligations (other than indemnity obligations with respect to which no claim has been made) on or prior to such 30th day after receipt by Lender of such written notice. Borrower may elect to terminate this Agreement in its entirety only. No section of this Agreement or type of Loan available hereunder may be terminated singly.

(c)    <u>Effectiveness of Termination</u>. All of the Obligations (other than indemnity obligations with respect to which no claim has been made) shall be immediately due and payable upon the Termination Date. All undertakings, agreements, covenants, warranties and representations of Borrower contained in the Loan Documents shall survive any such termination and Lender shall retain its Liens in the Collateral and Lender shall retain all of its rights and remedies under the Loan Documents notwithstanding such termination until all Obligations have been irrevocably discharged or paid, in full, in immediately available funds, including all Obligations under Section 3.4 and the terms of any fee letter resulting from such termination. Notwithstanding the foregoing or the payment in full of the Obligations, Lender shall not be required to terminate its Liens in the Collateral unless, with respect to any loss or damage Lender may incur as a result of dishonored checks or other items of payment received by Lender from Borrower or any Account Debtor and applied to the Obligations, Lender shall, at its option, (i) have received a written agreement satisfactory to Lender, executed by Borrower and, if Borrower's financial condition at that time is weaker than it is as of the date hereof, by any Person whose loans or other advances to Borrower are used in whole or in part to satisfy the Obligations, indemnifying Lender from any such loss or damage or (ii) have retained cash Collateral or other Collateral for such period of time as Lender, in its discretion, may deem necessary to protect Lender from any such loss or damage.

### 11.2    Survival

All obligations, covenants, agreements, representations, warranties, waivers and indemnities made by Borrower in any Loan Document shall survive the execution and delivery of the Loan Documents, the Closing, the making of the Advances and any termination of this Agreement until all Obligations (other than indemnity obligations with respect to which no claim has been made) are fully performed and indefeasibly paid in full in cash. Notwithstanding the foregoing sentence of this Section 11.2, the obligations and provisions of Sections 3.7, 10.1, 10.4,

13.1, 13.3, 13.4, 13.7 and 13.12 shall survive termination of the Loan Documents and any payment, in full or in part, of the then-outstanding Obligations.

## XII.   ASSIGNMENTS AND PARTICIPATIONS

### 12.1   Assignments

Lender may at any time assign the Lender's rights and obligations hereunder and under all other Loan Documents to one or more Eligible Assignees. Upon receipt of notice of such assignment, Borrower shall treat the assignee as the Lender for all purposes hereunder and under the other Loan Documents. Each Eligible Assignee shall have all of the rights and benefits with respect to the Obligations, Collateral and Loan Documents held by it as fully as if the original holder thereof; provided that, Borrower shall not be obligated to pay under this Agreement to any Eligible Assignee any sum in excess of the sum which Borrower would have been obligated to pay to Lender had such assignment not been effected. Notwithstanding any other provision of a Loan Document, Lender may disclose to any Eligible Assignee all information, reports, financial statements, certificates and documents obtained under any provision of any Loan Document. Borrower may not offset any amounts owing to Borrower by an Eligible Assignee from any amounts owed by Borrower to such Eligible Assignee pursuant to this Agreement.

### 12.2   Participations

Lender may at any time, without the consent of, or notice to, Borrower, sell to one or more Persons participating interests in its Loan, commitments or other interests hereunder (any such Person, a "**Participant**"). Notwithstanding any other provision of a Loan Document, Lender may disclose to any Participant all information, reports, financial statements, certificates and documents obtained under any provision of any Loan Document. Subject to Section 12.3, in the event of a sale by Lender of a participating interest to a Participant, (i) Borrower shall continue to deal solely and directly with Lender in connection with Lender's rights and obligations hereunder, and (ii) all amounts payable by Borrower shall be determined as if Lender had not sold such participation and shall be paid directly to Lender. Borrower agrees that if amounts outstanding under this Agreement are due and payable (as a result of acceleration or otherwise), each Participant shall be deemed to have the right of set-off in respect of its participating interest in amounts owing under this Agreement to the same extent as if the amount of its participating interest were owing directly to it as a Lender under this Agreement.

### 12.3   Defaulting Participants

Lender may from time to time notify Borrower of the participations sold by Lender hereunder and the share of each Participant's interest in the Loan (such notification, as it may be amended from time to time, is referred to herein as a "**Participation Notice**"). Following receipt by Borrower of a Participation Notice, (i) it shall be the responsibility of the Participant identified in the Participation Notice to fund each Advance in an amount equal to such Participant's share of each Advance as set forth in the Participation Notice, (ii) Borrower will look solely to Participant identified in the Participation Notice for the funding of such portion of each Advance as is equal to the Participant's share of such Advance as set forth in the Participation Notice, and (iii) notwithstanding any other provision of this Agreement or any other Loan Document, Lender shall

not be obligated to fund any portion of an Advance which is the responsibility of a Participant as set forth in a Participation Notice. Following receipt by Borrower of a Participation Notice, any Participant which shall fail to make any Advance or other credit accommodation, disbursement, settlement or reimbursement required pursuant to the terms of any Loan Document, for so long as such failure shall remain in existence and uncured, shall be deemed to be a "Defaulting Participant." After a Participant becomes a Defaulting Participant, and the circumstances causing such status shall not have been cured or waived, Borrower and Lender may, at their respective option, notify such Defaulting Participant of such Person's intention to obtain a replacement Participant ("**Replacement Participant**") for the Defaulting Participant, which Replacement Participant shall be an Eligible Assignee. In the event Borrower or Lender, as applicable, obtains a Replacement Participant, Borrower shall look to the Replacement Participant rather than the Defaulting Participant for the funding of future Advances in an amount equal to the Defaulting Participant's share of each Advance set forth in the Participation Notice. Any Replacement Participant shall not be responsible for, and such Replacement Participant's interest in the Loan shall not be subject to, any liabilities of the Defaulting Participant to Borrower accruing prior to the date of the transfer of the participation interest. Borrower may not offset any amounts owing to Borrower by the Defaulting Participant from any amounts owed by Borrower to Lender pursuant to this Agreement.

### 12.4    Definitions

For purposes of this Article XII, the following terms shall have the following meanings:

"**Approved Fund**" means any (a) investment company, finance company, fund, trust, securitization vehicle or conduit that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of business or (b) any Person (other than a natural person) which temporarily warehouses loans for Lender or any entity described in the preceding clause (a) and that, with respect to each of the preceding clauses (a) and (b), is administered or managed by (i) Lender, (ii) an Affiliate of Lender, or (iii) a Person (other than a natural person) or an Affiliate of a Person (other than a natural person) that administers or manages Lender.

"**Eligible Assignee**" shall mean (a) a Lender, (b) an Affiliate of a Lender, (c) an Approved Fund, and (d) any other Person (other than a natural person) approved by Lender; provided, however, that notwithstanding the foregoing, "Eligible Assignee" shall not include any direct competitor of Borrower.

## XIII.   MISCELLANEOUS

### 13.1    Governing Law; Jurisdiction; Service of Process; Venue

The Loan Documents shall be governed by and construed in accordance with the internal substantive laws of the State of New York without giving effect to its choice of law provisions; provided, however, if any provision(s) of any Loan Document would violate or have the effect of violating the laws of the State of New York but not the laws of the State of Illinois then, with respect to such provision(s), the laws of the State of Illinois shall apply. Any judicial

proceeding against Borrower with respect to the Obligations, any Loan Documents or any related agreement shall be brought in the Bankruptcy Court. By execution and delivery of each Loan Document to which it is a party, each of Borrower and Lender (i) accepts the exclusive jurisdiction of the aforesaid court and irrevocably agrees to be bound by any judgment rendered thereby, (ii) waives personal service of process, (iii) agrees that service of process upon it may be made by certified or registered mail, return receipt requested, pursuant to Section 13.5, and (iv) waives any objection to jurisdiction and venue of any action instituted hereunder and agrees not to assert any defense based on lack of jurisdiction, venue or convenience. Nothing shall affect the right of Lender to serve process in any manner permitted by applicable Law or shall limit the right of Lender to bring proceedings against Borrower in the courts of any other jurisdiction having jurisdiction. Any judicial proceedings against Lender involving, directly or indirectly, the Obligations, any Loan Document or any related agreement shall be brought only in the Bankruptcy Court. All parties acknowledge that they participated in the negotiation and drafting of this Agreement and that, accordingly, no party shall move or petition a court construing this Agreement to construe it more stringently against one party than against any other.

### 13.2   Binding Effect of Loan Documents

The Loan Documents shall inure to the benefit of Lender, its assignees, Participants and all future holders of the Obligations or any of the Collateral, and each of their respective successors and assigns. Each Loan Document shall be binding upon the Persons other than Lender that are parties thereto and their respective successors and assigns, and no such Person may assign, delegate or transfer any Loan Document or any of its rights or obligations thereunder without the prior written consent of Lender. No rights are intended to be created under any Loan Document for the benefit of any Person who is not a party to such Loan Document. Nothing contained in any Loan Document shall be construed as a delegation to Lender of any other Person's duty of performance. BORROWER ACKNOWLEDGES AND AGREES THAT LENDER AT ANY TIME AND FROM TIME TO TIME MAY (I) DIVIDE AND RESTATE ANY NOTE, OR (II) SELL, ASSIGN OR GRANT PARTICIPATING INTERESTS IN OR TRANSFER ALL OR ANY PART OF ITS RIGHTS OR OBLIGATIONS UNDER ANY LOAN DOCUMENT, THE OBLIGATIONS OR THE COLLATERAL TO AN ELIGIBLE ASSIGNEE.

### 13.3   Revival of Obligations

To the extent that any payment made or received with respect to the Obligations is subsequently invalidated, determined to be fraudulent or preferential, set aside or required to be repaid to a trustee, debtor in possession, receiver, custodian or any other Person under any Debtor Relief Law, common law or equitable cause or any other applicable Law, then the Obligations intended to be satisfied by such payment (whether or not previously terminated) shall be revived and shall continue as if such payment had not been received by Lender. Any payments received with respect to such revived Obligations shall be credited and applied in such manner and order, as Lender shall decide in its Permitted Discretion.

### 13.4   Indemnity

Borrower shall indemnify Lender, its Affiliates and its and their respective managers, members, officers, employees, Affiliates, agents, representatives, successors, assigns,

accountants and attorneys (collectively, the "**Indemnified Persons**") from and against any and all liability, obligations, losses, damages, penalties, actions, judgments, suits, reasonable out-of-pocket costs, expenses and disbursements of any kind of nature whatsoever (including reasonable fees and disbursements of counsel, expert witness fees, and reasonable in-house documentation and diligence fees and reasonable legal expenses) which may be imposed on, incurred by or asserted against any Indemnified Person with respect to or arising out of, or in any way relating to any litigation, proceeding or investigation instituted or conducted by any Person with respect to any aspect of, or any transaction contemplated by or referred to in, or any matter related to, any Loan Document or any agreement, document or transaction contemplated thereby, whether or not such Indemnified Person is a party thereto, except to the extent that any of the foregoing (i) arises out of the gross negligence or willful misconduct of any Indemnified Person or (ii) arises out of a dispute between or among any Indemnified Persons. If any Indemnified Person uses in-house counsel for any purpose for which Borrower is responsible to pay or indemnify, Borrower expressly agrees that its indemnification obligations include reasonable charges for such work commensurate with the fees that would otherwise be charged by outside legal counsel selected by Indemnified Person in its Permitted Discretion for the work performed. Lender agrees to give Borrower reasonable notice of any event of which Lender becomes aware for which indemnification may be required under this Section 13.4, and Lender may elect (but is not obligated) to direct the defense thereof, provided that the selection of counsel shall be subject to Borrower's consent which consent shall not be unreasonably withheld or delayed. Any Indemnified Person may in its reasonable discretion, take such actions, as it deems necessary and appropriate to investigate, defend or settle any event or take other remedial or corrective actions with respect thereto as may be necessary for the protection of such Indemnified Person or the Collateral. Notwithstanding the foregoing, if any insurer agrees to undertake the defense of an event (an "**Insured Event**"), Lender agrees not to exercise its right to select counsel to defend the event if that would cause Borrower's insurer to deny coverage; provided, however, that Lender reserves the right to retain counsel to represent any Indemnified Person with respect to an Insured Event at its sole cost and expense. To the extent that Lender obtains recovery from a third party other than an Indemnified Person of any of the amounts that Borrower has paid to Lender pursuant to the indemnity set forth in this Section 13.4, then Lender shall promptly pay to Borrower the amount of such recovery.

      **13.5**    **Notice**

      Any notice or request under any Loan Document shall be given to any party to this Agreement at such party's address set forth beneath its signature on the signature page to this Agreement, or at such other address as such party may hereafter specify in a notice given in the manner required under this Section 13.5. Any notice or request hereunder shall be given only by, and shall be deemed to have been received upon: (i) registered or certified mail, return receipt requested, on the date on which such received as indicated in such return receipt, (ii) delivery by a nationally recognized overnight courier, one (1) Business Day after deposit with such courier, or (iii) facsimile, pdf or other electronic transmission, in each case upon telephone or further electronic communication from the recipient acknowledging receipt (whether automatic or manual from recipient), as applicable. Any notice or request under any Loan Document or otherwise pursuant to any applicable Law which is given to one Borrower will be deemed to be notice (or, if applicable, a request) to Borrower.

**13.6    Severability; Captions; Counterparts; Facsimile Signatures**

If any provision of any Loan Document is adjudicated to be invalid under applicable Laws, such provision shall be inapplicable to the extent of such invalidity without affecting the validity or enforceability of the remainder of the Loan Documents which shall be given effect so far as possible. The captions in the Loan Documents are intended for convenience and reference only and shall not affect the meaning or interpretation of the Loan Documents. The Loan Documents may be executed in one or more counterparts (which taken together, as applicable, shall constitute one and the same instrument) and by facsimile, pdf or other transmission, and such signatures shall be considered original executed counterparts. Each party to this Agreement agrees that it will be bound by its own electronic signature and that it accepts the electronic signature of each other party.

**13.7    Expenses**

Borrower shall pay, whether or not the Closing occurs, all usual and customary costs and expenses incurred by Lender or its Affiliates, including documentation and diligence fees and expenses, all search, audit, appraisal, recording reasonable professional and filing fees and expenses and all other actual out-of-pocket charges and expenses (including UCC and judgment and tax lien searches and UCC filings and fees for post-Closing UCC and judgment and tax lien searches and audit expenses), and reasonable attorneys' fees and expenses, incurred (i) in any effort to enforce, protect or collect payment of any Obligation or to enforce any Loan Document or any related agreement, document or instruments (ii) in connection with entering into, negotiating, preparing, reviewing and executing the Loan Documents or any related agreements, documents or instruments, (iii) arising in any way out of administration of the Obligations, (iv) in connection with instituting, maintaining, preserving, enforcing or foreclosing on Lender's Liens in any of the Collateral or securities pledged under the Loan Documents, whether through judicial proceedings or otherwise, (v) in defending or prosecuting any actions, claims or proceedings arising out of or relating to Lender's transactions with Borrower, (vi) in seeking, obtaining or receiving any advice with respect to its rights and obligations under any Loan Document and any related agreement, document or instrument, (vii) in connection with any modification, restatement, supplement, amendment, waiver or extension of any Loan Document or any related agreement, document or instrument or (viii) in connection with all actions, visits, audits and inspections undertaken by Lender or its Affiliates pursuant to the Loan Documents, subject to the provisions of Section 6.7. In addition, Borrower shall pay Lender a wire fee of $25.00 with respect to each domestic wire transfer of funds by Lender to or for the benefit of Borrower. All of the foregoing shall be charged to Borrower's account and shall be part of the Obligations. If Lender or any of its Affiliates uses in-house counsel for any purpose under any Loan Document for which Borrower is responsible to pay or indemnify, Borrower expressly agrees that its Obligations include reasonable charges for such work commensurate with the fees that would otherwise be charged by outside legal counsel selected by Lender or such Affiliate in its Permitted Discretion for the work performed. Without limiting the foregoing, Borrower shall pay all taxes (other than taxes based upon or measured by Lender's income or revenues or any personal property tax), if any, in connection with the transactions contemplated by this Agreement and the Loan Documents and the filing or recording of any documents or financing statements.

### 13.8    Entire Agreement

This Agreement and the other Loan Documents to which Borrower is a party constitute the entire agreement between Borrower and Lender with respect to the subject matter hereof and thereof, and supersede all prior agreements and understandings, if any, relating to the subject matter hereof or thereof. Any promises, representations, warranties or guarantees not herein contained and hereafter made shall have no force and effect unless in writing signed by Borrower and Lender, provided, however, additional covenants, representations, warranties and guarantees will be enforceable if executed by the party against whom enforcement is sought. No provision of this Agreement may be changed, modified, amended, restated, waived, supplemented, discharged, canceled or terminated orally or by any course of dealing or in any other manner other than by an agreement in writing signed by Lender and Borrower. Each party hereto acknowledges that it has been advised by counsel in connection with the negotiation and execution of this Agreement and is not relying upon oral representations or statements inconsistent with the terms and provisions hereof. Any schedule may be amended from time to time by Borrower with the consent of the Lender, which consent shall not be unreasonably withheld if the revised schedule does not evidence any violation of the covenants in Articles VI or VII.

### 13.9    Lender Approvals

Any approval, consent, waiver or satisfaction of Lender with respect to any matter that is subject of any Loan Document (i) shall not be effective unless it is in writing and (ii) unless expressly provided herein to the contrary, may be granted or withheld by Lender in its sole discretion.

### 13.10    Confidentiality and Publicity

Borrower agrees, and agrees to cause each of its Affiliates, (i) not to transmit or disclose provisions of any Loan Documents to any Person (other than to Borrower's advisors and officers on a need-to-know basis) without Lender's prior written consent, which may be withheld in its sole discretion, and (ii) to inform all such Persons of the confidential nature of the Loan Documents and to direct them not to disclose the same to any other Person and to require each of them to be bound by these provisions. Lender reserves the right to review and approve all materials that Borrower or any of its Affiliates prepares that contain Lender's name or describe or refer to any Loan Document, any of the terms thereof or any of the transactions contemplated thereby. Borrower shall not, and shall not permit any of its Affiliates to, use Lender's name (or the name of any of Lender's Affiliates) in connection with any of its business operations. Nothing contained in any Loan Documents is intended to permit or authorize Borrower or any of its Affiliates to contract on behalf of Lender. Further, Borrower hereby agrees that Lender or any Affiliate of Lender may (i) disclose a general description of transactions arising under the Loan Documents for advertising, marketing or other similar purposes to the extent such information is publicly available and, if not publicly available, with Borrower's prior approval and (ii) use Borrower's name, logo or other indicia germane to such party in connection with such advertising, marketing or other similar purposes.

### 13.11   USA PATRIOT Act

Borrower shall not (a) be or become subject at any time to any law, regulation, or list of any government agency (including the U.S. Office of Foreign Asset Control list) that prohibits or limits Lender from making any advance or extension of credit to Borrower or from otherwise conducting business with Borrower, or (b) fail to provide documentary and other evidence of Borrower's or its corporate officers' identities as may be requested by Lender at any time to enable Lender to verify Borrower's identity or to comply with any applicable Law, including Section 326 of the USA PATRIOT Act of 2001, 31 U.S.C. §5318. Lender hereby notifies Borrower that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record certain information and documentation that identifies Borrower, which information includes Borrower's name and address and such other information that will allow Lender to identify Borrower in accordance with the USA PATRIOT Act.

### 13.12   Release of Lender

Notwithstanding any other provision of any Loan Document, Borrower voluntarily, knowingly, unconditionally and irrevocably, with specific and express intent, for and on behalf of itself, its managers, members, directors, officers, employees, stockholders, Affiliates, agents, representatives, accountants, attorneys, successors and assigns and their respective Affiliates (collectively, the "**Releasing Parties**"), (i) hereby fully and completely release and forever discharge the Indemnified Persons and any other Person or insurer which may be responsible or liable for the acts or omissions of any of the Indemnified Persons, or who may be liable for the injury or damage resulting therefrom (collectively, with the Indemnified Persons, the "**Released Parties**"), of and from any and all actions, causes of action, damages, claims, obligations, liabilities, costs, expenses and demands of any kind whatsoever, at law or in equity, matured or unmatured, vested or contingent, that any of the Releasing Parties has against any of the Released Parties as of the date of the Closing and (ii) by acceptance of each Advance hereunder fully and completely release and forever discharge the Released Parties, of and from any and all actions, causes of action, damages, claims, obligations, liabilities, costs, expenses and demands of any kind whatsoever, at law or in equity, matured or unmatured, vested or contingent, that any of the Releasing Parties has against any of the Released Parties as of the date of each such Advance. Borrower acknowledges that the foregoing release is a material inducement to Lender's decision to extend to Borrower the financial accommodations hereunder and will be relied upon by Lender in making the Advances.

### 13.13   Governing Documents.

To the extent that there is a conflict between any Loan Documents and the Financing Orders, than the Financing Orders shall govern over the relevant Loan Document.

**[SIGNATURES APPEAR ON THE FOLLOWING PAGES]**

IN WITNESS WHEREOF, each of the parties has duly executed this Credit and Security Agreement as of the date first written above.

BORROWER:

WEALSHIRE REHAB, LLC,
an Illinois limited liability company

By:_____
Name: Arnold Goldberg
Title:  Manager

Address for Notice:

Twelve South Broadway
Beverly Shores, IN 46301
Attn: Arnold Goldberg

With copy to (which shall not constitute notice):

Address for Notice:

Sher, LLP
5750 Old Orchard Road, Suite 420
Skokie, Illinois 60077
(847) 324-7993
steve@sherlegal.com

Levenfeld Pearlstein, LLC
Attn: Harold Israel, Jack O'Connor, Sean Williams
120 S. Riverside Plz., Ste. 1800
Chicago, IL 60606
(312) 346-8380
hisrael@lplegal.com
joconnor@lplegal.com
swilliams@lplegal.com

[Signature Page Continues]

LENDER:

ECAPITAL HEALTHCARE CORP.
a Delaware corporation


By: _____
Name:  Timothy Peters
Title:    Authorized Signatory

<u>Address for Notice:</u>
eCapital Healthcare Corp.
24 East Ave PMB 1285
New Canaan, CT 06840
Attention: Legal Department
Telephone: (203) 266-3210
Email: EHCLegal@ecapital.com

With copy to (which shall not constitute notice):

Foley & Lardner LLP
321 North Clark Street
Suite 3000
Chicago, IL 60654
Attention: Edward Green
Telephone: (312) 832-4375
Email: egreen@foley.com

ANNEX I

Financial and Loan Covenants

## EXHIBITS

Exhibit A          -          Borrowing Certificate

Exhibit B          -          Compliance Certificate

Exhibit C          -          Budget

## SCHEDULES

Schedule 2.4        -          Borrower's Account for Funding Wires

Schedule 2.5        -          Borrower's Deposit Accounts

Schedule 5.3        -          Organizational Information

Schedule 5.4        -          Real Property Owned or Leased

Schedule 5.6        -          Litigation

Schedule 5.11       -          Intellectual Property

Schedule 5.16       -          Insurance

Schedule 5.17A      -          Corporate Names

Schedule 5.17B      -          Business and Collateral Locations

Schedule 5.19       -          Healthcare Law Compliance Representations

Schedule 5.22       -          Material Contracts

Schedule 5.23       -          Third-Party Payor Billing Numbers

Schedule 7.3        -          Liens

## ANNEX I

## FINANCIAL AND LOAN COVENANTS

1)      **Reserved.**

2)      **Reserved.**

3)      **Loan Turnover Rate**

Beginning with the month then ending July 31, 2024, and at the end of each calendar month thereafter, the amount calculated by dividing (a) the average outstanding principal balance of the Revolving Facility for the applicable Test Period by (b) the result achieved by dividing (i) the sum of all collections received in the Controlled Deposit Account during the applicable Test Period with respect to all of Borrower's Accounts by (ii) the number of days in such Test Period, shall not be greater than 45. Notwithstanding the foregoing, the first three tests of the Loan Turnover Rate shall include (to the extent necessary to achieve a full Test Period) the average outstanding principal balance and sums collected by Lender under the Prepetition Credit Agreement.

For purposes of the covenants set forth in this Annex I, capitalized terms shall have the following meanings set forth below, or if not set forth below, the meanings set forth in Article I.

**"Current Ratio"** shall mean Borrower's ratio of current assets (determined in accordance with GAAP), to current liabilities (also determined in accordance with GAAP). For this purpose, the outstanding balance of the Revolving Facility shall be deemed to be a current liability.

**"Test Period"** shall mean three most recent calendar months then ended (taken as one accounting period).

4)      **Budget.**

Borrower shall comply with the most recently approved Budget subject to the Permitted Variance.

{00256624 7/1188/2}

EXHIBIT A

BORROWING CERTIFICATE
Dated as of _____, 20____

*The Borrowing Certificate shall set forth the Lender's calculation of the Net Collectible Value of the Eligible Receivables, Borrowing Base, Availability and related calculations, following which the following certification shall be appended:*

The undersigned hereby certifies to eCapital Healthcare Corp. ("**Lender**") that:

1. I am certifying the following facts and making and delivering this Borrowing Certificate pursuant to that certain Superpriority Debtor-in-Possession Credit and Security Agreement, dated as of June [__], 2024 (as the same may be, amended, restated, supplemented, or otherwise modified from time to time, the "**Credit Agreement**") between Wealshire Rehab, LLC ("**Borrower**") and Lender. Capitalized terms used in this certificate have the same meaning as set forth in the Credit Agreement.

2. All information contained in this Borrowing Certificate is true, correct, and complete as of the date hereof. All representations and warranties made by Borrower in the Credit Agreement are true and correct on and as of the date hereof as if such representations and warranties had been made as of the date hereof.

3. No Default or Event of Default has occurred and is continuing or will exist after giving effect to the Advance requested hereby.

4. Borrower has performed and complied with all agreements and conditions required under Article IV of the Credit Agreement to be performed or complied with by it on or prior to the funding of the Advance requested hereby.

5. There have been no modifications to reimbursement rates or other contractual arrangements that would adversely affect the valuation or collectability of the Accounts. There are no offsets, setoffs, counterclaims, disputes or defenses of any kind from any Account Debtor against any Account classified as an Eligible Receivable. All Accounts classified as Eligible Receivables and Ineligible Receivables in this Borrowing Certificate are properly so classified.

6. The Borrower has directed all Account Debtors to deliver all payments on the Accounts to the proper Controlled Deposit Account (including any Lockbox Account) as specified in the Credit Agreement and has identified such Controlled Deposit Account as the account to which all payments are to be sent on all invoices for Accounts with Dates of Service after the date of the Credit Agreement. All Accounts reflected in the Borrower's most recently submitted Accounts Receivable Aging Report are the subject of properly and validly billed invoices for services provided and Goods sold by the applicable Borrower in

the ordinary course of business. The aging buckets in this Borrowing Certificate reflect the number of days the Accounts have been outstanding subsequent to their respective Dates of Service. All collections on Accounts have been applied to the proper invoices resulting in accurate aging totals for each aging bucket. There are no known duplicate or fictitious claims or invoices included in the Accounts. The Borrower has not diverted or permitted to be diverted any such payments on Accounts to a deposit account other than the proper Controlled Deposit Account as required by Section 2.5 of the Credit Agreement. No collections on Accounts have been received that have not been applied to reduce the Accounts.

7.  Records regarding all Inventory are maintained on a perpetual inventory system, and all Inventory reflected in the Borrower's most recently submitted inventory report is bona fide Inventory, saleable in the ordinary course of Borrower's business. All such Inventory is owned by Borrower and is in Borrower's possession. There are no known duplicate or fictitious items included in the Inventory. All Inventory included in the Borrowing Base is either: (i) held by Borrower free and clear of all liens and encumbrances by vendors of such Inventory; or (ii) subject to a Subordination Agreement between Lender, Borrower and the vendor of any such Inventory.

8.  All Accounts owned by the undersigned, free and clear of all liens, security interests, claims, charges, or trusts, legal or equitable, now existing or which might arise with the passage of time, other than as set forth in the Credit Agreement.

9.  The Borrower has deposited all state and federal payroll withholding taxes required with respect to each payroll period through the most recent payroll period.

10. After Lender makes the Advance requested hereby, the aggregate amount of the Loan will not exceed the Revolving Loan Limit.

Signature:  _____

Name/Title:  _____

Borrower's Name:  Wealshire Rehab, LLC

EXHIBIT B

COMPLIANCE CERTIFICATE
Dated as of _____, 20___

This Compliance Certificate is delivered by Wealshire Rehab, LLC (the "**Borrower**"), in accordance with the Superpriority Debtor-in-Possession Credit and Security Agreement dated as of June [__], 2024, between Borrower and eCapital Healthcare Corp. ("**Lender**") (as amended, restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"). All capitalized terms not defined herein have the meanings given them in the Credit Agreement and other Loan Documents.

The undersigned hereby certifies that:

(a)     The financial statements delivered with this certificate in accordance with Section 6.1 of the Credit Agreement fairly present in all material respects the results of operations and financial condition of Borrower as of the dates and the accounting periods covered by such financial statements;

(b)     I have reviewed the terms of the Credit Agreement and have made, or caused to be made under my supervision, a review in reasonable detail of the transactions and financial condition of Borrower during the accounting period covered by such financial statements;

(c)     Such review has not disclosed the existence during or at the end of such accounting period, and I have no knowledge of the existence as of the date hereof, of any condition or event that constitutes a Default or an Event of Default, except as set forth in Schedule 1 attached hereto, which includes a description of the nature and period of existence of such Default or an Event of Default and what action Borrower has taken, is undertaking and proposes to take with respect thereto;

(e)     Except as noted on Schedule 2 attached hereto, the undersigned has no knowledge of any federal or state tax liens having been filed against Borrower or any Collateral;

(f)     Except as noted on Schedule 3 attached hereto, the undersigned has no knowledge of any failure of Borrower to make required payments of withholding or other tax obligations during the accounting period to which the attached statements pertain or any subsequent period.

(g)     Except as described in the Credit Agreement or on Schedule 4 attached hereto, the undersigned has no knowledge of any current, pending or threatened:

(i)     litigation against Borrower;

(ii)     inquiries, investigations or proceedings concerning the business affairs, practices, licensing or reimbursement entitlements of Borrower;

(iii)     default by Borrower under any material contract to which it is a party, including any leases.

(h)      Borrower is in compliance with the financial and loan covenants contained in Annex I of the Credit Agreement, as demonstrated by the calculation of such covenants below, except as set forth below; in determining such compliance, the following calculations have been made: See attached worksheets. Such calculations and the certifications contained therein are true, correct and complete.

Certified to as of _____, 20____ by:

Signature: _____

Name/Title: _____

**Schedules to Compliance Certificate**

Schedule 1 – Non-Compliance with Covenants

Schedule 2 – Federal or State Tax Liens

Schedule 3 – Unpaid Tax or Withholding Obligations

Schedule 4 –Pending Litigation, Inquiries or Investigations; Defaults under Material Contracts

Worksheet(s) for Financial or Other Covenant Calculations

**RESERVED**

{00256624 7/1188/2}

### Loan Turnover Rate Worksheet (Attachment to Compliance Certificate)

1.  Average outstanding principal balance of Revolving Facility for the
Test Period:                                                            $_____

2.  Total collections received in the Controlled Deposit Accounts during
most recently ended Test Period:                                        $_____

3.  Number of days during most recently ended Test Period:              _____ days

4.  Line 2 divided by Line 3:                                           _____ days

5.  Line 1 divided by Line 4:                                           _____ days

6.  Maximum Loan Turnover Rate:                                         45 days

7.  In compliance:                                                      -YES  -  NO

**RESERVED**

SCHEDULE 2.4

Borrower's Account for Funding Wires

Bank: Old National Bank
Address: Evansville, Indiana
Account No.: 127589654
ABA Wire No.: 086300012
Account Name: Wealshire Rehab, LLC

SCHEDULE 2.5

Borrower's Deposit Accounts

| GOVERNMENTAL COLLECTIONS ACCOUNT OLD NATIONAL BANK | | | |
|---|---|---|---|
| Account Name | Account Number | DAISA (Y/N) | Second Lien Creditor |
| Wealshire Rehab, LLC | 127694165 | Y | Cambridge |

| NON-GOVERNMENTAL COLLECTIONS ACCOUNT OLD NATIONAL BANK | | | |
|---|---|---|---|
| Account Name | Account Number | Blocked DACA (Y/N) | Second Lien Creditor |
| Wealshire Rehab, LLC | 127694176 | Y | Capital One |

| CONCENTRATION ACCOUNT OLD NATIONAL BANK | | | |
|---|---|---|---|
| Account Name | Account Number | Blocked DACA (Y/N) | Second Lien Creditor |
| Wealshire Rehab, LLC | 127694154 | Y | Cambridge |

| OPERATING ACCOUNT OLD SECOND NATIONAL BANK | | | |
|---|---|---|---|
| Account Name | Account Number | Springing DACA (Y/N) | Second Lien Creditor |
| Wealshire Rehab, LLC | 127589654 | Y | Cambridge |

| PAYROLL ACCOUNT OLD SECOND NATIONAL BANK | | | |
|---|---|---|---|
| Account Name | Account Number | Control Agreement (Y/N) | Second Lien Creditor |
| Wealshire Rehab, LLC | 127602249 | N | None |

SCHEDULE 5.3

Organizational Information

Borrower is a limited liability company organized under the laws of Illinois.

Borrower has no subsidiaries.

The number and class of equity securities issued and outstanding of each Borrower and the record and beneficial owners thereof (including options, warrants and other rights to acquire any of the foregoing) are as follows:

| Wealshire Rehab, LLC, | | |
|---|---|---|
| Beneficial Owner | Ownership Interest | Percent of Ownership Interest |
| Arnold Goldberg | Membership Interest | 100% |

SCHEDULE 5.4

Real Property Owned or Leased

150 Jamestown Lane, Lincolnshire, Illinois 60069

SCHEDULE 5.6

Litigation

Professional Medical Surgical Supply, Inc. v. Wealshire Rehab, LLC; Wealshire Plus, LLC; The Wealshire, Case No. 2024LA000473 (12th Judicial Circuit Court, Will County, Illinois)

Keziah Quality Nursing Staffing, LLC v. Wealshire Rehab, LLC, Case No. 23-L-008794 (Circuit Court of Cook County, Illinois)

Performance Food Group, Inc. v. Wealshire Rehab, LLC, Case No. 2024-LA-46 (14th Judicial Circuit Court, Rock Island County, Illinois)

Nursa, Inc. v. Wealshire Rehab, LLC, Case No. 24-cv-00053 (United States District Court for the District of Utah)

Healthcare Services Group, Inc. v. Wealshire Rehab, LLC; Wealshire Plus, LLC, Case No. 2024-00625 (Bucks County Court of Common Pleas, Pennsylvania)

NLAL Hospitality, LLC v. Wealshire Rehab, LLC, Arbitration Demand (AAA), filed

Delta-T Group Illinois, Inc. v. Wealshire Rehab, LLC, Case No. 2024-LA-00000308 (19th Judicial Circuit, Lake County, Illinois)

SCHEDULE 5.11

Intellectual Property

None

SCHEDULE 5.16

Insurance

Liability Insurance Policy Number _____ from _____ Insurance Company covering Borrower.

Commercial Property Insurance Policy Number _____ from Cincinnati Insurance Company covering Borrower.

Worker's Compensation Insurance Policy Number _____ from Diamond Insurance Company covering Borrower.

SCHEDULE 5.17A

Corporate Names

Wealshire Rehab, LLC

SCHEDULE 5.17B

Business and Collateral Locations

150 Jamestown Lane, Lincolnshire, IL 60069

SCHEDULE 5.19

Healthcare Law Compliance Representations

The Project commonly known as Wealshire Rehab, and located at 150 Jamestown Lane, Lincolnshire, IL 60069, has 144 licensed skilled nursing beds.

SCHEDULE 5.22

Material Contracts

- Sublease Agreement dated May 1, 2023 by and between Wealshire Master Tenant, LLC, an Illinois limited liability company, and Wealshire Rehab, LLC, an Illinois limited liability company.  Monthly Rent equal to 1.05 times the monthly principal and interest payments, the MIP Escrow, replacement reserves, property and liability insurance escrows and the real estate tax escrows, if any, under the HUD mortgage encumbering the property.

- Medicaid and Medicare Provider Agreements for Borrower

- Consulting Services Agreement between Wealshire Rehab, LLC and The Asher Group, LLC, an Illinois limited liability company, for consulting services.  Consulting Fee of 5% of gross revenues of the facility per month.

SCHEDULE 5.23

Third-Party Payor Billing Numbers

| Facility | Medicare | Medicaid |
|---|---|---|
| Wealshire Rehab | 14-6028 | To be provided post-closing pursuant to Section 4.3 of the Credit Agreement |

SCHEDULE 7.3

Liens

- UCC Financing Statements of Cambridge Realty Capital Ltd. of Illinois on Borrower

**EXHIBIT B**

**BUDGET**

**Wealshire Rehab LLC**
**13 Week Cash Flow Projection**
**Monday, June 24, 2024**

|  |  | 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|---|---|
| | Week Ending | 06/28/24 | 07/05/24 | 07/12/24 | 07/19/24 | 07/26/24 | 08/02/24 |
| | Beginning Cash | $ 848 | $ 48 | $ 172 | $ 747 | $ 547 | $ 156 |
| | | | | | | | |
| | Senior DIP Draw | $ 271,000 | $ 135,000 | $ 195,000 | $ 96,000 | $ 153,000 | $ 129,000 |
| | Junior DIP Draw | $ - | $ 18,000 | $ 191,000 | $ 30,000 | $ 184,000 | $ 62,000 |
| | Total Cash Inflow | $ 271,000 | $ 153,000 | $ 386,000 | $ 126,000 | $ 337,000 | $ 191,000 |
| 1 | Advertising | $ - | $ - | $ - | $ - | $ - | $ 1,200 |
| 2 | Bank Charges | $ - | $ 1,500 | $ - | $ - | $ - | $ 1,500 |
| 3 | CC Processing Fees | $ - | $ 2,400 | $ - | $ - | $ - | $ 2,400 |
| 4 | Liability Insurance Expense | $ - | $ 52,807 | $ - | $ - | $ - | $ 52,807 |
| 5 | Health Insurance | $ - | $ 25,500 | $ - | $ 40,000 | $ - | $ 38,000 |
| 6 | Licenses & Permits | $ - | $ - | $ - | $ - | $ - | $ - |
| 7 | Payroll - Related Expenses | $ 200,000 | $ - | $ 217,000 | $ - | $ 225,000 | $ - |
| 8 | Payroll - Related Expenses (Taxes) | $ 71,800 | $ - | $ 73,000 | $ - | $ 76,000 | $ - |
| 9 | Payroll - Related Expenses (Workman's Comp) | $ - | $ 5,564 | $ - | $ - | $ - | $ 5,564 |
| 10 | Staffing Agency | $ - | $ - | $ - | $ - | $ - | $ - |
| 11 | Legal Fees | $ - | $ 22,500 | $ 22,500 | $ 15,000 | $ 15,000 | $ 15,000 |
| 12 | Subchapter V Trustee Fees | $ - | $ - | $ - | $ - | $ - | $ 7,500 |
| 13 | Patient Care Ombudsman | $ - | $ - | $ - | $ - | $ - | $ 7,500 |
| 14 | GFS 503(b)(9)Payment | $ - | $ - | $ - | $ - | $ 26,390 | $ 26,000 |
| 15 | Rent | $ - | $ - | $ - | $ - | $ - | $ - |
| 16 | Repairs and Maintenance | $ - | $ 1,000 | $ - | $ - | $ - | $ 750 |
| 17 | Inventory Purchases | $ - | $ 13,000 | $ - | $ - | $ - | $ - |
| 18 | Property Taxes | $ - | $ - | $ - | $ - | $ - | $ - |
| 19 | Other Taxes | $ - | $ - | $ 45,000 | $ - | $ - | $ - |
| 20 | Equipment Lease | $ - | $ 120 | $ - | $ - | $ - | $ 120 |
| 21 | Janitorial & Cleaning | $ - | $ - | $ - | $ - | $ - | $ 750 |
| 22 | Cable service | $ - | $ 240 | $ - | $ - | $ - | $ 240 |
| 23 | Computer and Internet Expenses | $ - | $ - | $ - | $ 13,000 | $ - | $ - |
| 24 | Telephone Expense | $ - | $ 2,550 | $ - | $ - | $ - | $ - |
| 25 | Utilities Deposit | $ - | $ 6,465 | $ - | $ - | $ - | $ - |
| 26 | Utilities | $ - | $ 13,000 | $ - | $ - | $ - | $ 13,000 |
| 27 | Other G&A and Non-Reimbursables | $ - | $ 1,200 | $ - | $ - | $ - | $ 750 |
| 28 | Equipment Rental | $ - | $ - | $ 1,500 | $ - | $ - | $ - |
| 29 | Grounds Maintenance | $ - | $ 2,380 | $ - | $ - | $ - | $ 2,380 |
| 30 | Medical Director | $ - | $ 2,400 | $ - | $ - | $ - | $ 4,800 |
| 31 | Therapy Contract Services | $ - | $ - | $ - | $ 3,200 | $ - | $ - |
| 32 | Non-Emergency Ambulance | $ - | $ - | $ 425 | $ - | $ - | $ - |
| 33 | Professional Fees | $ - | $ - | $ 7,500 | $ - | $ - | $ - |
| 34 | Expense Reimbursements | $ - | $ - | $ 1,500 | $ - | $ - | $ - |
| 35 | Data Processing Fees(EMR, Timekeeping & Payroll) | $ - | $ - | $ 17,000 | $ - | $ - | $ - |
| 36 | Postage | $ - | $ 250 | $ - | $ - | $ - | $ 250 |
| 37 | Dues & Subscriptions | $ - | $ - | $ - | $ - | $ - | $ - |
| 38 | Management and Billing Services | $ - | $ - | $ - | $ - | $ - | $ - |
| 39 | Senior DIP Fees | $ - | $ - | $ - | $ - | $ - | $ - |
| 40 | Senior DIP Counsel Fees | $ - | $ - | $ - | $ 10,000 | $ 10,000 | $ 10,000 |
| | | | | | | | |
| | Total Cash Outlays | $ 271,800 | $ 152,876 | $ 385,425 | $ 81,200 | $ 352,390 | $ 190,511 |
| | Net Change in Cash | $ (800) | $ 124 | $ 575 | $ 44,800 | $ (15,390) | $ 489 |
| | | | | | | | |
| | Ending Cash | $ 48 | $ 172 | $ 747 | $ 45,547 | $ 30,156 | $ 30,645 |

# EXHIBIT C

## MILESTONES

|   | Milestone | Specified Deadline |
|---|-----------|--------------------|
| 1. | On or before "P" (the "Petition Date") the Debtor shall have filed motions seeking approval of the Interim DIP Order which shall be in form and substance acceptable to the Senior DIP Lender in all respects | June 20, 2024 |
| 2. | The Bankruptcy Court shall have entered (1) the Interim DIP Order and such Interim DIP Order shall be in full force and effect and shall not have been (A) vacated, reversed, or stayed, or (B) amended or modified except as otherwise agreed to in writing by the Senior DIP Lender | June 26, 2024 |
| 3. | Deadline for Debtor to enter into junior debtor in possession financing facility in form and substance reasonably satisfactory to Senior DIP Lender and a motion shall have been filed to approve such financing | July 2, 2024 |
| 4. | The Bankruptcy Court shall have entered: (1) the Final DIP Order, and such Final DIP Order shall be in full force and effect and shall not have been (A) vacated, reversed, or stayed, or (B) amended or modified except as otherwise agreed to in writing by the Senior DIP Lender | July 25, 2024 |
| 5. | A Plan of Reorganization, in form and substance agreed upon by the Senior DIP Lender, shall have been filed | September 18, 2024 |
| 6. | A Plan of Reorganization, in form and substance agreed upon by the Senior DIP Lender, shall have been confirmed pursuant to section 1129 of the Bankruptcy Code | November 1, 2024 |
| 7. | A Plan of Reorganization, in form and substance agreed upon by the Senior DIP Lender, shall have become effective. | November 30, 2024 |

Page **1** of