**OPERATIONS TRANSFER AGREEMENT**

by and between

Wealshire Rehab, LLC,
an Illinois limited liability company
"Old Operator"
and

Lincolnshire Nursing LLC,
an Illinois limited liability company
"New Operator"

Dated as of:  August 30, 2024

Docusign Envelope ID: 41767AD2-0B42-4566-A57A-B163F04A6268

**Exhibits**[1]

Exhibit A Bill of Sale

Exhibit B General Assignment


**Schedules**

Schedule 5 Excluded Assets

Schedule 7 Patient Trust Funds and Resident Property

Schedule 9(a) Assumed Contracts

Schedule 11(b) Old Operator Employee Expenses

Schedule 20(m) Labor Unions

Schedule 20(n) Multi-Employer Plans

Schedule 20(o) Employee Benefit Plans

Schedule 20(p) Environmental Condition

---

[1] All exhibits and schedules will be filed prior to the Closing.

## OPERATIONS TRANSFER AGREEMENT

This OPERATIONS TRANSFER AGREEMENT (this "***Agreement***") is entered as of August 30, 2024 (the "***Effective Date***"), by and between Wealshire Rehab, LLC, an Illinois limited liability company ("***Old Operator***"), and Lincolnshire Nursing LLC, an Illinois limited liability company ("***New Operator***").

### WITNESSETH:

**WHEREAS**, Lincolnshire Properties L.P., an Illinois limited partnership ("***Realty***"), currently owns that certain real property (the "***Real Estate***") improved with a skilled nursing care facility commonly known as The Wealshire Skilled Nursing and located at 150 Jamestown Lane, Lincolnshire, Illinois (the "***Facility***"), and certain furniture, fixtures and equipment and other items of personal property located therein; and

**WHEREAS**, Old Operator is currently subleasing the Facility under a sublease (the "***Sublease***") with Wealshire Master Tenant, LLC (the "***Master Tenant***"), and Master Tenant is currently leasing the Facility under a HUD Facilities Master Lease with Realty (the "***Master Lease,***" and, collectively, together with the Sublease, the "***Existing Lease***"), which Existing Lease shall terminate upon the Termination Date (as such term is defined in the Lease Termination Agreement (the "***Lease Termination Agreement***") between Old Operator and New Operator; and

**WHEREAS**, New Operator will be leasing the Facility from Realty per the terms of the Lease Agreement (the "***Lease***"), with a term to commence as of the commencement date thereunder (the "***Commencement Date***");

**WHEREAS**, Old Operator has filed a petition under Subchapter V of the Chapter 11 of the Bankruptcy Code, presently pending in the United States Bankruptcy Court for the Northern District of Illinois ("***Bankruptcy Court***"), under case no. 24-09110 ("***Bankruptcy Case***").

**WHEREAS**, eCapital Healthcare Corp. ("Senior DIP Lender") has made that certain Senior DIP loan facility available to Debtor as provided in the financing orders entered in the Bankruptcy Case ("***Senior DIP***").

**WHEREAS,** GS Capital Funding LLC, a Delaware limited liability company ("***GS***") has made that certain Junior DIP loan facility available to Debtor in the current amount of $500,000 in the Bankruptcy Case (as amended, "***Junior DIP***").

**NOW, THEREFORE**, for the mutual promises and covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby mutually acknowledged by the parties hereto, the parties hereto agree as follows:

1. <u>CLOSING</u>. The closing of the transactions contemplated hereby (the "***Closing***") shall take place on the Commencement Date, subject to satisfaction or waiver of the closing conditions provided for herein, or such other date as the parties mutually agree upon (the "***Closing Date***").

2. <u>CONDITIONS PRECEDENT TO OBLIGATIONS OF NEW OPERATOR</u>. New Operator's obligation to consummate the transactions contemplated in this Agreement shall be subject to the following conditions precedent on and as of the Closing Date to the reasonable satisfaction of New Operator or the waiver thereof by New Operator, which waiver shall be binding upon New Operator only to the extent made in writing and dated as of the Closing Date; provided, however, that if any of the following condition precedents are not satisfied or fulfilled and New Operator had knowledge of the same and proceeded to Closing, then such condition precedent shall be deemed to have been waived without any written acknowledgment:

a. Old Operator shall have duly and timely performed and fulfilled in all material respects its duties, obligations, promises, covenants and agreements hereunder;

b. Each of the representations and warranties of Old Operator contained in this Agreement shall be true and correct as of the Closing Date in all material respects;

c. Old Operator shall not be in any material breach of any term, provision or condition of this Agreement;

d. Old Operator shall deliver to New Operator on or before the Closing Date the following, each of which shall be in form and substance reasonably satisfactory to New Operator:

i. bill of sale, in substantially the form annexed hereto as <u>Exhibit A</u> (the "***Bill of Sale***"), duly executed and acknowledged by Old Operator, conveying to New Operator the Supplies (as herein defined);

ii. an assignment by Old Operator, in substantially the form annexed hereto as <u>Exhibit B</u> (the "***General Assignment***"), of all of Old Operator's right, title and interest in, to and under:

1) if and to the extent assignable, the Assumed Contracts (as defined herein);

2) the Patient Trust Funds and Resident Property (as defined herein);

3) if and to the extent assignable, the Provider Agreements (as defined herein);

4) the telephone numbers of Old Operator; and

5) the Resident Agreements (as defined herein).

iii. certificate of Old Operator, in a form reasonably acceptable to New Operator, executed by a duly authorized manager of Old Operator, dated the Closing Date, to the effect that the representations and warranties of Old Operator set forth in this Agreement to be effect as of the Closing Date are true and correct in all material respects as of the Closing Date to Old Operator's knowledge;

iv.    certificate from Old Operator, executed by a duly authorized officer of Old Operator, certifying the corporate documents of Old Operator including the (A) Articles of Organization, (B) operating agreement, and (C) resolutions authorizing the transactions contemplated hereby, and appearing on said certificate shall be the true and correct signatures of all authorized persons who have executed this Agreement on behalf of Old Operator (the "***Old Operator Transaction Documents***")); and

v.    duly executed Lease Termination Agreement.

e.    Except for the deficiencies and matters disclosed in Old Operator's bankruptcy schedules, between the Effective Date and the Closing Date there shall not then be imposed against Old Operator, nor shall have Old Operator received notice of (a) any civil monetary penalty ("***CMP***") or other federal, state or local fine and/or penalty ("***Penalty***"), which remains unpaid as of the Closing Date, or (b) any survey where a plan of correction has not been accepted and completed by the Closing Date with 2 or more violations with scopes and severities of G or higher or any violation designated as immediate jeopardy;

f.    On or before the Closing Date, Old Operator shall have transferred to New Operator the Patient Trust Funds and Resident Property in compliance with all governmental statutes, rules and regulations with respect to the transfer of such Patient Trust Funds and Resident Property and in accordance with the provisions of <u>Section 7</u> below;

g.    Between the Effective Date and the Closing Date, there shall not have been any material adverse change in the regulatory status and/or condition of any of Old Operator's licenses, permits and/or certifications, or the Medicare and Medicaid rates of the Facility; provided, however, that no event, circumstance, change or effect resulting from or arising out of the announcement of the execution of this Agreement or the pendency of consummation of the transactions contemplated by this Agreement (including the threatened or actual impact on relationships with residents, vendors, suppliers, distributors, or employees (including the threatened or actual termination, suspension, modification or reduction of such relationships)) shall constitute a material adverse change;

h.    On the Closing Date, the number of residents collectively present at the Facility shall be no less than ninety percent (90%) of the residents as of the Effective Date with either: (i) approval by Medicaid (i.e., Medicaid pendings are not included) or (ii) if private pay, do not have accounts receivable that is more than 90 days outstanding;

i.    On the Closing Date, there shall not be any actions, suits, claims or other proceedings pending, or injunctions or orders entered, against Old Operator, to restrain or prohibit the consummation of the transactions contemplated hereby;

j.    New Operator shall have received written confirmation from IDPH that has approved New Operator's license application to operate a skilled nursing facility;

k.      The emergency approval of the U.S. Department of Housing and Urban Development ("**HUD**") shall have been obtained, for commencement of the Lease, subject to approval of CHOW subsequently submitted;

l.      New Operator shall have approved of any updates to the schedules and exhibits hereto, provided by Old Operator, which approval shall not be unreasonably withheld, delayed or conditioned;

m.      HUD has approved the use of the mortgage reserve accounts to pay in full the past due principal and interest payments on the mortgage;

n.      There shall be no event of default under the Existing Lease;

o.      Old Operator shall have timely paid when due amounts owed to its employees; and

p.      No Old Operator Party shall have hired any of Old Operator's existing employees, except in accordance with the terms of Section 11 hereof; and

q.      Approval of the Bankruptcy Court, which shall provide that the assets transferred thereunder shall not be subject to the claims of the Senior DIP Lender or the Junior DIP Lender; and

r.      Duly executed unsecured promissory note executed by New Operator in favor of, Levenfeld Pearlstein, LLC in the amount of $250,000, payable $62.500,000 at closing and $187,500 evenly over a 24 month period commencing on November 1, 2024 (the "**Buyer Note**").

3.      <u>CONDITIONS PRECEDENT TO THE OBLIGATIONS OF OLD OPERATOR</u>. Old Operator's obligation to consummate the transactions contemplated in this Agreement shall be subject to the following conditions precedent on and as of the Closing Date to the reasonable satisfaction of Old Operator or the waiver thereof by Old Operator, which waiver shall be binding upon Old Operator only to the extent made in writing and dated as of the Closing Date:

a.      New Operator shall have duly and timely performed and fulfilled all of its duties, obligations, promises, covenants and agreements hereunder;

b.      a certificate of New Operator, in a form reasonably acceptable to Old Operator, executed by a duly authorized officer of New Operator or of its manager, dated the Closing Date, to the effect that the representations and warranties of New Operator set forth in this Agreement are true and complete on and as of the Closing Date to the best of such party's knowledge;

c.      a certificate from New Operator, executed by a duly authorized officer of New Operator, certifying the corporate documents of New Operator including the (A) Articles of Organization, (B) operating agreement, and (C) resolutions authorizing the transactions contemplated hereby, and appearing on said certificate shall be the true and correct signatures of all authorized persons who have executed this Agreement (and all

documents to be executed and delivered by New Operator pursuant hereto (the "***New Operator Transaction Documents***"));

      d.      The emergency approval of HUD shall have been obtained, for commencement of the Lease;

      e.      New Operator shall not be in breach of any term, provision or condition of this Agreement;

      f.      Old Operator shall have approved of any updates to the schedules and exhibits hereto, provided by New Operator;

      g.      New Operator shall have executed and delivered to Old Operator the New Operator Transaction Documents, as applicable, each of which shall be in form and substance satisfactory to Old Operator;

      h.      Duly executed counterparts by New Operator of the General Assignment and Bill of Sale;

      i.      Approval of the Bankruptcy Court, which shall provide that the Assets transferred thereunder shall not be subject to the claims of the Senior DIP Lender or the Junior DIP Lender; and

      j.      The Buyer Note.

4.      <u>NO ASSUMPTION OF LIABILITIES</u>.

      a.      Other than as specifically set forth in this Agreement, New Operator shall not assume and shall not be liable for, and Old Operator shall indemnify New Operator to the extent New Operator is held liable for, any debts, liabilities or obligations of the Old Operator including, but not limited to, any: (i) liabilities or obligations of the Old Operator to its creditors or owners; (ii) liabilities or obligations of the Old Operator with respect to any Rejected Contracts, acts, events or transactions occurring prior to the Closing Date; (iii) liabilities or obligations of the Old Operator with respect to management of the Facility, acts, events or transactions occurring prior to the Closing Date; (iv) liabilities or obligations of the Old Operator for any federal, state, county or local taxes applicable to or assessed against the Old Operator or the Assets or business of the Old Operator that accrue for time before the Closing; (v) any obligations under the Assumed Contracts for which Old Operator expressly agreed to be liable following New Operator's assumption of such Assumed Contracts or (vi) any contingent liabilities or obligations of the Old Operator, whether known or unknown by the Old Operator; provided, however, Old Operator shall not be responsible to indemnify New Operator if and to the extent New Operator becomes liable for penalties assessed prior the Effective Date of which it had knowledge, including the CMP penalty.  Without limiting the foregoing, Old Operator and New Operator intend that, to the fullest extent permitted by law (including under Section 363 of the Bankruptcy Code), upon the Closing, New Operator shall not be deemed to: (i) be the successor of the Old Operator, (ii) have, de facto, or otherwise, merged with or into the Old Operator, (iii) be a mere continuation or substantial continuation of the Old Operator or the enterprise(s)

of the Old Operator or (iv) be liable for any acts or omissions of the Old Operator in the conduct of its business or arising under or related to the Facility other than as expressly set forth in this Agreement. Without limiting the generality of the foregoing, and except as otherwise provided in this Agreement, the parties intend that New Operator shall not be liable for any encumbrance against the Old Operator or any of the Old Operator's predecessors or affiliates, and New Operator shall have no successor or vicarious liability of any kind or character whether known or unknown as of the Closing Date, including without limitation any liabilities for nursing assessments owed by the Old Operator to the Illinois Department of Public Health, whether now existing or hereafter arising, or whether fixed or contingent, with respect to the Facility or any liabilities of the Old Operator arising prior to the Closing Date. The parties agree that the provisions substantially in the form of this Section 4(a) shall be reflected in the Sale Order.

b. New Operator shall have no duty whatsoever to take any action or receive or make any payment or credit arising from or related to any services provided or costs arising from or related to any services provided or costs incurred in connection with the management and operation of the Facility prior to the Closing Date, including, but not limited to, any matters relating to Contracts, cost reports, collections, audits, hearing, or legal action arising therefrom; and Old Operator shall have no duty whatsoever to take any action or receive or make any payment or credit arising from or related to any services provided or costs arising from or related to any services provided or costs incurred in connection with the management and operation of the Facility on or after to the Closing Date, including, but not limited to, any matters relating to cost reports, collections, audits, hearing, or legal action arising therefrom.

5. CONVEYANCE OF ASSETS. On the Closing Date, Old Operator shall transfer to New Operator all of its right, title and interest in (i) all food, central supplies, linens and housekeeping supplies, other consumable, non-consumable inventory maintained with respect to the Facility (the "*Supplies*") and (ii) other assets of Old Operator, other than Excluded Assets (collectively, the "*Assets*"). Old Operator shall have no obligation to deliver the Supplies to any location other than that at which each item of Supplies is currently located, and New Operator agrees that the presence of the Supplies at the Facility on the Closing Date shall constitute delivery thereof.

6. PURCHASE PRICE. As set forth in Section 12 below, in consideration for the Supplies and other rights and Assets transferred by Old Operator to New Operator pursuant hereto, Accounts Receivable, with a face value of approximately $3.0 million, will be an Excluded Asset and the proceeds thereof will be used to pay the creditors of Old Operator in accordance with the priorities of the Bankruptcy Code. Further, as additional consideration, New Operator shall, pursuant to the Buyer Note, pay Old Operator's legal counsel (i) $62,500 at Closing; and (ii) $187,500 evenly over 24 months pursuant to the terms of an unsecured note executed by New Operator in favor of Levenfeld Pearlstein. Levenfeld Pearlstein agrees to subordinate its administrative claim against Old Operator to the allowed claims of all other administrative claimants of the Debtor's estate. To the extent Levenfeld Pearlstein receives any recovery from the Debtor's estate as an administrative claimant in excess of Levenfeld Pearlstein's total fees and expenses, such recovery shall serve as a credit against the Buyer Note. Additionally, should Levenfeld Pearlstein receive, due to the Buyer Note and recovery from the Debtor's estate as an

Docusign Envelope ID: 41761D2-0B42-4566-A57A-B153F04A626B

administrative claimant, proceeds that exceed the total amount of Levenfeld Pearlstein's fees and expenses after satisfaction of the Buyer Note, Levenfeld Pearlstein shall assign such additional proceeds to the New Operator.

      7.    <u>TRANSFER OF PATIENT TRUST FUNDS</u>.

      a.    Prior to the Closing, Old Operator shall provide to New Operator an accounting, certified by Old Operator as being true, correct and complete to Old Operator's knowledge, of any patient trust funds and an inventory of all residents' property held by Old Operator on the Closing Date for patients at the Facility, a copy of which shall be attached hereto as <u>Schedule 7</u> ("***Patient Trust Funds and Resident Property***"). New Operator hereby agrees that it will accept the Patient Trust Funds and Resident Property in trust for the residents, in accordance with applicable statutory and regulatory requirements, including specifically but not limited to 210 ILCS 45/2-201(12). Old Operator will indemnify, defend and hold New Operator harmless from any and all liabilities, claims, demands and causes of action of any nature whatsoever, including reasonable attorneys' fees: (i) in the event the amount of funds or property, if any, transferred to New Operator did not represent the full amount of the funds and/or property delivered to Old Operator and which was required to be held by Old Operator for the benefit of the residents as of the Closing Date less any amounts used or spent since delivery in accordance with Old Operator's custodial arrangements with its patients, (ii) with respect to any Patient Trust Funds and Resident Property delivered, or claimed to have been delivered, to Old Operator, which the Old Operator was required to turnover to the New Operator but which were not delivered by Old Operator to New Operator, or (iii) to the extent New Operator is held liable for claims which arise from actions or omissions of Old Operator with respect to the Patient Trust Funds and Resident Property prior to the Closing Date. Within seven (7) days of Closing, Old Operator will change any direct deposit instructions related to the Patient Trust Funds and Resident Property to the New Operator.

      b.    New Operator will indemnify, defend and hold Old Operator harmless from all liabilities, claims, demands and causes of action of any nature whatsoever, including reasonable attorneys' fees, in the event a claim is made against Old Operator with respect to the Patient Trust Funds and Resident Property where said funds were transferred to New Operator pursuant to the terms hereof, or for claims which arise from actions or omissions of New Operator after the Closing Date with respect to Patient Trust Funds and Resident Property actually received by New Operator.

      8.    <u>COST REPORTS; OVERPAYMENTS, CIVIL MONETARY PENALTIES</u>.

      a.    Old Operator shall prepare and file with the appropriate Medicare and Medicaid agencies its final cost reports in respect to its operation of the Facility as soon as practicable after the Closing Date, but in any event prior to the expiration of the period of time as may be required by law for the filing of each such final cost report under the applicable third party payor program, it being specifically understood and agreed that the intent and purpose of this provision is to ensure that the reimbursement paid to New Operator for the period beginning on the Closing Date is not delayed, reduced or offset in any manner as a result of Old Operator's failure to timely file such final cost reports. Old

Docusign Envelope ID: 41763452-0B42-4566-A57A-B153F04A6268

Operator shall deliver to New Operator draft copies of any Medicare and Medicaid cost reports for the Facility that have not been filed as of the Reference Date, for New Operator's review, at least ten (10) days prior to filing of such reports, and provide New Operator with reasonable access to the underlying documentation for such reports. New Operator shall notify Old Operator of any objections to any portions of such cost report within such ten (10) day period, and thereafter the parties shall diligently work to agree upon a final cost report to deliver to the appropriate agencies. If New Operator shall not so notify Old Operator during such ten (10) day period, it shall conclusively be presumed that New Operator has accepted such draft cost report.

b.      Each party hereto agrees to notify the other within five (5) business days after receipt of any written notice of any claim by IDPH, CMS, OIG or any other governmental or quasi-governmental authority with respect to any of the following, relating to periods prior to the Reference Date: (i) an alleged Medicare or Medicaid overpayment, or any other recoupment or adjustment to reimbursement, (ii) an alleged underpayment of any tax or assessment arising from or relating to patient services or payment thereof, (iii) any other governmental claims assessment arising from or relating to patient services or payment thereof, or (iv) other third-party payor claims assessment arising from or relating to patient services or payment thereof (collectively "**_Recapture Claim_**"). For avoidance of doubt, failure to timely notify shall not affect a party's rights to indemnification hereunder.

c.      In the event IDPH, CMS, OIG or any other governmental or quasi-governmental authority or agency making payments to New Operator for services performed at the Facility on or after the Reference Date make any Recapture Claim for any period prior, or partial period prior, to the Reference Date, then Old Operator shall be entitled to contest such Recapture Claim; provided however, that New Operator shall be allowed the opportunity to participate in all meetings, and be provided with copies of all audit adjustments and workpapers. Old Operator and New Operator shall cooperate to resolve such audit to their mutual satisfaction. In the event Old Operator fails to pursue any issue or issues raised in any such appeal, New Operator may (but is not required), at New Operator's expense, pursue an appeal of such issue or issues and Old Operator will cooperate fully with New Operator in such appeal (provided that Old Operator is not required to incur actual out-of-pocket expenses), including by providing copies of any documentation required to substantiate costs reported on the cost reports.

d.      Old Operator hereby agrees to save, indemnify, defend and hold New Operator harmless from and against any loss, damage, injury or expense incurred by New Operator arising from or related to a Recapture Claim arising prior to the Reference Date. In connection with the foregoing indemnification obligation or in the event that IDPH, CMS, OIG or any other governmental or quasi-governmental authority or agency or other third party payor source withholds amounts from New Operator's reimbursement checks as a result of such Recapture Claim, Old Operator shall pay such amounts to New Operator within three (3) business days following New Operator's demand therefor. For avoidance of doubt, in the event that as the result of a Recapture Claim, New Operator incurs an actual loss with respect to a Recapture Amount (as defined herein), then New Operator may seek payment from Old Operator immediately regardless of whether Old Operator is pursuing a

contest or appeal in connection therewith. If such Recapture Claim is ultimately paid by the Governmental Authority to New Operator or a credit is provided to New Operator related to a withheld amount, New Operator shall immediately pay such amount to Old Operator in immediately available funds.

e.      Old Operator shall be and remain obligated for and shall pay on or before the date due thereof all amounts of any license fees/taxes or other amounts payable to any other government authority with jurisdiction over the Facility accrued upon until the Reference Date. Old Operator shall provide to New Operator, on or before the Reference Date, evidence reasonably satisfactory to New Operator of payment of all of such fees and taxes. New Operator shall pay, on or before the date due, all amounts of any license fees/taxes or other amounts payable to any other government authority with jurisdiction over the Facility accruing on or after the Reference Date, including, but not limited to, any Medicaid provider taxes owed to the State of Illinois**.**

f.      Old Operator shall be liable and responsible for the correction of violations cited by IDPH in any survey ("***Survey***") prior to the Reference Date as detailed in the Statement of Deficiencies issued by IDPH ("***Statement***"), if any, accompanying said Survey, that impose remedies, including but not limited to any CMP, that result solely from an action or intentional inaction of Old Operator prior to the Reference Date, provided that New Operator shall allow Old Operator adequate access to all employees who were Current Employees and to all records necessary to contest and correct such citations and violations.

g.      Old Operator shall ensure the Facility is in compliance with the most recent Real Estate Assessment Center inspection dated prior to the Reference Date.

9.      <u>CONTRACTS</u>.

a.      In accordance with the terms of the General Assignment, and to the extent assignable, Old Operator shall assign to New Operator all of Old Operator's rights, title and interest in, to and under those contracts necessary for the operation of the Facility for which New Operator has given written notice of its desire to assume at least five business days prior to the Closing Date, which shall be set forth in <u>Schedule 9(a)</u> hereto (the "***Assumed Contracts***"; the Contracts not assigned to New Operator shall be referred to as the "***Rejected Contracts***"). Old Operator shall remain responsible for all liabilities and obligations: (i) under the Rejected Contracts, (ii) under the Assumed Contracts to the extent such liabilities and obligations accrue or arise prior to the Reference Date and (iii) for services or supplies which were performed or rendered prior to the Reference Date, and shall indemnify, defend and hold New Operator harmless on account of the same to the extent provided in Section 18 below. New Operator shall be responsible for, and agrees to indemnify, defend and hold harmless Old Operator from and against, any and all liabilities, claims, demands and causes of action of any nature whatsoever asserted against or incurred by Old Operator arising out of or connected: (x) with any liabilities and obligations under any of the Assumed Contracts that shall accrue or relate to periods on or after the Reference Date; and (y) for services and supplies which were performed and/or received on or after the Reference Date by New Operator.

b.      To the extent any third party consent is required in connection with the assignment and assumption of the Assumed Contracts, Old Operator hereby covenants and agrees to use its commercially reasonable efforts to obtain such third party consent prior to the Closing Date.  To the extent Old Operator shall be unable to obtain such third party consent, Old Operator and New Operator shall cooperate and take such steps as may be necessary in order for New Operator to receive the benefits under such Assumed Contracts, provided that New Operator agrees to fulfill any obligations of Old Operator that shall arise with respect to such Assumed Contracts on and after the Closing Date.

c.      Old Operator shall also transfer, convey and assign to New Operator on the Closing Date all existing agreements with residents and any guarantors thereof (the "***Resident Agreements***"), to the extent assignable by Old Operator.

d.      New Operator shall be responsible for paying all costs due and owing to the contract counterparty of an Assumed Contract under section 365(b) of the Bankruptcy Code, provided, however, to the extent such costs relate to periods prior to the Closing Date, at New Operator's election, New Operator shall have the right to offset against New Operator's obligations under the Lease, the amount of such costs paid by New Operator.

10.     Intentionally Omitted.

11.     <u>EMPLOYEES</u>.

a.      New Operator shall not be bound by or assume any employment contracts to which Old Operator may be a party.  From and after the Closing Date, New Operator shall determine, in its sole discretion, which of the employees providing services at the Facility as of the Closing Date ("***Current Employees***") shall be offered employment by New Operator ("***New Operator's Employees***").  Notwithstanding the foregoing, New Operator shall hire or offer to hire such Current Employees at wages and benefits sufficient to avoid the applicability of the Workers Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 or the Illinois Worker Adjustment and Retraining Notification Act, 820 ILCS 65.  Nothing in this paragraph, however, shall create any right in favor of any person not a party hereto, including without limitation, the Current Employees, or constitute an employment agreement or condition of employment for any employee of Old Operator or any affiliate of Old Operator who is a Current Employee.

b.      On the terms stated herein, at New Operator's election, New Operator shall have the right to offset against New Operator's obligations under the Lease, an amount equal to all of the accrued (whether vested, unvested, contingent or mature) paid time off with respect to New Operator's Employees (which shall include all days for which New Operator's Employees are paid but do not actually work, such as sick days, vacation days, and holidays) and all other accrued but unpaid payroll obligations including but not limited to all FICA, withholding, unemployment, workmen's compensation or other employment related taxes in connection with the foregoing which are required to be paid according to applicable federal and Illinois law ("***Old Operator's Employment Expenses***").  At least two business days before the Closing Date, Old Operator and New Operator shall agree on the amount of the Old Operator's Employment Expenses.  In exchange therefor, New

Operator expressly acknowledges that New Operator shall assume all obligations related to, and agrees to pay when and as due, all of such Old Operator's Employment Expenses, up to the aggregate amount credited hereunder, and Old Operator shall indemnify New Operator for any Old Operator's Employment Expenses paid by New Operator in excess of such credit amount. A schedule of Old Operator's Employment Expenses is attached hereto as <u>Schedule 11(b)</u>, and shall be updated prior to the Closing to reflect amounts outstanding at the Closing. In the event that New Operator discovers after the Closing Date that the amount credited is less than the amounts required under this <u>Section 11(b)</u>, Old Operator shall pay to New Operator, within ten (10) business days after New Operator provides notice thereof, an amount equal to such deficiencies.

      c.    New Operator and Old Operator agree and acknowledge that the employees at the Facility provide valuable services that are crucial for the success of the Facility, and New Operator's decision to serve as licensed operator of the Facility is based upon the skills and qualifications of such employees. As such, no person or entity that either directly or indirectly controls, is under common control with Old Operator (any of the foregoing, an "***Old Operator Party***") shall, during the period beginning on the Effective Date and ending upon the date that is twenty-four (24) months following Closing, solicit for employment any New Operator Employee, who was not fired by New Operator. The parties also agree that (i) advertisements available to the general public, such as through website job postings and newspaper, Internet and trade journals shall not constitute solicitation for purposes of this Section, and (ii) nothing shall prohibit solicitation of a Current Employee who was fired by New Operator. In the event of a breach of this Section 11(c) by an Old Operator Party, then Old Operator shall pay to New Operator an amount equal to Five Thousand Dollars ($5,000.00) as liquidated damages, for each such Current Employee subject to such breach. The parties agree and acknowledge that actual damages with respect to the foregoing would be difficult to ascertain and that Five Thousand Dollars ($5,000.00) is a fair and reasonable approximation of such actual damages. This provision shall not in any way limit such other remedies as may be available to New Operator. Old Operator further acknowledges that the scope and duration of the provisions of this Section 11(c) are reasonable and survive the Closing.

12.    <u>ACCOUNTS RECEIVABLE.</u>

      a.    Old Operator shall retain the right to collect all unpaid accounts receivable with respect to periods prior to the Closing Date as set forth herein. New Operator shall, at its cost, provide personnel to collect Accounts Receivable and shall collect such Accounts Receivable as if were its own Accounts Receivable. It agrees not to settle any Accounts Receivable for less than 90% of the face amount of such Accounts Receivable without the prior consent of Old Operator, which consent shall not be unreasonably withheld. Accounts receivables are not Assets conveyed hereunder. If at any time on or after the Closing Date, New Operator shall receive any payment from any federal or state agency, which payment includes any reimbursement with respect to payments or underpayments made to Old Operator for services rendered prior to the Closing Date, then New Operator shall remit such payments to Old Operator. New Operator and Old Operator shall send copies of all Medicare and Medicaid remittance advices to the other party for purposes of recording and pursuing accounts receivable for the period of twelve (12)

months following the Closing Date and thereafter as reasonably requested by each party. If at any time after the Closing Date, Old Operator shall receive any payment from any federal or state agency, which payment represents reimbursement with respect to payments or underpayments made to New Operator for services rendered on or after the Closing Date, then Old Operator shall remit such payments to New Operator. Any such remittances pursuant to this Section 12(a) shall occur within ten (10) days from the date the party required to make such remittance receives payment thereof, provided however, Old Operator shall use best efforts to make such remittance to New Operator within five (5) days of receipt provided that no failure in making such remittance within five (5) days of receipt shall be deemed a breach of this Agreement.

b.      Payments received by New Operator from non-governmental payment sources shall be paid to the party designated in such payments entitled to the payments for the services provided thereunder. Any non-designated payments received by New Operator or Old Operator from non-governmental payment sources within sixty (60) days after the Closing Date shall first be applied to any pre-Closing Date balances due to Old Operator for services provided prior to the Closing Date, with the excess, if any, applied to any post-Closing Date monthly balances due for services rendered by New Operator on or following the Closing Date. Any non-designated payments received by New Operator or Old Operator from non-governmental payment sources more than sixty (60) days after the Closing Date shall first be applied to any post-Closing Date balances due to New Operator for services provided on or following the Closing Date with the excess, if any, applied to any pre-Closing Date monthly balances due for services rendered by Old Operator prior to the Closing Date. Notwithstanding the foregoing, New Operator hereby acknowledges and agrees that such pre-Closing Date monthly balances are the property of Old Operator and Old Operator reserves the right to continue to directly pursue the collection of such pre-Closing Date monthly balances.

13.      EMPLOYMENT RECORDS. Old Operator shall deliver to New Operator, prior to the Closing Date, either the originals or full and complete copies of all employee records for all Retained Employees in its possession (including, without limitation, all employee employment applications, W-4's, I-9's and any disciplinary reports) (collectively, the "*Employee Records*"). Old Operator represents and warrants to New Operator that the Employee Records delivered to New Operator represent all employee records in Old Operator's possession or control as of the Closing Date.

14.      ACCESS TO RECORDS.

a.      On the Closing Date, Old Operator shall deliver to New Operator all of the records of the Facility necessary for the operation of the Facility, including patient medical and financial records, but specifically excluding Employee Records, provided, however, that nothing herein shall be construed as precluding Old Operator from removing from the Facility on the Closing Date its corporate financial records which relate to its operations at the Facility or to its overall corporate operations, provided, further, that Old Operator shall give New Operator access to any information in any such removed records as is necessary for the lawful operation of the Facility by New Operator or is otherwise required by law to be maintained at the Facility.

Docusign Envelope ID: 41651D2-0B42-4566-A57A-B153F04A6268

b.      Subsequent to the Closing Date, New Operator shall allow Old Operator and its agents and representatives to have reasonable access to (upon reasonable prior notice and during normal business hours), and to make copies of, the books and records and supporting material of the Facility relating to the period prior to and including the Closing Date, at its own expense, to the extent reasonably necessary to enable Old Operator to wind up its affairs, to review Employee Records and obtain copies as reasonably necessary, to investigate and defend malpractice or other claims, to file or defend cost reports and tax returns and to verify accounts receivable collections due Old Operator.

c.      Old Operator shall, if allowed by applicable law and subject to the terms of such applicable law, be entitled to remove any records delivered to New Operator, for purposes of litigation involving a resident or employee to whom such record relates, as certified to New Operator in writing prior to removal by an officer of or counsel for Old Operator in connection with such threatened or actual litigation.  Any record so removed shall promptly be returned to New Operator following its use.

d.      New Operator agrees to maintain such books, records and other material comprising records of the Facility's operations prior to the Closing Date that have been received by New Operator from Old Operator or otherwise, including patient records and records of patient funds, to the extent required by law, but in no event less than four (4) years.

e.      Old Operator shall retain medical and financial records of residents no longer at the facility at Closing but at the Facility in the previous three (3) years for the period required by law, but in no event less than three (3) years following the Closing Date. Old Operator shall allow New Operator reasonable access to the foregoing resident records.

15.    USE OF TELEPHONE NUMBER; POLICY AND PROCEDURE MANUALS.

a.      New Operator may use the present telephone numbers of the Facility.  Old Operator shall transfer or cause to be transferred, the telephone numbers used by the Facility as of the Closing Date.

b.      Old Operator agrees to leave its policy and procedure manuals at the Facility.

16.    PROVIDER AGREEMENTS.  For any periods following the Closing that New Operator is not yet able to bill under its Medicaid, Medicare and/or managed care provider agreements, as applicable (the "**Provider Agreements**"), to the extent allowed by the provider agreements and applicable law and provided that New Operator is using best efforts to be able to bill under such programs, Old Operator shall allow New Operator to bill under Old Operator's Provider Agreements and promptly forward to New Operator any payments received by Old Operator that arise out of operations on or after the Closing Date.

17.    COOPERATION; INTERIM OPERATIONS OF THE FACILITY.

a.      Old Operator agrees to cooperate with New Operator, and New Operator agrees to reasonable cooperate with Old Operator to effectuate an orderly transfer of the

Docusign Envelope ID: 41757AD2-0B42-4566-A57A-B1F3F04A6268

operation of the Facility. Old Operator shall provide reasonable cooperation to New Operator in connection with its efforts to secure a probationary skilled care nursing home license (the "License") from IDPH permitting New Operator to operate the Facility as a skilled nursing facility, and, in that regard, Old Operator agrees, promptly upon request by New Operator, to execute any reasonable applications or notifications required in connection with such efforts. Old Operator agrees to promptly provide or make available to New Operator, upon request, to the extent such documentation is within Old Operator's possession or control, any and all existing documentation requested by IDPH necessary for the issuance of the License. Notwithstanding the foregoing, Old Operator shall not be required to incur actual, out-of-pocket costs in connection with the foregoing, which are not reimbursed or paid for by New Operator. New Operator shall not be required to pay for *de minimis* charges such as copying and reasonable staff time.

b. Each Party hereto agrees to use commercially reasonable efforts to cause the conditions to its obligations and to the other party's obligations herein set forth to be satisfied at or prior to the Closing Date. Each party hereto agrees to execute and deliver any further agreements, documents or instruments reasonably necessary to effectuate this Agreement and the transactions referred to herein or contemplated hereby or reasonably requested by the other party to perfect or evidence their rights hereunder.

c. From the date of this Agreement until the Closing, Old Operator shall operate the Facility in substantially the same manner as it has heretofore operated, use commercially reasonable and diligent efforts to preserve intact the business operations and relationships of the Facility with third parties and use commercially reasonable best efforts to keep available the services of all of the Facility's employees. Without limiting the generality of the preceding sentences, until the earlier of (i) the Closing Date, or (ii) the termination of this Agreement, unless otherwise agreed or approved by New Operator in writing, Old Operator shall:

i. operate the Facility in the normal course of business and in compliance with all laws, ordinances, orders, rules, regulations and requirements of any federal, state or municipal governmental agency or authority;

ii. maintain the Facility's licensure status in substantial compliance with all applicable laws, rules and regulations;

iii. with exception to any excess Supplies not necessary to conduct business in ordinary course, not sell, transfer or otherwise dispose of any of the Supplies except in the ordinary course of business consistent with the prior practices of Old Operator, in which event Old Operator shall replace the same with similar property of equal quality, value and usefulness;

iv. not enter into any contract which shall become the obligation of New Operator nor modify, cancel, accept the surrender of or renew (except when any such acceptance of surrender or renewal is non-discretionary) any Contract which exists at present without New Operator's prior written consent, which consent will not be unreasonably withheld;

v.      not decrease the private pay rates of the residents of the Facility without the prior written consent of New Operator, which consent will not be unreasonably withheld;

vi.      maintain records in substantial compliance with all applicable federal and state laws and in such manner so that all records will be prepared in a consistent manner and will be current, complete, accurate and true;

vii.      not take any action which will or would cause any of the representations or warranties in this Agreement to become untrue or be violated;

viii.      not increase or promise to increase any wages or benefits of, or grant or promise to grant to, any of the employees of the Facility without the prior written consent of New Operator;

ix.      perform all of its obligations in respect of the Facility in the ordinary course of business consistent with past practice; and

x.      promptly inform New Operator in writing of any material event adversely affecting the ownership, use, occupancy, operation, management or maintenance of the Facility, whether or not insured against.

18.      INDEMNIFICATION; LIABILITY LIMITATION.

a.      New Operator shall indemnify, save, protect, defend and hold harmless Old Operator and its respective employees, affiliates, managers, shareholders, officers, directors and agents, from and against all claims, liabilities, losses, damages, demands and causes of action of any nature whatsoever (including demands and causes of action relating to injury or death to persons or loss of or damage to property), and all costs and expenses (including penalties and reasonable attorneys' and other professional fees and disbursements incurred in the investigation or defense of any such claims, or in asserting, pursuing or enforcing any such claims), resulting from third-party claims (collectively, "***Losses***") arising from, out of, or relating to (i) operation of the Facility by New Operator on or after the Reference Date, (ii) New Operator's use or occupancy of the Facility or the condition thereof on or after the Reference Date, (iii) any inaccuracy or breach of any representation, warranty, covenant, agreement or obligation of New Operator contained in this Agreement, the Schedules, the supplements to the Schedules, and any other Transaction Document.

b.      Old Operator agrees to indemnify, save, protect, defend and hold harmless New Operator and its respective employees, affiliates, managers, members, officers, directors and agents, from and against all Losses suffered by New Operator arising from, out of, or relating to (i) operation of the Facility by Old Operator prior to the Reference Date, (ii) Old Operator's use or occupancy of the Facility or the condition thereof prior to the Reference Date, (iii) any Recapture Claim, and (iv) any inaccuracy or breach of any representation, warranty, covenant, agreement or obligation of Old Operator contained in this Agreement, the Schedules, the supplements to the Schedules, and any other Transaction Document.

c.      In the event that any liability, claim, demand or cause of action which is indemnified against by or under any term, provision, section or paragraph of this Agreement ("***Indemnitee's Claim***") is made against or received by any indemnified party (hereinafter "***Indemnitee***") hereunder, said Indemnitee shall notify the indemnifying party (hereinafter "***Indemnitor***") in writing within twenty one (21) calendar days of Indemnitee's receipt of written notice of said Indemnitee's Claim; provided, however, that Indemnitee's failure to timely notify Indemnitor of Indemnitee's receipt of an Indemnitee's Claim shall not impair, void, vitiate or invalidate Indemnitor's indemnity hereunder nor release Indemnitor from the same, which duty, obligation and indemnity shall remain valid, binding, enforceable and in full force and effect so long as Indemnitee's delay in notifying Indemnitor does not, solely by itself, directly and materially prejudice Indemnitor's right or ability to defend the Indemnified Claim.  Upon its receipt of any or all Indemnitee's Claim(s), Indemnitor shall, in its reasonable discretion, diligently and vigorously defend, compromise or settle said Indemnitee's Claim at Indemnitor's sole and exclusive cost and expense and shall promptly provide Indemnitee evidence thereof within fourteen (14) calendar days of the final, unappealable resolution of said Indemnitee's Claim.  Upon the receipt of the written request of Indemnitee, Indemnitor shall within fifteen (15) business days provide Indemnitee a written status report regarding the then current status of said Indemnitee's Claim.  Prior to an Indemnification Default (as defined herein), Indemnitee may not settle or compromise an Indemnitee's Claim without Indemnitor's prior written consent, which consent shall not be unreasonably withheld.  Failure to obtain such consent shall be deemed a forfeiture by Indemnitee of its indemnification rights hereunder.  In the event that Indemnitor fails or refuses to indemnify, save, defend, protect or hold Indemnitee harmless from and against an Indemnitee's Claim (or in the event sufficient funds are not available for such indemnification) and/or to diligently pursue the same to its conclusion, or in the event that Indemnitor fails to timely report to Indemnitee the status of its efforts to reach a final resolution of an Indemnitee's Claim, on seven (7) business days prior written notice to Indemnitor during which time Indemnitor may cure any alleged default hereunder, the foregoing shall immediately, automatically and without further notice be an Event of Default hereunder (an "***Indemnification Default***") and thereafter Indemnitee may, but shall not be obligated to, immediately and with notice to Indemnitor, except such notice as may be required by law and/or rule of Court, intervene in and defend, settle and/or compromise said Indemnitee's Claim at Indemnitor's sole and exclusive cost and expense, including but not limited to attorneys' fees, and, thereafter, within seven (7) business days of written demand for the same Indemnitor shall promptly reimburse Indemnitee all said Indemnitee's Claims and the reasonable costs, expenses and attorneys' fees incurred by Indemnitee to defend, settle or compromise said Indemnitee's Claims.

d.      At New Operator's election, New Operator shall have the right to offset against New Operator's obligations under the Lease, any Losses suffered by New Operator on account of Old Operator's failure to perform its obligations under this <u>Section 18</u>.

e.      The parties' obligations under this <u>Section 18</u> shall survive the Closing.

19.      <u>REPRESENTATIONS AND WARRANTIES OF NEW OPERATOR</u>.  As an inducement to Old Operator to enter into this Agreement, New Operator covenants and makes the

following representations and warranties set forth below, which are true and correct as of the date hereof and which shall be true and correct on the Closing Date.

     a.    <u>Organization and Authority</u>.  New Operator is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Illinois and as of the Effective Date and the Closing Date will have, all necessary power and authority to enter into this Agreement and to execute all documents and instruments referred to herein or contemplated hereby and all necessary action has been taken to authorize the individual executing this Agreement to do so.  This Agreement has been duly and validly executed and delivered by New Operator and is enforceable against New Operator in accordance with its terms.

     b.    <u>No Violations</u>.  Neither the execution nor delivery of this Agreement, or any agreement referred to or contemplated hereby, by New Operator will:

     i.    violate any provision of its Operating Agreement; or

     ii.    be in conflict with constitute a default or create a right of termination or cancellation under any agreement or commitment to which New Operator is a party; or

     iii.    conflict with any laws.

     c.    <u>Accuracy of Representations and Warranties of New Operator</u>.  No representation or warranty by or on behalf of New Operator contained in this Agreement and no statement by or on behalf of New Operator in any certificate, list, exhibit, schedule or other instrument furnished or to be furnished to Old Operator by or on behalf of New Operator pursuant hereto contains any untrue statement of fact, or omits or will omit to state any facts which are necessary in order to make the statements contained therein, in light of the circumstances under which they are made, not misleading in any respect.

     d.    <u>Survival of Representations and Warranties of New Operator</u>.  Each representation and warranty of New Operator hereunder shall be true, complete and correct as of the Effective Date and Closing Date with the same force and effect as though such representation or warranty was made on such date, and all representations and warranties shall survive the Closing.

     20.    <u>REPRESENTATIONS AND WARRANTIES OF OLD OPERATOR</u>.  As an inducement to New Operator to enter into this Agreement, Old Operator covenants and makes the below representations and warranties, which are true and correct as of the date hereof and which shall be true and correct as of the Closing Date.

     a.    <u>Organization and Authority</u>.  Old Operator is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Illinois, and has all necessary power and authority to enter into this Agreement and to execute all documents and instruments referred to herein or contemplated hereby and all necessary action has been taken to authorize the individual executing this Agreement to do so.  This Agreement has been duly and validly executed and delivered by Old Operator and is

enforceable against Old Operator in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, arrangement, moratorium and other similar state or federal debt relief laws in effect from time to time, and to general principles of equity.

      b.    <u>No Violations</u>.  Neither the execution nor delivery of this Agreement, nor any agreement referred to or contemplated hereby, by Old Operator will violate any provision of its partnership agreement; or cause a material adverse impact on the operation of the Facility because of:

      i.    a conflict, default or right of termination or cancellation under any agreement or commitment to which Old Operator is a party; and

      ii.    the creation or imposition of any security interest, lien or other encumbrance upon any of the Supplies.

      c.    <u>Litigation</u>.  Except as disclosed in Old Operator's bankruptcy schedules and the non-payment of Old Operator's vendors and fines/penalties imposed by IDPH or CMS or known to New Operator prior to Closing,  to Old Operator's actual knowledge, there is not currently written notice of threatened claims, lawsuits, governmental actions or other proceedings, including without limitation, any desk audit or full audit described in below, involving the Facility or the operation thereof before any court, agency or other judicial, administrative or other governmental body or arbitrator.

      d.    <u>Overpayments</u>.  Except as disclosed in Old Operator's bankruptcy schedules or known to New Operator prior to Closing, there are no pending, nor, to Old Operator's actual knowledge, written notice of threatened claims, demands or other notices of or action alleging the overpayment of Medicaid, Medicare or other governmental or quasi-governmental reimbursements or demanding the return of such alleged overpayments by any third party payor.

      e.    <u>Audits</u>.  Old Operator agrees to reasonably cooperate with New Operator, at Old Operator's cost, in connection with any audit by IDPH or other applicable governmental regulatory agency in connection with any Medicaid or Medicare cost reports filed by Old Operator, including, but not limited to, providing New Operator with documentation, supporting schedules and personnel in its possession in order to properly support the dollar figures and classifications/characterizations contained in Old Operator's cost reports.

      f.    <u>Licensure</u>.  The Facility is and shall on the Closing Date be licensed by IDPH as skilled nursing home facility.  Except as disclosed in Old Operator's bankruptcy schedules or known to New Operator prior to Closing, Old Operator has not received any written notice from the IDPH or any other governmental agency requiring the correction of any condition with respect to such license which has not been the subject of a plan of correction for which compliance has been affected and Old Operator has received no written notice that the good standing of any such license is in jeopardy.

      g.    <u>Certification</u>.  The Facility is, and shall be on the Closing Date, certified for participation of the Medicare and Medicaid reimbursement programs.  Except as disclosed

in Old Operator's bankruptcy schedules or known to New Operator prior to Closing, Old Operator has not received any written notice from IDPH, CMS or any other governmental agency requiring the correction of any condition with respect to such certification which has not been the subject of a plan of correction for which compliance has been affected and Old Operator has received no written notice that the good standing of such certification is in jeopardy. Old Operator shall promptly comply with any violation notices concerning the Facility received after the date hereof and before the Closing Date to the extent that any such notice requires compliance activities. In addition to, and not in any manner limiting the generality of, the foregoing, from and after March 1, 2024, Old Operator has not received any of the following with respect to the Facility except for the deficiencies and matters known to New Operator prior to Closing:

        i.      A written notice of "immediate jeopardy" violations;

        ii.     A written notice of termination of the license issued by IDPH to operate the Facility as a 144 bed skilled nursing facility;

        iii.    A written notice of termination of the certification issued by IDPH or CMS of the Facility to participate in the Medicare and/or Medicaid reimbursement programs;

        iv.    A written notice that the Facility is not in substantial compliance with the requirements for participation in the Medicare and/or Medicaid reimbursement programs other than as known to New Operator prior to Closing; and

        v.     A written notice of imposition of civil monetary penalties or other intermediate sanctions in accordance with 42 CFR § 488.430 et seq. ther than as known to New Operator prior to Closing.

        h.    <u>Cost Reports</u>. Old Operator has filed, or will file, within the appropriate reporting period and with the appropriate authority, all cost reports required to be filed with respect to periods prior to Closing Date relating to the Facility. All such reports have been or will be prepared in all respects in substantial compliance with all applicable laws, rules and regulations.

        i.    <u>Life Care Contracts</u>. The Facility is not a party to any life care contract with respect to any resident of the Facility.

        j.    <u>Supplies and Residents</u>. Unless specifically permitted pursuant to the terms of this Agreement, Old Operator shall not remove any items of personal property from the Facility nor shall it transfer residents from the Facility to a skilled nursing facility owned or operated by an entity which is owned in whole or part, directly or indirectly, by the principals of Old Operator. There are no patient care agreements with respect to any resident of the Facility which differs materially from the standard form used at the Facility.

        k.    <u>Personal Needs Allowance</u>. Old Operator is currently in substantial compliance with all state and federal regulations relating to maintaining and accounting for

the personal needs allowance ("***PNA***") for residents who request the establishment of a PNA account. Except as known by New Operator prior to Closing, since March 1, 2024, Old Operator has not received any written notice from any governmental authority citing or alleging any violation by Old Operator or the Facility of any state or federal PNA regulations.

l.  <u>Furniture</u>. The Facility operating beds sufficient for its patients. Each bed conforms with the minimum standards set forth under the regulations adopted by IDPH. For each such bed, there also exists the minimum furnishings, fixtures and other accessories required by IDPH.

m.  <u>Labor Unions</u>. Except as set forth on <u>Schedule 20(m)</u> or known by New Operator prior to Closing, Old Operator is not party to any collective bargaining agreement with any labor union or similar organization, nor does Old Operator have knowledge of any such organization which represents any of Old Operator's Current Employees.

n.  <u>Multi-Employer Plans</u>. Except as set forth on <u>Schedule 20(n)</u> or known by New Operator prior to Closing, Old Operator does not, and is not required to, contribute (and has not ever contributed or been required to contribute) to any multi-employer plan, as defined in Section 3(37) of the Employee Retirement Income Security Act of 1974, as amended ("***ERISA***") with respect to the Current Employees.

o.  <u>Employee Benefit Plans</u>. Except as set forth on <u>Schedule 20(o)</u> or known by New Operator prior to Closing,

i.  Old Operator does not maintain or contribute to any non-qualified deferred compensation or retirement plans, contracts or arrangements;

ii.  Old Operator does not maintain or contribute to any qualified defined contribution plans (as defined in Section 3(34) of ERISA, or Section 414(i) of the Internal Revenue Code of 1986, as amended (the "***Code***"));

iii.  Old Operator does not maintain or contribute to any qualified defined benefit plans (as defined in Section 3(35) of ERISA or Section 414(j) of the Code);

iv.  Old Operator does not maintain or contribute to any employee welfare benefit plans (as defined in Section 3(1) of ERISA); and

v.  Old Operator has not entered into, nor has Old Operator established or maintained, any change-in-control or severance agreements or plans.

p.  <u>Environmental Condition</u>. Except as set forth on <u>Schedule 20(p)</u>, to Old Operator's actual knowledge, Old Operator has not generated, stored or disposed of any Hazardous Substances on the Facility or the Property, and Old Operator does not have any actual knowledge of any previous or present generation, storage, disposal or existence of any hazardous waste on the Facility or the Property, except in such quantities that is

customary in the operation of a skilled nursing facility and in all events in substantial compliance with all Environmental Laws.

q. <u>Compliance with Applicable Laws</u>. Except as known by New Operator prior to Closing, the Property has been and is presently used and operated in substantial compliance with applicable statute, law, regulation, rule, licensing requirement, ordinance, order or permit of any kind whatsoever affecting the Property or any part thereof, and any rules or regulations promulgated thereunder, as well as any thereof relating to wages, hours, hiring, promotions, retirement, working conditions, nondiscrimination, health, safety, pensions and employee benefits, but not including any Environmental Laws. Any representations or warranties related to Environmental Laws under this Agreement are contained in <u>Section 20(p)</u> above. In addition, no waivers have been obtained or are required to make the representations contained in this <u>Section 20(q)</u> fully true and correct.

r. <u>Census</u>. To Old Operator's actual knowledge, the census of the Facility, provided by Old Operator to New Operator, is substantially true and complete in all material respects.

s. <u>Representations and Warranties</u>. Except for the representations and warranties of Old Operator to New Operator contained in this Agreement, the Schedules, and any other Old Operator Transaction Document, neither Old Operator nor any other person shall be deemed to have made any representation or warranty, express or implied, and New Operator agrees that it has not and will not rely on any representation or warranty not expressly set forth herein.

t. <u>Survival</u>. Old Operator's representations and warranties shall survive only for a period of two years after the Closing Date, after which New Operator shall not be entitled to assert or maintain any claim arising from, relating to and/or based on such representations and warranties.

21. <u>NO JOINT VENTURE</u>. Nothing contained herein shall be construed as forming a joint venture or partnership between the parties hereto with respect to the subject matter hereof. The parties hereto do not intend that any third party shall have any rights under this Agreement.

22. <u>EXHIBITS AND SCHEDULES</u>. If any exhibits or schedules are not attached hereto and are required to be submitted under this Agreement, the parties hereto agree to attach such exhibits and schedules as soon as reasonably practicable but in any event prior to ten (10) days before the Closing Date. New Operator's obligations to close pursuant to this Agreement shall be conditioned upon New Operator approving all exhibits and schedules within seven (7) days of submission thereof to New Operator. The parties hereto agree that the party charged with providing an exhibit or schedule to this Agreement shall, to the extent necessary after delivery thereof, amend or supplement all exhibits and schedules in order for the same to be current, true and correct as of the Closing Date.

23. <u>EVENTS OF DEFAULT; REMEDIES</u>. Except as to those specific notices and cure periods, if any, particularly set forth elsewhere herein, the breach by either party ("***Defaulting Party***") hereto of any term, provision, condition, promise, covenant, agreement, representation,

warranty, guaranty, indemnity, duty or obligation if not cured within ten (10) business days of the earlier of said Defaulting Party's receipt or refusal of written notice of the same from the other party ("***Non-Defaulting Party***") hereto shall automatically and without further notice hereunder be an immediate event of default ("***Event of Default***") entitling the Non-Defaulting Party to exercise any and all remedies available to it hereunder or in law or equity, including seeking specific performance and/or monetary damages. The Non-Defaulting Party's rights and remedies hereunder shall be cumulative and not mutually exclusive and the exercise by the Non-Defaulting Party of one or more rights or remedies granted it hereunder or in law or equity shall not be deemed, interpreted or construed as an election of the same or to bar, prevent or preclude the simultaneous or consecutive exercise of any other right or remedy granted to the Non-Defaulting Party hereunder or in law or equity, including but not limited to the simultaneous or successive pursuit of money damages and injunctive relief. The Non-Defaulting Party shall not be required to post any bond, surety or security of any nature whatsoever to pursue injunctive relief, the necessity or requirement for the same being hereby waived by the Defaulting Party.

24.     CHOICE OF LAW. THIS AGREEMENT AND THE OTHER TRANSACTION DOCUMENTS SHALL BE GOVERNED AND CONTROLLED BY THE INTERNAL LAWS OF THE STATE OF ILLINOIS AS TO INTERPRETATION, ENFORCEMENT, VALIDITY, CONSTRUCTION, EFFECT, AND IN ALL OTHER RESPECTS.

25.     DISPUTE RESOLUTION. The parties hereto agree that if there is an Event of Default, then any dispute regarding this Agreement shall be resolved in the following manner:

a.     Written notice may be given from one party to the other identifying the dispute and the relief sought ("***Dispute Notice***"). During the ten day period after such notice is given, the parties shall use best efforts to physically meet at least three times to discuss the dispute and attempt to resolve the same with a representative chosen by and present on behalf of Old Operator and representative chosen by and present on behalf of New Operator. If the dispute cannot be resolved during such period, then the dispute shall be submitted American Arbitration Association ("AAA") and judgment on the award rendered by the arbitrator (the "Award") may be entered in any court having jurisdiction thereof. Said arbitration shall be conducted under and pursuant to the AAA's Commercial Arbitration Rules in effect at the time demand for such arbitration is made subject to the following provisions which shall augment (and if inconsistent with, supersede) such rules: (i) the matter in dispute shall be resolved by a single arbitrator, and (ii) irrespective of the amount of the claim involved, the arbitration shall be conducted in accordance with and pursuant to the Expedited Procedures comprising a part of the AAA Commercial Dispute Resolution Procedures in effect at the time demand for such arbitration is made. If at the time a Demand Notice is given, AAA no longer is available to administer the arbitration, the parties shall appoint an arbitrator selected by JAMS, which shall use their rules and procedures most comparable to those specified herein.

b.     All expenses and fees related to the dispute resolution set forth in this Section 25 shall be borne by the party that does not prevail with respect to the disputed matter.

26.    JURISDICTION; VENUE.    EXCEPT AS PROVIDED OTHERWISE IN THIS AGREEMENT, IN THE EVENT ANY DISPUTE BETWEEN THE PARTIES HERETO RESULTS IN LITIGATION, INCLUDING BUT NOT LIMITED TO WITH RESPECT TO ANY ACTION FOR SPECIFIC PERFORMANCE, OR TO THE EXTENT A PARTY MUST GO TO A COURT OF LAW TO ENFORCE A JUDGMENT ARRIVED AT THROUGH DISPUTE RESOLUTION PURSUANT TO SECTION 25 OF THIS AGREEMENT, ALL SUCH ACTIONS OR PROCEEDINGS IN ANY WAY, MANNER OR RESPECT ARISING OUT OF OR FROM OR RELATED TO THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREIN SHALL BE LITIGATED IN COURTS HAVING SITUS IN CHICAGO, ILLINOIS.  THE PARTIES HERETO HEREBY CONSENT AND SUBMIT TO THE JURISDICTION OF ANY LOCAL, STATE OR FEDERAL COURTS LOCATED WITHIN SAID COUNTY AND STATE.   THE PARTIES HERETO HEREBY WAIVE ANY RIGHT THEY MAY HAVE TO TRANSFER OR CHANGE THE VENUE OF ANY LITIGATION BROUGHT AGAINST SUCH PARTY IN ACCORDANCE WITH THIS SECTION.

27.    ATTORNEYS' FEES IN THE EVENT OF DISPUTE.  In the event any dispute between the parties hereto results in arbitration or litigation, the prevailing party shall be reimbursed for all reasonable costs, including, but not limited to, reasonable attorneys' fees.

28.    MEDICARE ADVANCES.  In the event that Old Operator has received any advance on Medicare payments with regard to the Facility ("*Advances*") at any time prior to the Effective Date that have not been re-paid prior to the Effective Date, to the extent the New Operator is required to repay such Advances, at New Operator's election, New Operator shall have the right to offset against New Operator's rent obligations under the Lease, an amount equal to 100% of all repayments by New Operator such Advances.

29.    EMPLOYEE ANNOUNCEMENT.   It is expected that Old Operator and New Operator will make a joint announcement to the Current Employees with respect to the transfer of operations contemplated by this Agreement (the "*Employee Announcement*") and that New Operator will start interviewing employees on no earlier than upon filing a motion with the Bankruptcy Court to approve this Agreement (the "*Announcement Date*").   Prior to the Announcement Date, neither Old Operator or New Operator shall announce to any employee of the Facility and shall cause its affiliates, representatives and agents not to, issue or cause any announcement to any Current Employee, without the express prior written approval of the other party.  New Operator and its respective affiliates, representatives and agents, may make general job postings prior to the Announcement Date but may not reference the Facility in the job posting.  Notwithstanding the foregoing, New Operator and its affiliates, representatives and agents may verbally reference the Facility when conducting interviews and during the hiring process.

30.    DEFINITIONS.  For purposes of this Agreement, the following terms shall have the following meanings (all terms used in this Agreement which are not defined in this paragraph shall have the meanings set forth elsewhere in this Agreement):

"*CMS*" shall mean the United States Department of Health and Human Services, Centers for Medicare and Medicaid Services.

"*Contracts*" shall mean all contracts, agreements, leases, commitments and arrangements (whether written or oral), including all service contracts, maintenance contracts and consulting agreements, and all of Old Operator's duties, obligations, covenants, promises, rights and privileges therein or thereunder to which the Old Operator or its predecessors or agents is a party and which relate to the Facility and the operations thereof.

"*Environmental Laws*" shall mean all federal, state and local environmental, health, or safety laws or regulations now or hereafter enacted.

"*Excluded Assets*" shall mean those assets listed on Schedule 5.

"*Hazardous Substances*" shall mean any toxic or hazardous waste or pollutants, or substances, including, without limitation, asbestos, PCB's, petroleum products and by products, substances defined or listed as: "Hazardous Substances" or "*Toxic Substances*" in the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("*CERCLA*") as amended, 42 U.S.C. § 9601, et seq., "*Hazardous Materials*" in the Hazardous Materials Transportation Act, 49 U.S.C. § 1802, et seq., "*Hazardous Waste*" in The Resource Conservation and Recovery Act, 42 U.S.C. § 6901, et seq., any chemical substance or mixture regulated under the Toxic Substance Control Act of 1976, as amended, 15 U.S.C. § 2061, et seq., any "*Toxic Pollutant*" under the Clean Water Act, 33 U.S.C. §125 1, et seq., as amended, any "*Hazardous Air Pollutant*" under the Clean Air Act, 42 U.S.C. § 7401, et seq., and any hazardous or toxic substance or pollutant regulated under any other applicable federal, state or local Environmental Laws.

"*OIG*" shall mean the United States Department of Health and Human Services, Office of Inspector General.

"*Reference Date*" shall mean the earlier of the following: (i) a date mutually agreed upon between the parties, in writing, and (ii) the Closing Date.

31.  <u>GENERAL PROVISIONS</u>.

a.  Upon the prior written approval of Old Operator, which may be withheld or conditioned in Old Operator's sole discretion, New Operator may, at reasonable times, enter upon the Property to conduct such staff interviews, observations, assessments, inspections, investigations, tests and studies as New Operator shall deem necessary, including, without limitation, environmental site assessments, engineering tests and studies, physical examinations of the Property, due diligence investigations and feasibility studies; provided that New Operator shall not be entitled to do any invasive or destructive testing without Old Operator's written consent, which may be withheld in Old Operator's sole discretion, provided further that no approval will be required after an announcement is made to the employees of the transfer.  After the Employee Announcement, Old Operator agrees to provide New Operator with appropriate office space at the Facility, but not less than two offices, to conduct private interviews until the Closing.  To the extent New Operator hires any third party site inspectors, engineers or other parties that will invasively inspect and/or test the Property, New Operator will first ensure that such third party(ies) have adequate insurance covering any potential damage done to the Property as a result of

Docusign Envelope ID: 41651D22-0B42-4566-A57A-B153F04A6268

such inspection/testing.  New Operator shall also have the right, at reasonable times, to tour the Facility, to review the books and records related to the financial condition and the operations thereof and to observe the day-to-day operations and management thereof until the date this Agreement is terminated or the transactions contemplated hereby close, upon the prior written approval of Old Operator, which approval may be withheld or conditioned in Old Operator's sole discretion.   Old Operator shall have the right to have its representative present at all times during any inspections, investigations, tests and studies and tours.  New Operator shall defend, indemnify and hold Old Operator harmless from any loss or damage arising from or related to any inspections, investigations, tests and studies and tours.

b.      Each party hereto agrees to use commercially reasonable efforts to satisfy its obligations required for the other party to close prior to the Closing Date.  Each of the parties hereto agrees to execute and deliver any further agreements, documents or instruments necessary to effectuate this Agreement and the transactions referred to herein or contemplated hereby or reasonably requested by the other party to perfect or evidence their rights hereunder.

c.      All notices to be given by either party to this Agreement to the other party hereto shall be in writing, and shall be: (i) given in person; (ii) deposited in the United States mail, certified or registered, postage prepaid, return receipt requested; (iii) sent by national overnight courier service, priority next business day service; or (iv) sent by email (followed by delivery by one of the other means identified in (i)-(iii)) each addressed as follows:

if to Old Operator:                   Wealshire Rehab, LLC
                                              Attn: Arnold Goldberg
                                              Twelve South Broadway
                                              Beverly Shores, Indiana 46301-0269
                                              arniegoldberg1@gmail.com

with a copy to:                       Lawrence M. Benjamin
                                              Reed Smith, LLP  40th Fl
                                              10 S. Wacker
                                              Chicago, IL
                                              lbenjamin@reedsmith.com

                                              and

                                              Harold D. Israel, Esq.
                                              Levenfield Pearlstein, LLC
                                              120 S. Riverside Plaza, Suite 1800
                                              Chicago, IL 60606
                                              hisrael@lplegal.com

Docusign Envelope ID: 41651D2-0B42-4566-A57A-B153F04A6268

if to New Operator:

    Attn:

with a copy to:    Jeremy Meisel, Esq.
    GUTNICKI LLP
    4711 Golf Road, Suite 200
    Skokie, IL 60076
    jmeisel@gutnicki.com

Any such notice personally delivered shall be deemed delivered when actually received; any such notice deposited in, the United States mail, registered or certified, return receipt requested, with all postage prepaid, shall be deemed to have been given on the earlier of the date received or the date when delivery is first refused; any notice deposited with an overnight courier service for delivery shall be deemed delivered on the next business day following such deposit; and any such notice delivered via email shall be deemed delivered upon being sent if sent before 5:00 pm (Central), otherwise on the following business day provided that the notifying party follows up such email transmission with one of the other means identified above. Any party to whom notices are to be sent pursuant to this Agreement may from time to time change its address for further communications thereunder by giving notice in the manner prescribed herein to all other parties hereto.

    d.    Each party hereto shall bear its own legal, accounting and other expenses incurred in connection with the preparation and negotiation of this Agreement and the consummation of the transaction contemplated hereby, whether or not the transaction is consummated.

    e.    This Agreement, together with all exhibits and schedules attached hereto and any other agreements referred to herein, constitutes the entire understanding between the parties with respect to the subject matter hereof, superseding all negotiations, prior discussions and preliminary agreements.

    f.    This Agreement may not be modified or amended except in writing signed by the parties hereto.

    g.    No waiver of any term, provision or condition of this Agreement, if any one or more instances, shall be deemed to be or be construed as a further or continuing waiver of any such term, provision or condition of this Agreement. No failure to act shall be construed as a waiver of any term, provision, condition or rights granted hereunder.

    h.    This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns.

Captions of paragraphs are for convenience only and are not part of this Agreement and do not affect, change or modify the paragraphs they precede.

     i.     All understandings and agreements heretofore and between the parties are merged in this Agreement and all exhibits and schedules attached hereto, which alone fully and completely expresses their agreement.

     j.     This Agreement may be executed in counterparts, each of which shall for all purposes be deemed an original, and all of such counterparts shall together constitute one and the same agreement. Delivery of an executed counterpart by email shall be deemed the same as delivery of an original.

     k.     The recitals set forth at the beginning of this Agreement constitute an integral part of this Agreement and are hereby incorporated by reference herein and made apart hereof as if fully set forth herein.

     l.     All nouns and pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, neuter, singular or plural as the identity of the person or persons, firm or firms, corporation or corporations, entity or entities or any other thing or things may require, or "any" shall mean "any and all"; "and/or" shall mean "or" "including" shall mean "including without limitation".

     m.     If any term or provision of this Agreement shall to any extent be held invalid or unenforceable, the remaining terms and provisions of this Agreement shall not be affected thereby, but, each term and provision shall be valid and be enforced to the fullest extent permitted by law.

     n.     The language used in this Agreement is the language chosen by the parties to express their mutual intent, and no rule of strict construction shall be applied against any of the parties hereto.

     o.     For purposes herein, New Operator's knowledge shall include facts known or disclosed to John Coglianese, Dimity Godin and Illya Shulman, including, without limitation, all schedules, motions and pleadings filed in Old Operator's Bankruptcy Case.

**[SIGNATURE PAGE FOLLOWS ON NEXT PAGE]**

Docusign Envelope ID: 41767A1D2-0B42-4566-A57A-B153F04A626B

IN WITNESS WHEREOF, the parties hereby execute this Agreement as of the day and year first above written.

**OLD OPERATOR:**

**Wealshire Rehab, LLC**, an Illinois limited liability company

By: _____

Name: Lawrence M. Benjamin

Title: Authorized Signatory

**NEW OPERATOR:**

**Lincolnshire Nursing LLC**, an Illinois limited liability company

By: _____

Name: Jennifer Daugherty

Title: Manager

**<u>SUBJECT TO CHANGE</u>**

---

**DISCLOSURE SCHEDULES**

**to the**

**OPERATIONS TRANSFER AGREEMENT**

**by and among**

**WEALSHIRE REHAB, LLC,**
**AN ILLINOIS LIMITED LIABILITY COMPANY**

**and**

**LINCOLNSHIRE NURSING LLC,**
**AN ILLINOIS LIMITED LIABILITY COMPANY**

**August 29, 2024**

---

Docusign Envelope ID: 41753102-0B42-4566-A57A-B153F04A6268

## SCHEDULE 5

## EXCLUDED ASSETS

Notwithstanding anything to the contrary contained in this Agreement or the General Bill of Sale, the Assets shall not include all or any of the Estate's right, title and interest in the following (collectively, the "Excluded Assets"):

(a) cash, cash equivalents, and security deposits of the Old Operator's bankruptcy estate, including checking accounts, bank accounts, certificates of deposit, time deposits, mutual funds and other investment securities;

(b) Accounts Receivable;

(c) Any intangible assets not specifically set forth in the Agreement;

(d) records of Old Operator's corporate existence, including the Old Operator's minute book, stock ledger and stock record book, but not including any records of the Business relating directly or indirectly to the Assets, provided, however, Old Operator shall furnish copies of all such documents to New Operator upon reasonable request;

(e) any records which the Old Operator's bankruptcy estate is required by Law to retain in its possession (as to which records the Estate shall provide copies to Purchaser at or prior to the Closing) and any records related exclusively to any Excluded Asset or a liability of the Company;

(f) all insurance policies and rights to returns of premiums relating to such policies;

(g) all tax returns;

(h) to the extent not assignable, all contracts and leases of the Company, including any rights or obligations under such contracts and leases;

(i) any claims or causes of action held by Old Operator against any third-party arising prior to the Closing Date, including, but not limited to any causes of action arising under chapter 5 of the Bankruptcy Code; and

(j) all rights of Old Operator pursuant to this Agreement and any related documents

## SCHEDULE 7

### PATIENT TRUST FUNDS AND RESIDENT PROPERTY

TO COME

SCHEDULE 9(A)

ASSUMED CONTRACTS

TO COME

Docusign Envelope ID: 417671D2-0B42-4566-A57A-B1F3F04A6268

## SCHEDULE 11(B)

## OLD OPERATOR EMPLOYEE EXPENSES

TO COME

SCHEDULE 20(M)

LABOR UNIONS

None

Docusign Envelope ID: 41767102-0B42-4566-A57A-B163F04A6268

## SCHEDULE 20(N)

## MULTI-EMPLOYER PLANS

None

SCHEDULE 20(O)

EMPLOYEE BENEFIT PLANS

None

Docusign Envelope ID: 41767AD2-0B42-4566-A57A-B153F04A626B

SCHEDULE 20(P)

ENVIRONMENTAL CONDITION

As set forth in assessment by Gabriel Environmental Services submitted on 5/25/2007