# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| WEALSHIRE REHAB, LLC, | ) | Case No. 24-09110 |
| | ) | |
| | ) | |
| Debtor. | ) | Honorable Donald R. Cassling |
| | ) | |

**DEBTOR'S AMENDED CHAPTER 11 PLAN OF LIQUIDATION**

Harold D. Israel (IL No. 6216289)
Sean P. Williams (IL No. 6314275)
**LEVENFELD PEARLSTEIN, LLC**
120 South Riverside Plaza, Suite 1800
Chicago, Illinois 60606
Telephone: 312.346.8380
Facsimile: 312.346.8434
e-mail: hisrael@lplegal.com
e-mail: swilliams@lplegal.com

*Counsel to the Debtor and Debtor in Possession*

# CONTENTS

**I. DEFINITIONS & RULES OF CONSTRUCTION**.................................................................. **2**

   **A. Defined Terms** ................................................................................................................. **2**

   **B. Rules of Interpretation and Computation of Time**.................................................... **9**

**II. BACKGROUND** ................................................................................................................. **9**

**III. CLASSIFICATION & TREATMENT OF CLAIMS**.................................................... **12**

   **A. General Overview/Summary** ..................................................................................... **12**

   **B. Unclassified Claims** ................................................................................................... **13**

   **C. Administrative Expense Claims** ............................................................................... **13**

   **D. Priority Tax Claims** ................................................................................................... **13**

**IV. ACCEPTANCE OR REJECTION OF THE PLAN** .................................................... **16**

   **A. Voting Classes**............................................................................................................. **16**

   **B. Acceptance by Impaired Classes** ............................................................................. **16**

   **C. Presumed Rejection of the Plan** .............................................................................. **16**

   **D. Nonconsensual Confirmation** .................................................................................. **16**

**V. IMPLEMENTATION OF THE PLAN** ........................................................................... **16**

**VI. CONDITIONS PRECEDENT TO CONFIRMATION & EFFECTIVE DATE** ........... **21**

   **A. Acceptance or Rejection of the Plan**........................................................................ **21**

   **B. Conditions Precedent to the Effective Date of the Plan**......................................... **22**

**VII. EFFECT OF PLAN CONFIRMATION**....................................................................... **22**

   **A. No Discharge**.............................................................................................................. **22**

   **B. Exculpation** ................................................................................................................ **22**

   **C. Injunction** .................................................................................................................. **23**

**VIII. ADDITIONAL PROVISIONS** ................................................................................... **24**

   **A. Retention of all Causes of Action, Defenses, and Counterclaims.** .......................... **24**

   **B. Standing.** .................................................................................................................... **24**

   **C. Unclaimed Distributions**........................................................................................... **24**

   **D. Executory Contracts & Unexpired Leases** ............................................................. **24**

   **E. Exhibits** ...................................................................................................................... **25**

   **F. Exemption from Stamp, Transfer, & Other Taxes**.................................................. **25**

   **G. Headings**.................................................................................................................... **25**

   **H. Binding Effect** ........................................................................................................... **25**

   **I. Governing Law** .......................................................................................................... **25**

   **J. Other Documents and Actions** ................................................................................. **25**

**K. Successors and Assigns**.................................................................................................. **26**

**L. Closing of Case**............................................................................................................... **26**

**IX. RETENTION OF JURISDICTION** ....................................................................................... **27**

## CHAPTER 11 LIQUIDATING PLAN

Wealshire Rehab, LLC, the debtor and debtor-in-possession in the above-captioned bankruptcy case, through its counsel, proposes this subchapter V liquidating plan pursuant to section 1189 of the Bankruptcy Code for resolution of all Claims against and Interests in the Debtor and its Estate.

Note that general unsecured creditors are: (a) not receiving a recovery pursuant to the Plan; (b) deemed to have rejected the Plan; and (c) are not entitled to vote on the Plan. This Plan should be read in its entirety prior to voting. No solicitation of votes will be made except pursuant to this document. Therefore, for purposes of voting on the Plan, parties in interest should not rely on any information relating to the Debtor other than the information contained herein or as filed in the Bankruptcy Case. Please read this document carefully before voting on the Plan.

The Debtor is furnishing this Plan to holders of claims in impaired classes, pursuant to the requirements of the Bankruptcy Code and Rule 3017 of the Bankruptcy Rules. Under section 1122 of the Bankruptcy Code, substantially similar claims are placed in classes. Under section 101(5) of the Bankruptcy Code, a "claim" means a right to payment or a right to an equitable remedy for breach of performance if such breach gives rise to a right to payment. Generally, in the context of voting for confirmation of a plan of reorganization, a claim or interest is deemed impaired unless one of three conditions is met, namely, (i) the legal, equitable, and contractual rights of the holder are left unaltered by the plan; (ii) the plan provides for curing defaults occurring before or after commencement of the case; or, (iii) the holder receives cash for the allowed amount of the claim or for the fixed redemption price or liquidated value of the interest. Unimpaired claims are more specifically defined in § 1124 of the Bankruptcy Code. This Plan identifies the classes and whether these classes are deemed impaired or unimpaired under the Plan.

A holder of a claim or interest in an impaired class is entitled to vote to accept or reject the Plan if such claim or interest has been allowed pursuant to section 502 of the Bankruptcy Code or temporarily allowed for voting pursuant to FRBP 3018.

**YOUR VOTE IS IMPORTANT**. Confirmation of the Plan and implementation of the proposed provisions and transactions under the Plan depends upon receipt of a sufficient number of votes in favor of the Plan. If the Debtor has received a sufficient number of votes in favor of the Plan upon expiration of the solicitation period, the Debtor intends to seek confirmation of the Plan.

**The Plan sets forth the proposed treatment of each class of Claims and Interests. You are urged to carefully review this Plan in full and to consult with your own legal and financial advisors about the Plan and its impact, including but not limited to possible tax consequences, upon your legal rights.**

**No representations concerning the Debtor, particularly as to the Debtor's financial condition, or the value of its property, are authorized by the Debtor except as set forth in this Plan. The information contained herein or appended hereto as exhibits, has not been**

**subject to a certified audit. Therefore, the Debtor is unable to warrant or represent that the information contained herein is without any inaccuracy.**

## SECTION I
## DEFINITIONS & RULES OF CONSTRUCTION

### A. Defined Terms

As used in this Plan, the following terms have the respective meanings specified below (such meanings to be equally applicable to both the singular and plural, and masculine and feminine forms of the terms defined).

1.      "**Administrative Expense Claim**" means a Claim for any cost or expense of administration of the Chapter 11 Case under sections 503(b) and 507(a)(2) of the Bankruptcy Code, including, without limitation, any actual and necessary post-Petition Date expenses of preserving and administering the Estate, including all Professional Fee Claims to the extent allowed by the Bankruptcy Court under sections 330, 331, 363, or 503 of the Bankruptcy Code.

2.      "**Administrative Expense Bar Date**" means forty-five days after the Effective Date and is the applicable date on which an Administrative Expense Claim, including but not limited to any Claim under section 503(b)(9) of the Bankruptcy Code, must be Filed, as established by Section III.C.1. of the Plan.

3.      "**Administrative Expense Proof of Claim**" means the form attached to the Confirmation Order as <u>Exhibit B</u>.

4.      "**Allowed**" means with respect to any Claim or Interest: (i) a Claim or Interest that is evidenced by a proof of Claim or proof of Interest, as applicable, Filed by the applicable claims bar date (or for which Claim or Interest  a proof of Claim is not required to be Filed under the Plan, the Bankruptcy Code, or a Final Order of the Bankruptcy Court); (ii) that has been listed by the Debtor in the Schedules as liquidated in amount and not disputed or contingent, and with respect to which no contrary proof of Claim or proof of Interest has been Filed; or (iii) a Claim or Interest allowed pursuant to the Plan or a Final Order of the Bankruptcy Court. However, with respect to a Claim or Interest described in clauses (i) and (ii) above, such Claim or Interest will be considered Allowed only if and to the extent that with respect to such Claim or Interest no objection to the allowance thereof has been interposed by the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court.

5.      "**Allowed Claim**" means a Claim that is Allowed.

6.      "**Allowed Class ___ Claim**" means an Allowed Claim in the Class specified.

7.      "**Asher Group**" means The Asher Group, LLC.

8.     "**Assets**" means all assets of the Debtor's Estate consisting of "property of the estate" as described in section 541 of the Bankruptcy Code, including, but not limited to, the Receivables.

9.     "**Avoidance Actions**" means (a) any and all claims and causes of action against any Entity arising under sections 506, 510, 542, 543, 544, 545, 547, 548, 549, 550, 551, and 553 of the Bankruptcy Code or any other section of the Bankruptcy Code or (b) any other similar actions or proceedings filed to recover property for or on behalf of the Debtor or the Estate or to avoid any Lien, incurrence of indebtedness or transfer of property.

10.     "**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.*, as amended.

11.     "**Bankruptcy Court**" means the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division, or, in the event such court ceases to exercise jurisdiction over the Chapter 11 Case, such other court that exercises jurisdiction over the Chapter 11 Case.

12.     "**Bankruptcy Rules**" means, collectively, (i) the Federal Rules of Bankruptcy Procedure, as amended from time to time, and as applicable to the Chapter 11 Case; and (ii) the Local Bankruptcy Rules for the United States Bankruptcy Court for the Northern District of Illinois, as amended, effective September 1, 2024, as the same may be amended from time to time thereafter.

13.     "**Business Day**" means any day that is not a Saturday, Sunday, or "legal holiday" as defined in Bankruptcy Rule 9006(a).

14.     "**Cambridge**" means Cambridge Capital, Ltd. of Illinois.

15.     "**Causes of Action**" means any claim, cause of action, chose in action, action, suit, demand, and any other debt, obligation, right, damage, remedy, controversy, agreement, promise, lien, variance, trespass, power, privilege, license, franchise, judgment, third-party claim, subrogation claim, guaranty claim, contribution claim, reimbursement claim, indemnity claim, counterclaim, right of setoff or recoupment, crossclaim, claim objection, defense to claim, and liability whatsoever of any kind or character relating to any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, secured or unsecured, assertable directly or derivatively, existing or hereafter arising, in law, equity, or otherwise.  Cause of Action also includes:  (a) any right of setoff, counterclaim, or recoupment and any claim on contracts or for breaches of duties imposed by law or in equity belonging to the Estate; (b) any claim pursuant to sections 362, 502, and 510 of the Bankruptcy Code and any analogous provisions of applicable state law belonging to the Estate; (c)  any claim, right or cause of action related to any and all Avoidance Actions; and (d)

any claim or defense including, but not limited to fraud, mistake, duress, and usury and any other defenses belonging to the Estate pursuant to section 558 of the Bankruptcy Code.

16.     "**Cash**" means cash or cash equivalents.

17.     "**Chapter 11 Case**" means the chapter 11 case, Case No. 24-09110, pending in the Bankruptcy Court.

18.     "**Claim**" means (i) any right to payment from the Debtor's Estate, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (ii) any right to an equitable remedy for breach of performance if such breach gives rise to a right of payment from the Debtor's Estate, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

19.     "**Class**" means one of the Classes of Claims or Interests designated in the Plan.

20.     "**Confirmation**" means the entry of the Final Order by the Bankruptcy Court confirming the Plan pursuant to section 1191 of the Bankruptcy Code.

21.     "**Confirmation Date**" means the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on its docket.

22.     "**Confirmation Hearing**" means, collectively, the hearing or hearings held by the Bankruptcy Court on Confirmation of the Plan, as such hearing or hearings may be continued from time to time.

23.     "**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan in accordance with the provisions of chapter 11 of the Bankruptcy Code.

24.     "**Creditor**" means all creditors of the Debtor holding Claims for debts, liabilities, demands or other Claims of any character whatsoever.

25.     "**Creditor Trust**" means the entity established pursuant to the Plan, the Creditor Trust Agreement, and the Confirmation Order for the sole and exclusive benefit of the Creditor Trust Beneficiaries.  The Creditor Trust will liquidate and distribute the Creditor Trust Assets in accordance with the Creditor Trust Agreement and the Plan.

26.     "**Creditor Trust Agreement**" means the agreement to be executed by the Debtor and Creditor Trustee as soon as reasonably practicable after the Confirmation Date, in a form substantially similar to the Creditor Trust Agreement filed as a plan supplement, which will govern the obligations of the Creditor Trustee with respect to the Creditor Trust Assets.  The Creditor Trust Agreement is incorporated into the Plan as if fully set forth herein.

27.     "**Creditor Trust Assets**" means: (a) the Causes of Action and (b) all attorney-client privileges of the Debtor existing as of the Effective Date.

28.     "**Creditor Trust Beneficiaries**" means the holders of Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Priority Unsecured Claims, and Allowed General Unsecured Claims entitled to share in the Creditor Trust Assets.

29.     "**Creditor Trust Expenses**" means the reasonable fees and expenses incurred by the Creditor Trust and any professionals retained by the Creditor Trustee and any other administrative expenses and costs of the Creditor Trust, including bank fees, professional fees and costs, and all other expenses related to the Creditor Trustee's duties under the Plan or the Creditor Trust Agreement.

30.     "**Creditor Trustee**" means Robert Handler, including any replacements thereof or successors thereto, serving as a custodian for the Creditor Trust and to oversee the liquidation and distribution of the Creditor Trust Assets held therein pursuant to sections 1123 and 1129 of the Bankruptcy Code, and further subject to the provisions of this Plan and the Creditor Trust Agreement.

31.     "**Debtor**" means the debtor and debtor in possession in the Chapter 11 Case, Wealshire Rehab, LLC.

32.     "**DIP Orders**" means, collectively, the: (a) *Interim Order (i) Authorizing the Debtor to Obtain Postpetition Financing on a Secured, Superpriority Basis; (ii) Authorizing the Debtor to use Cash Collateral; (iii) Granting Adequate Protection to Prepetition Secured Parties; (iv)Modifying the Automatic Stay, and (v) Granting Related Relief* [Docket No. 43], (b) *Second Interim Order (i) Authorizing the Debtor to Obtain Postpetition Financing on a Secured, Superpriority Basis; (ii) Authorizing the Debtor to use Cash Collateral; (iii) Granting Adequate Protection to Prepetition Secured Parties; (iv)Modifying the Automatic Stay, and (v) Granting Related Relief* [Docket No. 66]; (c) *Third Interim Order (i) Authorizing the Debtor to Obtain Postpetition Financing on a Secured, Superpriority Basis; (ii) Authorizing the Debtor to use Cash Collateral; (iii) Granting Adequate Protection to Prepetition Secured Parties; (iv)Modifying the Automatic Stay, and (v) Granting Related Relief* [Docket No. 85]; and (d) *Fourth Interim Order (i) Authorizing the Debtor to Obtain Postpetition Financing on a Secured, Superpriority Basis; (ii) Authorizing the Debtor to use Cash Collateral; (iii) Granting Adequate Protection to Prepetition Secured Parties; (iv)Modifying the Automatic Stay, and (v) Granting Related Relief* [Docket No. 141].

33.     "**Disputed Claim**" means any scheduled or Filed Claim with respect to which an objection has been Filed in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Plan, or an order of the Bankruptcy Court.

34.    "**Distribution**" means any transfer under the Plan of Cash or other property or instruments to a Holder of an Allowed Claim.

35.    "**eCapital**" means eCapital Healthcare Corp.

36.    "**Effective Date**" means the date selected by the Debtor which is a Business Day after the Confirmation Order on which: (i) no stay of the Confirmation Order is in effect, and (ii) all conditions specified in section VI.A. of the Plan have been satisfied, unless waived by the Debtor.

37.    "**Estate**" means the estate created under section 541(a) of the Bankruptcy Code on the Petition Date.

38.    "**Exculpated Parties**" means, collectively, and in each case in its capacity as such: (a) Levenfeld & Pearlstein, LLC; (b) Templin Healthcare Accounting Services, LLC; (c) the Subchapter V Trustee; and (d) each of their employees that actively participated on the Chapter 11 Case, after the Petition Date and through the Effective Date.

39.    "**File**," "**Filed**," or "**Filing**" means any document properly and timely filed with the Bankruptcy Court in the Chapter 11 Case, as reflected on the official docket of the Bankruptcy Court for the Chapter 11 Case.

40.    "**Final Order**" means an order or judgment of the Bankruptcy Court or other applicable court as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing are then pending; or as to which any right to appeal, reargue, rehear, or petition for certiorari has been waived in writing in form and substance satisfactory to the Debtor—or—in the event that an appeal, writ of certiorari, reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court or other applicable court will have been affirmed by the highest court to which such order or judgment was appealed, or from which reargument or rehearing was sought, or certiorari will have been denied, and the time to take any further appeal, petition for certiorari or move for reargument or rehearing will have expired.

41.    "**General Unsecured Claim**" means any Claim that is not an Administrative Expense Claim, Priority Tax Claim, Other Priority Claim, or a Secured Claim.

42.    "**Goldberg**" means Arnold Goldberg.

43.    "**GS Capital**" means GS Capital Funding LLC.

44.    "**Holder**" means the owner of a Claim or Interest.

45.    "**HUD**" means United States Department of Housing and Urban Development.

46.    "**HUD Documents**" means the HUD Guaranty and HUD Security Agreement.

47.     "**HUD Guaranty**" means that certain *Cross-Default Guaranty of Subtenants* dated May 1, 2023, executed by the Debtor in favor of Master Tenant.

48.     "**HUD Security Agreement**" means that certain *Operator Agreement* dated May 1, 2023 executed by the Debtor, in favor of Cambridge, giving Cambridge a second-priority security interest in substantially all of the Debtor's assets.

49.     "**Impaired**" has the meaning set forth in section 1124 of the Bankruptcy Code.

50.      "**Interest**" means any equity interest in the Debtor.

51.     "**Junior DIP Lender**" means GS Capital and Goldberg

52.     "**Junior DIP Loan**" means that certain junior revolving loan facility in the maximum principal amount of $500,000.00 funded by Junior DIP Lender pursuant to the DIP Orders, as modified by Note Assignment.

53.     "**Lien**" has the meaning set forth in section 101(37) of the Bankruptcy Code.

54.     "**Lincolnshire**" means Lincolnshire Properties Limited Partnership.

55.     "**Liquidation Analysis**" means the analysis attached hereto as <u>Exhibit A</u>.

56.     "**LSA**" means that certain Loan Sale Agreement dated as of September 4, 2024 by and between eCapital and GS Capital.

57.     "**Manager**" shall mean Robert Handler.

58.     "**Master Tenant**" means Wealshire Master Tenant, LLC.

59.     "**Note Assignment**" means that certain Partial Assignment of Junior DIP Facility. dated September 4, 2024, by and between GS Capital as assignee and Goldberg as assignor.

60.     "**OTA**" means that certain Operations Transfer Agreement dated September 30, 2024 by and between the Debtor and Purchaser.

61.     "**Other Priority Claim**" means any Claim entitled to priority under section 507(a) of the Bankruptcy Code, other than an Administrative Expense Claim or a Priority Tax Claim.

62.     "**Person**" means an individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization or other entity.

63.     "**Petition Date**" means June 20, 2024.

64.    "**Plan**" means this chapter 11 liquidating plan, including all exhibits attached to this chapter 11 liquidating plan, either in their present form or as they may be altered, amended, or modified from time to time.

65.    "**Priority Tax Claim**" means a Claim of a governmental unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

66.    "**Professional Fee Carve-Out**" shall have the meaning set forth in Section III.C.3.

67.    "**Professional Fee Claim**" means Claims of Professionals for compensation for services rendered in these Chapter 11 Case pursuant to sections 327, 328, 330, 331, 363, or 503 of the Bankruptcy Code.

68.    "**Purchaser**" means Lincolnshire Nursing, LLC.

69.    "**Prior Operator**" means Lincolnshire Living & Rehab Center, LLC.

70.    "**Professionals**" means Persons, including attorneys, accountants, auctioneers, and financial advisors retained by the Debtor or appointed pursuant to section 1183 of the Bankruptcy Code, or to be compensated pursuant to sections 327, 328, 330, 331, 363, or 503 of the Bankruptcy Code.   For the avoidance of doubt, Professionals in this case include, but are not limited to: Levenfeld Pearlstein, LLC; Templin Healthcare Accounting Services, LLC; and the Subchapter V Trustee.

71.    "**Rejection Damage Claim**" means a Claim for any obligations or damages arising under an unexpired real property or personal property lease, or executory contract, that the Estate reject under sections 365 of the Bankruptcy Code or pursuant to the terms of the Plan.

72.    "**Reorganized Debtor**" means the Debtor, on and after the Effective Date.

73.    "**Receivables**" means all of the Debtor's accounts receivable attributable to the period prior to the Closing Date (as defined in the OTA).

74.    "**Sale Order**" means that certain *Order: (a) Approving Private Sale of the Debtor's Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, and Entry into Operations Transfer Agreement (b) Approving the Form and Manner of Notices of the Sale; (c) Approving the Assumption and Assignment of Certain Contracts; (d) Rejecting Sublease Agreement; (e) Shortening and Limiting Notice; and (f) Granting Related Relief* [Docket No. 137].

75.    "**Schedules**" means the schedules of assets and liabilities, list of equity security holders, and statement of financial affairs Filed by the Debtor as required by sections 521(a)(1) of the Bankruptcy Code, Bankruptcy Rules 1007(a)(1), (3), and (b)(1), and Official Bankruptcy Form numbers 6 and 7, as amended from time to time.

76.    "**Secured Claim**" means a Claim (a) secured by a Lien on property in which an Estate has an interest, to the extent such Lien is valid, perfected and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code and to the extent of the value of its Holder's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or (b) Allowed as such pursuant to the Plan.

77.    "**Senior DIP Credit Agreement**" means that certain *Superpriority Debtor-In-Possession Credit and Security Agreement* dated as of June 2024, by and between the Debtor and GS Capital as successor in interest to eCapital pursuant to the LSA.

78.    "**Senior DIP Lender**" means GS Capital.

79.    "**Senior DIP Loan**" means that certain revolving loan facility in the maximum principal amount of $2,500,000.00 under the Senior DIP Credit Agreement.

80.    "**SNF**" means the skilled nursing facility operated by the Debtor.

81.    "**Subchapter V Trustee**" means Robert Handler.

82.    "**Unclassified Claims**" means a Claim not required to be placed in a Class under section 1123 of the Bankruptcy Code.

83.    "**Winddown Proceeds**" shall have the meaning set forth in Section 2.A.2

**B.  Rules of Interpretation and Computation of Time**

For purposes of the Plan, unless otherwise provided: (i) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural; (ii) any reference to any entity as a Holder of a Claim or Interest includes the entity's successors and assigns; (iii) captions and headings to articles and sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (iv) the rules of construction set forth in section 102 of the Bankruptcy Code will apply; and (v) in computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) will apply.

**SECTION II
BACKGROUND**

**A.  Description and History of the Debtor's Business**

**1.  The Debtor's Operations Prior to the Petition Date and Reasons for Filing**

Pursuant to 11 U.S.C. § 1191(1), the following constitutes a brief history of the business operations of the Debtor:

The Debtor was founded in 2023. It conducted operations on a 165,000 square foot facility in Lincolnshire, Illinois and provides skilled nursing care to its patients. The Debtor was licensed for 144 skilled nursing beds, with a current occupancy of approximately 85-90 patients on any given day (subject to day-to-day fluctuations). The Debtor is owned and operated by Mr. Goldberg and leased its building from Master Tenant, an entity whose sole member is Mr. Goldberg. Lincolnshire is the owner of the real property housing the SNF and leased the SNF to Master Tenant who in turn subleased the SNF to the Debtor.

The SNF (along with an assisted living facility) was located on a 20-acre lushly landscaped campus with walking paths and a state-of-the-art rehabilitation center with the updated equipment and a team of certified physical therapists. The Debtor's services included the following: post-surgical support, hip replacement rehabilitation, injury rehabilitation, recovery from acute medical event, stroke and cardiac rehabilitation, wound care, pain management, dementia programming, and chronic outpatient management.

As of the Petition Date, the Debtor had an accounts receivable facility with eCapital that had an outstanding balance of approximately $1.07 million as of the Petition Date.

Prior to May 2015, Mr. Goldberg operated the skilled nursing facility for more than 20 years. Due to personal and health issues, the skilled nursing facility was transferred to Prior Operator as of May 2015. The transaction was structured as a lease with an option to buy. At all times, Lincolnshire remained owner of the real estate housing the SNF, subject to a mortgage loan from Cambridge which mortgage was insured by HUD dated as of August 1, 2016.

The Prior Operator's affiliate elected not to purchase the SNF at the agreed-upon option price (due to market changes and other available opportunities), and the Prior Operator's lease was terminated as of to May 1, 2023, at which time the Debtor took over the SNF. In connection with the sale transaction, the Debtor executed the HUD Documents.

Immediately upon the Debtor's takeover of the SNF, the Prior Operator's nursing staff did not show up for nursing shifts leaving the patients without nursing coverage for a few hours. The nurse "walk-out" resulted in negative media coverage, an investigation and imposition of fines by the Illinois Department of Public Health, uncertainty for the residents and their families, patient discharges, a significant decline in census, and other significant expenses. It also put the Debtor at odds with the Prior Operator, making it impractical for the Debtor to temporarily use the Prior Operator's billing numbers for Medicare and Medicare (as is typically done) pending issuance of Debtor's new billing numbers. Without the use of Prior Operator's billing numbers, the SNF was cash-starved until the Debtor's new billing numbers were eventually issued in approximately December 2023.

The nurse walk-out forced the Debtor to immediately contract with a third-party management company and staffing agencies in order to keep operating. Both were a stopgap until the SNF's operations stabilized. Those measures, however, did not provide services at a level necessary for the Debtor to increase its census rates at a sufficient pace to pay the significant expenses incurred as a result of the walk-out, including fines levied by the Illinois Department of Public Health. In February, 2024, the contract with the third-party management company was

terminated, and Mr. Goldberg took over management of the SNF with assistance from the Debtor's experienced senior management team, and the Debtor hoped to be profitable within a few months.

### 2.   The Chapter 11 Case

In short, the transition from the Prior Operator came at a cost, both as a result of billing issues on the revenue side and management, as well as staffing and litigation issues on the expense side, which left the Debtor with no path other than to seek relief under subchapter V of chapter 11 of the Bankruptcy Code.  On the Petition Date, the Debtor filed the Chapter 11 Case.

Pursuant to the DIP Orders, the Debtor entered into the Senior DIP Credit Agreement with eCapital with respect to the Senior DIP Loan.  Pursuant to the DIP Orders, the Debtor also entered into a facility with GS Capital with respect to the Junior DIP Loan.

After the Petition Date, it quickly became clear the Debtor would not be able to generate sufficient cashflow to continue its operations.  The Debtor almost immediately began marketing its business and reached out to approximately seven potentially interested parties.  The Debtor's marketing efforts resulted in the entry into the OTA with the Purchaser and on September 5, 2024, the Court entered the Sale Order, approving the sale of the Debtor's operations to Purchaser.  The sale to Purchaser closed on September 19, 2024, effective as of September 1, 2024.

In addition to transferring the Debtor's operations to the Purchaser, the Sale Order provided the following:

- GS Capital acquired the Senior DIP Loan from eCapital for $1,200,000.00 pursuant to the terms and conditions of the LSA.  Also, as set forth in Sale Order, Goldberg acquired a fifty (50%) interest in the Junior DIP Loan in exchange for a cash payment of $200,000.00 to GS Capital prior to the closing of the LSA.

- Receivables are an "excluded asset" under the OTA and will remain property of the Debtor's estate.  The Purchaser will be collecting such Receivables, which will be distributed in accordance with the priority scheme of the Bankruptcy Code and this Plan.

- Purchaser shall pay the Debtor's estate $50,000 for purposes of funding winddown costs (the "Winddown Proceeds") for the Debtor and its estate upon the closing of the transaction.  Such payment shall be made to the Reorganized Debtor, in such manner as the Manager requests.  The Winddown Proceeds shall be used as follows: (a) $30,000 to the Estate Professionals, distributed *pro rata*; and (b) $20,000 to the Reorganized Debtor as winddown costs.

The Plan provides for the Reorganized Debtor to remain in possession of its business and operations, operated by the Manager.

**B. Liquidation Analysis**

To confirm the Plan, the Bankruptcy Court must find that all creditors and equity interest holders who do not accept the Plan will receive at least as much under the Plan as such claim and equity interest holders would receive in a chapter 7 liquidation. A liquidation analysis reflecting this is attached to the Plan as Exhibit A. As set forth in the Liquidation Analysis, after taking into account the anticipated liquidation value of the Debtor's assets, as well as the costs of administration of a chapter 7 case, it is unlikely that if the Chapter 11 Case is converted to chapter 7 that Administrative Expenses will be paid in full.

The liquidation valuations in the Liquidation Analysis have been prepared solely for use in this Plan and do not represent values that are appropriate for any other purpose. Nothing contained in the Liquidation Analysis is intended to be or constitutes a concession by or admission of the Debtor for any purpose.

**C. Ability to Make Future Plan Payments and Operate Without Further Reorganization**

The Plan is a liquidating plan and therefore any requirements that the Debtor prove its ability to make future plan payments and operate without a further reorganization are not applicable.

## SECTION III
## CLASSIFICATION & TREATMENT OF CLAIMS

**A. General Overview/Summary**

The chart below summarizes the Classes of Claims and Interests for all purposes, including voting, Confirmation, and Distribution purposes pursuant to the Plan.

| Class | Description | Status | Voting Rights |
|-------|-------------|--------|---------------|
| 1 | GS Capital Secured Claim (Senior DIP Loan) | Impaired | Entitled to Vote |
| 2 | GS Capital/Goldberg Secured Claim (Junior DIP Loan) | Impaired | Entitled to Vote |
| 3 | Cambridge Secured Claim | Impaired | Not Entitled to Vote |
| 4 | Other Priority Claims | Impaired | Entitled to Vote |
| 5 | General Unsecured Claims | Impaired | Not Entitled to Vote |
| 6 | Interests | Impaired | Not Entitled to Vote |

**B.  Unclassified Claims**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims have not been classified.  Holders of such Claims are not entitled to vote on the Plan.  All such Claims are instead treated separately according to the Plan and according to the requirements set forth in section 1129(a)(9) of the Bankruptcy Code.

**C.  Administrative Expense Claims**

1.      _Administrative Expense Bar Date_.  All Persons requesting payment of Administrative Expense Claims, including, without limitation, Claims under section 503(b) of the Bankruptcy Code and Professional Fee Claims, must File or serve such Administrative Expense Proof of Claim or fee application, to the extent applicable, in accordance with the Confirmation Order, no later than the Administrative Expense Bar Date.  Any Holder of Administrative Expense Claim who does not File such Administrative Expense Claim by the Administrative Expense Bar Date will be forever barred from asserting any such Administrative Expense Claim against the Debtor, its Estate, and any of its property, whether any such Administrative Expense Claim is deemed to arise before, on, or after the Effective Date, and will receive no Distribution under the Plan or otherwise on account of such Administrative Expense Claim.

2.      _Payment of Administrative Expense Claims_.  Subject to the Plan, the Reorganized Debtor will pay to each Holder of an Allowed Administrative Expense Claim from the proceeds of Receivables and/or the Creditor Trust Assets, on account of the Allowed Administrative Expense Claim, and in full satisfaction thereof, Cash equal to the amount of such Allowed General Administrative Expense Claim, after payment of Class 1 and Class 2 Claims in full, unless the Holder agrees to other treatment.  Except as otherwise provided in the Plan or in a prior order of the Bankruptcy Court, payment of an Allowed Administrative Expense Claim as of the Effective Date, will be made _pro rata_ as soon as practicable after payment in full of Class 1 and Class 2 Claims.  The Debtor estimates the aggregate amount of Administrative Expense Claims, exclusive of Professional Fee Claims is approximately $500,000.

3.      _Professional Fee Claims_.  On or as soon as practicable after the Effective Date, Estate Professionals shall receive a _pro rata_ payment in the amount of $30,000 from the Winddown Proceeds (the "Professional Fee Carve-Out").  After payment of the Professional Fee Carve-Out, Professional Fee Claims will be paid _pro rata_ with all other Administrative Expense Claims, to the extent not paid as required by the DIP Orders.  The Debtor estimates that the aggregate amount of Professional Fee Claims will be approximately $400,000, consisting of approximately $12,000 for the Subchapter V Trustee; $387,400 for Levenfeld Pearlstein, LLC; and $600 for Templin Healthcare Accounting Services, LLC.

**D.  Priority Tax Claims**

Except as otherwise agreed to by the parties, or ordered by the Bankruptcy Court, as soon as practicable after the Effective Date and after payment of Class 1, Class 2, and Administrative

Expense Claims, each Holder of an unpaid Allowed Priority Tax Claim will receive payment in full in an amount equal to the Allowed Priority Tax Claim from the proceeds of Receivables and/or the Creditor Trust Assets.

Except as otherwise provided in § 503(b)(1)(D) of the Bankruptcy Code and 28 U.S.C. § 960, any Holder of a Claim for taxes who does not File such Claim by the applicable bar date will be forever barred from asserting any such Claim against the Debtor, its Estate, and any of its property, whether any such Claim is deemed to arise before, on, or after the Effective Date, and will receive no Distribution under the Plan or otherwise on account of such Claim.

### E. Classified Claims & Interests

The treatment of Claims and Interests under the Plan is in full and complete satisfaction of the legal, contractual, and equitable rights that each Holder of a Claim or Interest may have in or against the Debtor or its Estate. This treatment supersedes and replaces any agreements or rights that those entities have in or against the Debtor or its Estate.

#### *Class 1: Secured Claim of GS Capital (Senior DIP Loan)*

| | |
|---|---|
| *Classification* | Class 1 consists of the Secured Claim of Senior DIP Lender related to the Senior DIP Loan in the amount of the Allowed Class 1 Claim. |
| *Treatment* | The Holder of an Allowed Class 1 Claim will be paid from the Receivables and is entitled to receive funds directly from the Purchaser. Senior DIP Lender agrees to waive all fees associated with the Senior DIP Credit Agreement and to charge interest only at the non-default rate of interest. |
| *Voting* | Class 1 is an Impaired Class and the Holder of the Class 1 Claims is entitled to vote to accept or reject the Plan. |

#### *Class 2: Secured Claim of GS Capital/Goldberg (Junior DIP Loan)*

| | |
|---|---|
| *Classification* | Class 2 consists of the Secured Claim of GS Capital/Goldberg related to the Junior DIP Loan in the principal amount of $500,000.00. |
| *Treatment* | The Holder of an Allowed Class 2 Claim will be paid from the Receivables, after payment of Class 1 Claims in full. Junior DIP Lender agrees to charge interest only at the non-default rate of interest in connection with the Junior DIP Loan. |
| *Voting* | Class 2 is an Impaired Class and the Holder of Class 2 Claims is entitled to vote to accept or reject the Plan. |

#### *Class 3: Cambridge Secured Claim*

| | |
|---|---|
| *Classification* | Class 3 consists of the Secured Claim of Cambridge against the Debtor, pursuant to the HUD Documents. |
| *Treatment* | In connection with the sale of the Debtor's assets, Cambridge agreed to waive all rights and claims against the Debtor in connection with the HUD |

Documents.  As of the Effective Date, each of the HUD Documents will be cancelled/terminated.

| | |
|---|---|
| *Voting* | Class 3 is an Impaired Class and the Holder of the Class 3 Claim is not entitled to vote on the Plan. |

### Class 4: Other Priority Claims

| | |
|---|---|
| *Classification* | Class 4 consists of the Other Priority Claims against the Debtor, including those arising under sections 507(a)(4), (5), and (7) of the Bankruptcy Code, other than Priority Tax Claims. |
| *Treatment* | Allowed Class 4 Other Priority Claims shall receive a *pro rata* distribution of from collection of the Receivables and the Creditor Trust Assets, after the payment of Class 1, Class 2, Administrative Expense Claims and Prioirty Tax Claims in full. |
| *Voting* | Class 4 is an Impaired Class and Holders of Class 4 Claims, if any, are entitled to vote on the Plan. |

### Class 5: General Unsecured Claims

| | |
|---|---|
| *Classification* | Class 5 consists of the Claims of Holders of General Unsecured Claims. |
| *Treatment* | Holders of Allowed Class 5 Claims shall receive a *pro rata* distribution from collection of the Receivables and Creditor Trust Assets, after the payment of Class 1, Class 2, Administrative Expense Claims, Priority Tax Claims and Other Priority Claims in full.  The Debtor does not anticipate that the Holders of Allowed Class 5 Claims will receive a Distribution under the Plan. |
| *Voting* | Class 5 is an Impaired Class and Holders of Class 5 Claims are not entitled to vote to accept or reject the Plan. |

### Class 6: Interest Holders

| | |
|---|---|
| *Classification* | Class 6 consists of the Holder of the Debtor's Interests |
| *Treatment* | The Holder of Class 6 Interests shall not receive a Distribution under the Plan, and its Interests shall be transferred to the Creditor Trust. |
| *Voting* | Class 6 is an Impaired Class and the Holder of Class 6 Interests is not entitled to vote to accept or reject the Plan. |

## SECTION IV
## ACCEPTANCE OR REJECTION OF THE PLAN

### A. Voting Classes

The Holder of an Allowed Claim in Classes 1, 2, and 4 are entitled to vote either to accept or to reject the Plan. Only those votes cast by the Holder of Allowed Claims will be counted in determining whether acceptances have been received in sufficient number and amount to obtain Confirmation.

### B. Acceptance by Impaired Classes

An Impaired Class of Claims will have accepted the Plan if: (i) the Holders (other than any Holder designated under sections 1126(e) of the Bankruptcy Code) of at least two-thirds in amount of the Allowed Claims actually voting in such Class have voted to accept the Plan; and (ii) the Holders (other than any Holder designated under sections 1126(e) of the Bankruptcy Code) of more than one-half in number of the Allowed Claims actually voting in such Class have voted to accept the Plan.

### C. Presumed Rejection of the Plan

The Holders of a Class 3 Claim and Class 5 Interests will not be receiving any Distributions under the Plan and are therefore deemed to reject the Plan and are not entitled to vote.

### D. Nonconsensual Confirmation

Because Classes 3 and 5 are deemed to reject the Plan by operation of law, the Debtor will request that the Bankruptcy Court confirm the Plan in accordance with section 1191 of the Bankruptcy Code.  Without limiting the foregoing, in the event that any Class of Claims entitled to vote on the Plan fails to accept the Plan as required by section 1129(a) of the Bankruptcy Code, the Plan may be amended and, in any event, the Debtor reserves the right to seek Confirmation of the Plan under 1191(b) of the Bankruptcy Code.

## SECTION V
## IMPLEMENTATION OF THE PLAN

### A. Disbursing Agent

Distributions shall be made in the manner and by the parties set forth herein. Notwithstanding section 1190(2), given the liquidating nature of the Plan and the terms of the OTA, the Debtor will not collect any future earnings or future income (likely only Receivables) and will not turn those funds over to the Subchapter V Trustee.  Rather, those funds, and the proceeds of the Creditor Trust Assets, will be Distributed in accordance with the terms of the Plan.

### B. The Creditor Trust

Unless otherwise agreed, on or before the Effective Date, the Creditor Trustee and the Debtor will execute the Creditor Trust Agreement, in form and substance satisfactory to the Creditor Trustee, the Manager, and the Debtor.  The Creditor Trust Agreement will become effective on the Effective Date (or such later date as agreed to by the Creditor Trustee, the Manager and the Debtor.  The due and proper execution and of the Creditor Trust Agreement shall be a condition to the confirmation of the Plan.  To the extent of a conflict between the terms and conditions of the Creditor Trust Agreement and the Plan, the Creditor Trust Agreement will govern.

Upon transfer of the Creditor Trust Assets to the Creditor Trust, the Creditor Trustee will maintain possession, control, and management of same pursuant to the terms of the Creditor Trust Agreement, subject to the Plan.  The Debtor (or the Reorganized Debtor, as the case may be) is hereby authorized and directed to take such steps as may be necessary or appropriate to confirm such transfer and contribution of the Creditor Trust Assets to the Creditor Trust.  Upon such transfer, title to the Creditor Trust Assets will automatically and irrevocably vest in the Creditor Trust and be deemed contributed thereto, subject to the terms of the Plan.  Upon vesting, the Creditor Trustee will have the sole authority to administer the Creditor Trust Assets for the benefit of the Creditor Trust Beneficiaries.  All property held for distribution pursuant to the Plan will be held by the Creditor Trust solely in trust for the benefit of the Creditor Trust Beneficiaries and will not be deemed property of the Debtor.  Nothing in the Plan, however, precludes payment from the Creditor Trust Assets any Creditor Trust Expenses.

The Creditor Trustee, or such other Person(s) as the Creditor Trustee may approve pursuant to the Creditor Trust Agreement, is authorized to execute, deliver, File, or record such pleadings, contracts, instruments, releases, and other agreements or documents and to take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan.  The Creditor Trustee or its designee is authorized to certify or attest to any of the foregoing actions.

Upon the Effective Date, the Creditor Trustee may employ such attorneys, accountants, consultants, and other Persons or professionals as it deems necessary and appropriate to fulfill the Creditor Trustee's duties and obligations under the Plan.  All professional and other compensation from and after the Effective Date will be payable in accordance with the Creditor Trust Agreement. Persons retained by the Creditor Trustee may include any professional who represented parties in interest in the Chapter 11 Cases, and the Creditor Trustee is permitted to retain any such persons in light of the efficiencies implicit in continuity.

The books and records maintained by the Creditor Trustee may be disposed of by the Creditor Trustee, without the need to seek authority from the Bankruptcy Court, at the later of: (a) such time as the Creditor Trustee determines that the continued possession or maintenance of such books and records is no longer necessary for the benefit of the Creditor Trust or the Creditor Trust Beneficiaries; or (b) upon the termination and completion of the winding down of the Debtors and the Creditor Trust.

The Creditor Trustee shall be compensated at his general hourly rate of $450 for administering the Creditor Trust.

### C. Funding of the Plan and Distributions to Creditors

The Plan will be funded with the collection of the Receivables by the Purchaser, as set forth in the OTA, and the proceeds of the Creditor Trust Assets. The Purchaser shall:

- Use reasonable best efforts to collect the Receivables, at no cost to the Debtor or Reorganized Debtor;

- Not settle any Receivable for less than 90% of the face amount of such Receivable without the prior consent of the Manager, which consent shall not be unreasonably withheld; and

- Not use the proceeds of the Receivables for any purpose other than as set forth herein.

Prior to payment in full of Class 1 and Class 2 Claims, Purchaser may distribute any collections directly to Holders of Class 1 and Class 2 Claims, in accordance with this Plan, the DIP Orders, and the Sale Order. After Class 1 and Class 2 Claims have been paid in full, the Purchaser shall distribute any collections of the Receivables directly to the Reorganized Debtor for distribution under this Plan. Distributions to the Reorganized Debtor shall be made as soon as practicable after the Purchaser's receipt of the Receivables, but in no case shall be less than once per month. The applicable Professionals reserve all rights to enforce their rights under the DIP Orders.

Upon receipt of proceeds from the Creditor Trust Assets, the Creditor Trustee shall deliver such proceeds to the Reorganized Debtor for distribution in accordance with the Plan.

### D. Management of the Reorganized Debtor

On the Effective Date, all managers, officers, and directors of the Debtor, including Arnold Goldberg, will be automatically deemed to have resigned from such positions, without further act, notice, deed, or court order and its implementation. Thereafter, the Manager shall be the sole manager of the Reorganized Debtor and manage its affairs, including monitoring the receipt of Receivables and distributing any funds collected after payment in full of Class 1 and Class 2 Claims.

The Manager shall be vested with the authority and responsibility for, among other things:

- Objecting to and resolving Disputed Claims;

- Employing and compensating professionals, without the need for application to the Bankruptcy Court to employ and compensate such professionals;

- Exercising the rights, power, and authority of the Reorganized Debtor under applicable provisions of the Plan and bankruptcy and non-bankruptcy law;

- Obtaining proceeds of the Creditor Trust Assets and distributing such funds in accordance with this Plan; and

- Coordinate the filing of all tax returns, with the cooperation of Mr. Goldberg given that the Debtor is a pass-through entity, when due including all tax returns necessary to close the Estate.

The Manager shall be compensated at his general hourly rate of $450 for administering the Estate.

### E.  Reporting on Receivables and Reorganized Debtor Assets

Starting on November 30, 2024, Purchaser shall send weekly reports to the Manager on the collection and distribution of Receivables to the Reorganized Debtor and provide any and all reports reasonably requested by the Manager related to the collection and distribution of the Receivables.  On November 30, 2024, the Purchaser shall also provide reporting to the Manager for any period prior to November 30, 2024, that was not previously provided to the Debtor or the Manager.  The Purchaser shall send detailed monthly reports to the Manager regarding the collection of receivables, status of outstanding receivables, and the amounts distributed to the Senior DIP Lender and Junior DIP Lender.

The Reorganized Debtor shall provide a list of Filed Administrative Expense Claims within thirty days of the Administrative Expense Bar Date to Levenfeld Pearlstein, LLC via electronic mail (hisrael@lplegal.com and swilliams@lplegal.com). The Creditor Trustee shall also provide a report to Levenfeld Pearlstein, LLC every sixty days, commencing on December 31, 2024, on the status of the reconciliation of Administrative Expense Claims and a report on the funds currently held by the Creditor Trust and/or Reorganized Debtor, including bank statements.

### F.  Continued Corporate Existence

The Reorganized Debtor shall continue to exist after the Effective Date as a corporate entity, in accordance with the laws of the State of Illinois, and pursuant to its articles of organization and operating agreement in effect prior to the Effective Date to the extent necessary to wind down its operations.

To the extent desirable, the Reorganized Debtor may be dissolved without any further action by the Manager.  In connection with its bylaws, the Reorganized Debtor may, in its sole discretion, file all necessary certificates of dissolution and take any other actions necessary or appropriate to reflect the dissolution of the Reorganized Debtor under Illinois law.  All applicable regulatory or governmental agencies shall accept any certificates of dissolution or other papers filed by the Reorganized Debtor and shall take all steps necessary to allow and reflect the prompt dissolution of such Reorganized Debtor as provided herein, without the payment of any fee, tax, or charge and without need for the filing of reports or certificates, except as the Reorganized Debtor may determine in its sole discretion.

### G. Corporate Action

On or after the Effective Date, the Reorganized Debtor will be authorized to take such action as is necessary under the laws of the State of Illinois, federal law, and other applicable law to carry out the terms and provisions of the Plan.

### H. Revesting of Assets

Except as otherwise set forth herein, the DIP Orders, the Creditor Trust Agreement, or in the Confirmation Order, as of the Effective Date, all property of the Estate, including any Causes of Action, shall revest in the Reorganized Debtor free and clear of all Claims, Liens, encumbrances, and other interests. From and after the Effective Date, except as set forth herein, the Reorganized Debtor or Creditor Trustee may use, acquire, and dispose of property and settle and compromise Claims, Causes of Action, or interests without supervision by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan, Creditor Trust Agreement, and the Confirmation Order. Without limiting the generality of the foregoing, the Reorganized Debtor or the Creditor Trustee may, without application to or approval by the Bankruptcy Court, pay fees that they incur after the Effective Date for professional fees and expenses.

### I. Cancellation of Notes, Instruments, and Debentures

On the Effective Date, except to the extent provided otherwise in the Plan, all notes, instruments, debentures, certificates, and other documents evidencing Claims against the Debtor shall be deemed canceled, terminated, and surrendered (regardless of whether such notes, instruments, debentures, certificates or other documents are in fact surrendered for cancellation to the appropriate indenture trustee or other such Person), provided however, that any and all notes, instruments evidencing the Senior DIP Loan and the Junior DIP Loan shall not be deemed canceled, terminated or surrendered until amount owed to the Senior DIP Lender and the Junior DIP Lender, respectively, are paid in full.

### J. Compliance with Tax Requirements.

In connection with the Plan, the Reorganized Debtor and Creditor Trustee will comply with any withholding and reporting requirements imposed by federal, state, and local taxing authorities, and Distributions will be subject to the withholding and reporting requirements. Notwithstanding any other provision of the Plan, each Holder of an Allowed Claim that is to receive a Distribution pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding and other tax obligations, on account of such Distribution.

### K. Insurance Preservation

Nothing in the Plan, including any releases, shall diminish or impair the enforceability of any policies of insurance that may cover any claims against the Debtor or any other Entity.

### L.  Distributions

Distributions made pursuant to the Plan, shall be in U.S. dollars and, at the option and in the sole discretion of the Reorganized Debtor, be made by (a) checks drawn on or (b) wire transfers from a domestic bank selected by the Reorganized Debtor.

Subject to the provisions of Rule 2002(g) of the Bankruptcy Rules, and except as otherwise provided herein, distributions and deliveries to Holders of Allowed Claims shall be made at the address of each such Holder as set forth on the Schedules filed with the Bankruptcy Court, unless superseded by the address set forth on a timely filed proof(s) of claim or some other writing Filed with the Bankruptcy Court and served upon the Reorganized Debtor.

Unless otherwise required by applicable bankruptcy law, or specifically provided for herein or any Exhibit hereto, post-petition interest shall not accrue or be paid on any Claims, and no holder of a Claim shall be entitled to interest or fees accruing on or after the Petition Date on any Claim.

In accordance with section 502(b)(2) of the Bankruptcy Code or as provided herein or any Exhibit hereto, the amount of all prepetition Unsecured Claims against the Debtor shall be calculated as of the Petition Date. Except as otherwise explicitly provided in the Plan, in section 506(b) of the Bankruptcy Code, or by Final Order, no Holder of a prepetition Claim shall be entitled to or receive interest or fees relating to such Claim.

Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided under the Plan, the provisions of this Plan shall constitute a good faith compromise of all Claims or controversies relating to the contractual, legal and subordination rights that a Holder of a Claim may have with respect to any Allowed Claim with respect thereto, or any distribution to be made on account of such an Allowed Claim.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims or controversies, and the Bankruptcy Court's finding that such compromise or settlement is in the best interests of the Debtor, its Estate, and Holders of Claims and is fair, equitable and reasonable.

**SECTION VI**
**CONDITIONS PRECEDENT TO CONFIRMATION**
**AND THE EFFECTIVE DATE**

### A.  Acceptance or Rejection of the Plan

     1.    <u>Acceptance by Impaired Classes</u>

An Impaired Class of Claims will have accepted the Plan if the Holders of at least two-thirds in amount and more than one-half in number of the Allowed Claims in the Class actually voting have voted to accept the Plan, in each case not counting the vote of any Holder designated under section 1126(e) of the Bankruptcy Code.

2.      <u>Nonconsensual Confirmation</u>

The Bankruptcy Court may confirm the Plan over the dissent of any Impaired Class if all of the requirements for consensual confirmation under subsection 1129(a), other than subsection 1129(a)(8), (10), and (15), of the Bankruptcy Code, and for nonconsensual confirmation under section 1191(b) of the Bankruptcy Code have been satisfied.

**B.  Conditions Precedent to the Effective Date of the Plan**

The occurrence of the Effective Date and the Consummation of the Plan are subject to satisfaction of the following conditions precedent, unless waived.

1.      <u>Confirmation Order</u>.  The Confirmation Order as entered by the Bankruptcy Court shall be a Final Order in full force and effect, in form and substance reasonably satisfactory to the Debtor.

2.      <u>Closing of Sale</u>.  The closing of the sale contemplated by the OTA shall have closed.

3.      <u>Notice of Effective Date</u>.   The Debtor shall have Filed a notice of the occurrence of the Effective Date with the Bankruptcy Court.

**SECTION VII
EFFECT OF PLAN CONFIRMATION**

**A.  No Discharge**

In accordance with section 1141(d)(3) of the Bankruptcy Code, the Confirmation Order will not discharge the Debtor.  However, no Holder of a Claim may receive any payment from, or seek recourse against, any Assets that are to be distributed under the Plan other than Assets required to be distributed to that Holder pursuant to the Plan.  As of the Confirmation Date, all Persons are enjoined from asserting against any property that is to be distributed under the Plan, any Claims, rights, causes of action, liabilities, or Interests based upon any act, omission, transaction, or other activity that occurred before the Confirmation Date except as expressly provided in the Plan or the Confirmation Order.

**B.  Exculpation**

**None of the Exculpated Parties shall have or incur any liability for any act or omission in connection with, related to, or arising out of the administration of the Chapter 11 Case or pursuit of confirmation of the Plan, solely with respect to any action taken from the Petition Date to the Effective Date, including, but not limited to, any action regarding the formulation, preparation, dissemination, implementation, enforcement, confirmation, or approval of this Plan, or any contract, instrument, release, or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in this Plan or the actions taken in connection with the implementation and enforcement of the Plan; provided, however, that the foregoing provisions shall not affect**

22

the liability of any Person that would result solely from any such act or omission to the extent that act or omission is determined by a Final Order of the Bankruptcy Court to have constituted willful misconduct (including a willful breach of fiduciary duty), fraud, or gross negligence; provided further, however, that this provision shall not limit the Debtor's obligations under this Plan.

## C. Injunction

**1.     Injunction Enjoining Holders of Claims Against the Debtor.**  The Plan is the sole means for resolving, paying, or otherwise dealing with Claims and Interests. To that end, except as expressly provided in the Plan, at all times on and after the Effective Date, all Persons who have been, are, or may be Holders of Claims against or Interests in the Debtor, arising before the Effective Date, will be permanently enjoined from taking any of the following actions, on account of any such Claim or Interest, against the Debtor or the Estate, their successors, or their respective property or assets (other than actions brought to enforce any rights or obligations under the Plan):

(a) commencing, conducting or continuing in any manner, directly or indirectly any suit, action, or other proceeding of any kind against the Debtor and/or its Estate, its successors, or its property or assets (including, without limitation, all suits, actions, and proceedings that are pending as of the Effective Date which will be deemed to be withdrawn or dismissed with prejudice);

(b) enforcing, levying, attaching, executing, collecting, or otherwise recovering by any manner or means whether directly or indirectly any judgment, award, decree, or order against the Debtor or the Estate, its successors, or its property or assets;

(c) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any Lien, security interest or encumbrance against the Debtor or its Estate, its successors, or its property or assets; and

(d) proceeding in any manner in any place whatsoever against the Debtor or the Estate, its successors, or its property or assets that does not conform to or comply with the provisions of the Plan.

**2.     Injunction.**  The Confirmation Order shall permanently enjoin the commencement or prosecution by any Person, whether directly, derivatively, or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, or liabilities enjoined, exculpated, or otherwise limited or prohibited pursuant to this Plan.

## SECTION VIII
## ADDITIONAL PROVISIONS

### A.  Retention of all Causes of Action, Defenses, and Counterclaims

Except as otherwise provided in the Plan, or in any contract, instrument, release, or other agreement entered into in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code, on and after the Effective Date, the Causes of Action are assigned and transferred to the Creditor Trust.  Thereafter, the Creditor Trustee is authorized to investigate, prosecute, settle, and compromise any Causes of Action.  The Creditor Trustee may, in its sole discretion, pursue or refrain from pursuing the Causes of Action, as appropriate.  For the avoidance of doubt, the Debtor and/or Reorganized Debtor do not intend to waive or release any Claims held by the Estate and shall not waive or release any Claims by failing to identify them in the Plan. Parties that the Reorganized Debtor and/or Creditor Trustee may pursue with respect to the Causes of Action includes, but is not limited to, those parties set forth on Exhibit B.  The Reorganized Debtor and/or Creditor Trustee also retains and may prosecute and enforce all defenses, counterclaims, and rights against or with respect to all Claims asserted against the Debtor, the Estate, or the Reorganized Debtor.

### B.  Standing

From and after the Effective Date and continuing through the date on which a Final Order closing the Bankruptcy Case is entered pursuant to section 350 of the Bankruptcy Code and Bankruptcy Rule 3022 (or, if the Bankruptcy Case is re-opened, the date on which it is closed again), the Reorganized Debtor and/or Creditor Trustee, as applicable, shall possess the rights of a party in interest pursuant to section 1109(b) of the Bankruptcy Code for all matters arising in, arising under, or related to this Bankruptcy Case or the Reorganized Debtor.

### C.  Unclaimed Distributions

All Distributions which remain uncashed for 180 days shall be void and deemed forfeited. The Reorganized Debtor shall not be liable for or obligated to pay any forfeited Distributions.  Any such unclaimed distributions shall be paid into the unclaimed funds account with the Clerk of the Bankruptcy Court.

### D.  Executory Contracts & Unexpired Leases

To the extent that any agreements executed by the Debtor before the Effective Date constitute executory contracts or unexpired leases under section 365 of the Bankruptcy Code, other than agreements that were previously either assumed and assigned or rejected either by a Final Order or under section 365 of the Bankruptcy Code, such agreements will be deemed rejected on the Effective Date.  The Confirmation Order will constitute a Final Order approving this rejection. All Rejection Damage Claims will be treated as Class 5 General Unsecured Claims.

### E. Exhibits

All exhibits attached to the Plan are, by this reference, hereby incorporated into the Plan, and the final version of all exhibits will be substantially in the form attached hereto or thereto. The Debtor reserves the right to make non-substantive changes and corrections to such exhibits in advance of the Confirmation Hearing. If any exhibits are changed or corrected, the replacement exhibits will be Filed with the Bankruptcy Court before the Confirmation Hearing commences.

### F. Exemption from Stamp, Transfer, & Other Taxes

Pursuant to section 1146(a) of the Bankruptcy Code, the issuance, transfer, or exchange of assets under the Plan by the Debtor; the creation of any mortgage, deed of trust, or other security interest; the making or assignment of any lease or sublease; or the making or delivery of any deed or instrument of transfer under, in furtherance of, or in connection with the Plan, will not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax.

### G. Headings

Headings are used in the Plan for convenience and reference only, and do not constitute a part of the Plan for any other purpose.

### H. Binding Effect

From and after the Confirmation Date, subject to the occurrence of the Effective Date, this Plan shall be binding and inure to the benefit of the Debtor, the Estate, all present and former Holders of Claims and Interests, and their respective assigns. The provisions of the Plan, the Confirmation Order, and any associated findings of fact or conclusions of law shall bind the Debtor, any entity acquiring property under the Plan, and any Creditor of the Debtor, whether or not the Claim of such Creditor is Impaired under the Plan and whether or not such Creditor has accepted the Plan.

### I. Governing Law

Unless a rule of law or procedure is supplied by: (i) federal law (including the Bankruptcy Code and Bankruptcy Rules); or (ii) an express choice of law provision in any agreement, contract, instrument or document provided for, or executed in connection with, the Plan, the rights and obligations arising under the Plan and any agreements, contracts, documents, and instruments executed in connection with the Plan will be governed by, and construed and enforced according to, the laws of the State of Illinois without giving effect to the principles of conflict of laws thereof.

### J. Other Documents and Actions

Before and on the Effective Date, the Debtor may execute such other documents and take such other actions as may be necessary or appropriate to effectuate the transactions contemplated under the Plan. Additionally, the Debtor may execute such other documents and take such other

actions as may be necessary or appropriate to effectuate the transactions contemplated under the Plan.

### K. Successors and Assigns

The rights, benefits, and obligations of any entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such entity.

### L. Closing of Case

The Chapter 11 Case shall remain open until such time as the Reorganized Debtor has requested a final decree and complied with all relevant statutory provisions of required for entry of a final decree.

### M. Notices

Any notice to the Reorganized Debtor required or permitted to be provided under the Plan will be in writing and served by either: (i) certified mail, return receipt requested, postage prepaid; (ii) hand delivery; or (iii) reputable overnight delivery service, freight prepaid, to be addressed as follows:

> Arnold Goldberg
> 12 South Broadway
> Beverly Shores, IN 46301

> With a copy to:

> Levenfeld Pearlstein, LLC
> Attn: Harold D. Israel
> 120 South Riverside Plaza, Suite 1800
> Chicago, IL 60606

Any notice to the Creditor Trustee required or permitted to be provided under the Plan will be in writing and served by either: (i) certified mail, return receipt requested, postage prepaid; (ii) hand delivery; or (iii) reputable overnight delivery service, freight prepaid, to be addressed as follows:

> Robert Handler
> 805 Greenwood St.
> Evanston, IL 60201

> With a copy to:

> Law Office of William J. Factor, Ltd.
> Attn: William J. Factor

105 W. Madison St., Ste. 2300
Chicago, IL 60602

**N.  Severability of Plan Provisions**

If, before Confirmation, any term or provision of the Plan is found by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision will then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order will constitute a judicial determination and will provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**O.  Entire Agreement**

On the Effective Date, the Plan shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations with respect to the subject matter hereof and thereof, all of which have become merged and integrated into the Plan.

**SECTION IX**
**RETENTION OF JURISDICTION**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain and have exclusive jurisdiction after the Effective Date over any matter arising under the Bankruptcy Code, arising in or related to the Chapter 11 Case or the Plan, or that relates to the following, in each case to the greatest extent permitted by applicable law:

    i.    to enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan;

    ii.    to determine any and all motions, adversary proceedings, applications and contested or litigated matters that may be pending on the Effective Date or that, pursuant to the Plan, may be instituted by the Debtor, Reorganized Debtor, or the Creditor Trustee after the Effective Date; provided, however, that the Reorganized Debtor and Creditor Trustee shall reserve the right to commence collection actions, actions to recover receivables, and other similar actions in all appropriate jurisdictions;

    iii.    to, among other things, interpret, enforce, and implement the terms and provisions of any orders entered in the Chapter 11 Case and to adjudicate disputes related to any order entered in the Chapter 11 Case;

iv.     to hear and determine any timely objections to Administrative Expense Claims and Other Priority Claims or to proofs of Claim and Interests filed, both before and after the Confirmation Date, including any objections to the classification of any Claim or Interest, and to allow, disallow, determine, liquidate, classify, estimate or establish the priority of or secured or unsecured status of any Claim, in whole or in part;

v.      to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, reversed or vacated;

vi.     to issue such orders in aid of execution of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code, including, without limitation, to enter an order or orders in addition to the Confirmation Order confirming and approving any sale or sales consummated at the Auction and making clear that any such sale is being made free and clear or liens, claims, and encumbrances as provided for in the Confirmation Order;

vii.    to consider any modifications of the Plan, to cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including the Confirmation Order;

viii.   to hear and determine all applications for awards of compensation for services rendered and reimbursement of expenses;

ix.     to hear and determine disputes arising in connection with or relating to the Plan or the interpretation, implementation, or enforcement of the Plan, including with respect to Purchaser's collection and distribution of the Receivables, or the extent of any Entity's obligations incurred in connection with or released or exculpated under the Plan;

x.      to issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with consummation or enforcement of the Plan;

xi.     to determine any other matters that may arise in connection with or are related to the Plan, the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with the Plan to be executed in connection with the Plan;

xii.    to hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

xiii.   to hear any other matter or for any purpose specified in the Confirmation Order that is not inconsistent with the Bankruptcy Code; and

xiv.    to enter a final decree closing the Chapter 11 Case.

Dated: November 11, 2024     Respectfully submitted,

**WEALSHIRE REHAB, LLC**

By: /s/ _____
     Arnold Goldberg
Its: Manager

# EXHIBIT A

## EXHIBIT A

**Wealshire Rehab, LLC Liquidation Analysis**

**OVERVIEW AND PURPOSES**

The "best interests of creditors" test is set forth in section 1129(a)(7) of the Bankruptcy Code, and the Bankruptcy Court may not confirm a plan of liquidation unless the plan provides each holder of a claim or interest who does not otherwise vote in favor of the plan with property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor was liquidated under chapter 7 of the Bankruptcy Code. See 11 U.S.C. § 1129(a)(7).[1]  Accordingly, to demonstrate that the Plan satisfies the "best interests of creditors" test, the Debtor has prepared a hypothetical liquidation analysis (this "Liquidation Analysis") presenting recoveries available assuming a hypothetical liquidation pursuant to a conversion to chapter 7 of the Bankruptcy Code, which is assumed to be as of September 18, 2024 (the "Conversion Date").

The Liquidation Analysis presents information based on, among other things, the Debtor's books and records and good-faith estimates regarding asset recoveries and claims resulting from a hypothetical liquidation undertaken under chapter 7 of the Bankruptcy Code.  The Liquidation Analysis has not been examined or reviewed by independent accountants in accordance with standards promulgated by the American Institute of Certified Public Accountants. Although the Debtor considers the estimates and assumptions set forth herein to be reasonable under the circumstances, such estimates and assumptions are inherently subject to significant uncertainties and contingencies beyond Debtor's control.  As a result, there can be no assurance that the results set forth by the Liquidation Analysis would be realized if Debtor was actually liquidated, and actual results in such a case could vary materially from those presented herein, and distributions available to members of applicable classes of claims could differ materially from the balances set forth by this Liquidation Analysis in such instance.

**THE LIQUIDATION ANALYSIS IS A HYPOTHETICAL EXERCISE THAT HAS BEEN PREPARED FOR THE SOLE PURPOSE OF PRESENTING A REASONABLE, GOOD-FAITH ESTIMATE OF THE PROCEEDS THAT WOULD BE REALIZED IF THE DEBTOR WAS LIQUIDATED IN ACCORDANCE WITH CHAPTER 7 OF THE BANKRUPTCY CODE AS OF THE CONVERSION DATE. THE LIQUIDATION ANALYSIS IS NOT INTENDED TO AND SHOULD NOT BE USED FOR ANY OTHER PURPOSE. THERE MAY BE A SIGNIFICANT DIFFERENCE BETWEEN THE LIQUIDATION ANALYSIS AND THE VALUES THAT MAY BE REALIZED, OR CLAIMS GENERATED IN AN ACTUAL LIQUIDATION.**

---

[1]     Capitalized terms used but not defined herein shall have the meanings set forth in the *Chapter 11 Liquidating Plan*, to which this Liquidation Analysis is attached as **Exhibit A**.

## NOTES TO THE WATERFALL LIQUIDATION MODEL

### 1. Sources

As described in the Plan, the Debtor sold substantially all of its assets, other than the Receivables, pursuant to the OTA. The only remaining assets of the estate are the Receivables, which will be collected by the Purchaser. In addition, the Debtor has certain potential causes of action available under the Bankruptcy Code.

With respect to the Receivables, the amounts in the "Chapter 11 Reorganization" column represents approximately 75% of the face value of the receivables ($3,441,477.05 as of September 4, 2024), recognizing that it is likely the Debtor may not collect in full on aged and disputed receivables (though this number is an estimate only and actual collections could be materially higher or lower). The Debtor believes that whatever the ultimate recovery is, it is likely to be higher under the Plan because the Purchaser's employees that will be handling collections are well-versed and experienced in collecting healthcare receivables, without charging the Debtor or Reorganized Debtor a fee. In the event of a conversion, a chapter 7 trustee would need to re-start these efforts (resulting in additional cost, delay, significant fees, and likely a lower collection rate). Thus, for purposes of this analysis, collections in a liquidation have been estimated at 30% lower.

This analysis does **not** capture potential proceeds from Causes of Action, but should not be construed as an admission or indication of the value of such claims (and in fact has no relation to the value thereof, if any). However, to the extent this analysis did capture such analysis, we believe that the Creditor Trustee and its professionals under a chapter 11 liquidation would be better positioned to prosecute such claims rather than a chapter 7 trustee due to their close familiarity with the Debtor and the Chapter 11 Case.

### 2. Chapter 11 Professional Costs

Unpaid and Estimated Professional Fees - Represents estimated accrued, unpaid, and estimated professional fees for Debtor's counsel and the Subchapter V Trustee through the Effective Date. Estimated Professional Fees do not include the fees of the Manager or the Creditor Trustee, which are dependent on a number of variables, including the number of Causes of Action brought and the complexity of the Reorganized Debtor's affairs. The chapter 7 scenario assumes that certain budgeted fees related to Plan confirmation would not be incurred by the Debtor's professionals in the event of conversion.

Chapter 7 trustee fees, professional fees, and other costs – Represents an amount equal to the estimated maximum statutory compensation allowed by section 326 of the Bankruptcy Code, plus approximately $30,000.00 in legal fees. Depending on a number of variables, distributions made in this case could fluctuate, thus increasing or decreasing the amount of compensation available to a chapter 7 trustee.

**3. Claims**

Senior DIP Loan/Junior DIP Loan – The Senior DIP Loan and Junior DIP Loan obligations are based on the outstanding principal amount of such loan.  Actual obligations of the Debtor may vary based, among other things, accrued interest, depending on how long the Senior DIP Loan and Junior DIP Loan are outstanding.

| Wealshire Rehab, LLC | | | |
|---|---|---|---|
| **Liquidation Analysis** | | | |
| | **Chaper 7** | **Chapter 11** | **Notes** |
| **Assets** | | | |
| Accounts Receivable | $ 1,548,664.67 | $ 2,409,033.94 | See Note 1 |
| Winddown Payment | $ 50,000.00 | $ 50,000.00 | |
| Lawsuits and Claims Against Third Parties | $ - | $ - | See Note 1 |
| | | | |
| **Total Assets** | $ 1,598,664.67 | $ 2,459,033.94 | |
| | | | |
| **Costs/Claims** | | | |
| Chapter 7 Trustee Fees and Expenses | $ 115,170.00 | $ - | See Note 2 |
| Chapter 11 Professional Fees | $ 325,000.00 | $ 400,000.00 | See Note 2 |
| Chapter 11 Administrative Expense Claims (not including Professional Fees) | $ 500,000.00 | $ 500,000.00 | |
| Senior DIP Loan | $ 1,200,000.00 | $ 1,200,000.00 | See Note 3 |
| Junior DIP Loan | $ 500,000.00 | $ 500,000.00 | See Note 3 |
| | | | |
| **Total Costs/Admin Claims** | $ • 2,649,718.94 | $ 2,600,000.00 | |
| | | | |
| **Distributions to Administrative Claims** | $ - | $ 759,033.94 | |
| **Ch 11 Administrative Claim Distributions** | 0% | 84% | |
| | | | |
| Other Priority Claims | $ 9,548.94 | $ 9,548.94 | |
| Distributions to Other Priority Claims | | $ - | |
| Other Priority Claims Distributions | 0% | 0% | |
| | | | |
| Priority Tax Claims | $ - | $ - | |
| | | | |
| General Unsecured Claims | $ 4,668,368.44 | $ 4,668,368.44 | |
| Distributions to General Unsecured Claims | $ - | $ - | |
| General Unsecured Claims Distributions | 0.00% | 0.00% | |

# EXHIBIT B

## EXHIBIT B

WEALSHIRE PLUS, LLC
WEALSHIRE MASTER TENANT LLC
LINCOLNSHIRE PROPERTIES LIMITED PARTNERSHIP
ARNOLD GOLDBERG
ECAPITAL HEALTHCARE CORP., any Causes of Action not released pursuant to Sale Order
CAMBRIDGE REALTY CAPITAL LTD. OF ILLINOIS
DEPARTMENT OF HEALTH AND HUMAN SERVICES
DEPARTMENT OF THE TREASURY
ILLINOIS DEPARTMENT OF HEALTHCARE AND FAMILY SERVICES
ILLINOIS DEPARTMENT OF PUBLIC HEALTH
ILLINOIS DEPARTMENT OF REVENUE
ILLINOIS DEPT. OF EMPLOYMENT SEC.
LAKE COUNTY HEALTH DEPARTMENT
LAKE COUNTY TREASURER
ILLINOIS SECRETARY OF STATE
U.S. DEPARTMENT OF HOUSING AND URBAN
CENTERS FOR MEDICARE AND MEDICAID
A PLUS EXHAUSTHOOD
A PLUS FIRE PROTECTION SERVICES
ABILITY NETWORK INC
ABILITY REHAB LLC
ACCU-TECH SERVICE INC
ACCURATE BIOMETRICS
ADVANTAGE AMBULANCE
AFFILIATED CUSTOMER SERVICE INC
ALL-STAT PICC LINE LLC
ALL-STAT PORTABLE X-RAY SERVICE
ALPHA BAKING COMPANY INC
ANDREW SUK LLC
ANGELS HOMECARE SERVICES
APPLOI CORPORATION
ASCENTIUM CAPITAL
BEAVER CREEK CONSTRUCTION LLC
BEDI & SINGER LLP
BERNARD HEALTH
BH WEB SERVICES LLC
BIZMATCH LLC
BUTTERFIELD HEALTH CARE GROUP, INC
CALIFF & HARPER, P.C.
CAMBRIDGE REALTY CAPITAL LTD OF IL
CAPITAL ONE
CENTERS FOR MEDICARE AND MEDICAID
CITY OF CHICAGO DEPT OF FINANCE

CLEAN START SYSTEMS
CLIPBOARD HEALTH
CMSA CHICAGO
COM ED
COMCAST
CONNOR
CONSTELLATION NEWENERGY
COZZINI BROS INC
CREATIVE SCAPE LANDSCAPERS
CROWN CARE SERVICES
CYNTHIA CHOW & ASSOCIATES LLC
DARLING INGREDIENTS
DE LAGE LANDEN FINANCIAL SERVICES
DELTA T GROUP
DEPARTMENT OF HEALTH AND HUMAN SERV
DEPARTMENT OF THE TREASURY
DIRECT TV PO BOX 5006
DR AJAY MADHANI
EDSON DEVELOPMENTS
EDWARD DON & COMPANY
ELDERWORKS EDUCATIONAL SERVICES
ELITE MEDICAL TRANSPORTATION
EMPIRE COOLER
ENTERTAIN 360 (FKASENIOR TV)
FAMILY HVAC LLC
FIRST INSURANCE FUNDING
FITZSIMMONS HOSPITAL SERVICES
FOCUSED CARE CONSULTING
FUSION DESIGN GROUP LTD
G L HILLS FUNERAL HOME
GENERAL PARTS GROUP LLC
GLOBAL WATER TECHNOLOGY INC.
GORDON FOOD SERVICE
GREATER CHICAGO TRANSIT
GREENWISE
GS CAPITAL FUNDING, LLC
GUARDIAN
HANGER, INC
HD SUPPLY
HEALTH CARE COUNCIL OF ILLINOIS
HEALTHCARE SERVICES GROUP
HEALTHIEST YOU
HOH WATER TECH
HOLLAND & HART
HOME DEPOT
ICE MILLER LEGAL COUNSEL

INNER SECURITY SYSTEMS
INOVALON PROVIDER
INSIGHT DRUG TESTING
INTEGRA IL
JC LICHT
JIM AUSTIN SHOWS
JIVETEL
KARE TECHNOLOGIES(AMERISOURCE)
KEZIAH QUALITY NURSING STAFFING
L.B. HALL
LAKE COUNTY HEALTH DEPARTMENT
LAKE COUNTY TREASURER
LAW OFFICE OF ANTWAN M. WILLIAMS
LEGACY HEALTHCARE
LEVCO TECHNOLOGIES INC
LINCOLN FIRE PRO
LINCOLNSHIRE HEALTH CARE CENTER
LINCOLNSHIRE LIVING & REHAB CENTER
LINCOLNSHIRE NURSING, LLC
LIQUITECH
LISA MENOTTI
MANAGEMENT & NETWORK SERVICES
MARCO TECHNOLOGIES  LLC
MECOR
MEDLINE INDUSTRIES INC
MEIKEM SUPPLY
MERCHANT SERVICES
MICHELLE DAMICO COMM LLC
MILLER & MERTKE CONSULTING CORP
ML ENTERPRISES
NATIONAL DATACARE CORP
NETSMART TECH
NEXT LEVEL HOSPITALITY SERVICES
NLAL HOSPITALITY SERVICES
NORTH SHORE GAS
NORTH SHORE SIGN
NURSA INC
OASIS SENIOR ADVISORS CHICAGO NORTH
OLD NATIONAL BANK
ONE STEP
PAMSKI SOLUTIONS
PARAGON MECHANICAL INC
PATRICK G. COOKE
PAYLOCITY
PERFORMANCE FOODSERVICE TPC
PERSONNEL PLANNERS INC

PHARMSCRIPT OF IL LLC
POINTCLICKCARE TECHNOLOGIES INC
POLSINELLI
PRARIE FARMS
PRECISION HEATING & AIR
PROCARE MEDICAL SUPPLIES
PROFESSIONAL MEDICAL INC
PROSHRED CHICAGO
QUENCH USA
R. JEREMY ADAMSON
RALPH WEINER ASSOCIATES LLC
REDWOOD SYSTEMS INC
REED SMITH LLP
REGAL BUSINESS MACHINES INC
ROBERT NELSON
ROTO ROOTER
SCHINDLER ELEVATOR CORP
SECRETARY OF STATE
SELECT REHABILITATION LLC
SENTRY PEST CONTROL INC
SHER, LLP
SHIFTKEY LLC
SILVER CONCIERGE
SMARTLINX SOLUTIONS
SNOWPLUSHER INC
SPECIAL CARE
STRAIGHT CARE STAFFING NURSING AGEN
SYNAPSE HEALTH
SYSTEMS PIPING
TELEMEDICINE SOLUTIONS LLC
TEMPLIN HEALTHCARE ACCOUNTNING SERV
THE LAW OFFICE OF DOUGLAS R. JOHNSON
THIRD EYE HEALTH
TIERRA EINVIRONMENTAL SERVICES, INC
TIMOTHY JOSEPH BARTON
TOP NOTCH PROMOTIONS
TRANSITIONAL CARE MANAGEMENT
TWINMED MEDICAL SUPPLIES & SERVICES
U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
UNIQUE UPHOLSTERY CARPET & RUG
UNITED HEALTH CARE
VARIFAX SYSTEMS
VILLAGE OF LINCOLNSHIRE
WAREHOUSE DIRECT
WASHTOWN
WASTE MANAGEMENT

WATER SERVICES CO
WEALSHIRE MASTER TENANT, LLC
WEBENVY
WELL SKY
XTREME FIRE PROTECTION INC